# EXHIBIT F

REDACTED PURSUANT TO COURT ORDER [DKT. NO. 71]

# THE LIFE SETTLEMENTS REPORT

NEWS, INFORMATION, AND ANALYSIS OF THE SECONDARY MARKET FOR LIFE INSURANCE

### Life Partners LEs Too Short?

**Trade Group Calls for SEC Investigation**

By Donna Horowitz
December 16, 2010 3:00 AM PST

A consulting physician for provider **Life Partners** testified that he prepares as many as 200 life expectancy estimates in three days, gets a $15,000-a-month retainer, earns an additional $500 for every policy purchased, uses a non-standard industry mortality table, and has no idea if his estimates are accurate.

Dr. Donald Cassidy, a Reno, Nev., internist and oncologist, made these statements in a deposition two years ago to the Colorado attorney general as part of a probe of the Waco, Texas, provider by the Colorado Division of Securities.

The deposition, obtained by *The Life Settlements Report* through a public-records request, reveals life expectancy practices that differ markedly from other life expectancy providers in the life settlements business.

Meanwhile, an industry trade group was so concerned that Life Partners' life expectancy estimates might be too short that it sent a letter last year to the Securities and Exchange Commission asking it to look into the matter.

It is unclear whether the SEC is conducting an investigation or a preliminary inquiry of Life Partners and a now-defunct Dallas investment club that posted the provider's life expectancy estimates on its website.

Michael King, assistant regional director of the Fort Worth, Texas, office of the SEC, said he can't confirm or deny whether his agency is investigating Life Partners. The SEC has not yet responded to a Freedom of Information Act request made by *The Life Settlements Report*.

The Life Settlement Institute, which sent the letter to the SEC, is mainly made up of life settlement providers. The group examined policies put up on the Life Settlements Investment Club website last year and found the life expectancy estimates to be much shorter than evaluations by other life expectancy underwriters in the market for the same policies, according to the letter.

In an Oct. 1, 2009, letter to the SEC, the Life Settlement Institute said of the 19 cases on the club's website, 16 had been offered to another trade group member. It said that the life expectancy estimates on insureds whose policies were being offered for sale by Life Partners ranged from two to four years or three to five years apparently "without consideration of the insureds' age, gender or medical condition."

The life expectancies for policies on the website came in at 55.8% to 75.7% shorter than life expectancy estimates done on the same policies prepared by at least two underwriters in the market, according to the letter. The midpoint range for the life expectancies on the site for the 16 cases was 3.4 years compared to an average life expectancy of 10 years forecast by the other underwriters, according to the letter.

The letter also said investors would be hurt by such short life expectancies. In one example, it said the longest life expectancy for a policy on the investment club site was 48 months while three underwriters in the market computed the average as 110 months. On such a policy, Life Partners' investors could expect an internal rate of return of 1.6% compared to 12.8% that was forecast on the investment club site.

Investors would pay less for policies that used estimates by underwriters in the market versus estimates on the investment club website, according to the letter. To get the 12.8% return, investors would pay $1.2 million minus the amount for future premiums instead of $3.9 million minus the amount for premiums, or $2.7 million more on the investment website.

Jerry Kingston, who started the Dallas investment club, said the club was shut down because the group that hosts the web portal did not understand the life settlement asset class. He knows of no similar life settlement investment clubs.

"My goal would be to set up an [investment] club locally but I have not been able to find 5 friends to plop $10k each into an investment nobody clearly understands or does not have a moral objection to," he said in a July email to *The Life Settlements Report*. "It's really sad too given the investment environment. LPHI [Life Partners Holdings Inc.] raised over 400 new investors last month alone and those investors plowed in $30.7 million!!!"

Kingston had pitched the club on the professional networking website LinkedIn in August 2009.

Brian Pardo, chief executive of Life Partners, didn't to return calls from *The Life Settlements Report* this week.

Asked previously if he was aware of the investment club, he said in an August 2009 email shortly after it formed that he had not heard of the group. He said then that "we have over 23,000 investor accounts… 23,345 at last count to be exact. On top of that we have 5,300 financial planners representing our product. So, as you can see, it would not be unusual for me not to know them specifically."

Brian Smith, president of the Life Settlement Institute who also is chief executive of Hudson, Ohio-based provider **Life Equity**, declined to comment.

Cassidy, the Life Partners physician who was deposed by Colorado securities regulators, also did not return calls.

The Colorado securities division obtained a court order in December 2008 permanently barring Life Partners from selling unregistered securities, or viatical settlements, in Colorado without a license.

As part of the settlement, Life Partners agreed to repurchase viatical policy interests from all Colorado residents who had purchased them since Jan. 1, 2006, plus 8% interest. Life Partners neither admitted nor denied the allegations in the state's lawsuit, which said that the firm raised more than $11.5 million from more than 110 Colorado investors through a fraudulent, unregistered securities offering of fractionalized interests in viatical and life settlements.

A statement announcing the filing of the complaint in Denver District Court in May 2007 alleged Life Partners failed to disclose to investors how life expectancies were determined, the high rate in which insureds outlived life expectancies predicted by Life Partners, and that investors were on the hook to pay premiums when insureds outlived the life expectancies. It also alleged that the provider failed to disclose the original purchase prices for policies and sales agents' commissions, making it impossible for investors to determine the true market value of the policies.

As part of the case, Cassidy testified in November 2008 that he had been working for Life Partners for nine or 10 years, initially preparing 50 to 80 life expectancy reports a week and ultimately as many as 200 a week. Cassidy, who also maintains a medical practice, said he only worked on the life expectancy reports three days a week.

Under questioning by First Assistant Attorney General Christine Stretesky, Cassidy said he viewed medical records ranging from a few pages to more than 1,000 pages.

When asked if he knew how accurate his life expectancy determinations were, Cassidy said he didn't know. This differs from other life expectancy providers in the business that try to discern the accuracy of their predictions.

Stretesky asked several times how much time Cassidy spent with most medical records. He answered at one point that "they are all different."

Under questioning, he also said he tried to send Life Partners his life expectancy estimates within two days of receiving the medical files.

Cassidy testified that he only sent the medical records back once to the provider without preparing an estimate because of a lack of information.

He recalled it was on a case where he saw a notation in a medical chart about a mass in the lung and a planned biopsy, but no information on the biopsy results.

In addition, Cassidy said he used a life expectancy table from the U.S. Department of Health and Human Services, a general-population mortality table that's not typically used in the life settlement industry because it includes poor people who don't generally buy life insurance.

He also said he had no actuarial training.

In response to another question, Cassidy said he developed his predictions based on his 34 years of clinical experience.

A life expectancy provider and a consultant who reviews life expectancy reports for investors were mystified about how Cassidy could prepare so many life expectancy reports by spending so little time on them each week.

Mike Fasano, president of **Fasano Associates**, a life expectancy provider based in Washington, said he has 20 physicians who help prepare life expectancy reports.

He said his physicians do anywhere from four to eight life expectancy reports a day, although the average is about six reports a day.

His life expectancy firm, like others, gets about $300 per report whether a policy is purchased or not.

Anna Hart, an underwriter with **ARHart Consulting** in Eastland, Texas, said she doesn't know how Cassidy can review so many medical records in such a short period, saying she would be unable to do that.

"It's one every nine minutes," Hart said. "It takes me an hour to an hour and a half to look at every [medical record]. I don't see how it's possible."

She said five years of medical records for an insured can range from 50 to 400 pages, although the average-length report is 150 pages.

She also questioned the extra $500 payment for every policy that's purchased.

"That's not a traditional practice. It could be potentially construed that it might raise questions about the independence of the LE provider," Hart said.

She said life expectancy providers don't know most of the time if the cases they evaluate end up being purchased.

Hart said the general-population mortality table used by Cassidy isn't appropriate for the life settlement market because it's based on the entire range of income levels, saying it's preferable to use a table representing the insured population.

Hart, who audited Cassidy's work for an investment firm several years ago, said she recommended that the firm always get at least two life expectancy estimates for each policy it plans to buy.

Obtaining at least two life expectancy reports to price policies is a common industry practice.

Cassidy testified that he included a disclaimer on his letters with his estimates to Life Partners saying that no single source of information should be relied upon in making life expectancy determinations.

In his deposition, Cassidy, who is licensed to practice in California, Nevada and Texas, said one complaint was made several years earlier against him by a patient who believed he released records without his permission, but that the case was closed and no action was taken.

In another case in Nevada, he said he was alleged to have ordered an excessive dose of a chemotherapy drug. The Nevada State Board of Medical Examiners dismissed the complaint with prejudice on Sept. 15 and ordered him to pay $3,940 to cover the board's investigatory costs. The April 2008 complaint said that after a 74-year-old woman with lung cancer who had lost 40 pounds in the preceding months took medication he prescribed, she went into a coma eight days later and then was withdrawn from life support.

In its annual report to the SEC for the fiscal year ending on Feb. 28, Life Partners said it uses in-house and outside specialists to price policies, including physicians.

"We cannot assure purchasers that, despite our experience in settlement pricing, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums," the report said.

In the same report, Life Partners said it settled a lawsuit with the state of Texas for alleged violations of the state's deceptive trade practices law. The state alleged that contracts Life Partners used for purchasers before 1998 did not clearly say they were responsible for paying premiums to maintain policies and that Life Partners violated the law by seeking premiums. The case was settled on April 1 with Life Partners agreeing to pay future premiums for the pre-1998 purchasers at a cost of $32,162 a year.

Life Partners also said in its July quarterly report to the SEC that it makes advances on policy premiums to maintain certain policies. When policies are purchased, premiums for projected life expectancies are added to the purchase price and the future premiums are set aside in escrow accounts, Life Partners said.

Although investors are obligated to pay the additional premiums when those future premium amounts are exhausted, Life Partners says in some cases when the purchasers have failed to pay the extra premiums, it has repurchased the policies or advanced the premiums to maintain the policies.

"While we have no contractual or other legal obligation to do so, and do not do so in every instance, we have made premium advances as an accommodation to certain purchasers based on our assumptions that we will ultimately recoup the advances," the provider said. "While some purchasers repay the advances directly, reimbursements of these premiums will come most likely as a priority payment from the policy proceeds when an insured dies."

000136

# EXHIBIT G

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION**, | : | |
| | : | |
| Plaintiff, | : | Civil Action No.: |
| | : | |
| v. | : | **COMPLAINT** |
| | : | |
| **LIFE PARTNERS HOLDINGS, INC., BRIAN D.** | : | |
| **PARDO, R. SCOTT PEDEN, AND** | : | |
| **DAVID M. MARTIN,** | : | |
| | : | |
| Defendants. | : | |
| | : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      Since 2006, Defendants Life Partners Holdings, Inc. (referred to jointly with its wholly-owned subsidiary, Life Partners, Inc. as "Life Partners" or the "Company")—through senior officers Brian D. Pardo ("Pardo"), R. Scott Peden ("Peden"), and, since 2008, David Martin ("Martin")—engaged in a disclosure and accounting fraud that misled the Company's shareholders about the sustainability of Life Partners' revenues and profit margins, consumer demand for the life settlement investments that the Company brokers, and, since at least fiscal year 2007, the Company's net income.  Pardo and Peden profited from the fraud by trading on inside information that Life Partners systematically uses life expectancy estimates that the Company knows to be materially short in brokering life settlements.  Life Partners engaged in this practice to artificially inflate the Company's revenues and profit margins.  Pardo and Peden knew the Company engaged in this practice, which Defendants concealed from shareholders, and took advantage of the non-public information to sell shares of Life Partners common stock at artificially inflated prices.

2.      Life Partners is a public company that trades on the NASDAQ under the ticker symbol "LPHI."   The Company is in the business of brokering life settlements.   In a life settlement transaction, a life insurance policy owner sells the policy to a purchaser, and the purchaser becomes an "investor" in the sense that the purchaser receives the death benefit when the policy matures (*i.e.,* the insured dies).   The purchaser makes a lump-sum payment in exchange for the policy, and assumes responsibility for paying premiums on the policy until maturity.

3.      Life Partners derives revenue from the life settlement transactions it brokers by keeping the difference between what investors pay to acquire a policy and what the policy owner receives from the sale.   In a typical life settlement transaction, Life Partners identifies a number of investors who purchase fractional interests in a given policy.   Included in the purchase price that investors pay are funds sufficient to cover future premium payments necessary to maintain the policy during the insured's estimated life expectancy, which funds Life Partners places in escrow.   Life Partners captures as revenue the difference between the purchase and sale prices, minus the escrowed funds and certain transaction costs.   If the insured under the policy outlives the life expectancy estimate that Life Partners assigns to the policy, investors have a continuing obligation to pay premiums after the escrowed funds are depleted.   Otherwise, the policy would lapse, and investors would lose their entire investment.

4.      In a life settlement transaction, the estimate of an insured's life expectancy ("LE") is a critical factor in determining the purchase price that investors are willing to pay.   Investors will pay more to acquire life settlements that have shorter LEs, as they receive their fractional interest in the death benefit sooner, and the anticipated period of time during which they have to make premium payments to maintain the policy is shorter.   Accordingly, because Life Partners'

revenue model is predicated on capturing the spread between the price investors are willing to pay for a life settlement and the amount paid to the policy seller, the LEs that Life Partners uses to broker life settlements are critical to the Company's revenues and profit margins. The shorter the LE, the greater the spread between the purchase and sale prices. Thus, LEs are not only critically important to investors in life settlement policies, but also to Life Partners and its shareholders.

5.       Despite the importance of reliable LEs to both investors and shareholders, Life Partners has, since at least 1999, systematically used materially underestimated LEs in order to inflate its revenues. Prior to 1999, Life Partners obtained the LEs that it used to broker life settlements from Dr. Jack Kelly ("Kelly")—a Reno, Nevada-based doctor that, as a founder and part owner of the Company, had a financial interest in Life Partners, Inc. Following Kelly's unexpected death in 1999—Pardo immediately hired Kelly's officemate, Dr. Donald Cassidy ("Cassidy"), to render Life Partners' LEs.

6.       Prior to hiring Cassidy, Life Partners and Pardo did not conduct any meaningful due diligence on Cassidy's qualifications to act as a life expectancy underwriter. In fact, during their only conversation (at Kelly's funeral), Pardo instructed Cassidy to review Kelly's life expectancy assessments to determine "how they were doing it." Within a few days of Kelly's funeral, Life Partners began sending all of its retail life expectancy work to Cassidy, paying him $500 for each policy Life Partners successfully brokered using the LEs that Cassidy provided. In February 2008, Life Partners began paying Cassidy an additional $15,000 per month.

7.       Prior to being hired by Life Partners, Cassidy had no experience rendering LEs. He had no actuarial training. As of February 8, 2011, Cassidy had never researched the

methodology used by life settlement underwriters.  In fact, in the ten-plus years he has worked for Life Partners, Cassidy never modified his methodology or evaluated his track record on LEs.

8.     By at least fiscal year 2006, it was obvious to Life Partners, Pardo, and Peden the extent to which Cassidy, utilizing the Kelly methodology, had delivered to Life Partners systematically and materially underestimated LEs.  Specifically, as of February 28, 2006, Pardo and Peden knew or were reckless in not knowing that 88% of the relevant policies brokered by Life Partners had exceeded their Cassidy–rendered LE.  By February 28, 2009, Life Partners, Pardo, Peden and Martin knew or were reckless in not knowing that 90% of the relevant policies brokered by the Company had exceeded their Cassidy-rendered LE.

9.     In fact, in 2007, the Colorado Securities Commission sued Life Partners, Pardo, and Peden for, among other things, failing to disclose to investors the "high frequency rate" at which insureds outlive the LEs that Life Partners assigns to the policies underlying its life settlement transactions.  Life Partners paid $12.8 million to settle the Colorado action.  The settlement required the Company, at the option of investors, to acquire the interests the Company had brokered to them and refund the purchase price.

10.     Despite their awareness of Life Partners' practice of systematically using materially short LEs to broker life settlements, Defendants misrepresented in the Company's public filings with the Commission between 2006 and 2011 that the underestimation of LEs was a contingent risk.  Defendants' misrepresentation of an existing reality—systematically and materially underestimated LEs—as a contingent risk left shareholders with the false and misleading impression that the Company could continue to capture the profit margins that it had historically realized.  In the same public filings, Life Partners also failed to disclose that the

underestimated LEs constituted a material trend impacting the Company's revenues, as required by the federal securities laws.

11.     Pardo, Peden and Martin's awareness of the LE fraud is evidenced by, among other things, their efforts to conceal it.  During quarterly conference calls with shareholders and investors in 2007 and 2008, Pardo lied about Life Partners' track record as delivering "double-digit" returns to investors.  When Pardo touted these returns, he knew that the purported "double-digit" returns did not include approximately 2,900 life settlements for which the insured had already outlived Life Partners' LE.   In fact, Pardo knew that the double-digit returns were impossible to achieve even under a "best case scenario"—*i.e.*, were all the insureds who had reached their life expectancy estimate to die as of the dates of his statements during the conference calls.

12.     Peden further concealed Life Partners' LE fraud by misrepresenting that Cassidy's methodology was consistent with industry practices.  In particular, in October and November 2008, Peden misrepresented to an investor, as well as a member of the network of independent buyers' agents that Life Partners uses to identify investors, that Cassidy used the 2008 Valuation Basic Table ("VBT") in rendering LEs for use by Life Partners.  When he made these false statements, Peden knew that Cassidy used a census table, not the VBT.  And, unlike the VBT, the census table that Cassidy used to estimate LEs contains data that was not limited to persons who had been underwritten for life insurance, but rather included the entire U.S. population.  Cassidy's use of the census table deviated from industry practices for life settlement underwriting.

13.     Finally, in August 2010, Peden and Martin, in an effort to cover up the LE fraud and convince Life Partners' auditor that Cassidy's LEs were reliable, provided the auditor with a

spreadsheet of the 300 "most recent" maturities. Notably, the spreadsheet included both viatical and life settlement policies dating back to fiscal year 2000, but it excluded 1,230 policies for which insureds had outlived Cassidy LEs. Peden and Martin knew that consideration of these 1,230 policies by the auditor would have been essential to an accurate assessment of Cassidy's track record, and they intentionally excluded these policies to mislead the auditor.

14.     Between February 2007 and January 2009, Pardo and Peden sold approximately $11.5 million and $300,000, respectively, of Life Partners common stock based on material, non-public information that the Company's stock price was dependant on its practice of systematically using materially short LEs to generate revenues.

15.     During the same time period that the Defendants were misleading shareholders about risks to Life Partners' business and investor returns, they also engaged in an accounting fraud. From at least fiscal year 2007 through the third quarter of fiscal year 2011, Life Partners materially misstated its net income by prematurely recognizing revenue from life settlement transactions that had not yet been completed. Additionally, Pardo, Peden and Martin knew or were reckless in not knowing that it was Life Partners' practice to conceal improper revenue recognition practices from it the Company's auditor by backdating transactional documents for the life settlements the Company brokered.

16.     From at least fiscal year 2009, Defendants also misstated net income by failing to appropriately impair life settlement policies owned by Life Partners. Despite their awareness that the Company's LEs were materially short, Defendants continued to use those LEs to value policies that the Company held on its own books, thereby artificially inflating the value of the policies in Life Partners' financial statements.

17.     As a result of Life Partners' practice of prematurely recognizing revenue and failing to appropriately impair its own investments in life settlements, Defendants materially misstated net income from at least fiscal year 2007 through the third quarter of fiscal year 2011. On November 22, 2011, Life Partners restated its financial results for fiscal years 2007 through 2010, and for the first three quarters of fiscal year 2011, to correct errors related to revenue recognition, impairment of investments in owned policies, accrued liabilities, and the related tax impact, which the Company admitted had been previously "incorrectly accounted for under [GAAP]."

18.     The Commission, in the interest of protecting the public from such fraudulent activities, brings this civil securities law enforcement action seeking a permanent injunction against Life Partners, Pardo, Peden, and Martin, enjoining them from committing or aiding and abetting further violations of the federal securities laws.  The Commission also seeks an order barring the individual Defendants from serving as officers or directors of a public Company, and imposing disgorgement of ill-gotten gains, plus prejudgment interest, and civil monetary penalties as allowed by law.  The Commission further seeks an order requiring Pardo and Martin to reimburse Life Partners for bonuses and profits realized from sales of Life Partners securities during time periods for which the Company had materially misstated its financial results.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action under Sections 20(b), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77u(a)] and Section 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(e) and 78aa].

20.    Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails in connection with the transactions described in this Complaint.

21.    Venue is proper in this Court under Section 22(a) of the Securities Act [15 U.S.C. §77u(a)] and Section 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa] because certain of the acts and transactions described herein took place in Waco, Texas, where the Company is headquartered.

## DEFENDANTS

22.    Life Partners Holdings, Inc. is a Texas corporation headquartered in Waco, Texas. The Company operates through a wholly-owned subsidiary, Life Partners, Inc.  Life Partners' common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act, and the Company is subject to the reporting requirements of the Exchange Act.  Since 2000, Life Partners common stock has traded on the NASDAQ exchange under the ticker symbol "LPHI." Life Partners' fiscal year ends on the last day of February.

23.    Brian D. Pardo, age 69, is Director, President and CEO of Life Partners Holdings, Inc. and the founder and CEO of Life Partners, Inc.  According to a Schedule 14A Proxy Statement filed by the Company on June 25, 2010, Pardo directly and indirectly owns 50.3% of Life Partners Holdings, Inc.  In July 1989, the Commission filed a complaint against Pardo and his company, ASK Corp. of Waco, Texas, alleging that they materially overstated the company's revenues and profits in public filings.  Pardo resolved the enforcement action by consenting to the entry of a permanent injunction enjoining him from future violations of Exchange Act anti-fraud provisions and from aiding and abetting Exchange Act reporting violations.

24.     R. Scott Peden, age 47, has served as Director, General Counsel, Secretary and President of Life Partners Holdings, Inc. since 2000.  Since its incorporation in 1991, Peden has served as Vice President and General Counsel of Life Partners, Inc.  Peden is an attorney and has been licensed to practice in Texas since 1990.

25.     David M. Martin, age 53, has served as the Chief Financial Officer for Life Partners Holdings, Inc. since February 2008.  Martin is a Certified Public Accountant, licensed in Texas since 1984.

## FACTS

### FRAUDULENT AND MISLEADING REPRESENTATIONS TO SHAREHOLDERS

#### A. *Life Partners' Business Model*

26.     Life Partners, through its wholly-owned operating subsidiary, brokers the sale of life insurance policies by policy owners (typically the insureds under the policies) to investors in the secondary market, a transaction referred to as a "life settlement."  In general, Life Partners purports to distinguish between "viaticals" and "senior life settlements" based on whether or not the insured covered under the policy is terminally ill or elderly.  In the former case, it categorizes the policies as viaticals, and, in the latter, as senior life settlements.  Life Partners refers to senior life settlements and viaticals collectively as "life settlements."

27.     The Company's revenue model is designed to capture the residual monies in the life settlement transactions it brokers (*i.e.,* the difference between the buy and sale prices of the insurance policy, minus transactional costs).

28.     Life Partners facilitates sales of fractionalized interests in a single policy to multiple investors, a structure the Company refers to as "direct fractional ownership."  At the date investors purchase an interest in a policy, they also contribute funds to escrow for future

premium payments on the policy for the term of the life expectancy estimate provided by Life Partners.  The escrowed amount, as well as a 12% commission paid to the investor's broker and medical review fees, are funded from the amount paid by the investors for the policies.  When an insured dies, investors in that policy collect their pro rata share of the policy's death benefit.

### B.  Life Partners' Profits Depend on Short LEs

29.    According to the Company's Forms 10-K and 10-KSB filed with the Commission for fiscal years 2008 through 2010, Life Partners prices life settlements "based on the policy face amount, the anticipated life expectancy of an insured and policy maintenance costs."  The policy face amount and policy maintenance costs are ostensibly fixed.  But the LE is variable in that it is set by an LE underwriter that analyzes the age and health of the insured.  Accordingly, the LE is a significant factor impacting both the price investors pay for policies and the revenues and profit margins that Life Partners extracts from the transactions that it brokers.

30.    Since 1999, the Company has relied exclusively on Cassidy, a Reno, Nevada-based internist, to provide LEs for the policies it brokers.  Prior to 1999, Life Partners obtained the LEs it used to broker life settlements from Kelly, a founder and part owner of Life Partners, Inc.  Kelly died unexpectedly in 1999.  Before his death, he and Cassidy shared office space in Reno, but maintained separate medical practices.

31.    Pardo met Cassidy at Kelly's funeral, and hired him to fill Kelly's role in furnishing LEs to Life Partners.  Pardo had never met Cassidy before, and, according to Pardo, never spoke to him again after their conversation at the funeral.  At Kelly's funeral, Pardo directed Cassidy to review Kelly's life expectancy assessments to determine "how they were doing it."  Cassidy agreed to do so, and, within days of meeting Pardo at Kelly's funeral, he was rendering LEs for Life Partners.

32.     Pardo hired Cassidy without conducting any meaningful due diligence on Cassidy's qualifications to serve as a life expectancy underwriter.  At the time Pardo hired him, Cassidy had no experience rendering LEs.  Cassidy has never had any actuarial training, and, as of February 8, 2011, had never taken any courses or received any professional guidance or instruction on life expectancy analysis.  He had never attended a life settlement conference or researched the methodology used by other underwriters in the life settlement industry.

33.     Initially, Life Partners paid Cassidy $500 for each policy Life Partners successfully brokered using Cassidy's LE.  In or around February 2008, Life Partners began paying Cassidy a $15,000 per month retainer on top of the $500 fee he received for every policy Life Partners brokered using his LE.  Since Kelly's funeral in 1999, Life Partners has sent all of its retail life expectancy work to Cassidy.  In the ten-plus years he has worked for Life Partners, Cassidy has never evaluated his track record on LEs or the reliability of his methodology, which he has never modified.

### C.  Cassidy's Methodology Results in Short Life Expectancy Estimates

34.     Cassidy described his methodology in letters to the Company dated March 2002 ("2002 Letter") and May 2009 ("2009 Letter") (collectively, the "Letters").  The purpose of the Letters was to provide information to Life Partners' auditor about Cassidy's methodology.

35.     According to the 2009 letter, Cassidy was rendering LEs using a census table published by the U.S. Department of Health and Human Services ("HHS").  The HHS table is a census table that addresses life expectancies for the entire U.S. population.  In contrast, mortality tables used by actuaries in the life settlement industry address mortality rates for a select portion of the population who have been underwritten for insurance.  LE estimates based on data provided in the HHS table are typically shorter than LE estimates based on data in tables tailored

to insured populations.  Cassidy's practice of using a census table to assess life expectancy deviates from the standard practice in the life settlement industry.

36.     Cassidy also deviated from standard practices in the life settlement industry by rendering LEs based on outdated mortality data instead of the most recent data, *e.g.,* using 1999 data when 2005 data was available.

37.     Cassidy has purportedly reviewed tens of thousands of policies during his decade-plus tenure underwriting LEs for Life Partners, but before they received inquiries from the Commission's staff in 2010, neither Cassidy nor the Company ever assessed the accuracy of his LE track record.  Nor did they otherwise attempt to inform future LE estimates based on other historical experiences, such as changes in medical treatments or mortality tables.  Cassidy's failure to factor in historical experience in his LE underwriting methodology deviates from standard practice in the life settlement industry.

38.     The Letters also indicate that Cassidy's methodology for generating LEs on viaticals and senior life settlements is substantially the same.  According to Life Partners, it brokered primarily viatical policies until fiscal year 2008.

39.     As a result of these deficiencies in Cassidy's methodology, his LEs are materially short, and the number of policies brokered by Life Partners for which the insured has exceeded Cassidy's LE has increased over time.  The actual number of maturities on policies underwritten by Life Partners is significantly lower than the expected number of maturities (based on Cassidy's LEs) for those same policies, for both viaticals and life settlements.

40.     For example, the average LE generated by Cassidy for all policies from 2000-2005 was 3.8 years, and his average LE for life settlements from 2000-2010 was 4.6 years.  Had the LEs been appropriately developed based on sound actuarial practices, including factoring in

historical experience, Cassidy's average LE for all policies (including viaticals) funded from 2000 through 2005 should have been at least 8 years longer. Cassidy's average LE for life settlements funded from 2000 through 2010 should have been at least 9 years longer than estimated.

41.     Cassidy's success rate in accurately estimating LEs was abysmal. The following chart shows, for the universe of policies from which his success rate is measurable, the percentage of policies that have exceeded Cassidy's LEs since Life Partners started brokering policies based on those LEs:

| Fiscal Year | Policies Exceeding LE |
|:---:|:---:|
| 2006 | 88% |
| 2007 | 88% |
| 2008 | 89% |
| 2009 | 90% |
| 2010 | 91% |

42.     In an effort to conceal Life Partners' practice of using Cassidy's flawed methodology to systematically underestimate LEs, and the accompanying risk that Life Partner's reliance on underestimated LEs posed to the Company's business, Peden misrepresented that Cassidy's methodology was consistent with industry practices. Peden misrepresented that Cassidy's LEs were based on the 2008 VBT, a table published by the Society of Actuaries that is widely used in the life settlement industry.

43.     In October 2008, Peden misrepresented to an investor that "the average LE is based on how old the insured is right now and what the 2008 VBT tables say your LE [is]." When he made this statement, Peden knew that Cassidy used a census table that included all persons, not a table, like the VBT, that includes data only for persons underwritten for life

insurance.  In fact, contrary to these statements, Life Partners made no use of the 2008 VBT table in its LE estimates.

44.     Similarly, in November 2008, Peden told a member of the network of independent buyers' agents that Life Partners uses to identify investors ("Licensees") that Cassidy "uses the same mortality table that 21st Services uses."  At the time that Peden made this representation, he knew that 21st Services, a well known life expectancy provider, was using the 2008 VBT Table, and that Cassidy was using the HHS table.

**D. Using Short Life Expectancy Estimates to Broker Life Settlements Enabled Life Partners to Inflate Its Revenues**

45.     Using Cassidy's materially short LEs enabled Life Partners to artificially inflate its revenues, as the Company extracted significantly more money from investors than it would have had it priced life settlements based on appropriately developed LEs.  During fiscal years 2006 through 2011, Life Partners extracted more than $400 million of revenue from the life settlement transactions it brokered.

46.     In September 2010, Peden provided to Life Partners' auditor, E&Y, a "pricing illustration" that demonstrates the importance of LEs to Life Partners' business model.  Peden based his pricing illustration on a policy that Life Partners brokered in 2010.  Under the terms of that life settlement transaction, the policy owner agreed to sell a policy with a face amount of $5 million for $1 million.  Using a 4-year LE, Life Partners marketed the policy to investors at a price of $3 million.  At the time of the closing, Life Partners deposited $800,000 of the $3 million purchase price in escrow for the purpose of funding future premium payments on the policy for the life expectancy of the insured.  In addition, Life Partners paid, from the $3 million purchase price, the investor's broker $360,000 (a 12% commission) and medical review fees to Cassidy.

47.     According to the pricing illustration, netting fees, expenses and escrowed premiums, Life Partners realized residual, net revenue of approximately $859,000 from the sale of the policy.  Using the same policy, if the LE were increased by just two years, to a 6-year life expectancy estimate, the transaction would have been unprofitable to Life Partners.  With a 6-year LE, Life Partners would have to market the same policy, if priced to achieve the same 13% investment return, at a purchase price of approximately $2.3 million.  From the $2.3 million purchase price, Life Partners would have been required to escrow $1.2 million, pay the investors' broker $279,000 (the 12% commission), and pay the policy seller $1 million.  Accordingly, with a 6-year LE, there would be no residual income from the sale for Life Partners to capture as revenue, and the transaction would have been unprofitable to the Company.

48.     From January 2000 through December 2010, Life Partners brokered approximately 2,260 life settlement transactions based on LEs provided by Cassidy.  Using appropriately developed LEs, the average projected ROI for investors in these policies would be approximately 0.4%.  Assuming that investors would have been willing to buy interests in life settlements with a 0.4% projected ROI at all, the price they would have been willing to pay for such a small return on their investment would have been substantially less.  For example, investors paid approximately $594 million for policies brokered by Life Partners using the Cassidy LE in 2009 and 2010.  Assuming a 10% return to investors and appropriately developed LEs, these policies were actually worth approximately $39 million.  Thus, by overvaluing its policies using materially short LEs, Defendants were able to extract from investors, during 2009 and 2010 alone, approximately $555 million more than they could have reasonably expected to earn using appropriately developed LEs.

**E.  *Defendants Knew that Cassidy's LEs Were Materially Short***

49.    Beginning at least as early as 2003, it was apparent to Life Partners' Audit Committee and Board of Directors that the LEs used by the Company to broker life settlement transactions were materially short.   In February 2003, Life Partners' auditor and Audit Committee expressed concern that that the number of maturities on the policies that the Company brokered was less than expected based on the LEs that Life Partners assigned to those policies.   In pertinent part, the Audit Committee's February 2003 quarterly report to Life Partners' Board of Directors stated:

> [D]iscussion was held regarding the small number of policies paying off during the nine months ended November 30, 2002.  Based on these discussions, the Committee recommended discussions with management about obtaining an independent review of this issue to determine whether adjustments are necessary to the Company's underwriting criteria.

Both Pardo and Peden were members of Life Partners' Board of Directors in February 2003.

50.    Despite the Audit Committee's concerns, Pardo and Peden did not attempt to review or adjust the Company's underwriting criteria or determine why Life Partners was not seeing the expected number of maturities based on Cassidy's LEs.  Indeed, neither Pardo nor Peden followed the audit committee's recommendation to conduct an independent review of Life Partners' underwriting criteria even though, according to them, they had not spoken to Life Partners' sole underwriter—Cassidy—for almost four years.

51.    In 2003, Life Partners began including data in its annual filings with the Texas Department of Insurance ("TDI") reflecting, for matured policies, the difference between Cassidy's LEs and when insureds actually died.  The reports filed by Life Partners for 2003 through 2009 reveal that insureds underlying approximately 80% of matured policies that the

Company brokered had outlived Cassidy's LEs. The annual reports filed with TDI were prepared by the Company's legal department, which Peden oversaw.

52. Life Partners disclosed in its periodic filings with the Commission that it advanced money to make premium payments on brokered policies when the amounts escrowed for premiums was depleted—*i.e.,* when insureds outlived their LEs, and additional premium payments came due. The amount of premiums advanced by Life Partners increased steadily from $827,583 in fiscal year 2005 to $2,518,316 in fiscal year 2010. During this period, Life Partners paid a total of $8,881,035 in premium advances. Defendants knew that Cassidy's flawed methodology for estimating LEs would result in an increasing rate of escrow depletion over time, as more escrow advances became necessary to address the rising incidence of insureds outliving Cassidy's LEs, and their knowledge of the result is manifest from Defendants' filings with the Commission.

53. In 2006, questions and concerns about the reliability of Life Partners' LEs were raised again, when an investment firm considered a potential investment in a pool of life settlements brokered by Life Partners. The Company authorized the investment firm to conduct due diligence on Life Partners' operations. The firm retained a due diligence consultant who concluded, in February 2006, that Life Partners had failed to analyze the accuracy of Cassidy's LEs, and that Life Partners provided no feedback to Cassidy on his track record or methodology. The consultant's report included a recommendation to Pardo and Peden that Life Partners "track, analyze, and validate" Cassidy's LEs. Again, Pardo and Peden did not follow the recommendation to analyze Cassidy's LEs.

54. Moreover, data available to Defendants from the Company's internal policy tracking system showed that, by at least fiscal year 2006, the LEs that Life Partners used to

broker life settlement interests were systematically and materially underestimated.   As of February 2006, tracking data revealed that, of the policies brokered by Life Partners for which the accuracy of Cassidy's LEs is measurable ("measureable policies"), insureds underlying 88% of those policies had outlived their LEs.   By February 2009, the tracking data showed that insureds under 90% of measurable policies had outlived their LEs.

55.     In 2007, the Colorado Securities Commission confronted Life Partners and its management, including Pardo and Peden, about the unreliability of Cassidy's LEs.   The Colorado Securities Commission filed an action against Life Partners, Pardo, Peden, and others alleging, among other things, that the Company's failed to disclose material facts to investors in its life settlement transactions, including "the high frequency rate in which the viators outlived life expectancies predicted by Life Partners."   Life Partners settled the suit by agreeing, with respect to investments in 524 policies, to refund the investors' money and take back their policy interests.  Company paid $10.1 million to do so, along with statutory interest of $2.7 million.

### F.  *Defendants Misled Shareholders About the Impact of Short Life Expectancy Estimates on Life Partners' Business*

56.     Notwithstanding the significance of LEs to Life Partners' profit margins, revenue, and investor demand for the Company's products, Life Partners misrepresented, as a contingent risk, the adverse impact of underestimated LEs on the Company's business.   In the Risk Factors section of each of its Forms 10-K and 10-KSB for fiscal years 2006 through 2011, the Company included the following disclosures:

| Fiscal Year End Forms 10-K | Disclosure |
|---|---|
| 2006 | *If we underestimate the average life expectancies*, our purchasers will not realize the returns they seek, demand will fall, and purchasers will invest their funds elsewhere . . . .  We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or viators and life settlors, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |
| 2007-2008 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere . . . .We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums. If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations. (Emphasis added.) |
| 2009-2010 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. . . . We cannot assure you that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums.  If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |
| 2011 | *If we underestimate the average life expectancies and price our transactions too high*, our purchasers will realize smaller returns, demand may fall, and purchasers may invest their funds elsewhere. . . . To support our pricing systems, we use life expectancy estimates from an outside practicing physician and a leading industry provider. We cannot assure purchasers that, *despite our experience in settlement pricing*, we will not err by underestimating or overestimating average life expectancies or miscalculating reserve amounts for future premiums.  If we do so, we could lose purchasers or policy sellers, and those losses could have a material adverse effect on our business, financial condition, and results of operations.  (Emphasis added.) |

57.     Contrary to Life Partners' misleading disclosures, Defendants knew, or were reckless in not knowing, that the Company's use of materially short LEs was not a mere possibility but an existing reality.  In connection with these misleading disclosures, Defendants acknowledged the material adverse impact that underestimated LEs posed to Life Partners' business, and particularly that investor demand for the Company's life settlements could drop off, making the business unsustainable.  Yet Defendants chose to misrepresent this known and existing risk to shareholders as a mere contingency.

58.     In late 2010 and early 2011, press articles regarding Life Partners' business practices and use of underestimated LEs had a significant, negative impact on the Company's share price.  On December 16, 2010, following an article in *The Life Settlements Report* highlighting problems with Cassidy's method for estimating LEs and the fact that his practices may be inconsistent with other LE underwriters, the Company's share price dropped by over 8%. Similarly, a January 19, 2011, article in *The Wall Street Journal*, which made public the Commission staff's investigation of Life Partners and raised questions about the accuracy of the Company's LEs, resulted in a 17% decline in the Company's share price.  As these significant declines in the Company's share prices suggest, the accuracy of the LEs that Life Partners uses is material to the Company's shareholders.

59.     In addition, Life Partners was required by Item 303 of Regulation S-K to identify in the Management Discussion and Analysis section ("MD&A") of its Forms 10-K and 10-KSB any known trends that would result in, or that were reasonably likely to result in, a material favorable or unfavorable impact on the Company's net revenue from continuing operations. Despite the known risk that underestimated LEs posed to Life Partners' business, Defendants never disclosed the known trend of materially short LEs.

60.     Pardo and Peden reviewed and signed Life Partners' Forms 10-K and 10-KSB for fiscal years 2006 through 2010.  Martin reviewed and signed each of Life Partners' Forms 10-K for fiscal years 2008 through 2010.

**H.     *Pardo Misrepresented Investor Returns During Conference Calls with Analysts and Shareholders***

61.     In at least two quarterly conference calls following earnings announcements by the Company, analysts inquired about the average ROI for investors in Life Partners' life settlements.  In an October 2007 conference call, Pardo misrepresented that:

> Most of our clients are looking for IRRs in the 12 to 14 % range, and this is quite common.  Some will pay a little less, some a little more.  But I would say that's a fair assessment of what they are looking for and also somewhat on the conservative side of what we think they are going to actually get.

In an October 2008 conference call, Pardo misrepresented that "I think if [clients] are expecting [11-12% returns], they will not be disappointed."

62.     Contrary to Pardo's representations, as of the 2007 and 2008 conference calls, the average or mean ROI for investors since the Company started brokering life settlements was nowhere near the "conservative" 11% to 14% returns touted by Pardo.

63.     As alleged above, Pardo was fully aware of the known practice and undisclosed trend of the Company's use of materially short LEs.  Pardo later acknowledged that the information Life Partners conveyed about historic ROI for its investors did not take into account policies that remained active beyond their LE.  He also acknowledged that, for such policies, investor returns could only decline, and more so with each passing day that the policy remained active.

## THE ACCOUNTING FRAUD

64.     In fiscal year 2003, Life Partners instituted a revenue recognition practice that was inappropriate under Generally Accepted Accounting Principles ("GAAP").  The Company's practice was improper because Life Partners prematurely recognized revenue from the life settlement transactions it brokered.  In 2004, Life Partners misled its auditor about the criteria the Company used to recognize revenue, and continued to improperly recognize revenue based on ill-gotten guidance from the auditor, even though the Company knew that the guidance was based on incomplete and misleading information.

65.     Life Partners also backdated certain transactional documents to hide the Company's premature revenue recognition from its auditors, and lied to shareholders about its revenue recognition practices in various, inconsistent disclosures in public filings.  Life Partners adhered to its inappropriate practice of prematurely recognizing revenue from fiscal year 2003 through the third quarter of fiscal year 2011 (*i.e.*, period ended November 30, 2010).

66.     In addition to prematurely recognizing revenue from life settlement transactions, Life Partners also made it a policy for certain life settlements to recognize revenue in a given quarter based on events occurring after the quarter ended, which also failed to comply with GAAP.  As a result of the Company's improper revenue recognition policies, Life Partners misstated net income in its financial statements.

67.     In addition, in analyzing the carrying value of life settlements owned by Life Partners – which, in most cases, became Company-owned because Life Partners elected to acquire them to settle disputes with investors – Life Partners' used the same LEs it assigned to the policies when it originally brokered the interests, which LEs the Company knew to be

flawed.  Through its use of the same flawed and materially short LEs to assess the value policy interests on its books, the Company materially understated impairment of its assets.

68.     On November 22, 2011, the Company announced in its Form 10-K for fiscal year 2011 that it was restating financial results for fiscal years 2007 through 2010 and the first three quarters of 2011 to correct these and other accounting errors (the "Restatement").   The Restatement addresses, among other things, errors related to revenue recognition, impairment of investments in Company-owned policies, accrued liabilities, and the related tax impact, all of which Life Partners admitted had been previously "incorrectly accounted for under [GAAP]."

### A. The Company's Life Settlement Transaction Cycle and Timely Revenue Recognition Under That Cycle

69.     In a typical life settlement transaction brokered by the Company, Life Partners first identifies policy owners interested in selling their policies, and negotiates a potential purchase of the policies through "Seller Agreements" between the policy owners and the Company.  Upon reaching an agreement for a potential sale by the policy owners, Life Partners forwards them assignment documents covering the policies, to be returned to the Company along with executed copies of the Seller Agreement.  Peden was one of three executives who reviewed and signed Seller Agreements on behalf of the Company.

70.     Prior to the "Closing Date," Seller Agreements are non-binding and unenforceable against the policy owner.  The Seller Agreements define "Closing Date" as "the date upon which the consideration for the transaction described herein is transferred from the Escrow Agent to the Seller."  Prior to the Closing Date, neither the policy owner nor Life Partners are contractually obligated to  proceed with the sale, as each may rescind the agreement at any time and for any reason without incurring a penalty.  In fact, for a 15-day period following the Closing Date (the "Rescission Period"), the policy owner has the option to rescind his or her

agreement to sell the policy for any reason.  Moreover, death of the insured covered by the policy prior to or during the Rescission Period triggers an automatic rescission under the Seller Agreement.

71.     While it processes the Seller Agreement, Life Partners sends the medical file for the insured underlying the policy to Cassidy for his review and analysis.   Once Cassidy completes his analysis, Life Partners prepares a confidential case history for each insured, which contains Cassidy's LE.   Licensees submit reservations on behalf of interested investors to purchase specified interests in a particular policy or policies.   To secure their reservation, investors mail or wire money to the escrow agent to be used to purchase life settlements at closing, and they deliver signed, but undated, "Policy Funding Agreements" to the Company. The Policy Funding Agreement specifies the policy or policies to be purchased, the acquisition price, and the escrow arrangements for receipt and disbursement of funds.

72.     After receipt of the Policy Funding Agreement, the Seller Agreement, and the accompanying assignment documents, Life Partners forwards to the escrow agent the documents necessary for closing.  A Life Partners employee responsible for coordinating funding sends the escrow agent a closing letter that provides instructions regarding the payment of funds at closing, including the amount to be paid to the seller, the amount to be placed into escrow for future premiums, and the residual amount to be sent to the Company.  The closing of a life settlement transaction occurs when the seller gets paid – *i.e.*, on the Closing Date, as defined in the Seller Agreement.

73.     At all times relevant to the Commission's claims, Pardo, Peden, and Martin participated in and/or monitored the process by which the Company processed and recorded revenue from life settlement transactions.   Martin, as CFO and head of the Accounting

Department, was responsible for reviewing and approving the quarter-end accrual journal entry reflecting revenues, including the journal entries necessary to reflect policies that were only partially funded – *i.e.*, polices as which the Company had secured commitments from investors sufficient to purchase some, but not all, fractional interests in the policy.  Pardo and Peden monitored daily, monthly, quarterly, and annual contract activity, including contract funding status, through an internal, electronic database that holds all information related to a particular policy.

### B. Life Partners Prematurely and Improperly Recognized Revenue

74.     Prior to fiscal year 2003, Life Partners recognized revenue as of the Closing Date. In fiscal year 2003, Life Partners began recognizing revenue prior to the Closing Date and, in so doing, began recognizing revenue from life settlement transactions in a manner inconsistent with GAAP.

75.     Specifically, the Company changed its policy to recognize revenue based on: (i) the receipt date of an executed Seller Agreement; (ii) the receipt date of documents from the seller authorizing assignment of the insurance policy; and (iii) the date of the Policy Funding Agreement from an investor committed to purchasing an interest in the policy.   Upon the occurrence of the last of these three dates for a given policy, the Company recognized, for the reporting period in which the last date fell, a *pro rata* portion of the total revenue it expected to earn when it completed the sale of 100% of the interests in that policy.   For example, if the Company had received a signed Seller Agreement and assignment documents, along with Policy Funding Agreements from purchasers to acquire 2% of a policy, the Company would recognize, in that reporting period, 2% of the total revenue anticipated from that life settlement transaction.

76.     Under GAAP, revenue can be recognized only when it is both (i) realized or realizable and (ii) earned.  Revenue is "realized or realizable" when products or services (in this case, life settlements) are exchanged or readily convertible to known amounts of cash or claims to cash.  Revenues are "earned" when "the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 605-10-25, Revenue Recognition (also contained in FASB Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements of Business Enterprises, paragraphs 83(a) and 83(b)).

77.     Life Partners' post-2003 revenue recognition policy is contrary to GAAP because the Company recognizes revenues prior to the Closing Date, a point before revenue becomes either (i) realized or realizable or (ii) earned.

78.      Revenue is not realized or realizable before the Closing Date because Life Partners receives no cash, and has no claim to cash, until a life settlement is purchased by investors and the policy owner/seller is paid by the escrow agent.  The policy/owner seller does not get paid until, at the earliest, the Closing Date.  Moreover, Life Partners cannot readily convert an investor's commitment to purchase a life settlement interest into cash or a claim to cash prior to delivering the corresponding interests in the underlying policy, which it cannot possibly do prior to the Closing Date.  Accordingly, prior to the Closing Date, Life Partners' revenues are neither realized nor realizable.

79.     Revenue is not earned before the Closing Date because the policy owner is not obligated to sell the policy to Life Partners prior to the Closing Date.  Life Partners' revenues do not qualify as "earned" until such time as it fully brokers the sale of 100% of a policy.  Policy owners sell their policies in a single transaction under the Seller Agreement, not on a prorated

basis, as Life Partners identifies investors interested in purchasing fractional interests in the policy. Consequently, after the Company identifies one or more interested investors in a given policy, Life Partners still has substantial continuing obligations to identify investors sufficient to purchase all the unsold interests in the policy before it becomes entitled to any portion of the proceeds from the sale. Life Partners is not entitled to any proceeds from the sale until investors purchase 100% of a policy, which does not happen until the Closing Date, at the earliest.

80.     In short, Life Partners could not properly recognize revenue prior to closing on a life settlement transaction (*i.e.*, prior to the policy owner/seller being paid) because the Seller Agreement allowed the policy owner and Life Partners to walk away from the deal at any time for any reason prior to closing.

### C. Life Partners' Disclosures to its Auditors Regarding Revenue Recognition Were Misleading

81.     In 2004, Pardo and Peden asked Life Partners' outside auditor if the Company could recognize revenue under a hypothetical scenario based on four assumptions. For its review, Pardo and Peden asked the auditor to assume that: (i) the policy owner has signed a Seller Agreement, (ii) "[n]o additional action of any kind is required on the part of either the seller, the purchasers, or Life Partners to finalize [the] transaction," (iii) investors have signed purchase documents and "funded in full the purchase price for the policies" as wells as amounts required to be escrowed for future premium payments, and (iv) the escrow agent has taken steps necessary to ensure that the insurance carrier is legally obligated to transfer ownership of the policy.

82.     Despite their knowledge of the policy owner's rescission rights under the Seller Agreement, Pardo and Peden omitted those known contingencies from the hypothetical scenario they asked the auditor to consider. Due to the omission, the hypothetical was incomplete, and

therefore misleading.  Based on the incomplete and misleading hypothetical, the auditor advised the Company in January 2004 that it could recognize revenue under the circumstances presented.

83.     Moreover, the auditor's 2004 guidance was based on unfounded assumptions. Pardo and Peden asked the auditor to assume that investors "had funded in full the purchase price for the policies" and that "[n]o additional action of any kind is required on the part of either the seller, the purchasers, or Life Partners to finalize [the] transaction."   These assumptions presuppose that Life Partners had identified a sufficient number of investors to purchase 100% of the interests in a given policy.  As adopted by Pardo and Peden, and implemented by Martin, the Company's revenue recognition policy was inconsistent with the 2004 guidance in that Life Partners recognized revenue after identifying investors sufficient to purchase as little as 2% of a given policy, a point after which substantial additional steps were required to finalize the transaction.  Namely, finding enough investors to purchase the remaining 98% of the policy.

84.     In an April 2010 memorandum addressed to Martin and others, Pardo and Peden memorialized Life Partners' improper revenue recognition policy, described in paragraphs 76 and 82 above.  Pardo and Peden sent the memo to Martin, the Company's CFO, to codify policies and procedures that, according to Pardo and Peden, Life Partners had "regularly utilized" since they obtained the January 2004 guidance from the Company's auditor.  The memorandum also contemplated that the Accounting Department, which Martin oversaw, "may audit and test" revenue recognition qualifications for a given reporting period by verifying the receipt of Seller Agreements and assignment forms, and the dates of the Policy Funding Agreements.

85.     For fiscal year end 2010 through the third quarter of 2011, Pardo, Peden, and Martin signed management representation letters to the Company's auditor dated May 12, 2010,

July 8, 2010, August 31, 2010, and January 10, 2011, falsely stating that Life Partners had

adequately disclosed a description of the revenue recognition policies that the Company applied

to major revenue-generating products, which products include life settlements.

86.     These management representation letters also stated:

> All revenue recognized as of the balance sheet date has been
> realized and earned.  Revenue has not been recognized before (1)
> persuasive evidence of an arrangement exists, (2) goods have been
> delivered or services rendered, (3) consideration to be received is
> fixed or determinable and (4) collectability is reasonably assured.

The representation that all revenue recognized has been realized and earned is false for the

reasons stated in paragraph 75 through 80 above.  Additionally, the lack of an obligation on the

policy owner's behalf to sell the policy prior to the Closing Date indicates an absence of

persuasive evidence that an arrangement exists.  Finally, prior to the Closing Date, the Company

has not delivered policy interests to investors, and collectability of the Company's receivables is

not reasonably assured.  Collectability cannot be assured until such time as the seller has been

paid and the policy interests are delivered to the investors, which cannot occur prior to closing.

### D. In Public Filings, Life Partners Misrepresented the Company's Revenue Recognition Policies and Practices

87.     In Life Partners' experience, policy owners periodically cancelled the Seller

Agreement prior to closing.  Additionally, insureds occasionally died within the Rescission

Period, triggering automatic rescissions of Seller Agreements.  Life Partners' practice of

prematurely recognizing revenue caused Life Partners to reverse in subsequent quarters revenues

reported in previous quarters.  There were 18 such reversals affecting 20 of the 27 quarters

during the period from fiscal year 2005 through the third quarter of fiscal year 2011.  Five of

these reversals took place during Martin's tenure as CFO.

88.     Pardo, Peden, and Martin were aware of periodic cancellations and rescissions of Seller Agreements, which exposed the impropriety of Life Partners' revenue recognition practices.  Pardo, Peden, and Martin knew, or should have known, that it was improper for the Company to recognize revenue prior to the Closing Date.

89.     Life Partners' revenue recognition practices, which Pardo and Peden established, and Martin implemented after he became CFO, were inconsistent with the Company's disclosures to shareholders in public filings signed by Pardo, Peden, and Martin.

90.     The Company's Forms 10-K and 10-KSB for fiscal years 2006 through 2010 contain two essentially identical descriptions of the Company's revenue recognition policy, both of which were false.  In these disclosures, the Company stated that it recognizes revenue "*at the time a settlement closes [has been closed]* and the purchaser has obligated itself to make the purchase." (Emphasis added.)  The Company's Forms 10-Q for fiscal years 2009 and 2010 also contain this false description.

91.     Contrary to these disclosures, Life Partners routinely recognized revenue from a particular life settlement transaction before the transaction closed.  While the Seller Agreement (Life Partners' own document) defines the "Closing Date" as the date upon which "consideration for the transaction described herein is transferred from the Escrow Agent to Seller," it was Life Partners' practice to recognize revenue well before that point.

92.     Life Partners' Forms 10-Q and 10-QSB for fiscal years 2007 and 2008 contain another false description of the Company's revenue recognition policy.  In that description, the Company recognizes income from life settlement transactions "*at the time a purchaser has accepted a tendered settlement and is contractually obligated to make payment.*" (Emphasis added.)  These disclosures to shareholder are false because the Company's revenue recognition

policy allowed it to recognize revenue before the purchaser becomes contractually obligated to make a payment. That obligation can arise only after closing for a particular transaction.

93.     Specifically, investors are not obligated to make a payment from escrow to purchase a fractional interest in a particular policy until the policy owner is obligated to sell the policy. Under the terms of the Seller Agreement, the policy owner is not obligated to sell the policy until closing.  Prior to that date, there is nothing for the investor to purchase. Consequently, investors are not obligated (contractually or otherwise) to purchase the policy until closing. Because the Company's revenue recognition policy allowed it to recognize revenue prior to closing – before investors become contractually obligated to make payments – the disclosures in the Company's Forms 10-Q and 10-QSB for fiscal years 2007 and 2008 were false.

94.     The Company's Forms 10-Q for fiscal year 2011 state a fourth false description of its revenue recognition policy. The Forms 10-Q state that the Company recognizes revenue from life settlement transactions "upon the receipt of executed contracts and assignment document, and when the sellers have obligated themselves to transfer title of policies." This description is false because the seller is not obligated to sell a policy and, therefore, transfer title, until the closing, but it was the Company's practice to recognize revenue before closing.

95.     On November 22, 2011, in the Restatement, the Company announced  that it was changing the date of revenue recognition from the date that purchasers commit to buy policies to the date that policy closings are funded (*i.e.,* the Closing Date).

### E. *Life Partners Backdated Certain Transactional Documents to the Month the Company Received the Seller Agreement*

96.     In an effort to conceal its improper revenue recognition practices from its auditor, Life Partners routinely backdated certain transactional documents underlying the Company's life settlements.  Unbeknownst to the Company's auditor, the Company's practice was to backdate closing letters, which instructed the escrow agent to execute a closing, to coincide with the month the Company received an executed Seller Agreement from the policy owner.  In many instances, the Company received executed Seller Agreements from policy owners weeks or months before the actual Closing Date for a particular transaction.  By backdating closing letters, which cued the Closing Date, the Company made it appear as though, for certain transactions, the Company's criteria for revenue recognition had been met around the time of the actual closing, which was not the case.

97.     Life Partners' practice of backdating closing letters hindered the Company's auditor's ability to evaluate when the closing for a particular transaction actually occurred versus when the Company recognized revenue from that transaction.  Through the practice, Life Partners concealed from its auditor repeated instances in which the Company's revenue recognition policy, as applied by the Company, was inconsistent with GAAP.  Closing letters containing accurate dates would have alerted the auditor that adherence to the Company's revenue recognition policy permitted the Company to recognize revenue prematurely, for transactions that did not close until months or weeks after the Company's criteria had been met.

98.     The Company also routinely backdated Policy Funding Agreements to coincide with the month that the Company received an executed Seller Agreement.  As alleged in paragraph 71 above, investors purchased life settlement interests under the terms set forth in the

Company's Policy Funding Agreements.  The agreements consist of two pages, with the date and purchase terms printed on the first page and the investor signature on the second page.

99.     At all times relevant to the Commission's claims, it was Life Partners' practice to collect and maintain executed, but undated, signature pages for Policy Funding Agreements in a filing cabinet.  The Company received, through its Licensees, signature pages from investors before such time as the investors had made a decision as to which or how much of a policy the investors wanted to buy.  When the investors made these decisions, the Company would complete the first page of the Policy Funding Agreement, which set forth purchase terms based on which and how much of the policy the investor had elected to purchase.  At the same time, the Company stapled the investor's undated signature pages to the first page of the Policy Funding Agreement, and inserted a date in the first page that coincided with the month it had received the executed Seller Agreement for the interests the investor had elected to purchase.

100.    As a result of this practice, and despite the fact that the date of the Policy Funding Agreement constituted one of the Company's three criteria for revenue recognition, the date reflected on the Policy Funding Agreement was not the date the investor "signed" the agreement or reserved an interest in a given policy.  Rather, the date Life Partners selected for the Policy Funding Agreement – a date in the month that the Company received an executed copy of the corresponding Seller Agreement – could have been and, in some instances was, weeks or months prior to either of these events.

101.    The Company's practice of backdating Policy Funding Agreements hindered its auditor's ability to evaluate whether the Company followed its own revenue recognition policy.  By backdating Policy Funding Agreements to a date in the month it received Seller Agreements from the owner of the policy that investors had agreed to buy, the Company made it appear as

though all three of its internal criteria for revenue recognition occurred in or around the same month, and that that point in time coincided with the date the Company recognized revenue from a particular transaction.   In reality, the Company was recognizing revenue before the final criteria of its stated policy had been met – *i.e.*, before the date of the Policy Funding Agreement from an investor committed to purchasing a life settlement interest.

102.    The Company's practice of backdating Policy Funding Agreements also interfered with its auditor's ability to determine whether the Company's revenue recognition policy was consistent with GAAP.   Had Policy Funding Agreements reflected their true execution dates, the Company's auditors would have seen that, in many instances, the Company recognized revenue before such time as investors had committed to purchase any interest, much less the totality of the interests, in a policy.   Revenue from life settlement transactions was neither realized nor realizable nor earned before such time.

103.    In a December 2006 email, the Company employee responsible for coordinating the funding of policies explained to a Licensee the reason Life Partners backdated Policy Funding Agreements.   The Funding Coordinator's email explained that she had finished the paperwork for a particular policy, including "changing the dates on the [funding status report] – you know for those who predated their [Policy Funding Agreements].   *Everything has to match for the auditors*."   (Emphasis added.)

104.    Defendants have admitted to the Commission that the dates on the Policy Funding Agreements did not reflect the dates that the agreements were signed by investors (unless the investor manually signed a date next to his signature).

105.    Defendants have also admitted that certain employees "had the ability to change the automatically generated [Policy Funding Agreement] date to match the month in which the

policy originated, and not the date of reservation.   Consequently, the [Policy Funding Agreement] date utilized by the accounting department may have reflected a date as of quarter-end even if the corresponding reservations did not occur until after the 15 business-day period after quarter end."

106.    In July 2011, Peden sent an email to Martin and others, copying Pardo, in which he explained that the Company had adopted a new document dating policy under which Policy Funding Agreements would be generated automatically to reflect the date on which an investor's reservation to purchase an interest in a policy was accepted by Life Partners and the funds on deposit had been allocated to a particular policy.   Importantly, Peden's new policy stated that "[t]hese dates cannot be edited."

107.    Finally, despite the July 2011 policy changes, Pardo, Peden and Martin failed to disclose Life Partners' backdating practices to the Company's current auditor until October 2011, over 40 days after Life Partners admitted the Company's document backdating history to the Commission.   The Company's backdating practices evidence Defendants' knowledge that Life Partners' revenue recognition practices were improper.

### C.   Improper Recognition of Revenues from Transactions Occurring After Period End

108.    Apart from prematurely recognizing revenue as a matter of course, Pardo and Peden developed, and Martin implemented, a policy that authorized the Company to recognize in a given quarter revenue from events that occurred as many as 15 business days following quarter end (the "15-business-day Policy").

109.    According to an April 2010 internal accounting policy memorandum from Pardo and Peden to Martin  (the "Cutoff Memo"), the Company had a policy of "clos[ing] the books and records for a quarter on or about 15 business days after the end of the quarter."   The

Company made it a practice to keep the books and records open for purposes of recording revenues since at least fiscal year 2004.   The Cutoff Memo set a uniform period of time during which the Company kept its books and records open for revenue recognition purposes at 15 business days.   The Cutoff Memo rationalized the practice on the ground that it "allowed time for transactions conducted in the latter part of the quarter to clear and to receive bills for goods and services rendered in the latter part of the quarter."

110.    Under the 15-business-day Policy, Defendants recognized revenue from a life settlement transaction, whether that revenue was recognizable under GAAP or not, in the quarter immediately prior to the quarter in which the events on which the Company based its decision to recognize revenue had occurred.

111.    For example, if an investor committed in a Policy Funding Agreement to purchase an interest in a policy after quarter end, but prior to 15 business days into the current quarter, Life Partners recognized the pro rata revenues and costs associated with the transaction in the previous quarter.   This practice is contrary to Pardo and Peden's stated rationale for the policy, which suggested that the policy was intended only to allow the paperwork for a transaction occurring in the previous quarter to be returned to Life Partners before being recorded in the previous quarter.

112.    Through its adherence to the 15-business-day policy, Life Partners recorded revenue in a particular quarter based on events that occurred in a future quarter, which is contrary to GAAP.

113.    After the Commission's staff began its investigation of the claims underlying this lawsuit, Defendants informed the Commission's staff that the Company had decided to discontinue its practice of recognizing revenue under the 15-business-day Policy.

**D.  *The Company's Auditors Withdraw Their Audit Reports***

114.    In June 2011, E&Y sent Life Partners a letter terminating its engagement as the Company's auditor.  E&Y had served as the Company's auditor since March 2, 2010.  In addition to terminating its auditor engagement, E&Y withdrew its audit report for the Company's 2010 financial statements.

115.    E&Y's letter states that, "upon a re-examination of the Company's revenue recognition policy, we have determined that the Company should revise its revenue recognition policy.  The Company should be recording revenue at the time of the final closing of escrowed funds with the seller, unless a rescission occurs, rather than at an earlier date reflecting the purchaser's obligation to make an investment."

116.    E&Y's letter further states that, as a result of Life Partners' revenue recognition policies, "a material weakness exists relating to the recording of revenue in the proper period."  E&Y's letter continues, "[u]ntil this deficiency is remediated, there is a more than remote likelihood that a material misstatement to the annual or interim consolidated financial statements could occur and not be prevented or detected by the Company's controls in a timely manner."

117.    According to E&Y, it resigned as Life Partner's auditor due to a threat Pardo made against E&Y in a June 2011 memorandum to certain Licensees.  In the memorandum, Pardo threatened to "take action" against E&Y unless it signed off on the Company's 2011 financial statements "as is."  As a result of Pardo's threat, along with other "recent developments," E&Y concluded that it was no longer able to rely on representations from Life Partners' management, and that it was unwilling to be associated with the Company's financial statements.

118.    In a letter to the Company dated June 2011, Eide Bailly LLP ("Eide Bailly"), Life Partners' auditor from August 2008 until it resigned in January 2010, withdrew its audit report on the Company's 2009 financial statements and internal control over financial reporting.  In its letter, Eide Bailly stated that, based on the disclosures in E&Y's June 2011 letter to the Company, Eide Bailly believed "there is a possibility that the Company's consolidated financial statements as of and for the year ended February 28, 2009, may have material misstatements related to improper revenue recognition."

### E.   Life Partners Understated Impairment of Investments in Policies

119.    As of November 30, 2010, Life Partners has spent in excess of $18.6 million to purchase more than one thousand life settlement interests that it had previously brokered to investors.  Life Partners acquired the majority of these interests to settle disputes with investors.  For example, Life Partners acquired over half ($12.8 million) of its investments in policies to settle a lawsuit that the Colorado Securities Commissioner brought against the Company in 2007 for violations of the Colorado Securities Act.  Despite their awareness that these policies may have been impaired when acquired, Defendants failed to properly evaluate potential impairment.  As a consequence, by understating the dollar amount by which its investments in policies should have been impaired, Life Partners has overstated those investments in financial statements filed with the Commission since fiscal year 2009.

120.    Under the FASB's ASC 360-10, (formerly Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets), a long-lived asset shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable.  Life Partners' investments in policies are "long-lived" because Life Partners expects to hold these assets for longer than one year.  The

"carrying amount" for Life Partners' investments in policies is equal to the amount reported on its balance sheet, which represents historical cost less any previously recorded amounts of impairment.

121.    Under ASC 360-10, an impairment loss shall be recognized if the carrying amount is not recoverable and exceeds its fair value.  The carrying amount is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset.  ASC 360-10 states that an impairment loss shall be measured as the amount by which the carrying amount exceeds fair value.  Fair value is the price that would be received to sell an asset in an orderly liquidation.  For long-lived assets having uncertainties in both in timing and amounts, such as life settlements, ASC 360-10 states that "an expected present value technique will often be the appropriate technique with which to estimate fair value."

122.    Since fiscal year 2007 through at least fiscal year 2009, Life Partners has reported its investments in policies at the lesser of cost – *i.e.,* the dollar amount it spent to purchase the policies – or 75% of the face value of the policy.  Life Partners recorded the difference between cost and 75% of the face value of the policies as settlement expense.  Life Partners' practice of recording the difference as settlement expense is not consistent with either evaluation of recoverability or determination of fair value under ASC 360-10.  The practice of recording policy value at the lesser of cost or 75% of face value also evidences Defendants' awareness that Life Partners' investments in policies acquired to settle disputes may have been impaired when acquired.

123.    Life Partners disclosed in its filings with the Commission that it evaluated the carrying value of its investments in policies on a regular basis "using new or updated information

that affects our assumptions about remaining life expectancy, credit worthiness of the policy issuer, funds needed to maintain the asset until maturity, capitalization rates and potential return."  Life Partners disclosed that it would recognize an impairment of individual policies "if the expected undiscounted cash flows are less than the carrying amount of the investment, plus anticipated undiscounted future premiums and capitalizable direct external costs, if any."  For the fiscal years ended February 28, 2010 and 2009, Life Partners reported impairments of investments in policies of $281,882 and $151,810, respectively.   For the nine months ended November 30, 2010, Life Partners reported impairments of investments in polices of $111,333.

124.   From fiscal year 2009 through the period ended November 30, 2010, contrary to these disclosures, Defendants failed to appropriately evaluate and reduce the carrying value of the Company's investments in policies to fair value.  In its filings with the Commission, Life Partners disclosed that impairment is "generally caused by the insured significantly exceeding the estimate of the original life expectancy, which causes the original policy costs and projected future premiums to exceed the estimated maturity value."  Yet, when Defendants evaluated Life Partners' investments in policies for potential impairment, Defendants relied on the LEs Cassidy provided when the Company originally brokered interests in the policies, which Defendants knew to be materially short.  As the number and percentage of insureds outliving Cassidy's LEs increased over time, this event or change of circumstances, known to Defendants, necessitated an evaluation and assessment of the reliability of Cassidy's LEs – a critical assumption in the Company's impairment analysis.  Instead, the Company used the same LEs Cassidy provided at the time Life Partners originated the interests, which Defendants knew to be underestimated.  As a result, the Company misled investors by materially understating impairment for its investments in life settlement policies.

125. Despite their improper reliance on Cassidy's flawed LEs, Pardo, Peden, and Martin informed the Company's auditor at fiscal year-end 2009 of their belief that "[w]e have reviewed long-lived assets and investments in life insurance policies and tested for impairment whenever events or changes in circumstances have indicated that the carrying amount of assets might not be recoverable and have appropriately recorded the adjustment, if any."

126. This representation was false. Pardo, Peden, and Martin understood that the Company's impairment calculations depended on the validity of Cassidy's LEs. They also knew, before year-end 2009, that the LEs were unreliable, and, in fact, systematically and materially underestimated

127. In July or August 2010, E&Y requested data from Life Partners to support the LEs underlying the Company's investments in policies, and the Company's related impairment analysis. In response, Peden and Martin submitted a chart with information on the most recent 300 maturities of viatical and life settlement policies sold by Life Partners. According to the chart, which covered a ten-year period, the ratio of policies that matured before, versus after, the date projected by Cassidy's LEs was roughly 50%/50%. But Peden and Martin failed to alert E&Y that, of the more than 4,000 total outstanding policies brokered by the Company that had yet to reach maturity, insureds underlying approximately 1,200 of those policies had outlived Cassidy's LE, and those policies thus failed to mature by the dates Cassidy projected.

128. In a letter to the Company's audit committee dated May 2010, E&Y reported that it had noted control deficiencies and other matters. E&Y considered the Company's internal control in order to design audit procedures in connection with its engagement to express an opinion on the Company's fiscal year 2010 financial statements. E&Y reported that the Company did not have a formal process in place to assess actual-to-expected LEs. E&Y

recommended that "[a] formal analysis, prepared quarterly, would provide management with an after the fact assessment of how accurate its initial LEs were and if any adjustments need to be made to its underwriting process."

### F.   Additional Management Representation Letters to Auditors

129.   Pardo, Peden, and, for certain periods after February 2008, Martin signed management representation letters to Life Partners' auditors containing materially misleading statements and omissions.

130.   From at least fiscal year 2007 through the third quarter of fiscal year 2011, Pardo and Peden signed quarterly management representation letters to the Company's auditors dated January 15, 2007; May 25, 2007; July 16, 2007; October 12, 2007; January 14, 2008; May 14, 2008; July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010; and January 10, 2011 stating that the Company's financial statements were fairly presented in conformity with GAAP; that there were no material transactions that had not been properly recorded; and that they had no knowledge of fraud or suspected fraud involving management.

131.   Martin signed management representation letters dated May 14, 2008; July 9, 2008; October 9, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 8, 2010; October 8, 2010; and January 10, 2011, containing these representations with respect to financial statements starting at fiscal year-end 2008 through the third quarter of 2011.

### G.  *Restatement and Net Effect*

132.    As described above, on November 22, 2011, Life Partners announced, in Form 10-K for fiscal year 2011, a Restatement that addresses, among other items, errors related to revenue recognition and impairment expense for investments in Company-owned policies.

133.    The Company's Form 10-K also reported that it had "improved" the method by which it calculated impairment on investments in policies by, among other things, increasing "the amount of actuarial data to improve our methodology for estimating life expectancy."  The Company reported that, rather than relying solely on Cassidy, the Company had obtained a second LE for each insured from an industry provider, typically 21st Services, LLC.  Not surprisingly, the addition of a second, well-known LE provider resulted in increased LEs for insureds underlying life settlements brokered by the Company, and increased impairment expense in prior periods.

134.    The Restatement, as it relates to impairment of investments in policies, however, does not exclusively result from a refinement of the Company's estimation process, which, under GAAP, should be reported prospectively.  To the contrary, the Restatement, as it relates to impairment of investments in policies, is due to misuse or oversight of facts that existed at the time the previously-issued financial statements were prepared.  In particular, Defendants' misuse or oversight of facts indicating that Cassidy's LEs were materially short is what caused the Company to understate impairment of investments in policies.

135.    According to the Company's Form 10-K for fiscal year 2011, the Company also corrected errors related to deferred policy monitoring costs, accrued liabilities, certain other items, and the related tax impact.

136.     Life Partners' 2011 Form 10-K also reports Pardo and Martin's conclusion that the Company did not maintain effective internal control over financial reporting as of the start of the end of fiscal year 2011, including effective controls to ensure the existence, completeness, accuracy, valuation, and presentation of activities related to, *inter alia*, revenue recognition and impairment of investment in policies.   These internal control deficiencies, according to the Company, resulted in the aforementioned misstatements of revenue and investments in policies.

137.     The table below is based upon the Restatement and indicates that Life Partners' misstatements of net income range from negative 29% to positive 11% for fiscal years 2007, 2008, 2009, and 2010.   Similarly, the Company misstated net income for the first, second, and third quarters of fiscal year 2011 by 7%, 2%, and (78)% respectively.   The misstatements of net income resulting from prematurely recognizing revenue prior to the Closing Date and inadequate impairment of investments in policies are material to Life Partners consolidated financial statements for fiscal years 2007, 2008, 2009, 2010 and for the first, second, and third quarters of fiscal year 2011.

| | Increase (Decrease) Net Income *(Dollars in millions)* | | | |
|---|---|---|---|---|
| **Nature of Restatement Adjustment** | **Year Ended 2/28/07** | **Year Ended 2/29/08** | **Year Ended 2/28/09** | **Year Ended 2/28/10** |
| 1. Revenue based on closing date | $ 0.4 | $ (3.8) | $  0.1 | $     (2.1) |
| 2. Impairment | -- | (0.2) | (2.2) | (1.8) |
| 3. Deferred policy monitoring costs | N/A | (1.9) | (0.7) | (0.4) |
| 4. Other[2] | (0.2) | (0.3) | 0.6 | (0.1) |
| Subtotal, pretax | 0.2 | (6.2) | (2.2) | (4.4) |
| Federal and state taxes | 0.2 | 2.0 | 0.6 | 1.1 |
| Misstatement, after tax | 0.4 | (4.2) | (1.6) | (3.3) |
| Reported net income | 3.4 | 18.8 | 27.1 | 29.4 |
| Restated net income | $ 3.8 | $ 14.6 | $ 25.5 | $ 26.1 |
| **% Misstatement, under (over) stated** | **11%** | **(29)%** | **(6)%** | **(13)%** |
| [1] The Company's restatement of prior year financial statements includes correction of errors related to the timing of expensing executive bonuses, impairment of investments in securities, and certain other items. | | | | |

## INSIDER TRADING

138.    As set forth above, by at least fiscal year end 2006, Pardo and Peden knew, but failed to disclose to shareholders, that Life Partners systematically underestimated LEs in pricing the life settlements interests it brokered.  This was material, non-public information because, as Pardo and Peden knew, the revenues and profit margins that Life Partners reported depended on underestimated LEs.  Life Partners could not sustain revenues and profit margins at the levels it reported without the continued use of underestimated LEs.  And Life Partners could not continue to use underestimated LEs to prop up its business had it disclosed its practice of doing so, as investor demand for the life settlement interests that the Company brokers would have greatly diminished if not vanished entirely had this information been public.

139.    Based on this material, non-public information, Pardo (through an entity under his control) and Peden sold approximately $11.5 million and $300,000 of Life Partners common stock, respectively.  Pardo Family Holdings, Ltd., a wholly-owned subsidiary of the Pardo Family Trust ("Pardo Trust"), sold Life Partners stock for Pardo, the beneficial owner of the Pardo Trust, as follows:

| Date | Price | # Shares Sold | Stock Sale Proceeds |
| --- | --- | --- | --- |
| 2/12/2007 | $10.00 | 96,155 | $961,550.00 |
| 5/18/2007 | $17.90 | 150,000 | $2,685,000.00 |
| 6/25/2007 | $34.10 | 100,358 | $3,422.207.80 |
| 10/17/2007 | $39.00 | 5,800 | $226,200.00 |
| 10/18/2007 | $39.00 | 11,200 | $436,800.00 |
| 7/25/2008 | $26.24 | 5,723 | $150,171.52 |
| 8/11/2008 | $27.64 | 6.661 | $184,110.04 |
| 8/12/2008 | $28.31 | 3,339 | $94,527.09 |
| 9/22/2008 | $35.32 | 15,000 | $529,800.00 |
| 10/14/2008 | $35.15 | 15,000 | $527,250.00 |
| 10/30/2008 | $40.71 | 15,135 | $616,145.85 |
| 10/31/2008 | $40.01 | 9,865 | $394,698.65 |

| 11/3/2008 | $36.67 | 2,866 | $105,096.22 |
| 1/7/2009 | $42.95 | 10,000 | $429,500.00 |
| 1/8/2009 | $43.50 | 10,000 | $435,000.00 |
| 1/9/2009 | $43.43 | 14,400 | $622,082.25 |
| **Total:** | | | **$11,528,839.42** |

On June 18, 2007, Peden sold approximately $300,000 of Life Partners stock held in his name.

140.    Life Partners' systematic use of materially underestimated LEs to price the life settlement interests it brokered inflated the Company's financial condition, and, consequently, its stock price.  Pardo and Peden took advantage of this material non-public information to sell Life Partners' stock at the inflated prices.

141.    Pardo authorized and set the terms of the sale of Life Partners stock.

142.    As officers and directors of Life Partners, Pardo and Peden owed fiduciary duties, including duties of trust and confidence, to Life Partners and its shareholders.

143.    Pardo and Peden knew or were severely reckless in not knowing that the information in their possession was material and nonpublic and that their trading on the basis of the information was in breach of their duties to the Company and its shareholders.

**E.  Salaries and Bonuses Paid to Pardo, Peden and Martin**

144.    During some of the 12-month periods following Life Partners' filing of its fraudulent Forms 10-K and 10-KSB for fiscal years 2007 through 2010, Pardo and Martin received from Life Partners the following ill-gotten gains in the form of salaries and bonuses:

| Year | Pardo | | Peden | | Martin | |
|---|---|---|---|---|---|---|
| | **Salary** | **Bonus** | **Salary** | **Bonus** | **Salary** | **Bonus** |
| 2007 | $450,000 | $15,031 | $143,113 | $ 24,843 | $      -- | $      -- |
| 2008 | $468,173 | $246,123 | $159,456 | $ 246,123 | $  8,462 | $      -- |
| 2009 | $574,838 | $383,440 | $158,062 | $ 383,907 | $112,444 | $27,429 |
| 2010 | $512,710 | $473,566 | $158,954 | $473,099 | $143,096 | $ 7,532 |

145.    Pardo and Martin have never reimbursed Life Partners for any portion of their bonuses and other incentive-based and equity-based compensation.

### FIRST CLAIM FOR RELIEF
**Violations of the Antifraud Provisions of the Securities Act**
**(Section 17(a) [15 U.S.C. § 77q(a)])**
**[against Defendants Life Partners, Pardo and Peden]**

146.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

147.    Defendants Life Partners, Pardo and Peden, in public filings with the Commission in January and February 2007, misrepresented, failed to disclose, and/or made misleading omissions regarding the Company's revenue recognition policies.

148.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo, and Peden, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, knowingly or with severe recklessness, employed devices, schemes, or artifices to defraud.

149.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo and Peden also, directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, in connection with the offer or sale of securities, and with negligence: (i) obtained money or property by means of  untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (ii) engaged in transactions, practices, and/or courses of business which operate as a fraud or deceit upon purchasers, prospective purchasers, and other persons.

150.    By reason of the foregoing, Life Partners, Pardo and Peden violated, and unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q].

**SECOND CLAIM FOR RELIEF**
**Violations of Antifraud Provisions of the Exchange Act**
**(Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5])**
**[against Defendants Life Partners, Pardo, Peden and Martin]**

151.   The Commission realleges and incorporates by reference Paragraphs 1 through 145.

152.   Defendants Life Partners, Pardo, Peden, and Martin, in public filings with the Commission from January 2007 through November 2011, knowingly or with severe recklessness, misrepresented, failed to disclose, and/or made misleading omissions regarding: (i) a material risk to the Company's business, (ii) a material trend impacting the Company's revenues, (iii) the Company's revenue recognition policies and (iv) the Company's net income.

153.   Defendants Life Partners and Pardo misrepresented historical returns to investors in life settlement interests brokered by Life Partners, and made projections about future returns that they knew to be false and/or made without having any reasonable basis on which to base the projections.

154.   Pardo (through Pardo Family Holdings) and Peden sold, for their personal benefit, approximately $11.5 million and $300,000, respectively, of Life Partners securities while in possession of material nonpublic information, namely that it was Life Partners' practice to systematically use materially short life expectancy estimates to broker life settlements, and that this practice had the effects of  artificially inflating the Company's revenues and profit margins, and creating investor demand for the life settlement interests that Life Partners brokered that would not exist but for the Company's practice of doing so.

155.   As officers and directors of Life Partners, Defendants Pardo and Peden owed fiduciary duties to Life Partners and its shareholders.  As a result, they each had a duty of trust

and confidence to not trade in Life Partners securities on the basis of material nonpublic information.  Pardo and Peden traded in the securities of Life Partners in breach of these duties.

156.    Defendants Pardo and Peden knew, or were severely reckless in not knowing, that the information in their possession was material and nonpublic and that their trading on the basis of the information was in breach of their duties.

157.    By engaging in the foregoing misconduct, Defendants Life Partners, Pardo, Peden, and Martin, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly:  (i) employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and courses of business which operate as a fraud or deceit upon persons, including purchasers and sellers of securities.

158.    By reason of the foregoing, Life Partners, Pardo, Peden, and Martin violated, and unless enjoined, will continue to violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

159.    Pardo, Peden and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners' violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

160.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
### Violations of the Reporting Provisions of the Exchange Act
### (Section 13(a) and Rules 12b-20, 13a-1 and 13a-13)
### [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.12a-13]
### [against Defendant Life Partners]

161.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

162.    Defendants Life Partners, Pardo, Peden and Martin, in public filings with the Commission from January 2007 through November 2011, misrepresented, failed to disclose, and/or made misleading omissions regarding: (i) a material risk to the Company's business, (ii) a material trend impacting the Company's revenues, (iii) the Company's revenue recognition policies, and (iv) the Company's net income.

163.    By engaging in the foregoing misconduct, Life Partners, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78]), failed to file annual and quarterly reports (on Forms 10-K, 10-KSB, 10-Q and 10-QSB) with the Commission that were true and correct, and failed to include material information in its required statements and reports as was necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

164.    By reason of the foregoing, Life Partners violated, and unless enjoined, will continue to violate, Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

165.    Pardo, Peden and Martin knowingly or with severe recklessness gave substantial assistance to Life Partners in its violations of Section 13(a) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

166.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)], and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13].

**FOURTH CLAIM FOR RELIEF**
**Violation of the Books and Records and Internal Control Provisions of the Exchange Act**
**(Sections 13(b)(2)(A) and 13(b)(2)(B))**
**[15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)]**
**[against Defendant Life Partners]**

167.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

168.    By engaging in the foregoing misconduct, from January 2007 through November 2011, Life Partners, whose securities are registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l]:

- Failed to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets; and

- Failed to devise and maintain a system of internal controls sufficient to provide reasonable assurances that:  (i) transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and (ii) to maintain accountability of assets.

169.    By engaging in the foregoing misconduct, Life Partners violated, and unless enjoined, will continue to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

170.    Pardo, Peden, and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners in its failure to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of the assets of Life Partners.

171.    By reason of the foregoing, Pardo, Peden and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)].

172.    Pardo and Martin knowingly or with severe recklessness provided substantial assistance to Life Partners in its failure to devise and maintain a sufficient system of internal accounting controls.

173.    By reason of the foregoing, Pardo and Martin aided and abetted Life Partners' violations, and unless restrained and enjoined will continue to aid and abet such violations, of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78(m)(b)(2)(B)].

**FIFTH CLAIM FOR RELIEF**
**Circumventing or Failing to Implement Internal Controls**
**(Exchange Act Section 13(b)(5) and Rule 13b2-1)**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. §§ 240.13b2-1]**
**[against Defendants Pardo, Peden and Martin]**

174.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

175.    By engaging in the foregoing misconduct, from January 2007 through November 2011, Defendants Pardo, Peden, and Martin violated, and unless enjoined will continue to violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] by knowingly circumventing or knowingly failing to implement a system of internal accounting controls at Life Partners, or by knowingly falsifying Life Partners' books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act.

176.    By engaging in the foregoing misconduct, Pardo, Peden, and Martin violated Exchange Act Rule 13b2-1 [17 C.F.R. §§ 240.13b2-1] by, directly or indirectly, falsifying or

causing to be falsified, the books, records or accounts of Life Partners subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

**SIXTH CLAIM FOR RELIEF**
**Misrepresentations and Misconduct in Connection**
**with the Preparation of Required Reports**
**(Exchange Act Rules 13b2-2(a) and 13b2-2(b))**
**[17 C.F.R. §§ 240.13b2-2(a) and 240.13b2-2(b)]**
**[against Defendants Pardo, Peden and/or Martin]**

177.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

178.    By engaging in the foregoing misconduct during the period January 2007 through November 2011, Pardo, Peden, and Martin violated Exchange Act Rule 13b2-2(a) [17 C.F.R. §§ 240.13b2-2a] by, directly or indirectly, making, or causing to be made, materially false or misleading statements, or omitting to state, or causing another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit, review or examination of the financial statements of Life Partners required to be made pursuant to Commission rules, or (ii) the preparation or filing of documents or reports required to be filed with the Commission.

179.    By engaging in the foregoing misconduct, in June 2011, Pardo violated Exchange Act Rule 13b2-2(b) [17 C.F.R. §§ 240.13b2-2(b)] by directly or indirectly taking action, or directing another to take action, to coerce, manipulate, mislead, or fraudulently influence an independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of Life Partners required to be filed with the Commission while he knew or should have known that such action(s), if successful, could result in rendering Life Partners' financial statements materially misleading.

### SEVENTH CLAIM FOR RELIEF
### Violations of Certifications Rules of the Exchange Act
### (Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14(a)])
### [against Defendants Pardo and Martin]

180.    The Commission realleges and incorporates by reference Paragraphs 1 through 145.

181.    On the following dates, acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Pardo and Martin certified Forms 10-K, 10-KSB, 10-Q, and 10-QSB on behalf of Life Partners: May 16, 2008;  July 9, 2008; October 10, 2008; January 9, 2009; May 29, 2009; July 10, 2009; October 9, 2009; January 11, 2010; May 12, 2010; July 9, 2010; October 8, 2010;  and January, 10, 2011.

182.    Further, on January 16, 2007; May 29, 2007; July 16, 2007; October 15, 2007; and January 14, 2008; acting under Section 302 of the Sarbanes-Oxley Act of 2002 and Exchange Act Rule 13a-14, Pardo certified Forms 10-K, 10-KSB, 10-Q, and 10-QSB on behalf of Life Partners.

183.    Specifically, Pardo and Martin certified that they had reviewed these reports and that, based on their respective knowledge, the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and, based on their knowledge, the financial statements and other financial information included in the reports, fairly presented in all material respects the financial condition, results of operation and cash flows of Life Partners of, and for, the periods presented on the reports.

184.    At the time Pardo and Martin issued these certifications they knew or were severely reckless in not knowing that the reports they certified contained untrue statements of

material facts and/or omitted to state material facts necessary to make the statements made therein, in light of the circumstances under which they were made, not misleading.

185.    By reason of the foregoing, Pardo and Martin violated and unless enjoined will continue to violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14(a)] promulgate under Section 302 of the Sarbanes-Oxley Act of 2002.

## REQUEST FOR RELIEF

For these reasons, the Commission respectfully requests that the Court enter a final judgment:

a)  permanently enjoining Life Partners from violating Section 17(a) of the Securities Act and Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

b)  permanently enjoin Pardo from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

c)  permanently enjoin Peden from violating Section 17(a) of the Securities Act and Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

d)  permanently enjoin Martin from violating Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder, and from aiding and abetting Life Partners' violations Sections 10(b), 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, and 13a-13 thereunder;

e)   ordering Defendants to disgorge all ill-gotten gains, with prejudgment interest;

f)   ordering Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) and 21A of the Exchange Act  [15 U.S.C. §§ 78u(d)(3) and 78uA];

g)   prohibiting each Defendant, under Section 20(e) of the Securities Act [15 U.S.C. § 77t(d)(4)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)]; and

h)   in a form consistent with Fed. R. Civ. P. 65(d), ordering Pardo and Martin to reimburse Life Partners for bonuses and profits they received from Life Partners stock sales, pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243].

i)   granting such other relief as the Court may deem just and appropriate.

Dated this 3rd day of January 2012        Respectfully submitted,

_____

Jason C. Rodgers
Texas Bar No. 24005540
Toby M. Galloway
Texas Bar No. 00790733
Michael D. King
Texas Bar No. 24032634
Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
801 Cherry Street, 19th Floor
Fort Worth, TX 76102
Phone: (817) 978-3821
Fax: (817) 978-2700

# EXHIBIT H

000195



**Ernst & Young LLP**
201 Main Street
Suite 1100
Fort Worth, Texas 76102-3161

Tel: 817.348.6003
Fax: 817.348.6024
www.ey.com

Audit Committee of the Board of Directors
Life Partners Holdings, Inc.



**ATTORNEYS EYES ONLY**



Page 2



A member firm of Ernst & Young Global Limited

ATTORNEYS EYES ONLY

000197 PI-Tur 002841





A member firm of Ernst & Young Global Limited

ATTORNEYS EYES ONLY

SBI-Tur 002842

Page 4

ERNST & YOUNG



A member firm of Ernst & Young Global Limited

ATTORNEYS EYES ONLY

000195 LEI-Tur 002843





A member firm of Ernst & Young Global Limited

ATTORNEYS EYES ONLY

LPI-Tur 002844

# EXHIBIT I

000201

**EDGAR** Online

# LIFE PARTNERS HOLDINGS INC

## FORM 8-K
### (Current report filing)

## Filed 07/05/11 for the Period Ending 07/01/11

| | |
|---|---|
| Address | 204 WOODHEW |
| | WACO, TX 76710 |
| Telephone | 8003685569 |
| CIK | 0000049534 |
| Symbol | LPHI |
| SIC Code | 6199 - Finance Services |
| Industry | Insurance (Miscellaneous) |
| Sector | Financial |
| Fiscal Year | 02/28 |



Powered By **EDGAR** Online

http://www.edgar-online.com

© Copyright 2011, EDGAR Online, Inc. All Rights Reserved.
Distribution and use of this document restricted under EDGAR Online, Inc. Terms of Use.

000202

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

## FORM 8-K

**CURRENT REPORT PURSUANT**
**TO SECTION 13 OR 15(D) OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

Date of report (date of earliest event reported):  July 1, 2011

# LIFE PARTNERS HOLDINGS, INC.

(Exact Name of Registrant as Specified in Its Charter)

Texas
(State of incorporation)

| | |
|---|---|
| 0-7900 | 74-2962475 |
| (Commission File Number) | (I.R.S. Employer ID no.) |

| | |
|---|---|
| 204 Woodhew | 76712 |
| Waco, Texas | (Zip Code) |
| (Address of Principal Executive Offices) | |

Issuer's telephone number, including area code:  254-751-7797

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions ( *see* General Instruction A.2. below):

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 4.01.  Changes in Registrant's Certifying Accountant**

On July 1, 2011, the Audit Committee of the Board of Directors of Life Partners Holdings, Inc. (" *we* " or " *Life Partners* ") approved Whitley Penn LLP (" *Whitley Penn* ") as our independent registered public accounting firm for the fiscal year ended February 28, 2011.  Whitley Penn will also re-audit our consolidated financial statements for fiscal year ended February 28, 2010.  Our prior auditors, Ernst & Young, withdrew its opinion for the fiscal year 2010 statements following a disagreement.

We did not engage Whitley Penn in any prior consultations during our two most recent fiscal years, or the subsequent period through the date of the filing of this Form 8-K regarding either:  (i) the application of accounting principles to a specified transaction, either completed or proposed, or the type of audit opinion that might be rendered on our consolidated financial statements, and neither a written report was provided to us nor oral advice was provided that Whitley Penn concluded was an important factor considered by us in reaching a decision as to the accounting, auditing, or financial reporting issue; or (ii) any matter that was the subject of either a disagreement (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K) or a reportable event (as defined in Item 304(a)(1)(v) of Regulation S-K).

**Item 9.01.  Financial Statements and Exhibits**

(d) Exhibits.

| **Exhibit Number** | **Description** |
|---|---|
| 99.1 | Press release dated July 5, 2011. |

2

**SIGNATURES**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

July 5, 2011.

Life Partners Holdings, Inc.

By: /s/ David M. Martin

_____
David M. Martin
Principal Financial Officer

3

000205

**EXHIBIT INDEX**

| Number | Description | Page |
|--------|-------------|------|
| 99.1 | Press release dated July 5, 2011 | 5 |

4

Exhibit 99.1

## LIFE PARTNERS ENGAGES WHITLEY PENN LLP AS ITS AUDITOR

**WACO, TX – July 5, 2011 – Life Partners Holdings, Inc. (NASDAQ GS: LPHI),** a leader in the life settlements industry, announced that the Audit Committee of its Board of Directors has engaged Whitley Penn LLP as the Company's new independent registered public accounting firm.  Whitley Penn is engaged to audit the Company's consolidated financial statements for fiscal year ended February 28, 2011.  Whitley Penn will also re-audit the consolidated financial statements for fiscal year ended February 28, 2010.  The company's prior auditors, Ernst & Young, withdrew its opinion for the fiscal year 2010 statements following a disagreement with the Company.

The Company anticipates that the retention of Whitley Penn and the audits of its statements will allow it to complete its annual report and resume its filings with the Securities and Exchange Commission.

**Life Partners** is the world's oldest and one of the most active companies in the United States engaged in the secondary market for life insurance, commonly called "life settlements".  Since its incorporation in 1991, Life Partners has completed over 132,000 transactions for its worldwide client base of approximately 28,000 high net worth individuals and institutions in connection with the purchase of over 6,400 policies totaling over $2.9 billion in face value.

Safe Harbor - This press release contains certain forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995.  Prospective investors are cautioned that any such forward-looking statements are not guarantees of future performance and involve risks and uncertainties, and that actual results may differ materially from those projected in the forward-looking statements because of various factors.  The statements in this news release that are not historical statements, including statements regarding the expectation of timely report filings are forward-looking statements within the meaning of the federal securities laws.  These statements are subject to numerous risks and uncertainties, many of which are beyond our control, that could cause actual results to differ materially from such statements.  For information concerning these risks and uncertainties, see our most recent Form 10-K.  We disclaim any intention or obligation to update or revise any forward-looking statements, whether because of new information, future events or otherwise, except as may be required by law.

LPHI-G

************

FOR MORE INFORMATION, CONTACT:
Shareholder Relations (254) 751-7797
or info@lifepartnersinc.com

Visit our website at:  www.lphi.com

5

# EXHIBIT J

000208



**REDACTED**

# EXHIBIT K

COMPLETED
XA 11/28/07



| Physical Address: | 204 Woodhew Dr. | Waco, Texas  76712 |
| Mailing Address: | P.O. Box 20034 | Waco, Texas  76702 |
| Telephone: | 800-368-5569 | Fax: 254-751-1025 |



SENT TO LPI
BY:
DATE 11/29/07

# REQUEST FOR ADDRESS & PERSONAL INFORMATION CHANGE

Received
NOV 1 5 2007

### Status:  PURCHASER

| NAME: | Robert C. Yoskowitz L13484   *IRA*   Sterling Trust Co. |

| NEW ADDRESS: | ██████████ |

| NEW CITY, STATE & ZIP: | ███████ CA █████ |

| NEW PHONE: | ████████ |

| NEW FAX: | |

| NEW E-MAIL: | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**FOR LPI USE ONLY**

DATE PRINTED:  November 13, 2007          ENTERED BY:

TO STERLING TRUST:          PLEASE SEND BACK TO LPI WHEN CHANGES
                           ARE COMPLETED.

**FOR STERLING TRUST CO. USE ONLY**

DATE ENTERED: _____     BY: _____

LPI/Tur 000334

000211

# EXHIBIT L

000212



**Madisonville, Louisiana**

206 Covington Street
Madisonville, LA 70447
Toll Free: (866) 467-1400
Phone: (504) 455-1400
Fax: (504) 455-1498

**New York, New York**

500 5th Avenue, Suite 1810
New York, NY 10110
Phone: (212) 696-3730
Fax: (504) 455-1498

www.ksfcounsel.com

**Table of Contents**

The Firm ...................................................................................................................... 2

Antitrust and Competition Litigation ...................................................................... 2

   Current Cases ........................................................................................................ 2

Consumer Protection Litigation ............................................................................... 2

   Current Cases ........................................................................................................ 2

   Recent Recoveries ................................................................................................ 3

Corporate Governance and Derivative Suits ........................................................... 4

   Current Cases ........................................................................................................ 4

   Recent Recoveries ................................................................................................ 4

Securities Fraud Litigation ......................................................................................... 5

   Current Cases ........................................................................................................ 5

   Recent Recoveries ................................................................................................ 6

Attorneys ........................................................................................................................ 7

   Partners ................................................................................................................... 7

     *Lewis S. Kahn* ..................................................................................................... 7

     *Michael A. Swick* ............................................................................................... 7

     *Charles C. Foti, Jr.* ............................................................................................ 8

     *Kim E. Miller* ..................................................................................................... 9

     *Albert M. Myers* .............................................................................................. 11

     *Andrew J. Morganti* ....................................................................................... 12

   Of Counsel .............................................................................................................. 13

     *Neil Rothstein* ................................................................................................ 13

     *Geoffrey C. Rodriguez* ................................................................................... 14

   Associates ............................................................................................................... 14

     *Bruce W. Dona* .............................................................................................. 14

     *Craig J. Geraci* ............................................................................................... 15

     *Christopher W. Kaul* ..................................................................................... 15

     *J. Ryan Lopatka* ............................................................................................. 16

     *Melinda A. Nicholson* .................................................................................... 16

     *Cecilia E. Rutherford* ..................................................................................... 17

# The Firm

Kahn Swick & Foti, LLC ("KSF") ([www.ksfcounsel.com](www.ksfcounsel.com)) is a boutique law firm with offices in Louisiana and New York City. KSF focuses predominantly on class actions, in the areas of securities and consumer fraud, and on shareholder derivative and other complex litigation. Since its inception in 2000, KSF has recovered tens of millions of dollars for its clients.

The lawyers of KSF have extensive experience litigating complex securities cases. Among other cases the firm is involved in, KSF has been appointed to leadership roles in the following litigations:

# Antitrust and Competition Litigation

## Current Cases

**In re Transatlantic Air Passenger Surcharge Competition Act Litigation,** 09-cv-384306
   *Ontario Superior Court of Justice, Toronto, Justice Perell*

**In re Transpacific Air Passenger Surcharge Competition Act Litigation**, 09-cv-384304
   *Ontario Superior Court of Justice, Toronto, Justice Perell*

**In re Packaged Ice Competition Act Litigation,** 10-cv-14457
   *Ontario Superior Court of Justice, Windsor, Justice Leitch*

**In re Polyurethane Foam Competition Act Litigation,** 10-cv-15164
   *Ontario Superior Court of Justice, London, Justice Leitch*

# Consumer Protection Litigation

## Current Cases

**In re: Actimmune Marketing Litigation**, No. C 08-02376 MHP (N.D. Cal.), *member of Plaintiffs' Steering Committee*, putative nationwide class action on behalf of consumers and third-party payors who paid for the prescription drug Actimmune to treat idiopathic

pulmonary fibrosis, an incurable disease for which Actimmune was not approved by the FDA as a treatment.  The complaint alleges that Actimmune was improperly marketed as providing a survival benefit for people with idiopathic pulmonary fibrosis despite the lack of any scientific study confirming the claim.

***Sean Turnbow, et al. v. Life Partners Inc., et al.,*** No. 3:11-CV-1030-M (N.D. Tex.), *Interim Co-Lead Class Counsel.* Putative nationwide class action on behalf of consumers (and a Subclass of California residents) who purchased or otherwise acquired fractional interests in life settlements from Life Partners Inc. Life settlement transactions involve the sale of an existing life insurance policy to another party whereby the selling policyholder receives an immediate cash payment. The complaint alleges that Life Partners Inc. and other Defendants negligently disregarded that the life expectancy assessments provided to Class members were materially inaccurate, resulting in overpayments by Class members for their investments.

## Recent Recoveries

***In re: General Motors Corp. Speedometer Products Liability Litigation,*** MDL No. 1896, *Co-Lead Counsel.* These multi-state consumer fraud actions, consolidated in federal court in the Western District of Washington, alleged that certain makes and models of GM vehicles contain a defective component that caused premature speedometer failure. The settlement required GMC to repair certain of the vehicles and to extend warranties for a substantial period of time or mileage duration, at an estimated value to the Class in excess of **$300 million.**

***Rose Goudeau, et. al. v. The Administrators of the Tulane Educational Fund, et. al.***, No. 2004-04758, Sec. 13, Div. J (Civil District Court for the Parish of Orleans), *Class Co-Counsel*, certified nationwide class action on behalf of the near relatives of individuals who donated their bodies to the Tulane Willed Body Program.  The complaint alleges that the Tulane Willed Body Program sold the donated bodies and/or body parts that it did not need to third parties. A settlement of $8,300,000 was obtained.

# Corporate Governance and Derivative Suits

## Current Cases

**In re Bank of America Corp. Securities, Derivative, and Employment Retirement Income Security Act (ERISA) Litigation,** 09 Civ.580 (DC)
*Southern District of New York*
*Co-Lead Counsel in the Consolidated Derivative Action*

**In re Barnes & Noble Stockholder Derivative Litigation**, C.A. No. 4813-VCS
*Court of Chancery of the State of Delaware*
*Co-Lead Counsel*

**In re BP Shareholder Derivative Litigation**, Master File No. 4:10-cv-03447
*Southern District of Texas*
*Co-Lead Counsel*

**In re ITT Educational Services, Inc. Securities and Shareholder Derivative Litigation,** 10-cv-8323
*Southern District of New York*
*Co-Lead Counsel*

**In re Moody's Corporation Shareholder Derivative Litigation,** No. 1:08-CV-9323
*Southern District of New York*
*Lead Counsel*

**In re Morgan Stanley & Co., Inc. Auction Rate Secs. Deriv. Litig.,** 1:08-cv-07587-AKH
*Southern District of New York*
*Lead Counsel*

**Robert Michael Shenk, Derivatively on Behalf of Sirius XM Radio, Inc., v. Melvin Alan Karmazin, et al.,** No. 01:11-cv-02943-JSR
*Southern District of New York*

## Recent Recoveries

**In re ArthroCare Corp. Sec. Litigation,** No. 08-cv-574-SS (W.D. Tex.), *Co-Lead Counsel*, federal derivative action filed on behalf of ArthroCare Corp. against certain officers and directors, resulting in a cash settlement of $8 million on behalf of the Company, along with important corporate governance changes.

**In re Proquest Company Shareholder Deriv. Litig.,** 2:06-cv-11845-AC-MKM (E.D. Mich.), *Co-Lead Counsel*, federal derivative action filed on behalf of ProQuest Company (now Voyager) against certain officers and directors, resulting in a settlement with important corporate governance changes.

# Securities Fraud Litigation

## Current Cases

*In re Allot Communications Ltd. Securities Litigation,* 1:07-cv-03455-RJH
*Southern District of New York*
*Co-Lead Counsel*

*Arfa v. Mecox Lane Limited,* 10-cv-9053-RWS
*Southern District of New York*
*Co-Lead Counsel*

*Bang v. Acura Pharmaceuticals, Inc.,* 10 c 5757
*Northern District of Illinois*
*Lead Counsel*

*In re China Sunergy Securities Litigation*, 1:07-civ-7895-DAB
*Southern District of New York*
*Lead Counsel*

*Elgaouni v. Meta Financial Group, Inc.,* 10-4108-MWB
*Northern District of Iowa*
*Lead Counsel*

*Gooden v. Smart Online et al.,* 1:07-cv-785-WLO
*Middle District of North Carolina*
*Co-Lead Counsel*

*In re HomeBanc Corporation Securities Litigation,* 1:08-cv-1461-TCB
*Northern District of Georgia*
*Co-Lead Counsel*

*In re MELA Sciences, Inc. Securities Litigation*, No. 10 Civ 8774(JFM)
*Southern District of New York*
*Co-Lead Counsel*

*Miyahira v. Vitacost.com, Inc.,* No. 1-80644-CIV-RYSKAMP/VITUNAC
*Southern District of Florida*
*Co-Lead Counsel*

*In re Nvidia Corporation Securities Litigation,* 08-CV-4260-JW
*Northern District of California*
*Co-Lead Counsel*

*Shah Rahman v. Kid Brands, Inc. et al.,* 11-cv-01624 (JLL) (CCC)
*District of New Jersey*
*Lead Counsel*

*In re Superior Offshore International, Inc. Securities Litigation,* 4:08-cv-00687-NFA
*Southern District of Texas*
*Lead Counsel*

## Recent Recoveries

*In re Virgin Mobile USA IPO Litigation,* 2:07-cv-05619-SDW-MCA (D.N.J.), *Co-Lead Counsel*, federal securities IPO-related class action against a company providing wireless communication services, certain officers and directors, certain controlling shareholder entities, and Virgin's underwriters, resulting in a cash settlement of **$19.5 million** for investors.

*In re BigBand Networks, Inc Securities Litigation,* 3:07-CV-05101-SBA (C.D. Cal.), *Co-Lead Counsel,* federal securities class action brought against a computer hardware corporation, certain officers and directors of the Company, and the Company's Underwriters, resulting in a cash settlement of **$11 million** for investors.

*In re U.S. Auto Parts Networks, Inc. Securities Litigation,* 2:07-cv-02030-GW-JC (C.D. Cal.), *Lead Counsel*, federal securities IPO-related class action against an online automotive supply company, certain members of its board of directors, and its underwriters, resulting in a cash settlement of **$10 million** for investors.

*In re ShoreTel, Inc. Securities Litigation*, 3:08-cv-00271-CRB (N.D. Cal.), *Lead Counsel,* federal securities IPO-related class action brought against an Internet protocol telecommunications company, certain of its officers and directors, and its underwriters, resulting in a cash settlement of **$3 million** for investors.

*In re Xethanol Corporation Securities Litigation,* 1:06-cv-10234-HB (S.D.N.Y.), *Lead Counsel*, federal securities fraud class action against an ethanol production company and certain of its officers and directors, resulting in a cash settlement of **$2.8 million** for investors.

*Mongeli v. Terayon Comm. Systems Inc. et al.,* 4:06-cv-03936-CW (N.D. Cal.), *Co-Lead Counsel*, federal securities fraud class action brought against a communications systems corporation, the Company's outside auditor, and certain officers and directors, resulting in a cash settlement of **$2.73 million** for investors.

*In re Opteum, Inc., Securities Litigation,* 2:07-cv-14278-DLG (S.D. Fla.), *Co-Lead Counsel,* federal securities fraud class action brought against a Real Estate Investment Trust and certain of its officers and directors, resulting in a cash settlement of **$2.35 million** for investors.

# Attorneys

## Partners

### Lewis S. Kahn

Lewis Kahn is the founding partner of KSF and serves as the firm's managing partner. A substantial portion of Mr. Kahn's practice is devoted to representing shareholders in connection with losses suffered as a result of securities fraud, and in shareholder derivative litigation.

Mr. Kahn manages the firm's portfolio monitoring program for public and private institutional investors. Additionally, Mr. Kahn oversees the firm's lead plaintiff motion practice in PSLRA class action litigation, and serves on the firm's settlement team, which has been responsible for settlements including *In re Virgin Mobile USA IPO Litigation,* 2:07-cv-05619-SDW-MCA ($19.5 million settlement), *In re BigBand Networks, Inc Securities Litigation,* 3:07-CV-05101-SBA ($11 million settlement), and *In re U.S. Auto Parts Networks, Inc. Securities Litigation,* 2:07-cv-02030-GW-JC ($10 million settlement).

In addition to securities lawsuits, Mr. Kahn has significant experience with consumer fraud and mass tort class actions. Mr. Kahn has been appointed to various leadership positions in federal class action litigation.

Mr. Kahn holds a Bachelor's degree from New York University and received a Juris Doctor from Tulane Law School in 1994. He has been a member of the Louisiana State Bar Association since 1995, and is a member of the Federal Bars for the Eastern, Middle and Western Districts of Louisiana.

### Michael A. Swick

Michael A. Swick is the co-founding partner of KSF and heads the firm's Securities Litigation Group. Mr. Swick has worked at some of the nation's leading securities class action law firms.

Over the past decade, Mr. Swick has played a significant role in investigating large corporate frauds and in initiating litigations against the nation's largest corporations. On behalf of shareholders, Mr. Swick has initiated actions in a number of federal courts, primarily seeking to recover for violation the Securities Act of 1933 and the Securities Exchange Act of 1934.

Recent actions have resulted in tens of millions of dollars of recoveries for investors. Over his career, Mr. Swick has also participated in the litigation of cases that have resulted in hundreds of millions of dollars in recoveries for aggrieved shareholders and institutional investors.

Mr. Swick also works closely with the firm's institutional investor clients and participates in the management and development of KSF's portfolio monitoring systems.

Mr. Swick received a Juris Doctor from Tulane Law School in 1994. Mr. Swick received a Masters of Political Philosophy from Columbia University in 1989 and a B.A. in Philosophy and Political Science from State University of New York at Albany in 1988. Mr. Swick was admitted to the State Bar of New York in 1997 and is admitted to practice before the United States District Court for the Southern District of New York.

## Charles C. Foti, Jr.

Charles C. Foti, Jr. served as the Attorney General for the state of Louisiana from 2004-2008, after serving for 30 years as one of the most innovative law enforcement officials in the United States as Orleans Parish Criminal Sheriff.  Throughout his career, General Foti has remained committed to public service.

As Attorney General for the state of Louisiana, General Foti's achievements include:

Recovering over $24 million for Louisiana consumers in consumer fraud matters, $8 million in anti-trust litigation, $9.1 million for state employees through Office of Group Benefits, over $2 million for auto complaints, over $33 million in Medicaid Fraud.

Investigating and apprehending numerous contractor fraud criminals in the wake of one of the worst natural disasters in United States history, Hurricane Katrina.

Doubling the number of arrests for crime against children through the Louisiana Internet Crimes Against Children Task Force.

In his tenure as Orleans Parish Criminal Sheriff, General Foti oversaw the enormous expansion of the parish jail, growing from 800 prisoners in 1973 to more than 7,000 currently. As the prison expanded, so did the need for education and rehabilitation skills for prisoners. As Sheriff, General Foti started the first reading and GED programs, work release programs, drug treatment programs and the nation's first boot camp at the local level, all to prepare prisoners for a future without crime. Administratively, General Foti

managed a multi-million dollar budget and a complex organization of more than 1,400 employees.

General Foti has for many years been an advocate for the elderly. As Sheriff, he and a small army of volunteers provided Thanksgiving meals for senior citizens in the New Orleans area. He started a back-to-work program for senior citizens that helps people over the age of 55 get back into the workforce.

General Foti received his Juris Doctor degree from Loyola University Law School in 1965, after serving his country in the United States Army from 1955 through 1958.

### Kim E. Miller

Kim E. Miller is a KSF partner who specializes in securities and consumer litigation.  Ms. Miller also supervises the New York City office of KSF.  Prior to joining the firm in 2006, Ms. Miller was a partner at one of the nation's leading plaintiff class action firms. Ms. Miller also spent two years as a securities litigator on the defense side.

Over the course of her career, Ms. Miller has represented many thousands of harmed investors and consumers in class actions filed throughout the country.  At a recent settlement hearing in which KSF served as Lead Counsel, *In re ShoreTel, Inc. Sec. Litig,*, 3:08-cv-00271-CRB (N.D. Cal.), the Federal District Court noted, with respect to Ms. Miller, "You're one of the best lawyers to appear in front of me in a long time..."

In addition to litigating many securities fraud and IPO-related securities cases, Ms. Miller has worked extensively on cases involving allegations of improper directed brokerage arrangements and excessive charges in mutual fund cases brought pursuant to the 1934 Securities Exchange Act and/or the Investment Company Act of 1940. She was also involved in the mutual funds late trading/market timing litigation.  Ms. Miller's class action trial experience includes participating in a four-month jury trial involving fraud-based claims the resulted in a jury verdict in favor of the Class.

In the course of her career, Ms. Miller has been involved in a variety of cases in which large settlements were reached, including:

**Settlement value of $127.5 million** *Spahn v. Edward D. Jones & Co., L.P.,* 04-cv-00086-HEA (E.D. Mo.)

**$110 Million Recovery.** *In re StarLink Corn Products Liability Litigation*, MDL No. 1403 (N.D. Ill.)

**$100 Million Recovery.** *In re American Express Financial Advisors*, Inc. Sec. Litig., 1:04-cv-01773-DAB (S.D.N.Y.)

Ms. Miller is KSF's lead litigator in its securities class action practice.  While at KSF, Ms. Miller has been involved in and supervised all aspects of the following successful litigations, among many others: *In re Virgin Mobile USA IPO Litig.,* 2:07-cv-05619-SDW-MCA ($19.5 million settlement), *In re BigBand Networks, Inc. Sec. Litig.,* 3:07-CV-05101-SBA ($11 million settlement), and *In re U.S. Auto Parts Networks, Inc. Sec. Litig.,* 2:07-cv-02030-GW-JC ($10 million settlement).

Ms. Miller is also currently the lead litigator in the firm's ongoing securities litigations, including the following cases in which the firm is Lead Counsel: *Bang v. Acura Pharmaceuticals, Inc.*, 10-cv-5757 (N.D. Ill);  *Elgaouni v. Meta Financial Group, Inc.,* 10-4108-MWB (N.D. Iowa); *In re China Sunergy Sec. Litig.*, 1:07-cv-7895-DAB (SDNY); *In re Superior Offshore International, Inc. Sec. Litig.,* 4:08-cv-00687-NFA (S.D. Tex.).  She is also currently the firm's lead litigator in the following cases in which KSF is Co-Lead Counsel: *In re Nvidia Corporation Sec. Litig.,* 08-CV-4260-JW (N.D. Cal.) ; *In re Allot Communications Ltd. Sec. Litig.,* 1:07-cv-03455-RJH (SDNY); *Gooden v. Smart Online et al.,* 1:07-cv-785-WLO (M.D.N.C.); *Miyahira v. Vitacost.com, Inc.,* No. 1-80644-CIV-RYSKAMP/VITUNAC (S.D. Fla.)

After graduating with honors from Stanford University in 1992 with a double major in English and Psychology, Ms. Miller earned her Juris Doctor degree from Cornell Law School, *cum laude*, in 1995. While at Cornell, Ms. Miller was the Co-Chair of the Women's Law Symposium, Bench Brief Editor of the Moot Court Board, and a member of the Board of Editors of the Cornell Journal of Law & Public Policy. During Law School, she also completed a summer judicial externship for the Honorable David V. Kenyon, Federal District Court Judge for the Central District of California.  Her *pro bono* work includes representing families of 9/11 victims at *In re September 11 Victim Compensation Fund* hearings. Ms. Miller has also served as a fundraiser for the New York Legal Aid Society. She is admitted to practice in the States of California and New York and before the United States District Courts for the Southern and Eastern Districts of New York and the Northern, Southern, and Central Districts of California. She is also admitted to the United States Court of Appeals for the Fifth Circuit.

**Albert M. Myers**

Albert M. Myers, a partner in the Louisiana office of KSF, prosecutes the rights of shareholders in class action litigation, shareholder derivative litigation, and corporate governance litigation.   In addition, he represents consumers in financial services class action litigation.

Mr. Myers is currently handling many KSF lead counsel engagements, including:

*In re Arthrocare Corp. Securities Litigation*, No. A-08-cv-00574-SS (W.D. Tex. 2009) (Co-Lead Counsel for Derivative Plaintiffs)

*In re Bank of America Corp. Securities, Derivative, and ERISA Litigation*, No. 09 MDL 2058 (DC) (S.D.N.Y. 2009) (Co-Lead Counsel for Derivative Plaintiffs)

*In re Barnes & Noble Stockholder Derivative Litigation*, C.A. No. 4813-VCS (Del. Ch. 2009) (Co-Lead Counsel)

*In re BP Shareholder Derivative Litigation*, Master File No. 4:10-cv-03447 (S.D. Tex.) (Co-Lead Counsel)

*In re Morgan Stanley & Co., Inc. Auction Rate Securities Derivative Litigation*, No. 08 Civ. 7587 (AKH) (S.D.N.Y. 2008) (Lead Counsel)

Since he began his practice in 1994, Mr. Myers has represented clients in securities and corporate disputes in numerous courts.   Successful results for clients include:

*Bailey v. Cumberland Casualty & Surety Co.*, No. 7:04-cv-02162-TMP, slip op. (N.D. Ala. June 3, 2005), aff'd, No. 05-13740-BB (11th Cir. May 11, 2006)

*In re Intelligroup Securities Litigation*, 468 F. Supp. 2d 670 (D.N.J. 2006)

*Kwiatkowski v. Bear Stearns Co.*, No. 96 Civ. 4798 (JGK), 1997 WL 538819 (Aug. 29, 1997)

*Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000)

*Quaker Oats Co. v. Borden, Inc.*, No. 95 Civ. 9300 (RO), 1996 WL 255386 (S.D.N.Y. May 15, 1996).

*In re Recoton Corp. Securities Litigation*, 358 F. Supp. 2d 1130 (M.D. Fla. 2005)

Mr. Myers received his B.A. from Yale University and his J.D., *magna cum laude*, from New York Law School, where he was the John Ben Snow Scholar (1991-1994), a Teaching Fellow, Chief Articles Editor of the *New York Law School Law Review*, and coached the school's moot court team in the Kaufman Securities Law Competition.

He served as a judicial intern to the Honorable Prudence Carter Beatty of the United States Bankruptcy Court for the Southern District of New York, and is the author of Anatomy of a Cross-Border Securities Investigation: A Case Study (Int'l Bar Ass'n Oct. 2004), Whom May the Corporation Serve?—The Constitutionality of Nonstockholder Constituency Statutes, 39 N.Y.L. Sch. L. Rev. 449 (1994), and other publications.

Mr. Myers is a member of the Georgia and New York bars, the Federal Bar Association, and the International Bar Association.

### Andrew J. Morganti

is the head of the Firm's Antitrust and Competition Law Litigation practice groups handling mandates in Canada and the United States. He has over twelve years of antitrust and competition law, commodity manipulation, and securities fraud litigation experience.

He is or was a member of the plaintiffs' counsel group in the following resolved or partially resolved actions:

*In re Polyurethane Foam Competition Litig.,* 10-cv-15164 (ON Superior Crt.);

*In re Confectionery Chocolate Antitrust Litig.,* 08-cv-347263 (ON Superior Crt.), partial settlement, only;

*In re Transpacific Passenger Fuel Surcharge Competition Litig.,* 09-cv-384304 (ON Superior Crt.), partial settlement, only;

*In re NovaGold Resources Securities Litig.,* CV-09-13833 (ON Superior Crt.), $28 million cross-border settlement;

*In re Initial Public Offering Securities Litig.,* 21 MC 92 (SAS) (S.D.N.Y.), $586 million settlement covering 309 new economy initial public offerings;

*Myers and Koehmsted v. Move, Inc., Merrill Lynch & Co., et al.,* No. BC 312115 (L.A. Sup. Crt.) and 03-cv-5574 (S.D.N.Y.), see also, Move, Inc., 2006 10-K;

*Purcell et al. v. Homestore.com, Inc., et al.,* No. LC 67919 (L.A. Sup. Crt. 2004), over $6 million settlement;

*Arsfinatica Ltd. v. Morgan Stanley,* NASD No. 04-07867 (Cal. arbitration), settlement value of approximately 50% of the recoverable losses;

*Bollinger Trust Ltd. v. Merrill Lynch Pierce Fenner & Smith,* NASD No. 03-08947 (N.Y. arbitration);

*In re USN Communications Securities Litig.,* 98-cv-7482 (N.D. Ill.);

and

*In re Cardizem CD Antitrust Litig.,* MDL No. 1278 (E.D. Mich.).

He is currently one of the vice chairs of the American Bar Association Class Action & Derivative Suit Committee and was the 2010-2011 Chair of the State Bar of Michigan Antitrust Section.  He has lectured on antitrust and shareholders rights' matters before various academic, governmental, and professional associations.

Mr. Morganti earned an undergraduate degree with honors from the University of Michigan, a Juris Doctor degree from Michigan State University, and a LL.M. in International Financial & Banking Laws from Boston University.  He is admitted to practice law in the State of Michigan (1998), the District of Columbia (2002), and Ontario, Canada (2010).

## Of Counsel

### Neil Rothstein

Neil Rothstein is of counsel to KSF.  Mr. Rothstein has spent more than twenty years involved in all aspects of class action litigation.  He is a graduate of Case Western Reserve University (B.A. 1986) and the Temple University School of Law (J.D. 1989).

During law school, Mr. Rothstein was a summer associate and a law clerk for two nationally known class action firms and later became an attorney at one of them. In 1997, he joined a small boutique law firm that worked on several important and widely-followed class action cases in the country.

Mr. Rothstein has extensive experience in all phases of securities, antitrust, consumer, and shareholder derivative litigation. He has always believed that the clients' needs come first.   In that light, he focuses on helping to lead Kahn Swick & Foti, LLC in client development and communications, client education and client participation in litigation in which they have been financially and otherwise injured.

### Geoffrey C. Rodriguez

Geoffrey Rodriguez, in KSF's Louisiana office, focuses on federal securities class action and derivative litigation.  He is actively involved in cases pending before various federal courts across the United States.

Mr. Rodriguez received a B.A. *magna cum laude* with majors in economics, history, political science, philosophy, and political economy from Tulane University (2005), where he was a Dunbar Fellow and received departmental honors in history and political science.  In 2008, he received his J.D. from Georgetown University Law, where he was a Dean's Scholar.  As a member of the Law Center's Moot Court team, he competed in the European Tax College Moot Court Competition in 2007, and served as a coach in the same competition in 2008.

Mr. Rodriguez is admitted to practice in Louisiana and is a member of the Louisiana State Bar Association.

## Associates

### Bruce W. Dona

Bruce Dona, an associate in KSF's New York office, focuses on federal securities class action litigation.  He is involved in cases pending before federal courts across the United States.

Mr. Dona received his J.D. from George Washington University Law School in 2009. During the summer of 2007, he studied international trade law and comparative mergers and acquisitions in Rio de Janeiro, Brazil.  He received his B.A. in 2004 with a double major in International Affairs and Foreign Languages (Spanish and French) from Lewis and Clark College.  He is fluent in Spanish, French and Portuguese.

Mr. Dona is admitted to practice in New York and is a member of the New York State Bar Association.

**Craig J. Geraci**

Craig Geraci, an associate in KSF's Louisiana office, focuses on federal securities litigation. He is actively involved in cases pending before various federal courts across the United States.

Mr. Geraci received his J.D. from Tulane University Law School in 2009 and received a B.S. with a major in finance from the University of New Orleans in 2005. Prior to joining KSF, Mr. Geraci litigated numerous matters in Mississippi state and federal courts. Mr. Geraci has also presented oral argument before the United States Court of Appeals for the Federal Circuit.

Mr. Geraci is admitted to practice in Louisiana, Mississippi and Alabama and is a member of the Louisiana, Mississippi and Alabama State Bar Associations. Mr. Geraci is admitted to practice before the United States Court of Appeals for the Fifth Circuit and the Federal Circuit and the United States District Courts for the Northern and Southern Districts of Mississippi.

**Christopher W. Kaul**

Christopher Kaul is an associate in the Louisiana office who focuses on federal securities class action and derivative litigation. He is actively involved in cases pending before various federal courts across the United States, including *In re Bank of America Corp. Securities, Derivative & ERISA Litigation*, 09 MD 2058 (DC) (S.D.N.Y. 2009).

Mr. Kaul received his J.D. *cum laude* from Loyola New Orleans College of Law (2010). During law school, Mr. Kaul worked for KSF as a law clerk and served as the print editor for the *Loyola Law and Technology Annual*. He received a B.A. with a major in finance from Wayne State University in Detroit, Michigan.

Mr. Kaul is admitted to practice in Louisiana and is a member of the Louisiana State Bar Association. Mr. Kaul is admitted to practice before the United States Court of Appeals for the Fifth Circuit and the United States District Courts for the Eastern, Middle, and Western Districts of Louisiana.

### J. Ryan Lopatka

J. Ryan Lopatka, an associate in KSF's Louisiana office, focuses on federal securities class action litigation.  He is involved in cases pending before federal courts across the United States.

Mr. Lopatka received his J.D. from Tulane University Law School in 2010.  During the summer of 2009, he studied international capital markets and securities law at Cambridge University and Queen Mary School of Law in London, England.  He received his B.A. with honors in history from Loyola University New Orleans in 2004.

Mr. Lopatka is admitted to practice in Louisiana and Illinois and is a member of the Louisiana and Illinois State Bar Associations and Chicago Bar Association.

**Publications:**

- Author, "*The Problem of Circumventing the Labor Management Reporting and Disclosure Act by Using the Ancillary Business Model*," Hot Topics in the Legal Profession - 2010, Quid Pro Law Books (2010).

- Contributing Researcher, NLRA Rights in the Nonunion Workplace, BNA Books (2010).

### Melinda A. Nicholson

Melinda A. Nicholson, an associate in KSF's Louisiana office, focuses on shareholder derivative and class action litigation.  She is actively involved in cases pending before various federal courts across the United States, including *In re Bank of America Corp. Securities, Derivative & ERISA Litigation*, 09 MD 2058 (DC) (S.D.N.Y. 2009).  Prior to joining the firm, Ms. Nicholson worked for defense firms in New York, handling complex commercial litigations and regulatory investigations involving a variety of legal issues, including fiduciary obligations, securities violations, contractual breaches, antitrust and insurance coverage.

Ms. Nicholson completed a joint B.A./J.D. program at Tulane University, receiving a B.A. in Political Science, with a concentration in American Politics and Policies and a minor in Economics, from Tulane in 2003 and a J.D. from Tulane in 2005.  While at Tulane Law School, Ms. Nicholson served as a Notes and Comments Managing Editor for the *Tulane Law Review*, which published her comment, *The Constitutional Right to Self-Representation: Proceeding Pro Se and the Requisite Scope of Inquiry When Waiving*

*Right to Counsel*, 79 TUL. L. REV. 755 (2005).  She has received numerous awards, including the Dean's Medal for attaining the highest grade point average during the third year, the George Dewey Nelson Memorial Award for attaining the highest grade point average in common law subjects throughout the three years of law study, and Order of the Coif.  She graduated from the law school *summa cum laude* and ranked second in her class.

Ms. Nicholson is admitted to practice in Louisiana and New York, and before the United States District Courts for the Eastern District of Louisiana, Western District of Louisiana, and Southern District of New York.

### Cecilia E. Rutherford

Cecilia E. Rutherford, an associate in KSF's Louisiana office, focuses on shareholder derivative litigation. She is actively involved in cases pending before federal courts across the United States.

Prior to joining KSF, Ms. Rutherford's legal work experience included representing major financial institutions in a wide variety of capital markets transactions, including representing trustees in closing numerous asset backed securitizations and collateralized debt obligations.  Ms. Rutherford also worked as a public defender in Orleans Parish Juvenile Court.

Ms. Rutherford received her J.D. from Boston University School of Law (2000). During law school, she served as the note editor for the *American Journal of Law & Medicine*. She attended St. Catherine's College, Oxford University and completed courses focusing on international and European Union law.  Ms. Rutherford received a B.A. in sociology/anthropology, with a concentration in political economy, from Carleton College in Northfield, Minnesota.

Ms. Rutherford is admitted to practice in Louisiana, New York and North Carolina.

**SUSMAN GODFREY L.L.P.**

www.susmangodfrey.com

| Suite 5100 | Suite 5100 | Suite 3800 | Suite 950 | 5th Floor |
|---|---|---|---|---|
| 1000 Louisiana | 901 Main street | 1201 third avenue | 1901Avenue of | 560 Lexington |
| Houston, Texas | Dallas, Texas | Seattle, Washington | the Stars | New York, New York |
| 77002-5096 | 75202-3775 | 98101-3000 | Los Angeles, Ca | 10022 |
| (713) 651 - 9366 | (214) 754 - 1900 | (206) 516 - 3880 | 90067-6029 | (212) 336-8330 |
| | | | (310) 789-3100 | |

# THE SUSMAN GODFREY DIFFERENCE

For more than thirty years, Susman Godfrey has focused its nationally recognized practice on just one thing: big - stakes commercial litigation. We are one of the nation's leading litigation boutique law firms with locations in Houston, Dallas, Los Angeles, Seattle, and New York. Each of the firm's 89 trial attorneys specialize in complex commercial litigation.

How successfully does Susman Godfrey represent its clients?

When *The American Lawyer* held the first-ever "Litigation Boutique of the Year" competition, the firm was named one of the two top litigation boutiques in the nation.

"These firms manage to combine cutting-edge technologies, palpable tastes for risk, and an old-fashioned sense of partnership," said *The American Lawyer*. "The rewards are obvious: Their clients are stellar, and so are their profits."

In other words, Susman Godfrey represents its clients *very* well.

**A record of winning**

Susman Godfrey's very first case, the *Corrugated Container* antitrust trial, led to one of the highest antitrust jury verdicts ever obtained. Since that extraordinary start, the firm has remained devoted to helping businesses and individuals achieve similarly extraordinary results. Recent high-profile victories (click on the links below to see the particular facts and circumstances of these representations):

- Representation of the plaintiffs in a number of successful private antitrust actions against Microsoft Corporation, including litigation or private negotiations on behalf of Gateway, Novell, Caldera, Be, Inc., Paltalk Holdings, and others.

- Representation of MicroUnity Systems in a variety of patent infringement litigation, which has led to confidential settlements with a variety of defendants, including Intel and Sony.

- Defeated claims for $550 million in damages brought by Alcoa against our client, Luminant and convinced the jury to award Luminant $10 million in counterclaim damages.

- Secured a $225 million jury award for Dillard's, Inc. against I2 Technologies for fraud and breach of warranty.

1

- Obtained a jury award of more than $178 million in a breach of fiduciary duty case brought on behalf of minority shareholders of an NL Industries, Inc. subsidiary.

- Representation of Sky Technologies in patent infringement cases against i2 Technologies, IBM, Ariba, Oracle, and SAP that each have led to confidential settlements.

- Representation of the bankruptcy estate of Enron Corp. against ten banks and investment banks for aiding and abetting breach of fiduciary duty and fraud. Settlements to date have brought more than one billion dollars in value to the Enron estate.

- Successfully concluded the pro bono representation of Texas Clean Air Cities Coalition which included Dallas, Houston, Fort Worth, Waco, El Paso, Plano, Arlington, Irving, and 28 other local governments across Texas. The cities were concerned about the environmental threats resulting from the large amounts of nitrogen oxides, sulfur dioxide, particulate matter, mercury, and carbon dioxide to be emitted from the proposed plants. The coalition of Texas cities challenged permit applications by TXU Corporation to build eight coal-fired power units across Texas. Following the announcement of the proposed buyout of TXU by two private equity firms and citing a new environmental direction for the company, TXU announced that it would withdraw applications for all eight of the coal units that the coalition opposed.

These are only a few of our recent cases. Our practice area inserts provide a more complete description of Susman Godfrey's successes in a number of areas of commercial litigation, including intellectual property, antitrust, accounting malpractice, energy and natural resources, securities litigation, and climate change litigation.

**The will to win**

At Susman Godfrey, we want to win because we are stand-up trial attorneys, not discovery litigators. We approach each case as if it is headed for trial. Everything that we do is designed to prepare our attorneys to persuade a jury. When you are represented by Susman Godfrey, the opposing party will know that you are willing to take the case all the way to a verdict if necessary; this fact alone can make a good settlement possible.

*The American Lawyer* award confirmed Susman Godfrey's longstanding reputation as one of the premier firms of trial lawyers in the United States. We are often brought in on the eve of trial to "rescue" troubled cases or to take the reins when the case requires trial lawyers with a proven record of courtroom success.

We also want to win because we share the risk with our clients. We prefer to work on a contingency-fee basis so that our time and efforts pay off only when we win. Our interests are aligned with our clients—we want to achieve the best-possible outcome at the lowest possible cost.

Finally, we want to win because each of our attorneys shares a commitment to your success. Each attorney at the firm – associate as well as partner – examines every proposed contingent fee case and has an equal vote on whether or not to accept it. The resulting profit or loss affects the compensation of every attorney at the firm. This model has been a tremendous success for both our attorneys and our clients. In recent years, we have achieved the highest profit-per-partner results in the nation. Our associates have enjoyed performance bonuses equal to their annual salaries. When you win, our attorneys win.

Timestamp: 2/14/2012 1:49 PM

**Unique perspective**

Susman Godfrey represents an equal number of plaintiffs and defendants. Ours is not a cookie-cutter practice turning out the same case from the same side of the bar time after time. We thrive on variety, flexibility, and creativity. Clients appreciate the insights that our broad experience brings. "I think that's how they keep their tools sharp," says one.

Many companies who have had to defend cases brought by Susman Godfrey on behalf of plaintiffs are so impressed with our work in the courtroom that they hire us themselves next time around – companies like El Paso Corporation, Georgia-Pacific Corporation, Mead Paper, and Nokia Corporation.

We know from experience what motivates both plaintiffs and defendants. This dual perspective informs not just our trial tactics, but also our approach to settlement negotiations and mediation presentations. We are successful in court because we understand our opponent's case as well as our own.

**A lean and mean structure**

At Susman Godfrey, our clients hire us to achieve the best possible result in the courtroom at the least possible cost. Because we learned to run our practice on a contingency-fee model where preparation of a case is at our expense, we have developed a very efficient approach to commercial litigation. We proved that big cases do not require big hours. And, because we staff and run all cases using the same model, clients who prefer to hire us by the hour also benefit from our approach.

There is no costly pyramid structure at Susman Godfrey. As a business, we are lean, mean and un-leveraged – with a one-to-one ratio between partners and associates. To counter the structural bloat of our opponents, who often have three associates for each partner, we rely on creativity and efficiency.

Susman Godfrey's experience has taught what is important at trial and what can be safely ignored. We limit document discovery and depositions to the essential. For most depositions and other case related events we send one attorney and one attorney alone to handle the matter. After three decades of trials, we know what we need – and what is just a waste of time and money.

**Unparalleled talent**

Susman Godfrey prides itself on a talent pool as deep as any firm in the country. Clerking for a judge in the federal court system is considered to be the best training for a young trial attorney, and 91% of our lawyers served in these highly sought-after clerkships after law school. Seven of our attorneys have clerked at the highest level – for Justices of the United States Supreme Court.

Our associates are not document-churning drones. Each associate at Susman Godfrey is expected to second-chair cases in the courtroom from the start. Because we are so confident in their abilities, we consider associates for partnership after seven years with the firm, unless they joined us following a federal judicial clerkship. In that case, we give credit for the clerkship, and the partnership track is generally six years.  We pay them top salaries and bonuses, make them privy to the firm's financials, and let them vote – on an equal standing with partners – on virtually all firm decisions.

Each trial attorney at Susman Godfrey is invested in our unique model and stands ready to handle your big-stakes commercial litigation.

Timestamp:  2/14/2012 1:49 PM

1445914v1/107965

000233

**No Matter What the Case**

Our firm is made up of the best and the brightest trial lawyers in the country. Quite simply, we can try any case, no matter what the subject matter. And our record proves it.

Patent law. Our lawyers are not "patent " lawyers . Yet Susman Godfrey is one of the nation's go-to firms for patent litigation. Indeed, as the amount in controversy soared in patent cases in the early 2000s, so has the number of patent cases tried and won by Susman Godfrey. Clients know that they need real trial lawyers to translate the patent talk into language that can be understood by a jury. And juries listen when Susman Godfrey lawyers talk. Our firm has won some of the largest jury verdicts in patent cases in the country.

Family law. Our lawyers are not "family " lawyers . Yet when the richest couples get in the nastiest divorce battles, they call the real trial lawyers for the ultimate show down. When the owner of the Dodgers risked losing his team to his wife in a bitter divorce battle, Frank McCourt called Susman Godfrey. When David Saperstein found himself in divorce proceedings with his wife in over their multi-million dollar estate, including their $125 million "Fleur de Lys" mansion, he hired Susman Godfrey.

Tax law. Our lawyers are not "tax" lawyers. Yet, when an individual had a $ 800 million tax dispute and needed a trial lawyer, he hired Terry Oxford of Susman Godfrey. Terry, with the assistance of tax counsel, tried the case for 5 weeks in federal court. The result: a decision that would return the taxpayer more than half the disputed amount.

Criminal law. Our lawyers are not " criminal " lawyers . Yet when evidence suggested a death row inmate was wrongly convicted, those trying to right the wrong called Susman Godfrey. When Barry Scheck and his Innocence Project wanted help reversing the wrongful conviction of George Rodriguez, they teamed up with Susman Godfrey. The conviction was reversed and Mr. Rodriguez freed, and Susman Godfrey continues the battle to obtain fair compensation for the 17 years he spent behind bars .

It does not matter what area of law your case is. If we haven't already been involved in path-breaking litigation there, we will master it. And you will have the best possible trial team on your side.

Disclaimer: The information contained herein is revised frequently and is only accurate and current as of the date printed below.  Please call us for the most recent edition.

Timestamp:  2/14/2012 1:49 PM

000234

# EXHIBIT M

000235

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| THE ARCHDIOCESE OF MILWAUKEE | § | |
| SUPPORTING FUND, INC., *On Behalf of* | § | |
| *Itself and All Others Similarly Situated,* | § | |
| | § | CIVIL ACTION NO. 3:02-CV-1152-M |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| HALLIBURTON COMPANY, et al., | § | |
| | § | |
| Defendants. | | |

## ORDER

Before the Court are Plaintiff's Motion to Certify Class [Docket Entry #341] and

Defendants' Alternative Motion to Supplement the Record [part of Docket Entry #468].  The

Motion to Certify Class is **GRANTED** and the Alternative Motion to Supplement the Record is

**DENIED** as untimely.  Defendants had a sufficient opportunity to develop the record to

supplement their position against class certification when the Court conducted a class

certification hearing on March 28, 2008.

This case was filed in 2002 as a purported class action.  The Court received briefs,

evidence, and heard argument on Plaintiff's Motion to Certify Class.  Following the law in the

Fifth Circuit pertaining to loss causation, this Court denied class certification [Docket Entry

#444], stating that but for Fifth Circuit law on loss causation, it would certify the class.  The

Fifth Circuit affirmed on that same basis, but on June 6, 2011, the Supreme Court reversed the

decision of the Fifth Circuit, holding that Plaintiff need not prove loss causation as a prerequisite

to class certification. The Fifth Circuit remanded the case to this Court for further proceedings.

The Court has reviewed the additional briefing from the parties on the issue of class certification [Docket Entries #468 and #469] and finds that all elements for class certification under Rule 23 have been met.

## Analysis

For the reasons below and those stated by the Court in its Memorandum Opinion and Order dated November 4, 2008 [Docket Entry #444] and on the record at the March 28, 2008 hearing, the Court finds that Plaintiff satisfied the class certification requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3). The proposed class is sufficiently numerous, the members of the class have common claims, The Archdiocese of Milwaukee Supporting Fund, Inc. (AMSF) is a typical and adequate class representative, and common questions of law or fact predominate, making a class action the superior method of adjudicating the claims of the class members.

1) Numerosity

Rule 23(a)(1) requires that the class be so numerous that the joinder of all members is impracticable. Plaintiff need not demonstrate the precise number in the class to satisfy this requirement. See *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1038 (5th Cir. 1981). Lead Plaintiff estimates that there are tens, if not hundreds, of thousands of class members. Defendants do not challenge certification on this ground.  The Court finds that the size of the proposed class is sufficiently large to satisfy Rule 23(a)(1).

2) Commonality

Rule 23(a)(2) requires that there be questions of law or fact common to the class. "The threshold of 'commonality' is not high." *Bertulli v. Ind. Ass'n of Cont'l Pilots*, 242 F.3d 290, 296-97 (5th Cir. 2001). It "does not require complete identity of legal claims among the class

members"—only that they have "at least one issue whose resolution will affect all or a significant number of the putative class members." *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982). This requirement, too, is satisfied, as at least the following issues constitute common questions of law or fact: whether the Defendants violated federal securities laws; whether the Defendants omitted or misrepresented material facts; whether Defendants acted with knowledge or with reckless disregard for the truth in omitting or misrepresenting facts; and whether the market price of the Company's common stock during the proposed class period was artificially inflated due to the Defendants' omissions and/or misrepresentations. Defendants do not dispute the satisfaction of this element, and the Court finds it to be established here.

    3) Typicality

Rule 23(a)(3) requires that the claims of the representative party be typical of the claims of the class, but the claims of the representative party need not be identical to those of the class. See *Philips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1024 (5th Cir. 1981). Typicality is satisfied when the representative plaintiff's claims arise out of the same event or course of conduct as the other class members, and is based on the same legal theory. See *Durrett v. John Deere Co.*, 150 F.R.D. 555, 558 (N.D. Tex. 1993). The test for typicality is not extremely rigorous. See *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993).

The Court finds that the claims of the Lead Plaintiff, AMSF, are typical of those of the class members. AMSF, like all class members, allegedly suffered economic losses from its transactions in Halliburton stock. As stated at the March 2008 hearing, the Court finds that AMSF's use of money managers does not disqualify its claims from being typical of those of

other class members, many of whom no doubt used advisors, brokers, and/or research in making their investments.

    4)  Adequacy

Rule 23(a)(4) requires a finding that the representative party will fairly and adequately protect the interests of the class. Under *Berger v. Compaq Computer Corporation*, 257 F.3d 475, 479 (5th Cir. 2001), *denying rehearing and rehearing en banc*, 279 F.3d 313 (5th Cir. 2002), to establish adequacy, a plaintiff must show that plaintiff's counsel has the zeal and competence to represent the class, and that the proposed class representative is willing and able to take an active role in controlling the litigation and protecting the absent class members. The adequacy inquiry also serves to uncover conflicts of interest between the named plaintiff and the class the plaintiff seeks to represent. *Id.* at 480.

Plaintiff's counsel has extensive experience in securities class action litigation that well-qualifies them to represent the class. The Court finds that the Lead Plaintiff has demonstrated sufficient interest in prosecuting this case and is willing to take an active role in controlling the litigation and protecting absent class members, as demonstrated in part by its vigor in challenging a settlement advocated by former Lead Plaintiffs and rejected by the Court, replacing counsel charged with, and later convicted of, crimes, and appealing the loss causation issue to the Fifth Circuit and Supreme Court. The Court knows of no relevant conflicts of interest between the Lead Plaintiff and other class members. The Court is not persuaded by Defendants' argument that AMSF is not an adequate representative merely because it designated an officer other than its CEO as its representative for the pursuit of this litigation.

5)  Common Questions of Law or Fact Predominate

Rule 23(b)(3) requires that common questions of law or fact predominate and that a class

action be superior to other methods of adjudication.  Here, the issues of law or fact common to

the members of the putative class predominate over questions affecting individual class

members. The fraud-on-the-market theory applies to this case, so proof of each individual class

member's reliance is not required. See *Basic, Inc. v. Levinson*, 485 U.S. 224, 248 (1988); see also

*Krogman v. Sterritt*, 202 F.R.D. 467, 473 (N.D. Tex. 2001). Although the extent of damages

suffered by each class member will vary, individual damages can be calculated. The Court

concludes that common questions of law or fact predominate over that individual issue, and a

class action is the superior method for adjudicating the issues alleged here. A class approach will

promote judicial economy and avoid the risk of inconsistent judgments, which would exist if

multiple individual suits were to be litigated. This method of adjudication is superior to

individual claims.

## Conclusion

Therefore, this case will proceed as a class action for all persons and entities who

purchased or otherwise acquired Halliburton Company's common stock between June 3, 1999,

through and including December 7, 2001, excluding the individual Defendants and their families,

and officers and directors of Halliburton and their families.

The Court appoints The Archdiocese of Milwaukee Supporting Fund, Inc. as Class

Representative and David Boies of Boies, Schiller & Flexner LLP as Class Counsel.

SO ORDERED.

January 27, 2012.

BARBARA M. G. LYNN
UNITED STATES DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

000240

# EXHIBIT N

000241

**From:**      Mark Embry
**Sent:**      Wednesday, October 12, 2005 8:59 AM
**To:**
**Subject:**
**Attach:**

ATTORNEYS EYES ONLY                                                        **LPI-Tur 000660**

# EXHIBIT O

000243



**ATTORNEYS EYES ONLY**                                                                                 **LPI-Tur 005132**



**ATTORNEYS EYES ONLY**                                                                                                  **LPI-Tur 005133**



**ATTORNEYS EYES ONLY**

**LPI-Tur 005134**



**ATTORNEYS EYES ONLY**                                                                                           **LPI-Tur 005135**

000247

**ATTORNEYS EYES ONLY**

**LPI-Tur 005136**



**ATTORNEYS EYES ONLY**

**LPI-Tur 005137**

000249



**ATTORNEYS EYES ONLY**



**ATTORNEYS EYES ONLY**

**LPI-Tur 005139**



**ATTORNEYS EYES ONLY**

**LPI-Tur 005140**



**ATTORNEYS EYES ONLY**

**LPI-Tur 005141**

000253



**ATTORNEYS EYES ONLY**

**LPI-Tur 005142**



**ATTORNEYS EYES ONLY** **LPI-Tur 005143**