IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SEAN TURNBOW, WILLIAM and MARY RICE, ROBERT YOSKOWITZ, FREDERICK VIEIRA, and ANTHONY TAYLOR, on behalf of themselves and all others similarly situated, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 3:11-CV-01030-M |
| LIFE PARTNERS, INC., LIFE PARTNERS HOLDINGS, INC., BRIAN PARDO, and R. SCOTT PEDEN, | § § § § | |
| Defendants. | § § | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Elizabeth L. Yingling
State Bar No. 16935975
E-Mail: elizabeth.yingling@bakermckenzie.com
Laura J. O'Rourke
State Bar No. 24037219
E-Mail: laura.orourke@bakermckenzie.com
Will R. Daugherty
State Bar No. 24053170
E-Mail: will.daugherty@bakermckenzie.com
BAKER & McKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201
Tel.: (214) 978-3000
Fax: (214) 978-3099

**ATTORNEYS FOR ALL DEFENDANTS**

## <u>TABLE OF CONTENTS</u>

I.      SUMMARY OF OPPOSITION .........................................................................................1

II.     ARGUMENT AND AUTHORITIES..............................................................................2

        A.      Plaintiffs Cannot Establish Commonality under Rule 23(a)(2)..............................2

        B.      Plaintiffs Cannot Establish Typicality or Adequacy Under Rule 23(a)(3-4)...........4

                1.      Turnbow is Not Typical or Adequate ........................................................8

                2.      William and Mary Rice are Not Typical or Adequate................................9

                3.      Yoskowitz is Not Typical or Adequate....................................................11

                4.      Vieira is Not Typical or Adequate ...........................................................14

                5.      Plaintiffs' Counsel is Not Adequate to Represent the Putative Class........16

        C.      Individual Issues Predominate with Respect to both Liability and Damages........18

                1.      Individualized Issues Predominate Regarding the Accuracy of the LEs...19

                2.      Individualized Issues Predominate the Calculation of Damages...............21

        D.      Plaintiffs have Failed to Establish the Superiority of a Class Action...................24

III.    CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altier v. Worley Catastrophe Response, LLC*,
  No. 11242, 2011 U.S. Dist. LEXIS 85696 (E.D. La. Jul. 26, 2011) ................................... 6, 17

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
  3:02-cv-1152-M, 2012 U.S. Dist. LEXIS 24823 (N.D. Tex. Jan. 27, 2012) .......................... 19

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ................................................................................... 20, 21, 23

*Berthelot v. Am. Postal Workers Union, Local 185*,
  No. H-10-0018, 2010 U.S. Dist. LEXIS 118788 (S.D. Tex. Nov. 8, 2010) ..................... 4, 6, 8

*Bridgewater v. Double Diamond-Del., Inc.*,
  No. 3:09-CV-1758-B ECF, 2011 U.S. Dist. LEXIS 47248 (N.D. Tex. Apr. 29, 2011) .......... 21

*Bruhl v. Price Waterhosue Coopers Int.'l*,
  257 F.R.D. 684 (S.D. Fla. 2008) ........................................................................................ 19

*Castano v. Am. Tobacco Co.*,
  84 F.3d 734 (5th Cir. 1996) ......................................................................................... 24, 25

*Cimino v. Raymark Indus., Inc.*,
  151 F.3d 297 (5th Cir. 1998) ............................................................................................. 23

*Erica J. Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ...................................................................................................... 19

*Gene and Gene LLC v. BioPay LLC*,
  541 F.3d 318 (5th Cir. 2008) ....................................................................................... 18, 19

*Hall v. LHACO, Inc.*,
  140 F.3d 1190 (8th Cir. 1998) ........................................................................................... 12

*In re Enron Corp. Sec. Litig.*,
  Civ. No. H-01-3913, 2006 U.S. Dist. LEXIS 43145 (S.D. Tex. June 7, 2006) ..................... 19

*In re Great S. Life Ins. Co. Sales Practices Litig.*,
  192 F.R.D. 212 (N.D. Tex. 2000) ....................................................................................... 19

*In re Heartland Payment Sys., Inc.*,
  MDL No. 09-2046, 2012 U.S. Dist. LEXIS 37326 (S.D. Tex. Mar. 20, 2012) ...................... 5

*In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.*,
    588 F. Supp. 2d 1111 (C.D. Cal. 2008) ................................................................12

*In re Nat'l W. Life Ins. Deferred Annuities Litig.*,
    467 F. Supp. 2d 1071 (S.D. Cal. 2006)................................................................12

*Kottaras v. Whole Foods Mkt., Inc.*,
    No. 08-1832 (JEB), 2012 U.S. Dist. LEXIS 10885 (D.D.C. Jan. 30, 2012) .........................22

*M.D. v. Perry*,
    No. 11-40789, 2012 U.S. App. LEXIS 6061 (5th Cir. Mar. 23, 2012) ...........................2, 3, 4

*Madison v. Chalmette Refining, LLC*,
    637 F.3d 551 (5th Cir. 2011) ................................................................18

*Middleton v. Arledge*,
    No. 3:06-cv-303-WHB-LRA, 2008 U.S. Dist. LEXIS 77352 (S.D. Miss. Mar. 31,
    2008) ................................................................18

*Ogden v. AmeriCredit Corp.*,
    225 F.R.D. 529 (N.D. Tex. 2005) ................................................................5

*O'Sullivan v. Countrywide Home Loans Inc.*,
    319 F.3d 732 (5th Cir. 2003) ................................................................21

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    100 Fed. App'x 296 (5th Cir. 2004) ................................................................21, 23

*Reed v. Advocate Health Care*,
    268 F.R.D. 573 (N.D. Ill. 2009)................................................................23

*Rivera v. Wyeth-Ayerst Labs.*,
    283 F.3d 315 (5th Cir. 2002) ................................................................2

*Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*,
    601 F.3d 1159 (11th Cir. 2010) ................................................................24

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
    No. 04-5898, 2010 U.S. Dist. LEXIS 105646 (E.D. Penn. Sept. 30, 2010) ......................23

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) ................................................................18, 21, 24

*Stine v. Stewart*,
    80 S.W.3d 586 (Tex. 2002)................................................................20

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006) ................................................................20

*Umsted v. Intelect Commc'ns, Inc.*,
  No. 3:99-CV-2604-M, 2003 U.S. Dist. LEXIS 218 (N.D. Tex. Jan. 7, 2003) ........................5

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S.Ct. 2541 (2011).................................................................................................2, 3

*Warren v. The Reserve Fund, Inc.,*
  728 F.2d 741 (5th Cir. 1984) ..............................................................................................10

*Willis v. Donnelly*,
  199 S.W.3d 262 (Tex. 2006)...............................................................................................20

*Windham v. Am. Brands, Inc.,*
  565 F.2d 59 (4th Cir. 1977) .........................................................................................21, 22

*Yang v. Shanghai Gourmet, LLC,*
  No. 10-17830, 2012 U.S. App. LEXIS 5464 (9th Cir. Mar. 15, 2012) ..................................20

## OTHER AUTHORITIES

Fed. R. Civ. Pro. 23............................................................................................ passim

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SEAN TURNBOW, WILLIAM and MARY RICE, ROBERT YOSKOWITZ, FREDERICK VIEIRA, and ANTHONY TAYLOR, on behalf of themselves and all others similarly situated, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 3:11-CV-01030-M |
| LIFE PARTNERS, INC., LIFE PARTNERS HOLDINGS, INC., BRIAN PARDO, and R. SCOTT PEDEN, | § § § § | |
| Defendants. | § | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Defendants, Life Partners, Inc., ("LPI"), Life Partners Holdings, Inc. ("LPHI"), Brian Pardo ("Pardo") and R. Scott Peden ("Peden") (collectively "Defendants") and file their Opposition to Plaintiffs' Motion for Class Certification (the "Motion") as follows:

## I.  SUMMARY OF OPPOSITION

Plaintiffs have wholly failed to meet their burden to establish that a class action should be certified in this case.  Under applicable Fifth-Circuit precedent, Plaintiffs do not meet the certification standards under Rule 23(a) with respect to commonality, typicality, or adequacy. Nor have Plaintiffs demonstrated under Rule 23(b) that common issues will predominate over individualized issues or that class adjudication is the superior method of resolving Plaintiffs' and the putative class members' claims.  More specifically, Plaintiffs have not proposed a trial plan to outline how the class claims would be litigated without devolving into a series of mini-trials. Nor have Plaintiffs submitted an expert report demonstrating how Plaintiffs will establish

liability or how Plaintiffs' suggested vague and theoretical "damages model" would be applied to the facts in this case.

In reality, because the "claims of the Class are rooted in the fact that Cassidy's method for determining life expectancy estimates ("LEs") systematically underestimated the amount of time that would pass before Class members would receive a return on their investment,"[1] each and every LE performed by Dr. Cassidy must be individually analyzed to, first, determine if such life expectancies were, in fact, underestimated, and second, if so, by what amount. It is self-evident that if certain of the LEs were not underestimated and the insured died at or before the LE provided by Dr. Cassidy, such purchasers cannot establish either liability or damages. Yet, such purchasers are included in Plaintiffs' proposed Class. In short, the analysis for both liability and damages must be conducted on a purchaser-by-purchaser and policy-by-policy basis. Therefore, this case is indisputably not appropriate for class certification, and Defendants respectfully request that the Motion be denied.[2]

## II.      ARGUMENT AND AUTHORITIES

### A.      Plaintiffs Cannot Establish Commonality under Rule 23(a)(2).

The Fifth Circuit recently examined important changes to the standards for determining "commonality" following the Supreme Court's landmark decision in *Wal-Mart Stores, Inc. v. Dukes. See M.D. v. Perry*, No. 11-40789, 2012 U.S. App. LEXIS 6061, at *10-19 (5th Cir. Mar. 23, 2012). In *Perry*, the court explained the new, more rigorous standards for commonality:

> [I]n *Wal-Mart*, the Court expounded on the meaning of its precedent providing that 'commonality requires the plaintiff to demonstrate that the class members

---

[1] Motion 22.

[2] Defendants filed their Motion to Dismiss Plaintiffs' Consolidated Complaint on September 15, 2011, and briefing thereon was completed by October 20, 2011. To date, the Court has not issued a ruling on Defendants' Motion to Dismiss. Defendants respectfully submit that their Motion to Dismiss should be ruled upon before the Court considers Plaintiffs' Motion for Class Certification. *See, e.g., Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 (5th Cir. 2002) (finding that the district court erred by certifying the class before it determined whether the plaintiffs had demonstrated that they had standing to bring their claims).

'have suffered the same injury.'  After *Wal-Mart*, Rule 23(a)(2)'s commonality requirement demands more than the presentation of questions that are common to the class because 'any competently crafted class action complaint literally raises common questions.'  Further, the members of a proposed class do not establish that 'their claims can productively be litigated at once,' merely by alleging a violation of the same legal provision by the same defendant. . . .

**Thus, the commonality test is no longer met when the proposed class merely establishes that 'there is at least one issue whose resolution *will affect all or a significant number* of the putative class members.'** Rather, Rule 23(a)(2) requires that all of the class member's claims depend on a common issue of law or fact whose resolution 'will *resolve* an issue that is *central to the validity* of each one of the class member's claims in one stroke.'

*Id.* at *16-18 (discussing and quoting *Wal-Mart*, 131 S. Ct. 2541, 2551 (2011)) (additional citations and internal punctuation omitted) (italics in original) (bold emphasis added).  In light of the foregoing, the Fifth Circuit held that the district court's analysis in *Perry* failed to satisfy *Wal-Mart*'s heightened standards for establishing commonality because "the district court merely found that the Named Plaintiffs' various allegations of 'systematic deficiencies' in the State's administration of its [permanent foster-care system] raised common questions of fact."  *Id.* at *15, 20 (quoting *Wal-Mart*, 131 S. Ct. at 2551).

In the instant case, despite the fact that Plaintiffs cite to *Wal-Mart*, Plaintiffs erroneously ask the Court to apply pre-*Wal-Mart* standards for Rule 23(a)(2) certification.[3]  Then, relying on the abrogated commonality standard, Plaintiffs craft four questions that they contend raise common issues of law and fact.[4]  However, "[w]hat matters to class certification … is not the raising of common 'questions'—even in droves—but, rather the capacity of [] classwide proceedings to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 131 S. Ct. 2551 (internal quotation omitted).  Plaintiffs offer nothing to establish that the

---

[3] *See* Motion at 10, n.11 (citing *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) for the commonality standard and quoting one out-of-context excerpt from *Wal-Mart*:  "[e]ven a single [common] question will do").

[4] *See id.* at 11.

determination of these questions would "resolve an issue that is central to the validity of each one of the [individual class member's] claims in one stroke." *Id.*

Instead, Plaintiffs merely state, in conclusory fashion, that "the claims asserted are based on a common set of facts and course of conduct by Defendants that impacted investors similarly."[5]  This is precisely the type of generalized and amorphous "analysis" that the Fifth Circuit found insufficient in *Perry*.  Plaintiffs make no attempt to go beyond the pleadings to explain how the claims, defenses, relevant facts, and substantive law applicable to each question satisfy commonality.  Accordingly, Plaintiffs have failed to satisfy their burden of establishing commonality under the heightened standards for Rule 23(a)(2) certification under *Wal-Mart* and, for this reason alone, class certification must be denied.

**B.      Plaintiffs Cannot Establish Typicality or Adequacy Under Rule 23(a)(3)-(4).**

Rule 23(a) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class ***and*** that the representative parties fairly and adequately protect the interests of the class.  "The typicality requirement 'focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent.'"  *Berthelot v. Am. Postal Workers Union, Local 185*, No. H-10-0018, 2010 U.S. Dist. LEXIS 118788, at *13 (S.D. Tex. Nov. 8, 2010) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)) (finding the plaintiff's claims were "highly personalized" and concluding that the "significant factual and legal differences between Plaintiff's claim and proposed class members' claims defeat[ed] Plaintiff's effort to meet his burden to demonstrate that 'his claims have the same essential characteristics of the putative class'") (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)).

---

[5] *Id.*

In *Ogden v. AmeriCredit Corp.*, the court found a proposed class representative inadequate based upon her "lack of knowledge and understanding, her level of reliance on counsel, and her failure to demonstrate her willingness and ability to proceed as class representative." 225 F.R.D. 529, 537 (N.D. Tex. 2005). Further, the court held that "it is error to presume the adequacy of the putative representative[] in the absence of specific proof otherwise." *Id.* at 532 (internal citation and quotation omitted). The court held that, "while 'class representatives need not be legal scholars and are entitled to rely on counsel, [they] do need to know more than that they were involved in a bad business deal.'" *Id.* (citation omitted); *see also Umsted v. Intelect Commc'ns, Inc.*, No. 3:99-CV-2604-M, 2003 U.S. Dist. LEXIS 218, at *4-10 (N.D. Tex. Jan. 7, 2003) (finding class representatives inadequate, holding that "class representatives must be willing to be more than spectators; they must work at and participate actively in the litigation").

Recently, the Southern District of Texas described the Fifth Circuit's adequacy standard as follows:

> To meet Rule 23 requirements [for adequate representation], the court must find that class representatives, their counsel, and the relationship between the two are adequate to protect the interests of absent class members. Counsel must be both competent and zealous in representing class interests. **Class representatives must satisfy the court that they, <u>and not counsel</u>, are directing the litigation.** To do this, class representatives must show themselves sufficiently informed about the litigation to manage the litigation effort. Finally, the Rule 23 adequacy inquiry also uncovers conflicts of interest between the named plaintiffs and the class they seek to represent. [I]ntraclass conflicts may negate adequacy under Rule 23(a)(4).

*In re Heartland Payment Sys., Inc.*, MDL No. 09-2046, 2012 U.S. Dist. LEXIS 37326, at *37-38 (S.D. Tex. Mar. 20, 2012) (emphasis added) (internal citations and quotations omitted).

Additionally, the adequacy requirement "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the

other class members." *Berthelot*, 2010 U.S. Dist. LEXIS 118788 at \*18 (citing *Stirman*, 280 F.3d at 563) (internal quotations omitted).

As with each of the requirements under Rule 23(a), the plaintiff has the burden to prove he can adequately represent the interests of the absentee class members.  *See, e.g., Altier v. Worley Catastrophe Response, LLC*, No. 11242, 2011 U.S. Dist. LEXIS 85696, at \*29-30 (E.D. La. Jul. 26, 2011).  In *Altier*, the court found that the representative plaintiffs failed to present any evidence to demonstrate that they were directing the litigation, that they were sufficiently informed about the case in order to manage the litigation effort, or that they had the willingness and ability to take an active role and protect the interests of absentee class members.  *See id.* at \*30.  The court noted that, "[i]n the absence of such evidence, plaintiffs have not carried their burden to demonstrate adequacy of representation," and further stated that the "absence of this type of evidence, as well as the absence of any trial plan … undercuts plaintiffs' argument that their counsel are skilled at prosecuting class actions." *Id.*  Thus, the court found adequacy was not established.

In this case, Plaintiffs' proposed class period begins when Dr. Cassidy began providing LEs for the facilitation of retail viatical settlements in October 1999.[6]  Notably, at that time, and through February 28, 2005, LPI was engaged primarily in the facilitation of viatical settlements.[7]  The distinction between the calculation of LEs for viaticals and life settlements cannot be overstated.  First, the populations of the two categories are unique in two critical respects—age and medical prognosis—*i.e.*, viaticals pertain(ed) almost exclusively insureds with a confirmed diagnosis of AIDS,[8] whereas life settlements pertain to senior citizens (male or female) at least

---

[6] *See* Motion 2, 8; App. 000002 (Peden Aff.), at ¶ 3.
[7] *See* App. 000002-03 (Peden Aff.), at ¶¶ 3-6.
[8]  App. 000002 (Peden Aff.), at ¶ 3.  Viaticals may also pertain to other individuals who have been diagnosed with a terminal illness, but the more than 90% of viaticals facilitated by LPI involved AIDS patients. *Id.*

65 years of age (but typically at least 75) with no diagnosed terminal illness.[9]  Second, the impact on the AIDS-patient population of (i) newly FDA-approved medications, (ii) rapid development of drug "cocktails" with varying degrees of acceptance and success, and (iii) the ultimate wide-spread availability of such pharmaceuticals was impossible to predict with any form of consistency during the late 1990's through the early to mid-2000's.[10]  Third, because of many unique factors within the AIDS population, the use of "actuarially" determined life expectancies were either unavailable, unrealistic, or unreliable for the timeframe in question.[11]

Thus, it is indisputably necessary to separately analyze the LEs for insureds who sold viaticals (*i.e.,* AIDS patients) from those who sold life settlements (*i.e.,* senior citizens). Moreover, the determination of whether such life expectancies were underestimated must be assessed based upon the medical information, prognoses, and treatments that were available when the estimates were generated, not based upon hindsight information acquired over a decade later.  Of particular importance to this analysis is the fact that **none** of the named Plaintiffs purchased viaticals facilitated by LPI.[12]  Accordingly, **none** of the named Plaintiffs are typical or adequate vis-à-vis the absentee class members who purchased viaticals and not life settlements.[13] Additionally, for all of the reasons detailed below, none of the named Plaintiffs are appropriate class representatives for the class as a whole, or for either proposed "Subclass."

---

[9] *Id.* at ¶ 4.

[10] *See* App. 000005-06, Joseph T. King Jr., MD, MSCE, et al., *Long-Term HIV/AIDS Survival Estimation in the Highly Active Antiretroviral Therapy Era*, Med. Decision Making, Jan.-Feb. 2003 ("King article"), a true and correct copy of which is attached hereto and incorporated by reference as Exhibit "B," at 9-10.

[11] *See, e.g., United States HIV & AIDS Statistics Summary*, AVERT, http://www.avert.org/usa-statistics.htm (last visited May 14, 2012) (discussing the reasons for discrepancies in AIDS statistics, including the fact that, even now, only 40 states have been utilizing confidential name-based reporting long enough for the CDC to "apply statistical adjustments" and that the "HIV Surveillance Report for 2012 (published in 2014) will be **the first time** HIV data from all 50 states will be included") (emphasis added).

[12] App. 000003 (Peden Aff.), at ¶ 7.

[13] Indeed, Plaintiff Turnbow admitted that as he is *not* representing purchasers of viatical settlements. *See* App. 000023 (Turnbow Excerpts), at § A.1.

### 1.      Turnbow is Not Typical or Adequate.

Sean Turnbow's ("Turnbow") claims are atypical of the putative class's claims because he disagrees with one of the fundamental bases for Plaintiffs' claims. More specifically, the Complaint alleges that LPI breached fiduciary and contractual duties because it used Dr. Cassidy, "a full-time practicing physician with no actuarial training or experience" who "does not have an actuary on staff" to prepare the LEs.[14]  However, Turnbow testified that, in his opinion, Dr. Cassidy did *not* need to have actuarial experience or training in order to provide LEs.[15]  Thus, Turnbow's belief is inconsistent with the claims of the class on this issue—a key allegation asserted in the Complaint on behalf of the class, which forms the basis for both the breach of fiduciary duty and breach of contract claims—rendering him atypical and inadequate as a representative. *See Berthelot*, 2010 U.S. Dist. LEXIS 118788 at *13.

In addition, Turnbow's deposition established his inadequacy as a class representative. Throughout the course of his deposition, Turnbow indicated that he would have to defer or refer to his counsel to answer numerous basic questions concerning the claims asserted, the bases for the claims asserted, and the nature of the damages he is seeking, among other things.[16]  He further testified that the first time he saw any of Defendants' requests for production or Plaintiffs' responses thereto was the day before his deposition.[17]  Turnbow also revealed that, prior to the day before his deposition, he had, at most, only one or two interactions with Plaintiffs' counsel since the filing of the lawsuit.[18]  With respect to his ability to protect the interests of the absent class members, Turnbow testified that, prior to hiring counsel in the case, he did nothing to determine his lawyer's or law firm's qualifications and conceded that this was

---

[14] Compl. ¶ 13; Motion 2.

[15] *See* App. 000025-26 (Turnbow Excerpts), at § A.3.

[16] *See* App. 000026-30 (Turnbow Excerpts), at § B.1.

[17] *See* App. 000030-31 (Turnbow Excerpts), at § B.2.

[18] *See* App. 000031-33 (Turnbow Excerpts), at § B.3.  Mr. Turnbow confirmed on cross examination that he had received two pieces of written correspondence from his attorneys in the case.  *See id.*

not in the best interests of the class.[19]   Importantly, Turnbow testified that, while he would "definitely make every effort to testify, if that's required" of him at trial, he could not "commit to being there for the entirety of the trial."[20]

In light of the above, it is clear that Turnbow (i) is not sufficiently informed about the factual bases for the claims in the suit; (ii) is not directing the litigation; and (iii) is unable to adequately protect the interests of the absent class members.   Nor are the bases for Turnbow's claims typical of the class.   Accordingly, the Court should deny Plaintiffs' motion to certify the class with Turnbow as a class representative.

### 2.   William and Mary Rice are Not Typical or Adequate.

The Rices are each atypical and inadequate to serve as representatives for the class.   First, the Rices are not typical of the class because they are not accredited investors, despite having represented to LPI that they were.[21]   As the documents reflect, and as Scott Peden testified, LPI requests a representation, in writing, from purchasers of life settlements stating that they are accredited investors.[22]   Further, it is clear that the Rices fundamentally misunderstood (and still misunderstand) the life settlement transactions into which they entered.[23]   For example, the Rices believed that the entirety of their initial investment was used for premium payments,[24] that the investments would be tax-free,[25] and that premiums were prepaid for 12 years, regardless of the LEs of the insureds.[26]   Additionally, Mrs. Rice does not have a clear understanding of the difference between viaticals and life settlements.   Although she now believes that her

---

[19] *See* App. 000033-34 (Turnbow Excerpts), at § B.4.
[20] App. 000034 (Turnbow Excerpts), at § B.5.
[21] *See* App. 000060 (William Rice Excerpts), at § A.1;  App. 000101-02 (Exhibit 107 to William Rice's deposition).
[22] App. 000110-11 (Peden Dep.), at 101:16-104:7.
[23] *See* App. 000061-62 (William Rice Excerpts), at § A.3; App. 000118-20 (Mary Rice Excerpts), at § A.3; *see also* App. 000103-05 (Exhibit 108 to William Rice's deposition).
[24] App. 000061-62 (William Rice Excerpts), at § A.3; App. 000118-20 (Mary Rice Excerpts), at § A.3.
[25] App. 000118-20 (Mary Rice Excerpts), at § A.3.
[26] *Id.*; App. 000061-62 (William Rice Excerpts), at § A.3.

investments were in life settlements, at the time of her investment, she believed she was purchasing viatical settlements.[27]  None of these beliefs is supported by the documents that form the basis of the claims in this case.

The explanation for this is simple—**the Rices did not read any of the documents prior to signing them**.[28]  In fact, both Rices testified that it is not their policy to review documents before signing them.[29]  Indeed, the Rices admit that, **had they read the documents, they would not have purchased the life settlements**.[30]  Such an admission renders the Rices' claims atypical, as the claims asserted in the complaint are based upon alleged breaches of the written agreements (including the breach of fiduciary duty claim, which alleged relationship arose only through the Agency Agreements executed by Plaintiffs).[31]  Thus, because the Rices (1) did not read the agreements, (2) would not have entered into the transactions *had* they read the agreements, and (3) made multiple written representations to LPI to the contrary, they are subject to unique defenses that would become a significant focus in the litigation, thereby rendering their claims atypical.  *See, e.g., Warren v. The Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984)(defenses unique to class representative renders him atypical).

Further, the Rices also unequivocally believe that they were lied to and defrauded by their licensee.[32]  Nonetheless, despite the Rices' belief that their licensee lied to them and that they *could* assert claims directly against him, they have not done.[33]  Similarly, although no fraud claim is presently asserted in this suit, the Rices believe that it is in the best interest of the class to assert a fraud claim against LPI, and their testimony indicates that they believe they still have

---

[27] *See* App. 000115-17 (Mary Rice Excerpts), at § A.1.
[28]  App. 000117-18 (Mary Rice Excerpts) at § A.2.
[29] *Id.*; App. 000060-61 (William Rice Excerpts), at § A.2.
[30] App. 000126-29 (Mary Rice Excerpts), at § B.3.
[31] *See* Compl. ¶¶ 53, 68.
[32] App. 000062-63 (William Rice Excerpts), at § A.4; App. 000120-22 (Mary Rice Excerpts), at § A.4.
[33] App. 000062-63 (William Rice Excerpts), at § A.4; App. 000120-22 (Mary Rice Excerpts), at § A.4.

a valid fraud claim against LPI.[34]  These beliefs concerning fraud claims against their licensee and LPI are inconsistent with the claims of the class (inasmuch as no such claims are asserted in the live complaint) and indicate that the Rices are not typical of the class and/or that they have a conflict of interest with the class on this issue.  They also raise the likelihood that their licensee is a necessary party with respect to their individual claims.

The Rices are also inadequate in that they lack a clear understanding of the duties of a class representative as well as the bases for the class's claims against certain Defendants.  For instance, Mrs. Rice testified that she "plans on representing the class of people that aren't going to be able to be here to represent themselves in the -- California subclass 172."[35]  She further stated that her understanding of a fiduciary (as class representative) is simply "[t]o be honest in [her] representation, in what [she] tell[s] people."[36]  She also testified that she believes the class period begins in Spring of 2007 and ends in January or February of 2011.[37]  In addition, she believes that she is suing Brian Pardo because, as CEO, he has a fiduciary duty to "tell us the truth and not to be deceitful…".[38]  In fact, Mrs. Rice believes that, as a purchaser of a hamburger, the president of McDonald's would have a fiduciary duty to her.[39]

For each of these reasons, the Rices are atypical of the class they seek to represent and are unable to adequately protect the interests of the class.  Therefore, the Court should deny Plaintiffs' motion to certify the class with Mr. and Mrs. Rice as class representatives.

### 3.      Yoskowitz is Not Typical or Adequate.

Robert Yoskowitz ("Yoskowitz") is designated as a representative for the California subclass.  However, Yoskowitz was not a California resident at the time of his investments and,

---

[34] *See* App. 000122-25 (Mary Rice Excerpts), at § B.1.
[35] *See* App. 000125-26 (Mary Rice Excerpts), at § B.2.
[36] *See id.*
[37] *Id.*
[38] App. 000122-25 (Mary Rice Excerpts), at § B.1.
[39] *Id.*

thus, has no standing to assert the California claims.[40]   Courts in California have held that § 17200 of the UCL does not allow claims to be brought by non-resident plaintiffs against non-resident defendants for conduct occurring outside of California.  *See, e.g., In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 467 F. Supp. 2d 1071, 1089 (S.D. Cal. 2006) (holding that a Pennsylvania resident could not state claims against a Colorado corporation headquartered in Texas under § 17200 for purchases occurring in Pennsylvania); *In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.*, 588 F. Supp. 2d 1111, 1119 (C.D. Cal. 2008) (California "statutory remedies may be invoked by out-of-state parties [only] when they are harmed by wrongful conduct occurring in California.").  Accordingly, because Yoskowitz was not a California resident at the time of his purchases, the purchases occurred outside of California, and Defendants are not California residents, Yoskowitz does not have standing to assert a UCL claim, individually, or on behalf of a subclass of California residents.  Federal law is clear that if a proposed class representative "does not have standing to pursue his . . . claim, he cannot be the representative of a class of persons with such claims."  *See, e.g., Hall v. LHACO, Inc.*, 140 F.3d 1190, 1198-99 (8th Cir. 1998).

Yoskowitz is also atypical of the broader class in that he does not contend that oncologists or medical doctors are unqualified to provide life expectancies.[41]   Yoskowitz's testimony also revealed a lack of knowledge regarding the details of the litigation and his claims in this action.[42]   For instance, he did not recall originally filing a complaint listing only himself as a named plaintiff.[43]   Moreover, Yoskowitz did not initially understand that his original

---

[40] *See* App. 000161 (Yoskowitz Excerpts), at § A.1.
[41] App. 000161-62 (Yoskowitz Excerpts), at § A.2.
[42] *See* App. 000162-67 (Yoskowitz Excerpts), at § B.1.
[43] *Id.*

complaint was brought on behalf of a class.[44]   He also had difficulty recalling all four of the causes of action asserted in the consolidated complaint, and at various times in his deposition he incorrectly testified that he had claims against Pardo for breach of contract and against Peden for breach of fiduciary duty.[45]   Yoskowitz additionally testified that LPHI was his agent based on the fact that the agency agreement states that "Life Partners is a registered service mark of Life Partners Holdings."[46]   Yoskowitz also admitted that when he filed his original complaint, he did not believe it was in the best interests of the class not to name LPHI as a defendant.[47]   Further, he does not know if individuals whose policies matured prior to the expiration of the LE are included in the class, but, in his opinion, such persons have not been financially harmed.[48]   This admission creates a conflict of interest between Yoskowitz and those members of the putative class whose policies matured prior to the expiration of the LE provided by Dr. Cassidy.

In addition to the above, Yoskowitz has had limited interactions with counsel. Yoskowitz has spoken with Steven Sklaver fewer than five times, and, as of his deposition, he had not spoken to Mr. Sklaver in over six months.[49]   Yoskowitz had also never met Mr. Oxford, Mr. Bridges, or Ms. Miller prior to the day before his deposition, and he is unclear about their role in the litigation.[50]   He was also unclear as to who Mr. Packard represents, and he had never heard of Mr. Geraci.[51]   Yoskowitz testified that he heard about the potential for litigation from a stranger on the Internet, which lead him to the Susman & Godfrey website.[52]   But, aside from determining that the Susman firm has handled class actions, he has done nothing to determine the

---

[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.*
[49] App. 000168-72 (Yoskowitz Excerpts), at § B.2.
[50] *Id.*
[51] *Id.*
[52] App. 000172-75 (Yoskowitz Excerpts), at § B.3.

qualifications of the various firms serving as counsel for the class.[53]  Overall, Yoskowitz's lack of detailed knowledge regarding his claims, lack of coordination with counsel and direction of the litigation, and atypical position as a non-California resident make him an inappropriate representative for the general class and for the California subclass.  The Court should thus deny the motion for class certification with Yoskowitz as class representative.

### 4.      Vieira is Not Typical or Adequate.

Vieira is atypical of the entire class he purports to seek to represent, first and foremost, because he has sold all of the life settlements that he purchased through LPI.  Specifically, Vieira sold 7 of his 10 life settlements on January 10, 2011.[54]  He sold the remaining three on March 10, 2012, after the Motion was filed.[55]  During his testimony, he admitted that he first inquired about re-selling **all of his policies** to LPI in **June of 2010**.[56]  He sold the first 7 policies because he needed the money, not, as inferred from the Motion, as a result of his reading of the *Wall Street Journal* article.[57]  Indeed, Vieira testified that he did not read the *Wall Street Journal* article until approximately February of 2011, one month *after* he sold his first 7 interests (and, coincidentally, one month after he retained counsel), and approximately *eight* months after he first approached LPI about re-selling his interests in all 10 policies.[58]  Thus, given that Vieira no longer owns any life settlements facilitated by LPI and that his sales had nothing to do with the *Wall Street Journal* article, but were premised entirely upon his need for cash, he is neither typical nor adequate to represent a subclass of persons whose sales were purportedly based upon the "disclosures" revealed by the *Wall Street Journal* article.  The fact that he no longer owns

---

[53] *Id.*

[54] *See* App. 000215-20 (Vieira Excerpts), at § A.4.

[55] *See* App. 000285-87 (Vieira Sales Records).

[56] *See* App. 000215-20 (Vieira Excerpts), at § A.4.

[57] *See* Motion 8 (identifying Vieira as the representative of the Subclass "comprising those members of the Class who sold, after December 21, 2010 (the date the *Wall Street Journal* article was published), some or all of the life settlements they acquired from or through LPI or LPHI").  *See also* App. 000215-20 (Vieira Excerpts), at § A.4.

[58] App. 000220-29 (Vieira Excerpts), at § B.1.

any of his life settlements also creates a conflict of interest between Vieira and the class members who still retain their life settlement interests.

Vieira is also atypical of the absent class members with respect to the manner in which he acquired his life settlements.  More specifically, he bought his life settlements through his "daughter" Teri Osato-Taylor.[59]  He testified that he relied on her and trusted her in executing the purchases of life settlements—so much so that he did not read the documents carefully, if at all.[60]  Vieira further testified that **if Teri had explained several of the key aspects of the transactions to him, he "most likely [would] not" have purchased the life settlements**.[61] Most importantly, with respect to the fact that Teri was his licensee, Vieira admitted that he is seeking to protect her from being sued and that he is concerned about such a possibility.[62] Therefore, Vieira's claims are clearly atypical because he relied solely on a family member (and not the LPI documents) in making his decision to invest in life settlements, and, further, he has a clear conflict with the other putative class members because he has admitted that he does not wish to involve his "daughter" in the litigation.  Accordingly, Vieira is likely to direct the litigation in such a manner as to minimize or eliminate any focus on licensees' involvement, regardless of the importance of the licensee's role in the process or the unique defenses that arise therefrom.

With respect to adequacy, Vieira lacks even the most basic knowledge about the facts, parties, and bases for the litigation.  Specific examples include: (i) no real understanding of who the Defendants are and the reasons he and the class are suing the different parties; (ii) the first

---

[59] *See* App. 000209-15 (Vieira Excerpts), at § A.2.

[60] *Id.*; App. 000215 (Vieira Excerpts), at § A.3.

[61] App. 000211-12 (Vieira Excerpts) at § A.2, pp. 4-5.

[62] App. 000214-15 (Vieira Excerpts), at § A.2, pp. 7-8 (stating "Because I care for her so much.  She's got my only grandchild" and admitting he was concerned that the fact that Teri was his licensee could cause "problems with our family").

time he ever learned of Scott Peden's name was the day before his deposition; (iii) the only reason he is suing Brian Pardo is because "it's his company," and the only reason he is suing Scott Peden is because he "believes" Peden has an "executive role"; (iv) he believes that LPI and LPHI are "one and the same" based upon "the CEO status"; (v) the first time he learned that he was suing LPHI was three or four weeks before his deposition, when he received the Complaint in the mail from his counsel.[63]   Additionally, Vieira repeatedly impeached himself during his deposition, revealing that he is willing to change his testimony as needed (if not outright bend the truth) and that he is singularly uninformed about the facts of his case.[64]

Vieira is also inadequate as a class representative, whether for the entire class or either Subclass, given that he has had extremely limited contact with Plaintiffs' counsel since the suit was filed.[65]   He has no knowledge of any attorneys representing Plaintiffs other than Jonathan Bridges and Terry Oxford, and he has only spoken or communicated with those two attorneys.[66] He also lacks a clear understanding of a class representative's duties to the members of the class and, more specifically, of his role in this case.[67]   Accordingly, Vieira is more of a spectator than an active participant, and the Court should thus deny the motion for class certification with Vieira as a class representative.

### 5.   Plaintiffs' Counsel is Not Adequate to Represent the Putative Class.

Plaintiffs' counsel have failed to demonstrate that they can adequately represent the putative class in *this* litigation.   As an initial matter, they have failed to meet their burden to present the Court with a trial plan of how the class litigation would be managed.   Such a

---

[63] *See* App. 000220-23 (Vieira Excerpts), at § B.1, pp. 13-16.
[64] *See* App. 000208-09 (Vieira Excerpts), at § A.1; App. 000215-20 (Vieira Excerpts), at § A.4; App. 000229 (Vieira Excerpts), at § B.4.
[65] *See* App. 000229-30 (Vieira Excerpts), at § B.3.
[66] *See id.*
[67] *See* App. 000234-35 (Vieira Excerpts), at § B.5 (testifying that he is not sure whether he would have a fiduciary obligation to the class members if he were found to be an adequate class representative by the Court and further testifying that he believes he invested in LPI).

---

deficiency, in and of itself, may be a basis for finding class counsel inadequate.  *See Altier*, 2011 U.S. Dist. LEXIS 85696 at *29-30.  Tellingly, Plaintiffs' counsel has also failed to provide any semblance of an explanation regarding how the Plaintiffs' damages could be determined in a manageable fashion on a class-wide basis -- another fatal deficiency.[68]  *See id.*

In addition, it was readily apparent during the depositions of each of the Plaintiffs that there is no consensus among the Plaintiffs as to bases for the claims asserted, the actual claims asserted, or even the parties being sued.[69]  For instance, the Rice Plaintiffs clearly believe they have a fraud claim against Defendants, as well as against the licensee who facilitated their purchases of the LPI life settlement interests.[70]  Yet, despite having previously asserted a fraud claim in the suit filed in California, and despite their belief that such a claim is warranted, the fraud claim was dropped when the case was transferred to Texas.[71]  These deficiencies in the representative Plaintiffs' understanding and conflicts with the class's claims are indicative of the Plaintiffs' inadequacy to serve as lead plaintiffs, but they are also a clear indication, contrary to the assertions made by Ms. Miller in her Declaration submitted with the Motion, that Plaintiffs have **not** been "actively monitoring and consulting with Interim Co-Lead Counsel in the prosecution of this case," having "frequent communications with Interim Co-Lead Counsel," or receiving "regular status updates throughout the course of this litigation."[72]

---

[68] *See* discussion regarding Plaintiffs' failure to meet their burden regarding damages, at Section II(C)(2), *infra*.
[69] *See* Section II(B)(1)-(4), *supra*.
[70] *See* App. 00120-25 (Mary Rice Excerpts), at §§ A.4, B.1; App. 000062-63 (William Rice Excerpts), at § A.4.
[71] *See* App. 00120-25 (Mary Rice Excerpts), at §§ A.4, B.1; App. 000062-63 (William Rice Excerpts), at § A.4.
[72] *See* Ex. 1 to Motion (Declaration of Kim Miller), at ¶ 3.  Notably, Ms. Miller's assertion that she has personal knowledge of each of the statements made in her Declaration, particularly the statements regarding the frequency and nature of communications with the Plaintiffs, is highly questionable given the fact that none of the Plaintiffs testified to having communicated directly with her prior to the day before their respective depositions. *See* App. 000031-33 (Turnbow Excerpts), at § B.3; App. 000070-73 (William Rice Excerpts), at § B.2; App. 000126-29 (Mary Rice Excerpts), at § B.3; App. 000168-72 (Yoskowitz Excerpts), at § B.2; App. 000229-30 (Vieira Excerpts), at § B.3.

Additionally, during the depositions of the Plaintiffs, their attorneys repeatedly and inappropriately asserted claims of privilege, lengthy speaking objections, and other verbal cues to the witnesses, effectively precluding Defendants' counsel from eliciting candid, un-coached responses from the witnesses.[73]  In addition to being inappropriate under the Rules, such tactics merely highlighted the fact that Plaintiffs' counsel, and not Plaintiffs, are the ones directing the litigation, making them inadequate to serve as lead counsel for the class.  *See, e.g., Middleton v. Arledge*, No. 3:06-cv-303-WHB-LRA, 2008 U.S. Dist. LEXIS 77352, at *35 (S.D. Miss. Mar. 31, 2008) (concluding, based upon the plaintiffs' deposition testimony that such class representatives were "simply lending [their] name[s] to a suit controlled entirely by the class attorney" and that this rendered class certification inappropriate).

**C.     Individual Issues Predominate with Respect to both Liability and Damages.**

"The predominance requirement of Rule 23(b)(3), though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Gene and Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)(quoting *Amchen Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)).   "Determining whether the plaintiffs can clear the predominance hurdle set by Rule 23(b)(3) requires district courts to consider 'how a trial on the merits would be conducted if a class were certified.'"  *Madison v. Chalmette Refining, LLC*, 637 F.3d 551, 554 (5th Cir. 2011) (quoting *Sandwich Chef of Tex. Inc. v. Reliance Nat'l Ins. Indem. Co.*, 319 F.3d 205, 218 (5th Cir. 2003)).   "This, in turn, entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating

---

[73]  *See* App. 000288-97 (Selected Excerpts of Plaintiffs' Counsel's Objections Pertinent to Adequacy of Representation).

into a series of individual trials." *Id.* (internal quotations omitted). "The cause of action as a whole must satisfy Rule 23(b)(3)'s predominance requirement." *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 601 (5th Cir. 2006). "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica J. Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011).

### 1.  Individualized Issues Predominate Regarding the Accuracy of the LEs.

Underlying each of Plaintiffs' claims for relief is the assertion that Dr. Cassidy's LEs were systematically underestimated.[74]  For each of their claims, Plaintiffs assert that they have satisfied the Rule 23(b)(3) requirements because the class members have all been subject to the "same alleged course of conduct from Defendants."[75]  However, the Fifth Circuit has held that a plaintiff cannot satisfy its burden under Rule 23(b)(3) by simply alleging, as Plaintiffs have done, that the defendant has engaged in a "common course of conduct." *Gene and Gene LLC*, 541 F.3d at 326 (denying class certification where the predominant issue of fact was whether the individual class members consented to certain conduct, and rejecting the argument that class members were subjected to a common course of conduct, namely, the receipt of unwanted fax advertisements).[76]

As in *Gene and Gene*, "one substantive issue undoubtedly will determine how a trial on the merits will be conducted if the proposed class is certified," *id.*, that is, whether Dr. Cassidy's

---

[74] *See* Motion 3-6, 13, 20, 22-23.

[75] Motion 17; *see also* Motion 19 ("conduct remained unchanged"), 21 ("same alleged course of conduct").

[76] Plaintiffs' cases do not support their "common course of conduct" argument. *See, e.g., Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 3:02-cv-1152-M, 2012 U.S. Dist. LEXIS 24823, at *14 (N.D. Tex. Jan. 27, 2012) (finding 23(b)(3) satisfied because "fraud-on-the-market" theory supplanted proof of individual questions of reliance); *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 221 (N.D. Tex. 2000) (pre-*Wal-Mart* case that involved a claim of fraud, not, as Plaintiffs assert, a claim for breach of fiduciary duty, and in which the court presumed reliance, thereby supplanting individualized proof thereof); *In re Enron Corp. Sec. Litig.*, Civ. No. H-01-3913, 2006 U.S. Dist. LEXIS 43145, at *78 (S.D. Tex. June 7, 2006) (certifying ERISA class action under *Rule 23(b)(1)*, not 23(b)(3)); *Bruhl v. Price Waterhouse Coopers Int.'l*, 257 F.R.D. 684, 694-98 (S.D. Fla. 2008) (finding reliance could be presumed for all class members, and rejecting argument that no fiduciary duty existed).

LEs were underestimated for **each** of the approximately 2,300 viatical and life settlement policies at issue.[77] Otherwise, if the LE provided by Dr. Cassidy in connection with a particular policy was "accurate," then, LPI could not have breached any fiduciary duty or any contract or violated any provision of the California UCL by relying on and utilizing Dr. Cassidy's life expectancy estimate for that particular policy.[78]

Determining whether Dr. Cassidy's LE for a particular policy was "accurate" or "reasonable" is a highly individualized determination, and one that requires expert analysis of the medical records of each insured for more than 2,300 policies. More specifically, experts will have to consider the insured's personal medical records that were made available to Dr. Cassidy at the time he prepared the LE, as well as individualized evidence concerning the medical treatments and prognostications available for each insured's particular maladies *at that time*. The continually evolving medical environment in which LEs were prepared is particularly salient when assessing insureds for "viatical settlements," which Plaintiffs have included within the definition of "life settlements," and further illustrates why individualized issues predominate.[79]

In short, the determination of the "accuracy" or "reasonableness" of each LE provided by Dr. Cassidy over more than a ten-year period will unquestionably degenerate into thousands of mini-trials in contravention of Rule 23(b)(3). Accordingly, Plaintiffs' Motion should be denied.

---

[77] *See* App. 000002-03 (Peden Aff.), at ¶ 6.

[78] Moreover, because the majority of the viaticals facilitated by LPI during the Class Period were purchased from 1999 through 2005 (with ever decreasing numbers thereafter), App. 000002-03 (Peden Aff.), at ¶¶ 3-6, and because the statute of limitations began to accrue once each putative class member had actual knowledge that the insured exceeded Dr. Cassidy's LE, Defendants' statute of limitations defense presents issues that cannot be decided on a class-wide basis. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 321-22 (4th Cir. 2006) (holding plaintiffs bear the burden of demonstrating that resolution of statute of limitations defense can occur on a class wide basis, and affirming the denial of class certification where statute of limitations defense required individualized examination of each putative class member's knowledge to determine when their respective claims accrued); *Willis v. Donnelly*, 199 S.W.3d 262, 278 n.33 (Tex. 2006) (four year statute of limitations for a breach of fiduciary duty claim); *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002) (four-year statute of limitations for breach of contract claims); *Yang v. Shanghai Gourmet, LLC*, No. 10-17830, 2012 U.S. App. LEXIS 5464, at *8 (9th Cir. Mar. 15, 2012) (four-year statute of limitations for UCL claim).

[79] *See* Section II(B), *supra*, discussing the quickly evolving treatments of HIV/AIDS during the Class Period.

*See Bell Atlantic Corp.*, 339 F.3d at 301 ("We stress that it is the party seeking certification who bears the burden of establishing that the requirements of Rule 23 have been met.").

      **2.      Individualized Issues Predominate the Calculation of Damages.**

      The Court need look no further than the question of damages to conclude that individualized issues predominate in this case. In seeking class certification, the plaintiff has the burden of establishing not only predominance of common questions of law or fact pertaining to liability, but also predominance of common questions of law or fact pertaining to damages. *Bell Atlantic Corp.*, 339 F.3d at 301; *Bridgewater v. Double Diamond-Del., Inc.*, No. 3:09-CV-1758-B ECF, 2011 U.S. Dist. LEXIS 47248, at *53 (N.D. Tex. Apr. 29, 2011) ("[F]or the purposes of class certification, Plaintiffs have the burden of showing that class certification is appropriate and that individual damages issues do not predominate over common issues."). Indeed, the Fifth Circuit has repeatedly held that class certification is improper "where the calculation for damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties proposed to calculate individual damages is clearly inadequate." *Bell Atlantic Corp.*, 339 F.3d at 307 (citing with approval *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 68 (4th Cir. 1977)).[80]

      In the seminal case of *Windham*, the Fourth Circuit set forth the following critical consideration in determining whether certification is appropriate under Rule 23(b)(3):

> [I]n cases where the fact of injury and damages breaks down in what may be characterized as virtually a mechanical task, capable of mathematical or formula calculation, the existence of individualized claims for damages seems to offer no barrier to class certification on the grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical

---

[80] *See also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 Fed. App'x 296, 300 (5th Cir. 2004) (same); *Steering Comm,* 461 F.3d at 601 ("[W]here individual damages cannot be determined by reference to a mathematical or formulaic calculation, the damages issues may predominate over any common issues shared by the class."); *O'Sullivan v. Countrywide Home Loans Inc.*, 319 F.3d 732, 744-45(5th Cir. 2003) (holding the district court abused its discretion in certifying a class where individual issues pertaining to the calculation of damages predominated).

---

calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created make the damage aspect of the case predominate, and render the case unmanageable as a class action.

*Id.* at 68.  The *Windham* court also held that the district court properly rejected the plaintiffs' representation "that they 'expect' to develop a formula, which will simplify the computation of individual damages, at some later point in the litigation," because courts "should not certify the class merely on the assurance of counsel that some solution will be found."  *Id.* at 71.

Here, Plaintiffs seek disgorgement of fees and/or profits received by Defendants as a result of their alleged breach of fiduciary duties and violations of the UCL, or, in the alternative, damages for breach of contract equal to the amount class members over-paid for their respective interest in each life settlement.[81]  Plaintiffs proffer a "methodology" that an undisclosed "expert" will purportedly apply to all putative class and subclass members.[82]  However, Plaintiffs' proposed "methodology" is too vague and undeveloped for Defendants or the Court to fully evaluate and, thus, is insufficient to support class certification.  *See Kottaras v. Whole Foods Mkt., Inc.*, No. 08-1832 (JEB), 2012 U.S. Dist. LEXIS 10885, at *33-34 (D.D.C. Jan. 30, 2012) (holding that the plaintiff's expert's proposed methodology was not "sufficiently developed to meet Plaintiff's burden of showing that common questions predominate over individual ones, as required by Rule 23(b)(3)").

Further, fundamentally, Plaintiffs' vague methodology is critically flawed because LPI did not, during the proposed Class Period, utilize a precise formula in pricing its life settlements.[83]  Thus, one cannot simply input a "true LE"[84] into an LPI formula to determine

---

[81] Motion 21-22.
[82] *See id.* at 22. Whether viewed as "disgorgement" or "damages," the amounts are the same and, according to Plaintiffs, reflect the ill-gotten gains Defendants received and that Plaintiffs paid for each policy. *Id.*
[83] App. 000302-304 (Carr Dep.), at 22:1-12 (indicating that he is "not entering anything into a formula"), 27:11-13 ("Q. So is it fair to say that the fees vary from policy to policy? A. Yes.").

what the actual acquisition cost would have been or to determine what LPI's fees would have been.  Thus, calculating the amount of disgorgement or damages will require a highly individualized analysis of each of the more than 2,300 putative Class Policies, and then, an assessment of each putative class member's respective fractional ownership in one or more of the Class Policies.

Defendants retained the expert services of Bruce L. Blacker of the Analysis Group, Inc., and Mr. Blacker opined as follows:  "I have concluded that a **class-wide formula cannot be utilized** to reasonably estimate the actual damages allegedly suffered by individual purchasers in the purported Class.  Without a single formula, **the computation of damages would be a highly individualized task**."[85]  More specifically, Mr. Blacker opined that a class-wide formula for damages could not be calculated because of the several factors that affect the acquisition cost of policies, resulting in unique differences among the policies.[86]  Further, Mr. Blacker opined that a class-wide formula cannot determine the disgorgement of LPI's fees that may be awarded to individual class members because LPI's fees varied from policy to policy.[87]  In addition, Mr.

---

[84] To the extent Plaintiffs intend to utilize averages in applying the "true" LEs to the class as a whole, such an application is improper for class certification in a case like this, where adjustments would have to be made to take into account differences between AIDS patients versus senior citizens, as well as medical treatments known and available at the time the estimates were provided.  *See, e.g., Piggly Wiggly Clarksville, Inc.,* 100 Fed. App'x at 300 n. 2 (affirming denial of certification based on individualized damages issues where plaintiffs' proposed use of average profit margin, while a measure of the whole class, does not address "that damages to each *individual* class member could not be calculated by a formula and would require individualized proof"); *Bell Atlantic Corp.,* 339 F.3d at 307 (affirming the district court's denial of certification under Rule 23(b)(3) on the grounds that "the plaintiffs' damages formula—a formula based on nationwide averages that makes no effort to adjust for the variegated nature of the businesses included in the classes—cannot reasonably approximate the actual damages suffered by the class members"); *Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 312 (5th Cir. 1998) (reversing district court's trial plan that applied average damages); *Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* No. 04-5898, 2010 U.S. Dist. LEXIS 105646, at *100-01 (E.D. Penn. Sept. 30, 2010) (holding "plaintiffs' methodology [for calculating damages] is insufficient because the calculations were made using *average* prices... [that] say nothing about the actual price paid by each purported class member"); *Reed v. Advocate Health Care,* 268 F.R.D. 573, 594-95 (N.D. Ill. 2009) (holding plaintiffs failed to satisfy Rule 23(b)(3) because, *inter alia,* plaintiffs' damages expert "unacceptably relies on averages" and "fails to account for the host of factors that affects [each class member]").
[85] App. 000311 (Expert Report) (emphasis added).
[86] App. 000311-12 (Expert Report).
[87] *Id.*

Blacker opined that the diversity in the characteristics of both viatical and life settlements precludes the use of sub-class formulas.[88]  Finally, Mr. Blacker opined that "Plaintiffs' proposed methodology is theoretical in nature and vague," such that he was "unable to test the application [of the] methodology to determine whether it would adequately address damages on a class-wide basis."[89]   Nevertheless, Mr. Blacker also opined that Plaintiffs' "theoretical *pro rata* share" approach to damages was inadequate.[90]   Therefore, it is indisputable that the individualized issues predominate the calculation of damages and Plaintiffs have not satisfied their burden.

**D.     Plaintiffs have Failed to Establish the Superiority of a Class Action.**

Plaintiffs have also failed to establish superiority under Rule 23(b)(3).  Of course, "the predominance analysis has a tremendous impact on the superiority analysis … for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiff's claims …   [However], [t]he converse is also true: the less common the issues, the less desirable a class action will be as a vehicle for resolving them."  *Sacred Heart Health Sys. v. Humana Military Healthcare Servs.*, 601 F.3d 1159, 1183-84 (11th Cir. 2010) (internal quotations omitted); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.19 (5th Cir. 1996) ("The greater the number of individual issues, the less likely superiority can be established.").

The highly individualized issue of the "accuracy" or "reasonableness" of Dr. Cassidy's LEs, as well as the individualized issue of damages for each of the more than 2,300 policies, strongly disfavors a class action as the appropriate vehicle of adjudication of these claims.[91]   *See Steering Comm.,* 461 F.3d at 604 ("the predominance of individual issues relating to the

---

[88] App. 000314-16 (Expert Report).
[89] App. 000320-21 (Expert Report).
[90] App. 000325-27 (Expert Report).
[91] Motion 22.

plaintiffs' claims for compensatory and punitive damages detracts from the superiority of the class action device in resolving these claims").

Plaintiffs' sole argument to establish superiority is that "the size of the damages and other relief that Class members – and even the named Plaintiffs here – may recover may be insufficient to justify the prosecution of separate, individual actions."[92]   Plaintiffs submitted no evidence to support their position.[93]   To the contrary, Plaintiffs' position is belied by their own testimony. Proposed class representatives Yoskowitz, Mrs. Rice, and Vieira all testified they would pursue their claims individually if a class was not certified.[94]   Further, this is not a case in which the amounts at issue for each class member are minimal.   To the contrary, the Rices invested $200,000;  Turnbow invested $65,000;  Yoskowitz invested $50,000;  and Vieira invested $99,625.[95]   In addition, Plaintiffs seek compensatory damages, exemplary damages, attorney's fees, prejudgment interest, costs, restitution, disgorgement.[96]   *See Castano*, 84 F.3d at 748 (holding, where punitive damages and attorney's fees are available, individual suits were feasible and thus, supportive of a lack of superiority).   Thus, this is by no means a case in which individual plaintiffs have "no realistic alternative" to a class action.   For this additional reason, class certification is not appropriate.

## III.   CONCLUSION

Because Plaintiffs have not met their burden to demonstrate that a class should be certified under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Defendants

---

[92] *Id.* at 24.
[93] *See id.* at 24-35.
[94] App. 000175-76 (Yoskowitz Excerpts), at § B.4; App. 000130-31 (Mary Rice Excerpts), at § B.6.   Prior to reviewing his engagement agreement with interim-Lead Counsel, which provides that "[s]hould this case not be certified as a class action, you presently intend to dismiss your individual claim," Vieira testified that he would pursue his claim individually.   App. 000207-08 (Vieira Excerpts), at § A.1.   Neither Turnbow nor William Rice testified on this issue.
[95] App. 000003 (Peden Aff.), at ¶ 7.
[96] *See* Compl. ¶¶ 58, 71, 80.

respectfully request that the Court deny their Motion for Class Certification in its entirety and decline to certify a class or any sub-classes of purchasers of life settlements facilitated by Life Partners, Inc.  Defendants further request that the Court grant them any and all further such relief to which they may be justly entitled.

Respectfully submitted,

*/s/ Elizabeth L. Yingling*
Elizabeth L. Yingling
State Bar No. 16935975
E-Mail: elizabeth.yingling@bakermckenzie.com
Laura J. O'Rourke
State Bar No. 24037219
E-Mail: laura.orourke@bakermckenzie.com
Will R. Daugherty
State Bar No. 24053170
E-Mail: will.daugherty@bakermckenzie.com
BAKER & McKENZIE LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX  75201
Tel.: (214) 978-3000
Fax: (214) 978-3099

**ATTORNEYS FOR ALL DEFENDANTS**

**CERTIFICATE OF SERVICE**

I hereby certify that on May 16, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel who have registered with the Court.  All others were served a copy via U.S. mail.

*/s/ Elizabeth L. Yingling*

DALDMS/710122.3