1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  This is the start of

3      tape labeled number 1 of the videotaped deposition of

4      Kurt Carr in the matter of Turnbow, et al., versus LPI

5      for the United States District Court, Northern District

6      of Texas, Case Number 3:11-CV-1030-M.

7              This videotaped deposition is being held

8      in Waco, Texas on December 13, 2011, and the time is

9      approximately 2:34 p.m.

10             My name is Adam Meggs, the Legal Video

11     Specialist; the court reporter is Therese Casterline,

12     in association with TSG Reporting.

13             Would counsel please identify yourselves.

14             MR. GERACI:  Craig Geraci with Kahn Swick

15     & Foti for the plaintiffs.

16             MR. BRIDGES:  Jonathan Bridges, Susman

17     Godfrey, for the Plaintiffs.

18             MS. YINGLING:  Elizabeth Yingling, Baker

19     McKenzie, for the defendants.

20             MR. DAUGHERTY:  Will Daugherty, Baker

21     McKenzie, for the defendants.

22             THE VIDEOGRAPHER:  Our court reporter may

23     now swear in the witness.

24                    KURT CARR,

25     having been first duly sworn, testified as follows:

EXHIBIT "C-17"

Page 18

1     A.  Okay.
2     Q.  So if you would take a second to review that
3   and let me know.
4     A.  Second paragraph?  I'm sorry, which paragraph
5   again?
6     Q.  The first paragraph.
7     A.  Okay.
8     Q.  Does this 10-K, this Form 10-K, Exhibit 6,
9   accurately describe the life settlement transaction
10  from the buy side that you basically described to us
11  today?
12    A.  I don't think it gets into the level of detail
13  we just discussed.
14    Q.  Okay.  But -- but generally speaking?  Do you
15  have any reason to --
16    A.  This paragraph or the whole thing?
17    Q.  Just the first paragraph.
18    A.  I don't think you cover enough of it in the
19  first paragraph probably.
20    Q.  Do you have any reason to believe that that
21  first paragraph is inaccurate?
22    A.  No.
23    Q.  And what's contained in paragraph 1, has that
24  always been the process, or have there been material
25  changes throughout the years?

Page 19

1     MS. YINGLING:  Objection, mischaracterizes
2   his prior testimony.
3     A.  Yeah, I -- I'm not clear about the question,
4   really.
5     Q.  Paragraph 1 states, as a purchasing agent, we
6   identify, examine, and purchase policies on behalf of
7   our clients that match their buying parameters and
8   return expectations.  Because we are obliged to work
9   within these parameters, we must make offers that are
10  competitive from the seller's point of view but still
11  fit within the buying parameters of our clients.
12         And then it goes on to discuss how you
13  locate potential policy owners through a network of
14  life settlement brokers.
15         Is that generally -- generally the process
16  by which LPI acquires life insurance policies?
17    A.  Yes.
18    Q.  And has that always generally been the
19  process?
20    A.  Yes.
21    Q.  How does LPI determine the price it lists
22  fractional interest in life insurance contracts for
23  sale?
24    MS. YINGLING:  And I'm going to object to
25  the extent that Mr. Peden was the individual that was

Page 20

1   designated as the corporate rep to testify regarding
2   the sell side.
3         Mr. Carr is testifying regarding the buy
4   side of the transaction.
5     MR. GERACI:  But I think topic 2, if you
6   look, it says, the method or formula used to price
7   fractional interest in life insurance contracts and how
8   life expectancy estimates affect pricing.  And Kurt
9   Carr was designated for that topic.
10    A.  Okay.  So from my perspective in my job --
11  because I think Scott can answer this question
12  differently in -- in the sense that I make offers on
13  policies, so I have to start somewhere, and it's
14  with -- with an acquisition based on some sort of
15  target return for the client.  So I have an acquisition
16  I start with.  That's how I work with that.
17         Is -- does that help?
18    Q.  So are you purchasing or making bids on these
19  policies with specific clients in mind?
20    A.  I can, yes.  I wouldn't say every time, but,
21  yes, I can.
22    Q.  Are there times where you are purchasing these
23  policies basically just for inventory to offer for sale
24  to investors at later times, under no specific
25  parameters?

Page 21

1     A.  No, I think there's always parameters that fit
2   the buyers at the time, I think would be the way I -- I
3   could answer that.
4     Q.  Is there some formula or equation used to
5   price the fractional interest in life insurance
6   contracts?
7     A.  Not that I'm using.  What -- what I'm looking
8   at specifically is an acquisition based on some sort of
9   target return at a given life expectancy.  So that's --
10  I have to start in acquisition.  So as far as
11  fractional, in that -- I just don't work with
12  fractional pieces in -- in that way.
13    Q.  Is there a method or formula used to price the
14  life insurance policies purchased from the brokers?
15    A.  I -- that's still not clear to me, I'm sorry.
16    Q.  Besides your subjective review of potential
17  life insurance policies to purchase from brokers, is
18  there any LPI standard formula or method that you are
19  required to abide by to purchase the life insurance
20  policies?
21    MS. YINGLING:  I'm going to object to the
22  extent that the question mischaracterizes the witness'
23  prior testimony and assumes facts not in evidence.
24    A.  Yeah, it's not -- that makes it not clear.
25  I'm not sure.  Can you be more specific?  Is there --

6

EXHIBIT "C-17"

000302

Page 22

1    Q. What I'm trying to find out, if there is some
2  set equation that you plug X factor in, add Y factor,
3  and then that equals a potential purchase price that
4  you're required to abide by internally at LPI.
5    A. I don't work -- I guess I don't work that --
6  that way. So a target -- if I start with an
7  acquisition, it generally has a return of -- of a
8  certain amount. I don't plug anything in. I'm looking
9  for a target acquisition -- I mean, acquisition with a
10 target return between certain maybe parameters as far
11 as return for that life expectancy, so I have to start
12 there. So I'm not entering anything into a formula.
13        (Off the record.)
14    Q. And I think your answer was regarding how LPI
15 prices its fractional interests in life insurance
16 contracts, that you don't deal with that side, and that
17 we probably have to ask Mr. Peden that question?
18    A. No.
19        MS. YINGLING: Objection, mischaracterizes
20 testimony.
21    A. I -- can you read it back one more time.
22    Q. What I'm trying to determine is how LPI prices
23 its fractional interest in life insurance contracts for
24 sale.
25    A. Okay. And that would be -- I would use --

Page 23

1  when I make an offer on a policy, I start with an
2  acquisition, and the acquisition returns some sort of
3  a target internal rate of return at a given LE. That's
4  what we start with. That's how it's done.
5    Q. And with regard to pricing the actual
6  fractional interests that are then offered for sale to
7  investors, how are those prices determined?
8    A. Those are the -- it's all the same. I start
9  with an acquisition. That's their price. So their
10 fraction is a percentage of that acquisition, which
11 includes escrow and any fees and whatever we offered
12 the seller and so forth. That's the total.
13        (Off the record.)
14    Q. Well, what's the formula for coming up with
15 that price to offer the fractional interest to
16 potential investors?
17        MS. YINGLING: Objection, asked and
18 answered.
19    A. Exactly. I'm sorry, I don't know how to
20 answer it any better than that.
21        MR. BRIDGES: It's not an answer at all.
22        MS. YINGLING: Object to the sidebar.
23        There's not a question.
24    Q. Are life expectancy assessments necessary to
25 price these investments?

Page 24

1    A. Yes.
2    Q. Can you price a fractional interest in a life
3  insurance policy without a life expectancy?
4        MS. YINGLING: Objection, vague and
5  ambiguous.
6    A. When you ask me to narrow it down to a
7  fraction, I'm not thinking about -- I don't work in
8  fractions, so it --
9    Q. Just the life settlement.
10    A. I just want to make it clear that I -- I just
11 don't think of it that way.
12        So as far as the life expectancy is used
13 to determine the escrow required to reserve, the total
14 escrow required for the life expectancy, so that's done
15 first, and there's some sort of premium paid every
16 year, and so there's an outflow of cash from the
17 person -- from the -- from this point, I guess the
18 fractional buyer's escrow account, each year that a
19 premium payment's made -- you have a premium payment
20 being made every year.
21        And I think this is where you're going,
22 but I'm not sure. So that's why I keep asking for
23 clarification on -- on that, and -- and where that's
24 going, because I'm not -- I'm still not really sure.
25    Q. What I'm trying to do here is just understand

Page 25

1  how the transaction works and how the life insurance --
2  how the life settlement contracts are priced, and I
3  might be using the wrong terms. I'm not familiar with
4  the industry, so that's kind of where you come in, and
5  I'm trying to get some guidance from you. And I'm
6  probably just phrasing the questions wrong, so I'll try
7  to be more specific.
8        How do life expectancy assessments factor
9  into the determination of the price of the investment
10 of the life insurance?
11    A. It's going to help set my target
12 acquisition -- or my acquisition based on the target
13 return for that life expectancy.
14    Q. What is the relationship between the duration
15 of the life expectancy assessment and the price that
16 the life settlement contract is ultimately offered to
17 an investor?
18        MS. YINGLING: Objection, vague and
19 ambiguous.
20    A. I -- I could answer based on something more --
21 I'm having a hard time just being -- with the specific
22 example.
23    Q. Well, let me give you a hypothetical.
24        If there were two policies, A and B, with
25 the exact same elements, except for the life -- the

TSG Reporting - Worldwide          800-702-9580

EXHIBIT "C-17"

Page 26

1   life expectancy assessment was different in A, was
2   shorter in A, two to three years versus five to seven
3   years in B, what would the price difference be between
4   the two, generally speaking?
5       A. It would depend on the cost of insurance. So
6   the higher the cost of insurance would make a -- a
7   difference, given the return requirement.
8       Q. So if all things are the same, and one life
9   expectancy assessment is shorter than the other, would
10  the -- the policy with the shorter duration be more
11  expensive than the other policy?
12          MS. YINGLING: Objection, calls for
13  speculation, vague and ambiguous.
14      A. I -- I couldn't say exactly. I'd have to have
15  something more specific. There's several factors that
16  go into the pricing of a policy. It's possible. I'm
17  not sure.
18      Q. When the life settlement transaction closes
19  and the escrow agent pays fees or charges to LPI, how
20  is that fee determined?
21      A. The fees are -- are included at the time I
22  make an offer, so at the time I make an offer, I start
23  with a target, the acquisition at the -- that level
24  that we just discussed, and I have to estimate fees
25  related to that, which would be medical fee, generally

Page 27

1   around 500, and that would be 1100 or 1,000. It
2   just -- we're just -- I'm plugging in estimates at that
3   point. I don't have it down to an exact number until
4   we have closed the transaction or when we send it over,
5   but -- for closing.
6           And then I have to estimate licensee fees
7   at a percentage, and given at the point in time it --
8   it could be different over the years. So I have to
9   plug in a number for that and determine what that
10  estimate could be.
11      Q. So is it fair to say that the fees vary from
12  policy to policy?
13      A. Yes.
14      Q. Could you explain to me to whom the fees are
15  paid?
16      A. Going back to your last question, the escrow
17  company's going to pay Life Partners the -- the gross
18  amount, the difference between what the seller's
19  receiving and the acquisition price and -- after you've
20  subtracted the escrow amount, so they're going to send
21  that amount to Life Partners. And then Life Partners
22  is going to pay the broker and the licensees and the
23  medical -- Dr. Cassidy or 21st Services.
24      Q. Are Dr. Cassidy and 21st services the only
25  people who provide life expectancy assessments for LPI

Page 28

1   for the sale of life settlements?
2       A. Today, yes.
3       Q. Were there others at any other time?
4       A. There were for different buyers.
5       Q. And why would that occur?
6       A. Because the buyer requested certain reviews.
7       Q. And would those be in addition to Dr. Cassidy
8   and 21st Services or in lieu of?
9       A. In addition.
10      Q. Are certain life expectancy providers used for
11  institutional investors versus retail investors?
12      A. Institutional investor could determine --
13  they -- they like certain reviewers, and so they
14  would -- they would request certain reviews from
15  certain companies. We've had that over time.
16      Q. And I think I know the answer to this, but
17  does Dr. Cassidy still prepare life expectancy
18  assessments for LPI to this date?
19      A. Yes.
20      Q. And who at LPI would be the contact with
21  Dr. Cassidy or his staff?
22      A. Someone in the transaction department is going
23  to be contacting him as far as, here are the new ones,
24  and then receiving that information back from them,
25  somebody in that department. It could be Chris --

Page 29

1   Chris Ward or Ladonna Johnson. It's different people
2   over the last several years.
3       Q. And now that LPI receives life expectancy
4   assessments from Dr. Cassidy and 21st Services, how
5   would LPI reconcile some material difference between
6   the two?
7       A. I think you'd have to define material
8   difference and how that -- what that means. From my
9   perspective, they issue opinions, both of them. I
10  escrow for the longest life expectancy, so I'm not
11  reconciling differences in -- in -- in any sense
12  that -- that I'm aware of. I --
13      Q. Okay. Does LPI purchase life settlement
14  investments for its own investment purposes?
15      A. The question one more time?
16      Q. Does LPI purchase life settlement contracts or
17  investments for its own investment portfolio?
18      A. Yes.
19      Q. When making these purchases for its own
20  portfolio, does LPI rely on life expectancy assessments
21  from Dr. Cassidy for these investments?
22      A. I don't make those decisions. I couldn't tell
23  you who -- if they rely on something else or not.
24      Q. Do you know why LPI acquires policies for its
25  own portfolio?

EXHIBIT "C-17"

Page 53

1    I, KURT CARR, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4                          _Kurt Carr_

5                          KURT CARR

6

7  THE STATE OF _Texas_ )

8  COUNTY OF _McLennan_ )

9

10    Before me, _Christina Butler_ , on this

11  day personally appeared KURT CARR, known to me (or

12  proved to me under oath or through _DL 12858945_ )

13  (description of identity card or other document) to be

14  the person whose name is subscribed to the foregoing

15  instrument and acknowledged to me that they executed

16  the same for the purposes and consideration therein

17  expressed.

18    Given under my hand and seal of office this

19  _16_ day of _January_ , 2011.

20

21  [Notary Seal:
    Christina R. Butler
    Notary Public
    State of Texas
    My Comm. Exp 5-18-2013]          _Christina R. Butler_

22

                            NOTARY PUBLIC IN AND FOR

23

                            THE STATE OF _Texas_

24  My commission expires: _5-18-2013_

25

EXHIBIT "C-17"                                      000305

Page 54

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE NORTHERN DISTRICT OF TEXAS
3                    DALLAS DIVISION
4

5    SEAN TURNBOW, WILLIAM and    )
     MARY RICE, ROBERT YOSKOWITZ, )
6    FREDERICK VIEIRA, and        )
     ANTHONY TAYLOR, on behalf    )
7    of themselves and all others )
     similarly situated,          )
8                                 )
          Plaintiffs,             )
9                                 )
     VS.                          )   NO. 3:11-CV-1030-M
10                                )
     LIFE PARTNERS, INC., LIFE    )
11   PARTNERS HOLDINGS, INC.,     )
     BRIAN D. PARDO, and R. SCOTT )
12   PEDEN,                       )
                                  )
13        Defendants.             )

14              REPORTER'S CERTIFICATION
15    ORAL AND VIDEOTAPED DEPOSITION OF KURT CARR
16                DECEMBER 13, 2011
17        I, Therese J. Casterline, Registered Merit
18   Reporter, Certified Realtime Reporter, Certified
19   Shorthand Reporter in and for the State of Texas, do
20   hereby certify that there came before me on the 13th
21   day of December, 2011, at the offices of Naman, Howell,
22   Smith & Lee, PLLC, located at 204 Woodhew Drive, Waco,
23   Texas, the following named person, to wit:  KURT CARR,
24   who was duly sworn to testify the truth, the whole
25   truth, and nothing but the truth of knowledge touching

EXHIBIT "C-17"                                        000306

Page 55

1  and concerning the matters in controversy in this

2  cause; and that he was thereupon examined upon his oath

3  and his examination reduced to typewriting under my

4  supervision; that the deposition is a true record of

5  the testimony given by the witness, that review by the

6  witness was requested on the record, and signature of

7  the witness is to be signed before any notary public.

8       I further certify that I am neither attorney

9  nor counsel for nor related to any of the parties to

10  the action in which this deposition is taken, and

11  further that I am not a relative or employee of any

12  attorney or counsel employed by the parties hereto, or

13  financially interested in this action.

14       Given under my hand on this the 22nd day of

15  December, 2011.

16

17

_____

Therese J. Casterline, Texas CSR

18  5001, Expiration Date:  12-31-11

Firm Registration No. 615

19  TSG Reporting - Worldwide

747 Third Avenue

20  New York, New York  10017

(877) 702-9580

21

22

23

24

25

EXHIBIT "C-17"                                                     000307

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SEAN TURNBOW, WILLIAM and MARY RICE, ROBERT YOSKOWITZ, FREDERICK VIEIRA, and ANTHONY TAYLOR, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 3:11-CV-OI030-M |
| v. | ) ) | |
| | ) | |
| LIFE PARTNERS, INC., LIFE PARTNERS HOLDINGS, INC., BRIAN PARDO, and R. SCOTT PEDEN, | ) ) ) ) | |
| | ) | |
| Defendant. | ) ) | |

**EXPERT REPORT OF BRUCE L. BLACKER**

**May 16, 2012**

EXHIBIT " D "

000308

# EXPERT REPORT OF BRUCE L. BLACKER

## MAY 16, 2012

I.     ASSIGNMENT ...................................................................................................1

II.    SUMMARY OF OPINIONS .......................................................................... 2

    A. A Class-Wide Formula Cannot Be Utilized in the Purported Class ............................ 2

    B. A Formula Cannot Be Utilized to Determine the Damages Allegedly Suffered by the Named Plaintiffs ................................................................................................. 4

    C. A Formula Cannot Be Utilized to Determine the Damages Allegedly Suffered by a Random Sample of Investors in the Purported Class................................................. 4

        1. Viatical and Life Settlement Policies (Random Sample of Investors) ................... 5

        2. Life Settlement Policies Only (Random Sample of Investors).............................. 5

        3. Viatical Policies Only (Random Sample of Investors).......................................... 6

III.   QUALIFICATIONS AND EXPERIENCE .................................................... 7

IV.   FACTS, DATA, AND INFORMATION RECEIVED.................................... 9

V.    OVERVIEW OF LIFE SETTLEMENT AND VIATICAL TRANSACTIONS......... 9

VI.   OVERVIEW OF PLAINTIFFS' PROPOSED DAMAGES METHODLOGY ........ 11

VII.  ANALYSIS OF SELECT INVESTORS AND POLICIES ......................... 12

    A. Characteristics of Life Settlement Policies of the Named Plaintiffs.......................... 12

    B. Characteristics of Life Settlement and Viatical Policies of Random Sample............. 14

    C. Any Class-Wide Formula Cannot Estimate Damages Suffered by Individual Purchasers of the Purported Class.............................................................................. 16

    D. Any Class-Wide Formula Cannot Estimate the Disgorgement of LPI's Fees for Individual Purchasers of the Purported Class ........................................................... 18

EXHIBIT "___D___"

## EXPERT REPORT OF BRUCE L. BLACKER

### MAY 16, 2012

## I.   ASSIGNMENT

1.   I have been asked by counsel for Life Partners, Inc. et al. ("LPI") to apply my accounting, economic, financial, and damage quantification expertise to issues bearing on Plaintiffs' motion for class certification in the of matter *Sean Turnbow, William and Mary Rice, Robert Yoskowitz, and Frederick Vieira, on behalf of themselves and all others similarly situa ted v. Life P artners, Inc., Life Partners   Holdings, Inc., Brian Pardo, and R. Scott Peden.*[1]   I understand that Plaintiffs seek to represent the following:

> (1) a Class, consisting of all those in the United States who at any time purchased or otherwise acquired fractional interests in life settlements from or through LPI or LPHI for which Cassidy provided life expectancy assessments; and (2) a Subclass (the "17200 Subclass") comprising those members of the Class who are or were residents of California at the time they acquired Defendants' life settlements.  Excluded from the Class are Defendants, the officers and directors of LPI and LPHI at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.[2]

2.   Specifically, I understand that Plaintiffs allege that "[d]ue to the materially improper and inaccurate life expectancy assessments utilized by LPI, LPI overcharged Class members for their life settlement investments...."[3]  As a result of the alleged wrongful conduct of Life Partners, Inc., Life Partners Holdings, Inc., Brian Pardo, and R. Scott Peden ("Defendants"), the Plaintiffs and purported Class "seeks certification of claims for damages, restitution and fee disgorgements...."[4]

---

[1] Plaintiffs' Motion for Class Certification and Memorandum in Support, February 15, 2012.

[2] Consolidated Class Action Complaint, August 25, 2011, pp. 12 – 13.

[3] Consolidated Class Action Complaint, August 25, 2011, p. 5.

[4] Consolidated Class Action Complaint, August 25, 2011, p. 13.

- 1 -

000310

Expert Report of Bruce L. Blacker
May 16, 2012

3.      Given the Plaintiffs' allegations in this matter, I have been asked by counsel for LPI to evaluate whether formulas can be developed and applied <u>on a class-wide basis</u> to determine the claimed damages suffered by individual purchasers in the purported Class.

## II.      <u>SUMMARY OF OPINIONS</u>[5]

4.      Based upon (a) my accounting, economic, financial, and damages quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) my discussions with LPI personnel, and (e) standard damage quantification techniques, I have concluded that a class-wide formula cannot be utilized to reasonably estimate the actual damages allegedly suffered by individual purchasers in the purported Class.  Without a single formula, the computation of damages would be a highly individualized task.

### A.   <u>A Class-Wide Formula Cannot Be Utilized in the Purported Class</u>

5.      An analysis of the numerous variables used to price both life settlement policies and viatical policies indicate that a class-wide formula cannot be utilized to determine the alleged overpayment damages or disgorgement of LPI's fees.

   a.   <u>Claimed Overpayment Damages</u>.   Any class-wide formula cannot be utilized to determine the allegedly overpayment damages suffered by individual purchasers in the purported Class.   This is because there are many factors that affect the acquisition cost of policies including:

      i.   face value of the policy,

      ii.  life expectancy estimate,

      iii. payment to seller,

      iv.  premiums escrowed,

---

[5] This Summary of Opinions is intended to be an overview.  A full description of my opinions is contained throughout this narrative and the associated exhibits.

EXHIBIT " <u>D</u> "

000311

v.  fees to participants (origination, licensee, escrow, medical, and LPI), and

vi.  investor's investment preference and expectations.

Many of these factors vary from policy to policy and result in unique differences among policies.  In the present case, any class-wide formula, including plaintiffs' theoretical approach of using a class member's *pro rata* share based on his or her investment, would rely on class average data and would be inadequate for determining individual damages.  Such an approach will lead to certain purported Class members being overcompensated while other members would be undercompensated. Therefore, individual inquiry is required to evaluate the impact on the acquisition cost of a policy, if any, from Plaintiffs' purported corrections to LPI's life expectancy estimates.

b.  Claimed Disgorgement of LPI's Fees.  Similarly, any class-wide formula cannot determine the disgorgement of LPI's fees that may be awarded to individual purchasers of the purported Class.  This is because the fees received by LPI, in terms of both dollar amount and percentage of acquisition cost, vary from policy to policy (irrespective of the policies being a life settlement or viatical policy).  This is because there are many factors that affect LPI's fees including:

i.  face value of the policy,

ii.  acquisition cost,

iii.  life expectancy estimate,

iv.  payment to seller,

v.  premiums escrowed,

vi.  fees to participants (origination, licensee, escrow, medical, and LPI), and

vii. investor's investment preference and expectations.

Any class-wide formula for alleged disgorgement of LPI's fees will lead to certain purported Class members receiving disgorgement amount greater than the fees that LPI received from the policies acquired by these purchasers.  Accordingly, other purported Class members will receive disgorgement amount less than the fees that LPI received from the policies acquired by these purchasers.

6.  My conclusions are supported by, among other things, an analysis of (a) the life settlement polices invested in by Sean Turnbow, William and Mary Rice, Robert Yoskowitz, and Frederick Vieira (the "Named Plaintiffs") and (b) an analysis of the life

EXHIBIT " D "

Expert Report of Bruce L. Blacker
May 16, 2012

---

settlement policies and viatical policies invested in by a random sample of investors in

the purported Class.

**B.  A Formula Cannot Be Utilized to Determine the Damages Allegedly Suffered
by the Named Plaintiffs**

7.     I have analyzed the Named Plaintiffs' investment portfolios in life settlement policies.

The investment portfolios of the Named Plaintiffs involve 26 life settlement policies.[6]  I

found the following information related to these policies.

   a.  The number of fractional share policies purchased by the Named Plaintiffs ranges
       from two to ten.

   b.  The estimated life expectancy ranges from four to six years, with an average of 4.7
       years.

   c.  The amount paid to the seller as a percentage of acquisition cost ranges from ▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   d.  Acquisition cost as a percentage of face value ranges from ▮▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   e.  Fee paid to origination source as a percentage of acquisition cost ranges from ▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   f.  Fee paid to licensees as a percentage of acquisition cost ranges from ▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

   g.  Fee paid to LPI as a percentage of acquisition cost ranges from ▮▮▮▮▮▮▮▮
       ▮▮▮▮▮▮▮▮▮▮▮▮▮.

**C.  A Formula Cannot Be Utilized to Determine the Damages Allegedly Suffered
by a Random Sample of Investors in the Purported Class**

8.     In addition to analyzing the investment portfolio of the Named Plaintiffs, I have

analyzed the investment portfolios of 19 investors who were randomly selected from the

purported Class members.  The investment portfolios of the randomly selected purported

---

[6] Out of these 26 policies, two policies were invested in by multiple Named Plaintiffs. Therefore, the investment
portfolios of the Named Plaintiffs involve 24 unique life settlement policies. (*See* **Appendix A**.)


EXHIBIT "___D___"

- 4 -

**REDACTED**
**ATTORNEYS EYES ONLY**

000313

Expert Report of Bruce L. Blacker
May 16, 2012

Class members involve 29 viatical policies[7] and 39 life settlement policies[8] (68 total

policies).[9]

### 1. Viatical and Life Settlement Policies (Random Sample of Investors)

9.    Based upon an analysis of the policies invested in by the 19 investors identified by a

random sample, I found the following information.

    a.  The number of fractional share viatical and life settlement policies purchased by the
purported Class members selected in the random sample ranges from one to fifteen.

    b.  The estimated life expectancy ranges from one to seven years, with an average of 3.7
years.

    c.  The amount paid to the seller as a percentage of acquisition cost ranges from ▮
▮▮▮▮▮▮▮▮▮▮▮.

    d.  Acquisition cost as a percentage of face value ranges from ▮▮▮▮▮
▮▮▮▮▮▮▮.

    e.  Origination fee as a percentage of acquisition cost ranges from ▮▮▮▮
▮▮▮▮▮.

    f.  Fee paid to licensees as a percentage of acquisition cost ranges from ▮▮▮
▮▮▮▮▮▮.

    g.  Fee paid to LPI as a percentage of acquisition cost ranges from ▮▮▮▮
▮▮▮▮▮▮.

### 2. Life Settlement Policies Only (Random Sample of Investors)

10.    I also evaluated the life settlement policies in isolation to see if a sub-class formula

could be utilized to calculate the damages allegedly suffered by individual purchasers in

the purported Class (sub-class).  Based on my analysis of the <u>life settlement</u> policies

---

[7] Two investors purchased fractional interest from the same viatical policy. Therefore, there are 28 unique viatical policies involved. (*See* **Appendix B**.)

[8] One investor purchased two fractional shares from one life settlement policy through two different accounts. Therefore, there are 38 unique life settlement policies involved. (*See* **Appendix B**.)

[9] Three policies obtained from the random sample do not involve a life expectancy estimate by Dr. Donald T. Cassidy. Therefore, those policies are not considered for the count of policies or any other analyses presented in this report.

EXHIBIT " D "    **REDACTED**
**ATTORNEYS EYES ONLY**    000314

acquired by the purported Class members selected in a random sample, I conclude that

there is diversity in the characteristics of life settlement policies which precludes the use

of a sub-class formula.

   a.  The number of fractional share life settlement policies purchased by the purported Class members selected in a random sample ranges from one to fifteen.

   b.  The estimated life expectancy ranges from four to seven years, with an average of 4.4 years.

   c.  The amount paid to the seller as a percentage of acquisition cost ranges from ██ ███████████████████████████████████.

   d.  Acquisition cost as a percentage of face value ranges from ████████ ████ ███████████████████████.

   e.  Origination fee as a percentage of acquisition cost ranges from ████████ ███████████████████.

   f.  Fee paid to licensees as a percentage of acquisition cost ranges from ████████ ███████████████████████.

   g.  Fee paid to LPI as a percentage of acquisition cost ranges from ████████ ████████████████████.

### 3. Viatical Policies Only (Random Sample of Investors)

11.   I also evaluated the viatical policies in isolation to see if a sub-class formula could be

utilized to calculate the damages allegedly suffered by individual purchasers in the

purported Class (sub-class). Based upon my analysis of the <u>viatical</u> policies acquired by

the purported Class members selected in a random sample, I conclude that there is

diversity in the characteristics of viatical policies which precludes the use of a sub-class

formula.

   a.  The number of fractional share viatical policies purchased by the purported Class members selected in a random sample ranges from one to nine. Based on observations of the policies in the random sample, purchasers of viatical policies generally acquire fewer policies per individual.

EXHIBIT " __D__ "
**ATTORNEYS EYES ONLY**     **REDACTED**     000315

Expert Report of Bruce L. Blacker
May 16, 2012

---

    b. The estimated life expectancy ranges from one to four years, with an average of 2.9 years. Based on observations of the policies in the random sample, the estimated life expectancy for viatical policies is generally lower than that for life settlement policies.

    c. The amount paid to the seller as a percentage of acquisition cost ranges from ███ ██████████████████████████████████████ .

    d. Acquisition cost as a percentage of face value ranges from ███████████ ████████████████████████ Acquisition cost for viatical policies is generally higher than that for life settlement policies.

    e. Origination fee as a percentage of acquisition cost ranges from █████████████ █████████████████ .

    f. Fee paid to licensees as a percentage of acquisition cost ranges from ██████████ ██████████████████████ .

    g. Fee paid to LPI as a percentage of acquisition cost ranges from ██████████████ ██████████████████ .

12.    My detailed evaluation and the bases for my opinions are contained throughout my report and associated exhibits.

## III.   QUALIFICATIONS AND EXPERIENCE

13.    I am a Vice President at Analysis Group, Inc. ("AG"). AG provides economic, financial, and business strategy consulting to its clients and specializes in the interpretation of economic and financial data and the development of economic and financial models. Nationally, AG consists of nearly 500 professionals who specialize in, among other things, the fields of economics, accounting, finance, and strategy consulting.

14.    My primary responsibility at AG is to provide financial, accounting, and damage quantification consulting services to clients. During my career I have provided financial consulting services in intellectual property (copyright infringement, patent infringement, trade dress, trademark, and trade secrets), breach of contract,

EXHIBIT " D "   **REDACTED**
ATTORNEYS EYES ONLY   000316

Expert Report of Bruce L. Blacker
May 16, 2012

mismanagement/negligence, lender liability, securities-related, wrongful death, and wrongful termination claims. I have provided expert testimony in deposition and trial settings.

15. I specialize in the application of financial and accounting principles to complex financial disputes, and I am generally retained in cases requiring financial analyses. During the course of my career, I have frequently performed financial analyses using large databases of information and complex computer models.

16. I received my Bachelor of Science in Accounting from Brigham Young University in 1989 and a Masters in Accounting from Brigham Young University in 1989. I am a Certified Public Accountant ("CPA") licensed in the state of Texas (AG is not a CPA firm) and Certified in Financial Forensics ("CFF") by the American Institute of Certified Public Accountants. Attached as **Exhibit 1** is a true and correct copy of my current resume that includes my trial and deposition testimony experience. My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

17. AG is being compensated based upon hours incurred and the hourly rates of the personnel involved. Payment to AG is not contingent upon my findings or the outcome of this matter. AG is being compensated at a rate of $475 per hour for my time. Hourly rates for other AG personnel working on this matter range from $200 to $475 per hour, depending upon their level and experience.

EXHIBIT " D "                                                                      000317

Expert Report of Bruce L. Blacker
May 16, 2012

---

IV. **FACTS, DATA, AND INFORMATION RECEIVED**

18. The facts, data, and information available to me in forming my opinions are contained in

    **Exhibit 2** or elsewhere in my report (including exhibits).  Examples of the types of

    information available to me include the following:

    a. legal documents (e.g., Consolidated Class Action Complaint, Plaintiffs' Motion for
       Class Certification and Memorandum in Support; Defendants' Motion to Dismiss
       and Brief in Support; etc.);

    b. deposition transcript (i.e., deposition of Kurt Carr as Corporate Representative of
       Life Partners, Inc. taken December 13, 2011);

    c. documents produced by LPI (e.g., purchaser portfolios of the Named Plaintiffs;
       closing worksheets for the Named Plaintiffs; purchaser ID's for the purported Class:
       purchaser portfolios of a random sample of purported Class members, Summary of
       Transaction Memorandums for a random sample of purported Class members; etc.);

    d. information independently obtained (e.g., Life Partners, Inc. website; various Life
       Partners Holdings, Inc. annual reports; etc.).

    e. Discussions with LPI Personnel (i.e., Kurt Carr (Vice President of Policy
       Administration))

19. My analyses and opinions are based upon the information available to date and are

    contained throughout this report.  I reserve the ability to (a) review documents,

    deposition transcripts, expert reports, or other information still to be produced by the

    Parties to this dispute and (b) supplement my opinions based upon that review, if

    appropriate.  I also reserve the ability to use demonstrative exhibits and/or other

    information at trial to illustrate my opinions.

V. **OVERVIEW OF LIFE SETTLEMENT AND VIATICAL TRANSACTIONS**

20. Transactions of life settlement and viatical policies involve the sale of an existing life

    insurance policy to another party.  The selling policyholder receives an immediate cash

    payment.  The purchaser acquires an ownership interest in the policy, including future

EXHIBIT "___D___"

000318

Expert Report of Bruce L. Blacker
May 16, 2012

obligations to make premium payments.  When the insured dies, purchasers receive cash payment from the death benefits of the policies.  Viatical policies are different from life settlement policies because the insureds have been determined to be terminally ill.

21.   Life settlement transactions can involve many different parties, including: (a) the policy owners/insured ("Seller"), (b) originators or brokers to the policy sellers, (c) life settlement providers such as LPI that pool purchasers to acquire policies and facilitate the buy-sell process, (d) investors who purchase the policies, (e) financial planners (LPI's "Licensees") who market the policies to potential purchasers, and (f) individuals or entities that provide life expectancy estimates for the life settlement and viatical policies that are being traded.

22.   I am informed by LPI that purchasers of life settlement or viatical policies facilitated by LPI generally acquire fractional shares.  The purchasers pay a portion of a policy's acquisition cost according to their fractional percentage share.  The acquisition cost is used for the following purposes: to pay the seller of the policy, to pay the various fees of third-party participants, and to cover the expected future premiums on the policy.  The amount paid to the seller of the policy is based on competitive bids and varies as a percentage of the face value of the policy.  The fees paid to third-parties, as a percentage of acquisition cost, also vary across policies.  Because the percentage amounts paid to third-party participants in a life settlement or viatical policy vary, as a result, the fees received by LPI as a percentage of acquisition cost also vary across policies.

EXHIBIT "__D__"

000319

Expert Report of Bruce L. Blacker
May 16, 2012

23.     I am informed by LPI that LPI competes against other entities in bidding the acquisition

        of life settlement and viatical policies.  LPI, more often than not, does not facilitate the

        acquisition of the policies on which they bid.[10]

## VI.    OVERVIEW OF PLAINTIFFS' PROPOSED DAMAGES METHODLOGY

24.     I understand that Plaintiffs allege that Dr. Cassidy systematically underestimated the life

        expectancies and that such underestimation of life expectancies caused the purported

        Class members damages because they overpaid for their policies.[11]  Plaintiffs claim that

        "if an insured outlives a life expectancy estimate, death benefits accruing from that

        policy are delayed.  This reduces the return on investment and also requires additional

        premium payments."[12]

25.     Specifically, Plaintiffs state the following:

                The claims of the Class are rooted in the fact that Cassidy's method for
                determining LEs systematically underestimated the amount of time that
                would pass before Class members would receive a return on their
                investment. ... Once the magnitude of the systematic understatement is
                determined, it can be "reversed out" to develop "true" LEs associated
                with each policy at the time class members acquired their interests.
                Plaintiff's damages expert will then derive a discount rate that is
                observable in the market for life settlements by calculating the internal
                rate of return associated with the policy's cash flows given the LE.   This
                observed discount rate can then be used, in conjunction with the "true"
                LEs, to determine the true value of the life settlement interests purchased
                by class members at the time of purchase.  Damages will then be the
                difference between these values and the amounts paid for Class members'
                life settlement interests.[13]

26.     I have been asked by counsel for LPI to evaluate the Plaintiffs' proposed

        damagesmethodology as set forth.  Plaintiffs' proposed methodology is theoretical in

_____

[10] Based on discussions with Mr. Kurt Carr.

[11] Consolidated Class Action Complaint, August 25, 2011, p. 4.

[12] Consolidated Class Action Complaint, August 25, 2011, p. 4.

[13] Plaintiffs' Motion for Class Certification and Memorandum in Support, February 15, 2012, pp. 22 – 23.

EXHIBIT "__D____"                                                                000320

nature and vague.  Even assuming that the life expectancies can be proven to be "systematically underestimated", Plaintiffs have not specified or demonstrated how their damages expert would implement the theoretical methodology and derive a class-wide formula for estimating damages.[14]  Because the methodology is vague and theoretical, I am unable to test the application of Plaintiffs' methodology to determine whether it would adequately address damages on a class-wide basis.  However, as discussed and illustrated later in my report, an individual inquiry on a policy by policy basis is required to assess the inputs Plaintiffs purport to use (i.e., a discount rate(s), internal rate of return(s), and a policy's cash flows given the life expectancy).

## VII.   ANALYSIS OF SELECT INVESTORS AND POLICIES

27.    I have examined the characteristics of life settlement policies acquired by the Named Plaintiffs and certain life settlement and viatical policies acquired by purchasers in a random sample from the purported Class members.

### A.   Characteristics of Life Settlement Policies of the Named Plaintiffs

28.    All Named Plaintiffs purchased only life settlement policies.   Rice purchased five policies, Turnbow purchased nine policies, Vieira purchased ten policies, Yoskowitz purchased two policies.

29.    I received from LPI purchaser portfolio documents for the Named Plaintiffs. These documents include a summary of the fractional share policies purchased by each named plaintiff, a closing worksheet for each policy purchased, a preliminary analysis worksheet of the policy, and a confidential case history of the underlying life insurance policy to the life settlement policy transacted. From those documents I collected key

---

[14] Should Plaintiffs' damages expert propose a specific formula, I reserve the right to evaluate such information and to supplement my report, if necessary.

EXHIBIT "  D   "

Expert Report of Bruce L. Blacker
May 16, 2012

information relating to each policy purchased by the Named Plaintiffs, including the face value of the policy, the acquisition cost, the amount the purchaser invested in the policy, the date the policy was funded, the unique identifier of the policy, the estimated life expectancy, the amount paid to the seller, total premiums escrowed, and the fees paid to various parties of the transaction, including the medical reviewer, the origination source (e.g. brokers), the licensee, referrals, escrow agency, and LPI. The purchaser portfolio data are presented in **Appendix A**.

30.     The Named Plaintiffs exhibit different investment preferences.  **Exhibit 3** shows that the number of fractional share policies purchased by the Named Plaintiffs varies. For example, plaintiff Vieira chose to invest in ten fractional share policies, whereas plaintiff Yoskowitz only acquired two fractional share policies.  The Named Plaintiffs also exercised different choices of investment in policies that have varying life expectancies. For example, plaintiff Rice invested primarily in policies with life expectancy of five years. Four out of the five fractional share policies purchased by Rice had a life expectancy estimate of five years.  In contrast, the majority of the fractional share policies purchased by plaintiff Vieira (seven out of ten) had a life expectancy of four years.  The variation in the life expectancy associated with the policies purchased by the Named Plaintiffs indicates difference in preference in terms of risk and return.

31.     When examining the policies purchased by the Named Plaintiffs as a whole, I find dispersion in the various components of acquisition cost. The results show, in **Exhibit 4**, that various components of the acquisition cost vary from policy to policy. For example, the amount paid to the seller as a percentage of acquisition cost ranges from ████████

████████. The fee paid to LPI as a percentage of acquisition cost ranges from ██

EXHIBIT " D "          **REDACTED**          000322
          **ATTORNEYS EYES ONLY**

Expert Report of Bruce L. Blacker
May 16, 2012

█████████████. Furthermore, I separately examined the percentage fees paid to

LPI by each named plaintiff to see whether a given named plaintiff was charged the

same or similar percentage fee to LPI for all of the fractional share policies that he or she

purchased. The results show, in **Exhibit 5**, that even for the same named plaintiff, the

percentage fees paid to LPI vary across the policies purchased by that plaintiff. For

example, out of the nine fractional share policies purchased by plaintiff Turnbow, the

minimum percentage fee paid to LPI was ███████████████

Similarly, out of the ten fractional share policies purchased by plaintiff Vieira, the

minimum percentage fee paid to LPI was ███████████████

32.   A closer investigation on the amount paid to the seller as a percentage of acquisition cost

shows that there is also disparity in that characteristic among the policies acquired by the

same named plaintiff and across Named Plaintiffs. (*See* **Exhibit 6**.)

## B.   Characteristics of Life Settlement and Viatical Policies of Random Sample

33.   To verify my observations for the fractional share life settlement policies purchased by

the Named Plaintiffs, I obtained a random sample of individuals in the purported Class

who purchased viatical and/or life settlement policies during the proposed class period

from 1999 to 2011.[15]   I obtained from LPI purchaser portfolio documents for the

---

[15] I acknowledge that although all Named Plaintiffs purchased only life settlement policies, the purported Class also includes purchasers who acquired fractional share viatical policies.  Therefore, I generated a random sample of both life settlement and viatical policies. The random sample generation process starts with a database of 15,895 purchaser IDs and the corresponding dates on which purchasers acquired fractional share life insurance policies from LPI for the first time during the proposed class period.  From this database, I drew a random sample from each year (1999 – 2011) using the software program SAS, with a seed value specified so that the random sample generation process can be replicated.  Information provided by LPI for the randomly selected purchasers revealed that the purchaser selected from the year 2001 did not meet the criteria for this class action lawsuit.  Specifically, the purchaser purchased resold policies involving life expectancy estimates by Dr. Kelly.  To replace that purchaser, I randomly selected another purchaser from the year 2001 using a different seed value.  This sample selection procedure resulted in a random sample of 13 purchasers, with 12 viatical policies and 38 unique life settlement policies involving a life expectancy estimate by Dr. Donald T. Cassidy.  Given that the sample size for viatical policies is smaller than that for life settlement policies in the random sample, I drew an additional random

EXHIBIT "__D__"   **REDACTED**
**ATTORNEYS EYES ONLY**   000323

Expert Report of Bruce L. Blacker
May 16, 2012

randomly selected purchasers in the sample, and conducted the same data collection effort as I did for the Named Plaintiffs.  With the collected data[16], I performed the same analyses, as applied to the Named Plaintiffs, to the random sample.

34.   I find my observations for the policies in the random sample generally consistent with my findings for the policies purchased by the Named Plaintiffs.  As shown in **Exhibits 7**, **8**, **9**, and **10**, there is dispersion in the number of fractional share policies purchased by each individual, the amount paid to the seller as a percentage of acquisition cost, and the percentage fees paid to LPI for the life settlement and viatical policies separately, and as a whole.  For example, the percentage price paid to the seller ranges from ████ ███████████████████ for the viatical policies in the random sample. For the same set of policies, the percentage fees paid to LPI ranges from ██████████████████ Combining all the life settlement and viatical policies in the random sample, the minimum and maximum percentage price paid to the seller are ███████████████ percent, respectively; the minimum and maximum percentage fees paid to LPI are ██ █████████████████, respectively.  In addition, I again find varying percentage fees paid to LPI for the policies acquired by the same purchaser and across purchasers.  (*See* **Exhibit 11**.)

35.   Similar to the finding for the Named Plaintiffs, I find variation in the amount paid to the seller as a percentage of acquisition cost for the viatical and life settlement policies acquired by purchasers in a random sample. (*See* **Exhibit 12.)**

---

sample for each year from 1999 through 2004 using the same selection process. The additional random sampling process added an additional six purchasers, with 17 viatical policies.

[16] The purchaser portfolio data collected for the random sample are presented in **Appendix B**.

- 15 -

EXHIBIT " **D** "          **REDACTED**          000324
**ATTORNEYS EYES ONLY**

Expert Report of Bruce L. Blacker
May 16, 2012

36.     It is worth noting that based on my observations of the random sample, viatical policies

have certain differentiating characteristics from life settlement policies. First, purchasers

of viatical policies generally invest in a fewer number of policies for their portfolio than

life settlement policy purchasers. (*See* **Exhibit 7**.)  Second, the acquisition costs as a

percentage of face value for the viatical policies are generally higher than those for life

settlements. The average acquisition cost percentage for the viatical policies in the

random sample is ███████, whereas that for the life settlements in the random

sample is ███████  Third, the estimated life expectancies associated with viatical

policies are generally lower than those associated with life settlement policies.   For

example, the average life expectancy estimate for the viatical policies in the random

sample is 2.9, compared to 4.4 years for the life settlements in the random sample.  (*See*

**Exhibits 8** and **9**.)

   **C.   Any Class-Wide Formula Cannot Estima te Damages S uffered by Individual
          Purchasers of the Purported Class**

37.     I conclude that, based on the diverse characteristics of the life settlement and viatical

policies acquired by both the Named Plaintiffs and by purchasers in a random sample,

any class-wide formula for estimating damages would lead to overcompensation of

certain purchasers and undercompensation for other purchasers.    Therefore, an

assessment of damages requires individual inquiry.

38.     Specifically, Plaintiffs assert that damages to individual purchasers in the purported

Class can be determined based on their theoretical *pro rata* share of fractional interest

invested applied to the aggregate amount of estimated overpayment in the policies

EXHIBIT " D "     ATTORNEYS EYES ONLY     REDACTED     000325

Expert Report of Bruce L. Blacker
May 16, 2012

---

acquired by the purported Class.[17]  This approach is inadequate for at least the following

reasons described below.

a. <u>The policies acquired by individual purchasers in the purported Class are unique</u>. The alleged underestimation of life expectancy, if it exists, would be unique to individual policies and would require an individualized assessment.   Under one interpretation, Plaintiffs' *pro rata* approach is equivalent to assuming that policies will have an identical level of underestimation—estimated by analyzing the life expectancy of a pool of the policies at issue.

Despite the vagueness of the Plaintiffs' proposed damages methodology, I have attempted to evaluate the methodology by utilizing certain assumptions in crafting hypothetical examples.  The following *hypothetical example*  illustrates a key conceptual problem in a class-wide formula for estimating claimed damages.  *(The example is for illustrative purposes only.)*

i.  Named plaintiff Robert Yoskowitz acquired a fractional share of a $1 million policy with a five-year life expectancy.  Mr. Yoskowitz paid $25,000 for his fractional share.

ii.  For the purpose of the hypothetical example, it is assumed that Plaintiffs' alleged the class-wide life expectancy underestimation is two years and that in an individualized evaluation, the life expectancy of the policy acquired by Mr. Yoskowitz is underestimated by one year.

iii. If the acquisition cost is assumed to be reduced by 10 percent for each year of underestimation of life expectancy, Plaintiffs' approach would yield compensation to Mr. Yoskowitz of $5,000 ($2,500 per year for two years).

iv. To the contrary, an individual inquiry of the actual policy would yield compensation to Mr. Yoskowitz of only $2,500 ($2,500 for one year only).

v.  In this case Mr. Yoskowitz would be overcompensated by $2,500 under a class-wide formula.

vi. Further, a *pro rata* approach suggests that if Mr. Yoskowitz is overcompensated, there is at least another purported Class member who would be undercompensated.

vii. Conversely, if the individualized evaluation shows that the life expectancy is underestimated by three years (instead of one year) then Yoskowitz would be undercompensated by $2,500.

---

[17] Plaintiffs' Motion for Class Certification and Memorandum in Support, February 15, 2012, pp. 23-24.


EXHIBIT " D "

000326

Expert Report of Bruce L. Blacker
May 16, 2012

A class-wide formula generally will lead to either overcompensation or under-compensation for the claimed damages, if any, suffered by individual members in the purported Class.

b. <u>There is a variation in the amounts paid to sellers as well as the fees paid to various participants</u>.  As illustrated by an analysis of the life settlement and viatical policies acquired by both the Named Plaintiffs and purchasers of a random sample of the purported Class, there are variations in the amounts paid to the sellers as well as the fees paid to various participants.  These components are moving parts (and do not necessarily move in correlation with one another) that comprise the acquisition cost; as such, a class-wide formula does not account for the possible changes that would occur in these components when the life expectancy estimate is changed.

c. <u>Purchasers of the life settlement or viatical policies have individual investment preferences</u>.  A class-wide formula does not account for how purchasers would assess a different combination of life expectancy and corresponding acquisition cost offer.  Some purchasers may choose to purchase a higher fractional share in the policy, others may choose to purchase a lower fractional share.  The uncertain outcomes of individual choices given changes in life expectancy may affect the estimation of damages to each purchaser.

d. <u>LPI competes with other prospective buyers in the market place for the purchase of viatical and life settlement policies</u>.  If, as alleged by the Plaintiffs, the policies facilitated by LPI should systematically have had higher life expectancy estimates, the competitive process would have led to different outcomes for different policies.

**D.  Any Class-Wide Formula Cannot Estima  te the Disgorgement of L  PI's Fees for Individual Purchasers of the Purported Class**

39.     If it is determined that some or all of the fees paid to LPI should be disgorged, any class-wide formula would inevitably lead to overcompensation of some purchasers and under-compensation for other purchasers.  As my analysis shows, there is wide disparity in LPI's fees as a percentage of acquisition cost.  Therefore, to determine the appropriate disgorgement amount due to each purchaser requires examining the specific policies purchased by that individual.  This requirement is demonstrated by the following two *hypothetical examples*.

a. The first example assumes a class-wide disgorgement calculation that is based on an average percentage applied to the fees paid to LPI by each purported Class member.

EXHIBIT " D "

000327

i.   Suppose, for illustrative purpose only, that 50% of the fees paid to LPI should be disgorged.

ii.  If a purported Class member invested in a policy and as a result paid $1,000 in fees to LPI, the disgorgement damages will be $500.

iii. Since, as shown in **Exhibits 8**, **9**, and **10** , the fees as a percentage of acquisition cost vary across viatical and life settlement policies, the only way disgorgement damages can be computed for individual purchasers is by examining the actual policies they acquired and the actual fees they paid to LPI.

iv.  Any computation based on average fees paid to LPI necessarily will overcompensate certain purported Class members while undercompensating others.

b. The second example assumes a class-wide disgorgement calculation that is based on an average percentage applied to the acquisition costs paid by individual purported Class members on policies they acquired through LPI.

i.   Suppose, for illustrative purposes only, that 15 percent of the acquisition cost paid by purported Class members should be disgorged.  Under this formula, if a purported Class member invested $10,000 to acquire a fractional share in a policy, the disgorgement compensation will be $1,500 (15 percent of $10,000)

ii.  As shown in **Exhibit 13** , based on this hypothetical class-wide disgorgement formula, named plaintiff Yoskowitz, who paid 12.7 percent of the acquisition cost to LPI as a fee on one of the fractional interests he purchased, would be overcompensated by 2.3 percent (15 percent minus 12.7 percent) on that fractional interest.  In dollar terms, the hypothetical disgorgement formula would overcompensate Yoskowitz by $579.

iii. In contrast, named plaintiff Rice paid 20.8 percent in fee to LPI on one of their fractional interests.  Under the hypothetical class-wide disgorgement formula, Rice would be undercompensated by 5.8 percent (15 percent minus 20.8 percent) on that fractional interest.  In dollar terms, the hypothetical disgorgement formula would undercompensate Rice by over $8,000.  (*See* **Exhibit 13**.)

* * * * * *

40.  My analyses and opinions contained in this report are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other

EXHIBIT " D "

000328

information still to be produced by the Parties to this dispute and to supplement my

opinions based upon that review.

*Bruce L. Blacker*

_____

Bruce L. Blacker, CPA

EXHIBIT " __D__ "

# Exhibit 1

**ANALYSIS GROUP**
ECONOMIC, FINANCIAL and STRATEGY CONSULTANTS

Main 1 214 523 1400   Fax 1 214 523 1401   www.analysisgroup.com

2911 Turtle Creek Boulevard   Suite 600   Dallas, TX   75219

## BRUCE L. BLACKER
### Vice President

Phone: (214) 523-1406
Fax: (214) 523-1401
bblacker@analysisgroup.com

Bruce L. Blacker has experience in litigation and dispute analysis, corporate recovery, business valuation, and tax compliance services.  Mr. Blacker has provided accounting, finance, and economic analyses in a variety of engagements.  His litigation consulting case experience includes antitrust, breach of contract, business interruption, forensic accounting, fraud investigations, intellectual property (copyright infringement, patent infringement, trade dress, trademark, trade secrets), lender liability, loss of earnings (wrongful death/wrongful termination), securities fraud, and general damage quantification matters.  Mr. Blacker has served as an arbitrator and has testified at trial and in deposition.

Mr. Blacker has a Masters and B.S. in Accounting from Brigham Young University and is a Certified Public Accountant licensed in the State of Texas and is certified in financial forensics (CFF).

## EDUCATION

| | |
|---|---|
| 1989 | M.ACC., Brigham Young University, Provo, Utah |
| 1989 | B.S., Accounting, Brigham Young University, Provo, Utah |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 – Present | Analysis Group, Dallas, Texas - Vice President |
| 1991 – 2004 | PricewaterhouseCoopers LLP, Dallas, Texas – Partner, July 2003; Director, July 1999; Manager, July 1994; Senior Consultant, July 1992; Staff Consultant, January 1991. |
| 1990 | KPMG Peat Marwick, Dallas, Texas - Tax Specialist |
| 1988 – 1989 | Brigham Young University, Provo, Utah - Legal Research Assistant, 1988 to 1989; Teaching Assistant, 1988. |

## PROFESSIONAL DESIGNATIONS AND BUSINESS AFFILIATIONS

Certified Public Accountant ("CPA"), State of Texas

Certified in Financial Forensics ("CFF")

American Institute of Certified Public Accountants
        Forensic and Valuation Services Section

Texas Society of Certified Public Accountants

Dallas Chapter of Texas Society of Certified Public Accountants

Participant in programs sponsored by the National Institute for Trial Advocacy

Dallas Fort Worth Management Society

Board of Directors, North Dallas Chamber of Commerce, 2001 - 2004

BOSTON    CHICAGO    DALLAS    DENVER    LOS ANGELES    MENLO PARK    MONTREAL    NEW YORK    SAN FRANCISCO    WASHINGTON

EXHIBIT " D "

## LITIGATION CONSULTING EXPERIENCE

### Arbitration and Settlement Proceedings

- Evaluated various automobile dealerships involved in arbitration with a major automobile manufacturer per the Consolidations Appropriations Act 2010 (H.R. 3288).  The purpose of the arbitration was to determine which dealerships would be dealerships of the automobile manufacture post-bankruptcy and which dealerships would be terminated.  In that regard, an analysis of the following factors was performed: (1) the dealership's profitability, (2) the dealership's current economic viability, (3) the manufactures business plan, (4) the dealership's performance related to objectives established in the dealership agreement, (5) demographics and geography of the dealership's market, (6) dealership's performance in relation to other dealership's, and (7) the dealership's length of experience.  Dealerships were evaluated in Florida, Oregon, Tennessee, and Texas.

- Appointed by the court to perform as the arbitrator in a global settlement agreement to resolve a dispute between the estate of a deceased owner and the surviving owner/businesses in the oil and gas industry.  Specifically, performed an accounting analysis of the books, records, and statements of accounts for four related entities.  Analyzed all cash distributions, payments, and dividends of cash or other assets to determine whether such distributions were made in accordance with their respective ownership interests.  Determined the adjustments that were required to bring the distributions into conformity with the owners respective ownerships interests.

- Assisted the arbiter in a purchase price dispute involving the determination of final net working capital related to the sale of a restaurant.  Items in dispute included but were not limited to, the cut-off date, net tax benefit, net operating losses, contractor liens, accrued expenses, and bonuses.

- Provided litigation consulting services to an insurance company who sought to settle a dispute between their client, a major motion picture and television company, and a direct mail promotional company.  The Plaintiff's alleged that the airing of three television shows by the Defendants caused the loss of customers and resulted in economic harm.  The insurance company requested that I evaluate the Plaintiff's expert's reports on damages and the Defendant's (i.e., their client's) rebuttal expert report and provide an assessment of the strengths and weakness of the damages opinions rendered.  The case settled after submitting a report of my findings.

### Antitrust

- Evaluated Plaintiff's claim that a national orthodontic trade association's advertising guidelines resulted in antitrust injury in the markets for orthodontic brackets and orthodontic services.  Through empirical analysis concluded the advertising guidelines were lowered consumer search costs, promoted competition, and did not stifle innovation in the relevant markets.  Performed quantitative analyses to demonstrate that legitimate advertising was not impacted by the advertising guidelines.

- Evaluated distributors' claims of past lost profits, future lost profits, and reductions in franchise value damages in a carbonated soft drink antitrust litigation.  Plaintiffs were alleging Defendants entered into a series of anti-competitive marketing agreements with retailers relative to the distribution, marketing, advertising, promotion, and sale of national brand carbonated beverages.   Analysis demonstrated Plaintiff's expert did not take into account the brand composition of Plaintiff's case sales, underestimated variable costs of distribution, did not adjust for increased competition from private-label brands and other drinks, and failed to account for the lack of advertising and other promotional support from distributor's parent company.

- Critiqued the Plaintiff's damage model in an alleged tying case dealing with automotive CAD/CAM design software and mainframe timesharing.  Analyzed the total size of the market, CAD/CAM timesharing competitors, the likelihood of new entry into the market, and the Plaintiff's market share in an alleged unfettered market.

- Analyzed the fast food point-of-sale ("POS") equipment and software industry in an alleged antitrust tying case.  Issues investigated included the number of competitors, price competition, non-price competition, ease of entry, and the relative market shares of fast food POS equipment manufacturers.

- Provided litigation assistance to the Plaintiff's counsel in an antitrust lawsuit against a major manufacturer of high-speed laser printers and copiers.  Developed a model to calculate the damages to 16 equipment leasing partnerships arising from antitrust practices.

**Breach of Contract**

- Analyzed damages in a breach of contract matter for a company in the business of designing, producing, and deploying its proprietary high-speed data network system in healthcare facilities.  Plaintiff claimed that delay in delivery and defective products caused a delay in installations and damages.  Monetary damages evaluated included delay damages and damages related to increased expenses.

- Quantified the royalty payments owed by the patent holder in a breach of contract dispute involving call processing and fraud control software technologies used in the corrections industry related to telecommunications services.  Issues in the case included failure to pay royalties, failure to make royalty reports, failure to keep accurate books and records, and failure to comply with audit obligations.  Analyses included a determination of the number of phone lines in service (each month) in various prisons and correctional facilities, the identification of equipment taken out of service and placed in inventory, and calculation of the claimed royalty payments due.

- Evaluated the developer/franchisee's claimed damages related to a major sandwich franchisor's alleged breach of a five-state area development agreement.  Reviewed the area development agreement.  Analyzed revenues, costs and profitability associated with each franchise store and estimated the Claimant's lost development fees (lost franchise fees and lost royalty fees) based on various scenarios contemplated by the Parties.

- Evaluated Plaintiff's breach of contract damages claim relating to an exclusive license to distributor aircraft turbochargers and parts.  Calculated lost turbochargers sales using a market share approach.  Lost profits were calculated on both lost turbochargers sales and lost part sales.

- Assisted a group of radiology physicians in assessing whether a management company was appropriately accounting for account receivable reserves under the terms of their service agreement.  Performed an analysis to understand how the management company accounted for account receivable reserves.  Analyzed the reserve methodology utilized by the management and compared their methodology to both industry standards and generally accepted accounting principles.  Determined the amount of inadequate reserves and analyzed the effect on the calculations on the buy-out of two physicians.

- Evaluated Plaintiff's claimed damages in a breach of contract matter the telecommunications industry.  Specifically, the dispute related to marketing services performed on behalf of a long distance carrier to soliciting residential and business customers in Mexico during the "Equal Access Program" (i.e., the break up of Mexican telephone monopoly) and the fees due for such services.  Analyses included the evaluation of Plaintiff's claimed lost commission profits, lost commission buyout, and destruction of business value.  Also, calculated and an alternative damages amount.

- Provided litigation consulting services in a breach of contract matter in the telecommunications industry related to an interconnection agreement. Specifically, the dispute arose over an incumbent local exchange carrier's ("ILEC") refusal to supply unbundled network elements ("UNE") and other services to a major metropolitan city to make the city a fully operationally telecommunications network. Issues analyzed included: lost revenues, lost savings, actual damages for equipment purchase, and litigation activities.

- Evaluated Plaintiffs' claimed damages in a breach of contract matter involving the aborted sale of assisted living facilities. Analyzed current trends in the assisted living industry, the financial condition of the target company, the projected financial results of certain to-be-constructed properties, and the target company's performance related to projections. Also at issue was whether a material adverse change had occurred in the target company's operations and business. Lost profit, interest-related damages, lost fees, and diminution-in-value damages were evaluated.

- Quantified damages on behalf of an information technology firm alleging a recruiting firm breached its contract to fulfill its executive search obligations. Lost profits where calculated under a delayed theory that their hiring strategies were postponed due to the breach. Analysis included an assessment of expected vs. delayed revenues and the associated incremental costs and profits.

- Provided litigation consulting services in a dispute between a management services organization ("MSO") for physicians and an integrated Management Information System ("MIS") provider. The MSO alleged that the MIS provider made misrepresentations and breached the service contract which lead to alleged poor collections of physician billings, which lead to alleged critically low cash flow, and ultimately resulted in the failure of the MSO. The MIS filed a counterclaim alleging that it had sustained damages the MSO's misrepresentations and breach of contract. Quantified damages for the MIS company under a benefit-of-the-bargain approach and an out-of-pocket approach. Evaluated the MSO's claims and illustrated that the MSO's business failure was due to its inability to reduce physician costs, corporate overhead, lack of capitalization, and a financially flawed business model. Additionally, demonstrated that the MSO's business model was unattractive to prospective physicians compared to other models and that its business plan contained unreasonable assumptions.

- Evaluated Plaintiff's damages claim relating to a NASCAR racing team's sponsorship agreement. Plaintiff alleged the sponsor, an Internet service provider, interfered with the NASCAR team's ability to sell advertising banners that were part of the sponsorship agreement. Assessed the Plaintiff's damages methodology and calculations. Analyzed the appropriate methodology for valuing a NASCAR race team and assessing comparable transactions. Additionally, assessed the financial performance of the racing team and the risks associated with a barter arrangement.

- Calculated damages sustained by the Plaintiff as the result of the Defendants breaching the supply agreement for roofing granules used in the manufacturing of roofing shingles. Analyzed the granule requirements of the Defendant and the capacity of the Plaintiff to meet those requirements. Performed a lost profit analysis. The lost profit analysis included assessing prompt payment discounts, freight equalization charges, incremental manufacturing costs, and transportation allowances or credits. Additionally, evaluated the Defendant's counterclaim for damages alleging a breach of contract relating to its pricing practices (i.e., "favored nations" clause). Evaluated the Defendant's claimed damage period and the methodology used to estimate a discount from list price in the absence of the Plaintiff's alleged treatment of pricing issues. Evaluated the Defendant's regression analysis and identified for counsel the methodological errors contained in the Defendant's claim.

- Evaluated the Plaintiffs' claimed damages in a breach or contract / breach of warranty case in the grocery salvage industry. The Plaintiffs' alleged they lost their brokerage license and were put out of business as a result of the sale of contaminated goods by the Defendants. Specifically, the Plaintiffs claimed lost personal income, lost inventory, and the lost value of the business as damages.

- Assisted a hospital in evaluating its participation in a Shareholder Contribution Agreement among and between various other hospitals and certain managed healthcare plans. Specifically, evaluated the amount assessed the hospital under the agreement relating to Medicare, Medicaid, and commercially managed healthcare plans. Also, assessed the financial impact to the hospital under various potential exit strategies from the agreement.

- Evaluated Plaintiff's damages claim arising from the alleged failure of a call center to properly process inquiries relating to the sales of a collectible doll. The figurine was that of a recently deceased public figure. Analyses included advertising expenditures, response rates across cities, major news announcements related to the marketing of such merchandise, and contributing problems caused by Plaintiff's actions. Employed a before-and-after approach to estimate damages by comparing sales in an unimpacted period with sales in the alleged impacted period.

- Evaluated the Plaintiff's claimed damages in a breach of contract/failed initial public offering ("IPO") case in the temporary staffing and professional employer organization ("PEO") services industry. At issue was the underwriter's ability to price and close the IPO in light of the "book" for the transaction and the stock's price performance in the aftermarket had the IPO been consummated. Evaluated the Plaintiff's damages claim, including the projected post-IPO stock price, profitability of certain aspects of the business, ownership percentages in the company, and how the proceeds would have been shared between the owners of the consolidating private companies.

- Critiqued the lost profit claim of a rural water district against a city in a breach of contract dispute involving the supply of water to an industrial park. Analyzed the water usage of the industrial park's tenants, the city's public works accounting records, and various contracts relating to the supply of and payment for water to the industrial park.

- Analyzed the Plaintiff's damages claim in a breach of contract dispute involving extremely low frequency ("ELF") electro-magnetic radiation protection system ("RPS") for video display terminals. At issue was the likely market penetration rate of a newly introduced RPS add-on device given declining monitor prices and compliance with radiation standards for monitors. Prepared an expert witness report and trial exhibits.

- Evaluated damages in a breach of contract claim between a television shopping network and a local television station. At issue were the lost profits to the television shopping network when the local television station discontinued broadcasting the retailer's programming.

- Performed a solvency analysis in a breach of contract dispute between a clinic and a doctor. The matter was ultimately resolved through arbitration.

- Calculated damages in a breach of contract lawsuit between two major semiconductor manufacturers. Analyzed the historical and projected trends of the semiconductor industry specifically focusing on the life cycle of semiconductor chips from current technology to obsolescence. Performed a competitor analysis. Critiqued the opposing side's damage model.

- Provided consulting services to the Defendant, during settlement negotiations, in a breach of contract lawsuit relating to lease agreements for heavy equipment used in a gunite business. Critiqued the opposing expert's damage model.

- Calculated damages in a breach of contract lawsuit relating to the sale of accidental death and dismemberment insurance policies.

- Quantified damages in a breach of contract lawsuit involving an insurance company and a non-compete agreement. Analyzed premiums, loss ratios, expense ratios, and investment returns relating to property and casualty insurance policies.

- Reviewed the financial operations of an oil and gas jobber in a breach of contract lawsuit. The jobber alleged that the fuel manufacturer diminished his business through direct competition of newly opened and owned retail stores. Performed a market analysis to determine if the retail owned outlets affected the jobber's business.

- Analyzed an opposing expert's damage model and developed an alternative damage testimony in a breach of contract litigation matter.

**Business Interruption**

- Calculated lost profits suffered by a major amusement park due to the Defendant's, a ride manufacture, alleged wrongful conduct which resulted in an accident and death of a patron. Analyses included; lost attendance, lost ticket revenue, lost in-park revenue, incremental costs, and evaluated alternative reasons for declines in attendance. Damages were calculated using both a before-and-after and a benchmark approach.

- Evaluated the damages sustained by a cosmetic company as the result of defective decorative glass containers being furnished for its new therapy products. Evaluated and/or verified product retrieval costs, retrieval program administration costs, customer goodwill, replacement gift costs, waste disposal costs, and lost profits on the therapy products. The lost profit analysis included assessing the life cycle sales pattern of new cosmetic products introduced by the company.

- Evaluated Plaintiff's claimed damages from a lost bid to retrofit a refinery in Pakistan. Analyzed Plaintiff's allegations that Defendants made untrue statements to the bid evaluation team concerning Plaintiff's net worth, working capital, and profitability trends. Evaluated Plaintiff's claimed damages using as a benchmark prior engineering projects completed by Plaintiff.

- Evaluated Plaintiffs' damages claim relating to the installation of an allegedly defective computer software system at an automobile dealership. Plaintiffs contended the software had defects adversely affecting the accounting system and day-to-day operations of the dealership, and submitted an "increased cost" damages claim. Analysis demonstrated Plaintiffs' expert used an inappropriate methodology for measuring damages and submitted cost increases unrelated to the allegedly defective software.

- Evaluated the Plaintiff's lost profit calculations in a condemnation/business interruption lawsuit between a tree nursery business and a state. The Plaintiff alleged that the state's highway construction impeded access to the Plaintiff's business and caused damages in the form of lost profits and additional expenses. Critiqued Plaintiff's damage model, prepared an expert witness report, and created trial demonstratives.

**Commercial Litigation**

▪ Evaluated the impact on the sales of a major manufacturer and marketer's pork breakfast products line because of the use of an unauthorized personal guarantee printed on the packaging. Plaintiff claimed that the manufacture had benefited from the unauthorized use of the guarantee. After evaluating other factors that could impact sales (e.g., sow prices, seasonality trends, etc), determined that Plaintiff's claim could not be supported or causally connected to the personal guarantee.

▪ Evaluated Plaintiffs' claims for approximately $1 billion relating to a prior settlement of claims for plumbing failures allegedly caused by leaks in plastic plumbing systems manufactured and sold during the 1970's. During the 1980's, claims of leaks in polybutylene plumbing systems began and resulted in several class action lawsuits. The Defendant (in this matter) filed for bankruptcy when these class actions were being brought and the Plaintiffs (in this matter) continued to control the claims resolution process under the terms negotiated in those class actions. When the Defendant emerged from bankruptcy, the Plaintiffs sought recovery from the Defendant for a portion of the claims paid related to the earlier class actions. Over the course of the claims administration process, nearly 900,000 claims were made, over 2 million leaks identified and inspected, and approximately 1.6 million checks disbursed for repair and replacement of plumbing systems. Assignment: evaluated the large databases relied on by the Plaintiffs to determine if the data was complete and reliable for purposes of evaluating economic damages. Shortly after the exchange of expert witness reports, rebuttal reports, and the deposition of Plaintiffs' expert witness, the case settled very favorably for the Defendants.

**Environmental**

• Analyzed a complex real estate transaction in an environmental contamination lawsuit against a major oil company. Designed the graphic presentation used to explain the transaction during trial.

**Executive Compensation**

• Provided litigation consulting services in a dispute over an executive's severance package for a major competitive local exchange carrier ("CLEC"). The dispute centered on whether the executive qualified for the severance package and the value of the various severance package components. Analyzed the CLEC industry both historically and based on analyst forecasts. Also evaluated the Plaintiff's calculations of the basic severance package including benefits, stock options, and other incentive plans.

**Forensic Accounting/Fraud/Investigations**

• Performed certain procedures in assisting a hospital with the investigation of a hotline report which alleged various issues concerning the materials management department including, but not limited to, falsifying inventory reports. Investigation included analysis of financial documents and conducting interviews.

• Assisted counsel in a health care criminal matter in which a group of doctors and a hospital were alleged to have conspired to receive remuneration in return for medical-eligible patient referrals. Analyzed the various medical labs to determine utilization rates and profitability. Quantified the value of reduced admission rates of patients and the reduced average length of time that a patient stays in geriatrics due to the services provided by the doctor group.



- Analyzed the return performance of a pension plan in a mismanagement lawsuit against the trustee. This included researching the historical performances of comparable mutual funds, calculating the returns of individual investors in the pension plans and comparing the returns to funds with the same investment objective to determine damages.

- Performed extensive financial analyses on several publicly traded day-care centers to determine the financial position and market value of a day-care center in relation to a negligence lawsuit. Designed the graphic presentations used at trial.

- Reviewed numerous private deferred annuity trusts for a litigation matter relating to distributions.

- Reviewed the financial records and bank statements of a manufacturing company that defaulted on a loan where the bank considered foreclosure actions.

- Prepared an exception report for a large real estate management company. Included analyzing numerous residential, commercial and mini-storage properties to develop financial tests used to identify properties with the potential for fraud and/or mismanagement.

- Performed a forensic investigation for a major airline company to determine the use of insurance proceeds by the family of a crash victim.

- Performed a forensic investigation on behalf of a lender to determine if assets existed that could support the value of a real estate developer's loan guarantee.

**Intellectual Property: Patent Infringement**

- Analyzed Plaintiff's lost profit and reasonable royalty damages in a patent infringement matter related to spinning wing decoy products used by sportsman. Two patents were at issue where the inventions related to animated waterfowl decoys and game decoys with high speed rotating strobe wings. Lost profits were calculated using the Panduit factors and a market share approach using Mor-Flow as guidance. Reasonable royalties were calculated on sales for which lost profits were not being claimed. Plaintiffs were also alleging a false marking claim against the Defendant. Evaluated the possible number of false marking offenses based on sales data.

- Evaluated Plaintiff's claimed royalty damages in a patent infringement matter against a major movie and video rental company. The technology at issue related to a claimed invention for limiting the use of down loaded video on demand data applicable to video on demand rentals. Identified flaws in the Plaintiff's Georgia-Pacific analysis and performed an independent Georgia-Pacific analysis. Concluded that Plaintiff's analysis had failed to consider, among other things, (a) that no royalties were ever paid on the claimed established royalty rate, (b) the lack of competition between the parties, (c) the patent holder's inability to market the claimed invention, and (d) the resources and know how available to the Defendant to commercialize the invention. These considerations placed significant downward pressure on the claimed royalty rate.

- Analyzed Plaintiff's lost profit and reasonable royalty damages in a patent infringement matter related to three-way call detect and call blocking technologies used in telecommunications services at corrections facilities. Evaluated Plaintiff's lost profits using as guidance the Panduit factors. Determined the number of phone lines to correctional facilities that were lost sales to the Plaintiff and then quantified lost profits. Calculated royalties on the infringing lines at correctional facilities for which lost profits were not claimed. Analyzed the Georgia-Pacific factors, constructed a hypothetical negotiation

framework to determine the royalty rate, and quantified the royalty base. Evaluated Plaintiff's damages based on various scenarios of potential findings of infringement - - there were four patents at issue in this matter.

- Evaluated Plaintiff's claimed compensatory damages in a patent infringement matter involving a method and apparatus for allowing a potential automobile purchaser to create and submit a purchase request over a computer network. Plaintiff and Defendant compete as web-based companies in the sales lead generation industry where potential buyers of automobiles are identified and then those buyer leads are sold to automobile dealers. Evaluated Plaintiff's claimed lost profits using a Panduit analysis and industry market share data. Also, evaluated Plaintiff's claimed reasonable royalty, increased cost, and price erosion damages.

- Evaluated the Plaintiff's claim against five Defendants in a patent infringement matter involving certain traffic management methodologies capable of implementation in Asynchronous Transfer Mode ("ATM") telecommunications switching systems. Issues in the case included the use of the entire market value rule, availability of non-infringing alternatives, and the negotiating positions of the various Parties in hypothetical negotiation construct. Performed a Georgia-Pacific Factors analysis and provided alternative reasonable royalty damages.

- Analyzed claimed damages in a patent infringement matter brought by the inventor against a major designer and marketer of technology-based educations products. Five patents were at issue related to hardware and/or software products. Analyzed the Georgia-Pacific factors, conducted market and industry research, and compiled an accused product sales database. Calculated royalty damages under numerous scenarios by considering the impact on the hypothetical negotiation date, negotiating positions of the Parties, and products covered by the patents based on under various potential findings of infringement.

- Analyzed Plaintiff's lost profits and reasonable royalty damages in a patent infringement matter relating to scanning, counting, and counterfeit detection technologies in currency discriminators. With respect to Plaintiff's lost profits-related damages, performed incremental profit analyses on lost unit sales and ancillary sales. Evaluated Plaintiff's reasonable royalty-related damages. Developed a computer model to evaluated damages under a variety of scenarios based upon potential findings of infringement on patents and claims contained in these patents.

- Evaluated claimed royalty damages against a nutritional supplement company in a patent infringement matter. The technology at issue related to hydrosoluble organic salts of creatine and methods for enhancing muscle performance and recovery from fatigue. Analyzed the Plaintiff's expert's hypothetical negotiation framework, considered the availability of non-infringing methods and compositions, and identified inconsistencies in between Plaintiff's royalty rate and licensing evidence.

- Critiqued the Plaintiff's claimed economic damages in a patent infringement matter involving technology related to liquid crystal displays ("LCD") (i.e., TVs, Computers, and portable DVD players). Specifically, the Patents at issue related to two categories of technology: DC to AC converter technology and phased burst mode technology. Alleged infringing products include notebook computer panels, notebook computers, LCD panels, LCD TVs and monitors, and portable DVD players with the patented technology residing on inverter controller integrated circuits used in conjunction with cold cathode florescence lamps ("CCFL"). Evaluated claimed royalty damages as presented by Plaintiff's expert through a report, deposition, supplemental report, and trial testimony. Identified conceptual inconsistencies in Plaintiffs claimed royalty rate when analyzing the claimed royalty rate across time periods and products. Also, addressed issues of royalty stacking, multiple patents, hypothetical negotiations, etc.

- Evaluated the Plaintiff's claimed damages in patent infringement matter involving on-line PINless debt bill payment processing. Specifically, Plaintiff's claimed lost profit and reasonable royalty damages related to PINless debt transactions initiated by consumers using interactive voice recognition (IVR). Evaluated the impact on the alleged infringing transactions of the parties' different business models, customer preferences, and non-infringing substitutes. Performed an incremental profit analysis. Evaluated the claimed reasonable royalty rate, base, and damages. Computed alleged damages using a reasonable royalty approach.

- Evaluated Plaintiff's claimed damages in a patent infringement matter dealing with non-reusable protective safety syringes. Specifically, the patent related to the syringe mechanism which, when the plunger on a syringe is fully depressed, causes the needle to retract into a cavity in the plunger. Analyzed other competitors offering a retractable syringe and the Parties' products; distribution capabilities; relative pricing structures; manufacturing capacity, and incremental costs. Calculated damages utilizing both a lost profits approach and a reasonable royalty approach.

- Evaluated the Plaintiff's claimed damages in a patent infringement matter involving six patents related to the Plaintiff's communications networking systems and technology. Also, computed damages related to the Defendants counterclaim that the Plaintiffs were infringing seven of the Defendant's patents relating to its communications networking systems and technology. Specifically, the technology at issue involved multiservice optical switches and the multiplexing protocols for transferring multiple digital bit streams using lasers or light-emitting diodes (LEDs) over the same optical fiber [Synchronous Optical networking (SONET) and Synchronous Digital Hierarchy (SDH)]. Evaluated the Plaintiff's damages model. Prepared a damages model to quantify the alleged damages related to the Defendants counterclaim. After the issuance of expert reports and depositions, the case settled and the parties entered into a long-term patent cross-license agreement.

- Assessed damages resulting from the alleged infringement of three patents related to home lighting controls. Quantified damages utilizing both a lost profits approach (on both accused products and ancillary sales) and a reasonable royalty approach. Determined the royalty rate appropriate to this instance based on the bargaining positions of the parties in a hypothetical negotiation and guidance as provided by the 15 Georgia-Pacific factors. Issues in the matter included properly identifying and classifying accused products and systems based on the assert claims and developing a damages model that would calculate damage for all possible liability outcomes (infringement of 1, 2, or all 3 patents).

- Computed reasonable royalty damages in a patent infringement matter involving technology related to an optical projector in a head-up guidance system used in aircraft. Analyses included: determining (from the documents produced) the date of the alleged infringers first infringing sale, quantifying the Defendants' unit and dollar sales of the alleged infringing products during the claimed damages period, evaluating the Defendants' profitability associated with the alleged infringing products, providing this data to the Plaintiff's reasonable royalty expert, and calculating Plaintiff's claimed reasonable royalty damages using the royalty base determined and the royalty rate as provided by the Plaintiff's reasonable royalty expert.

- Calculated the Plaintiff's claimed lost profit damages dealing with inbound routing of faxes over computer networks using direct inward dialing (typically known by the acronyms DID, DNIS, DDI, MSN). Performed the lost profits analysis utilizing a market share allocation methodology. Determined the market shares of the competitors in the intelligent fax board market in the United States, assessed Plaintiff's market share in the absence of Defendant's alleged infringement, and allocated the Defendant's unit sales to the Plaintiff, and determined whether additional constraints existed regarding the Plaintiff's increased sales in the absence of Defendant's alleged infringement by cross-checking

whether Plaintiff had products comparable to that sold by Defendant, analyzing Plaintiff's and Defendant's relative prices, and analyzing Plaintiff's distribution coverage and manufacturing capacity. Additionally, evaluated the Defendant's cross-claim for reasonable royalty damages for the Plaintiff's alleged patent infringement of Defendant owned patents relating to the same technology.

- Analyzed and assessed the royalty damages claimed by the Plaintiff in a patent infringement matter against one of the world's largest Dynamic Random Access Memory ("DRAM") integrated circuits manufactures.  The patented technology involved patents for the invention of a word line driver, a boosted voltage supply, and a high voltage boost word line supply charge pump regulator for a DRAM. Evaluated the Plaintiff's expert's damage model, identified errors in the royalty base, and assisted the Defendant's royalty rate / licensing expert in performing a George-Pacific factors analysis.  Performed various reasonableness tests.

- Evaluated Plaintiff's claims of lost profit, price erosion, and royalty damages in a patent infringement matter relating to degradable films for covering landfills.  Analyses demonstrated Plaintiff failed to rule out alternative reasons for the decline in sales, ignored Plaintiff's lack of cost competitiveness with competing technologies, inappropriately assumed Defendant would not have been in the market with a competing product, overstated price reduction damages by ignoring discounts granted by Plaintiff in the normal course of business, and overstated the appropriate royalty rate by ignoring industry licenses and Plaintiff's incremental profit rate.

- Computed damages in a patent infringement/trade secret matter in the entertainment lighting industry.  Determined the Plaintiff's lost luminaire rentals by applying the Plaintiff's application share to the Defendant's sales and adjusting for inventory available at the time of the sale; rental utilization rates; capacity constraints; and dealer, distributor, and sub-distributor issues.  Calculated lost profits on the lost luminaire rentals.  Royalty calculations were performed on the Defendant's sales for which the Plaintiff would not have made an equivalent rental.  Evaluated trade secret damages on one of the Plaintiff's luminaries.  Prepared expert witness reports.  Assisted counsel during mediation and settlement discussions.

- Calculated lost profit damages, lost royalties damages, and price erosion damages in a design patent case for a manufacturer of vending machines.  At issue was a vending machine dispensing refrigerated and unrefrigerated foods.

- Quantified damages in a patent infringement case involving blasting hole drilling rigs.  Performed a detailed analysis to determine which of the infringing rigs would have likely been made by the Plaintiff in the absence of the infringement (i.e., analyzed the comparability of rig models, geographical distribution, price, capacity, etc.).  Calculated lost profit damages on those rigs determined to be lost rig sales.  Also, analyzed parts sales and calculated damages relating to the lost parts sales associated with the lost rig sales.  Additionally, for those infringing sales which were not considered to be a lost sale, calculated lost royalties damages.

- Calculated damages in a patent infringement lawsuit involving dispense system products.  Performed a lost profits analysis, performed an incremental cost analysis, analyzed capacity issues, and reviewed royalty rates for the high technology industry for the patent owner.  Critiqued the opposing side's expert report.

**Intellectual Property: Trade Secret**

- Provided litigation consulting services in a theft of trade secret matter dealing with terabit optical routers in the telecommunications industry. At issue was the alleged theft of trade secrets used by former Plaintiff employees who formed a start-up company to develop a terabit optical router. Researched the terabit optical router industry including analyzing competition, competing products, current and projected demand for terabit routers, and valuations for terabit router companies. Also computed damages under a reasonable royalty approach employing the Georgia Pacific factors.

- Provided litigation consulting services in a theft of trade secret matter dealing with next generation switching equipment in the telecommunications industry. At issue was the alleged theft of trade secrets when the Defendant firm hired nine employees of the Plaintiff firm. Evaluated the Plaintiff's damages, analyzed claimed inability to maintain its projected market share, the alleged accelerated entry of the Defendants firm into the next generation switching equipment market, disgorged measure of damages, and reasonable royalty measures of damages. Also, researched royalty rates in the telecommunications industry and investigated accounting and reporting issues surrounding the alleged intellectual property.

- Analyzed damages in a trade secrets case involving drilling bits. The allegation was that "anti-whirl" technology was stolen when a competitor firm hired certain employees. Created a database of the bits in dispute. Assisted counsel in settlement negotiations by determining lost revenues under various scenarios and assessing incremental profits.

**Intellectual Property: Copyright, Trade Dress, Trademark**

- Evaluated the Plaintiffs' claimed damages in a trademark infringement matter involving companies which specialize in industry-specific insurance programs and targeted temporary staffing and Professional Employer Organizations ("PEOs"). Plaintiffs' damages included a profit disgorgement claim and corrective advertising claim. Analysis indicated the lack of an economic causal link between the alleged wrongful conduct and the claimed damages. Attended trial and assisted counsel in preparation for cross examination of the Plaintiff's damages expert.

- Critiqued the Plaintiff's claimed economic damages in a trademark matter between two major hospitals. Plaintiffs alleged that the Defendants were infringing its trademark and engaging in unfair competition by allegedly creating confusion in the marketplace relating to the Defendant's pediatric healthcare facility. Specifically, evaluated the Plaintiff's claimed damages related to lost sales, corrective advertising, and lost royalties.

- Quantified the Plaintiff's claimed damages in a matter dealing with various computer circuit packs and telecommunication switches. Plaintiff's claimed four causes of action: copyright infringement, common law trademark infringement, violation of Section 43(a) of the Lanham Act, and unfair competition. Specifically, evaluated the Defendant's unit sales and revenues of the accused products and calculated the Plaintiff's actual damages in the form of lost profits for various damage periods related to the various causes of action. Evaluated the impact of product availability and industry events.

- Evaluated claimed damages in trademark and trade dress infringement matter in the military loans industry (i.e., financial institutions specializing in making loans to military personnel). The Plaintiff's claimed the trademark was infringed because the Defendants placed the Plaintiff's name in the meta tags of its website to misdirect potential customers who use internet search engines. The trade dress claim related to the look and feel of the various branch offices. Analyzed the incremental profitability of the Defendant's Internet loan business and critiqued the Plaintiff's corrective advertising claim.

- Calculated damages in a trade dress case involving corn dogs. Damages included disgorgement of Defendant's profits and actual damages sustained by Plaintiff's as a result of the Defendant's alleged wrongful activities, to the extent they were non-duplicative.

- Conducted a net profit analysis for one of the world's largest retailers in a copyright infringement lawsuit involving women's sleep shirts. Performed an expense allocation analysis and calculated the net profits from the sale of the shirts at issue.

**Intellectual Property: Royalty Audits, Licensing Negotiations, and Professional Malpractice**

- Assisted a major company in the wireless innovations and mobile systems industry in the valuation of a patent. Identified and evaluated market comparables. Researched and quantified the potential royalty base using various units of measure including the number of subscribers, infrastructure equipment, and automatic cross-connection equipment (AXE) switching equipment.

- Evaluated claimed damages in a legal malpractice matter where the Plaintiff alleged the Defendants did not properly provide legal representation. Specifically, Plaintiffs' (shareholders) claimed legal counsel failed to conduct proper due diligence and draft a proper contract (purchase agreement) related to the sale of a company which specialized in children's oral care products (sculpted manual toothbrushes, sculpted battery powered toothbrushes, and toothpaste). Claimed damages were based on the allegation that the acquiring company interfered with the Plaintiff's business impeding performance that would have resulted in a high level of deferred compensation. Concluded that Plaintiff's failed to demonstrate an economic causal link between the alleged wrongful conduct and the claimed damages. Further, concluded that Plaintiff's had not quantified claimed damages with a reasonable degree of certainty.

- Conducted a royalty examination for a domestic company involving the sale of Hydroxylamine products by an international company. This royalty examination was prompted by the drop in overall product sales and by the disparity, identified by the domestic company, in price per gallon charged in Japan versus that charged in the U.S. and in Korea for royalty bearing products. Reviewed and tested the basis for the royalty reports including sales and deduction items.

- Assisted a large petroleum chemical company (the patent holder) in negotiating a licensing agreement regarding the chemicals and high polymers used in the manufacturing of certain plastic bottles. Evaluated market size; projected revenues, costs, and profits; discount rates, and the implied royalty rate.

- Evaluated Plaintiffs' claimed damages relating to an alleged failure by a law firm to properly file certain patent applications relating to a video processor recorder. Plaintiffs' business opportunities and licensing fees in the United States and Europe were allegedly lost due to the ensuing delays. Analyzed Plaintiffs' causation linkages to the claimed damages, length of the claimed damages period, forecasted units sold, forecasted market share, forecasted costs of production, and claimed licensing rate.

- Analyzed a license agreement between the patent holder and a manufacturer of polypropylene in a breach of contract lawsuit. Reviewed historical royalty payments, calculated estimated royalties based on various royalty rates, and calculated the implicit royalty rates of other license agreements.

- Critiqued the Plaintiff's expert's damage calculations in a lawsuit alleging the failure to protect a company's intellectual property through the proper prosecution of international patent applications. Specifically, this case involved an eye-correction surgical product used in the field of ophthalmology to treat presbyopia. Assisted counsel in discovery and settlement discussions.

**Lender Liability**

- Evaluated the Plaintiff's damages claim in a breach of contract / lender liability matter in the long-term healthcare industry.  Plaintiff's claimed that with the alleged line of credit they would have built and managed several assisted living facilities and avoid a merger.  Plaintiff's claimed damages including: diminution of value, lost profits, market/contract interest rate differential, merger costs, loss of development fees, management fees, and loss of investment, among others.  Evaluated Plaintiff's claim by analyzing trends in the assisted living industry, evaluating the financial condition of the Plaintiff to illustrate that it could not have met the proposed terms for funding, and analyzed the financial results to the Plaintiffs constructed facilitates.  Other issues included "black-box" financing and "off-balance sheet" financing.

- Provided litigation assistance to Defendant's counsel in a lender liability/ breach of contract suit related to funding residential development loans.  Evaluated the Plaintiff's damages claim, analyzed Plaintiff's five-year projections, performed lost profits analyses, and evaluated the shareholder's future value under various scenarios.

- Analyzed a Plaintiff's complex damage model which estimated past and future lost profits for a high technology training company in relation to a lender liability lawsuit.  This included evaluation of assumptions and sensitivity testing.

**Securities Fraud**

- Analyzed the Plaintiff's claimed damages in a securities law violation lawsuit against a global telecommunications company.  Plaintiff's claimed damages resulted from an acquisition of the Plaintiff's company.  Issues and analyses included employee stock options, the options to sell rather than pursue an initial public offering, lost wages, lost benefits, and an event study of alleged misrepresentations.

- Evaluated Plaintiffs' claimed damages related to a merger in the banking industry.  At issue was whether material adverse changes regarding loan loss reserves had occurred but were not disclosed.  Analyzed whether the complained of events were related to conditions and circumstances in the banking industry.  Also analyzed the value of alternative offers for the target bank and the pre-merger volatility in the acquiring bank's stock price.

- Evaluated Plaintiff's claim of damages in a shareholder suit in the wireless cable industry.  Plaintiff alleged that the company artificially inflated its stock price by making false representations relating to the growth of the industry, its introduction of a new product, and expected international sales.  Analyses demonstrated that the Plaintiff's expert had no justification for the dates of the damage period, that the comparable companies selected were not comparable, that the "value line" used by the Plaintiff was inappropriate, and lead to an overestimation of alleged damages.  Analysis also included demonstrating that increases and subsequent decreases in the company's stock price related in part to a joint venture of regional telephone companies entering the wireless cable industry (an industry effect ignored by the plaintiff's expert) and other company-specific events unrelated to the allegations.

- Analyzed the stock price movement of a computer card developer and manufacturer in a class action shareholder's securities fraud case.  Performed an event study, identified an appropriate peer group, constructed a damage model, and analyzed economy-wide, industry-specific, and company-specific factors impacting the company's stock price.

- Provided litigation assistance to counsel in their representation of a health care company involved in a securities litigation matter. The Plaintiffs alleged that the company failed to disclose the full scope of certain alleged fraudulent practices regarding its psychiatric facilities. Assisted counsel in understanding the Plaintiffs' damages model, performed an event study, analyzed class certification issues, and evaluated "corrective disclosures" to the market. Performed alternative damage calculations to assist counsel in settlement negotiations.

- Analyzed the stock price movement of an arts and crafts store in a class action shareholder's securities fraud case. Analyzed the stock/option transactions of the named Plaintiffs, performed an event study, developed a Plaintiff-style damage model, critiqued the Plaintiffs' damages report, and consulted with counsel regarding the strengths and weaknesses of the testifying expert's report.

- Analyzed the stock price movement of a life insurance company in a class action shareholder's securities fraud case. Performed an event study, determined an appropriate peer group, compared the company's actual stock price to its "true value" line, constructed a volume matrix to track ins-and-outs traders and retention shareholders, and calculated damages.

- Analyzed the stock price movement of a real estate company's common stock in a class action shareholder's securities fraud case. Analyses included the development of an appropriate peer group and the isolation of economy-wide, industry-specific, and company-specific factors impacting the company's stock price. Also, compared the company's actual stock price to its "true value" line, constructed a volume matrix to track ins-and-outs traders and retention shareholders, critiqued the Plaintiff's damage model, and calculated damages under Section 10b-5 claims.

- At the request of a company's Board of Directors, analyzed the stock price movement of a medical equipment manufacturing company's common stock subsequent to the company's findings of an internal investigation which revealed that net income and assets may have been overstated in previously reported periods. Developed a Plaintiff-style damage model. Calculated damages assuming a claim under Section 10b-5 of the Securities Act of 1933. Prepared a summary report of the analysis for the company's Board of Directors.

- Analyzed the stock price movement of a computer/networking company, at the request of a potential acquiring company, during a time period when public announcements were being made concerning new products, the company's dependence on a single large customer, acquisition rumors, and merger activity in the industry. Analyses included performing an event study and identifying economy-wide, industry-specific, and company-specific factors that impacted the company's stock price.

- Analyzed the stock price movement of a biotechnology company's common stock in a shareholder's securities fraud case. Critiqued the Plaintiff's expert's damage report and model. Performed an event study, determined an appropriate peer group, compared the company's actual stock price to its "true value" line, constructed a volume matrix to track ins-and-outs traders and retention shareholders, and calculated damages under Section 11 and Section 12 claims.

**Wrongful Death / Wrongful Termination / Employment Issues**

- Evaluated Plaintiff's claimed economic losses against a global financial services firm in a wrongful termination / discrimination matter. Specifically, the dispute involved the position of national underwriting and processing manager for multi-family lending. Evaluated Plaintiff's claimed past and future losses. Analyzed economic factors unrelated to the claimed wrongful conduct such as

consolidation in the banking industry, the financial crisis, and the mortgage crisis.  Illustrated the unreasonableness of Plaintiff's claimed losses in light of numerous unrelated economic factors which Plaintiff's had not considered or explained.

- Evaluated the Plaintiff's claimed damages against a county hospital in a wrongful termination/discrimination matter.  Evaluated alleged past and future lost earnings, alleged lost future pension income, and the alleged value of lost health insurance under two scenarios presented by the Plaintiff: (1) Plaintiff would have remained in same position and (2) Plaintiff would have been promoted.  Identified assumptions erroneously assumed by the Plaintiff's expert which were contrary to the facts of the case.  Concluded that Plaintiff's expert utilized assumptions that were unsupported, failed to consider Plaintiff's replacement income, and failed to consider other likely employment scenarios given the facts and circumstances of this case.  Assisted counsel during trial.

- Evaluated the Plaintiffs' claimed lost future earnings in a wrongful death matter involving a lumber yard worker.  Issues investigated included consumption expenses, assumptions regarding future work, likely possibility of separation from the workforce, estimated pay increases, cost of living adjustments, and taxes.

- Evaluated the Claimant's damage analyses and conclusions in a wrongful termination claim involving a senior life insurance broker/branch manager.  Issues investigated included the assessment of income in the absence of an alleged wrongful termination, the assessment of income given the fact that termination did occur, an analysis of the expected work life of the Claimant, fringe benefits, and business expenses.

- Evaluated the lost earnings of a manager of an over-the-counter trading department in an alleged wrongful termination action.  Since the manager's compensation was based on the profitability of the department, the performance of the department pre- and post-termination was investigated relative to the performance of the manager's new employer.

- Performed extensive financial analysis on several publicly-traded psychiatric hospitals to determine the financial position and market value of a psychiatric hospital in a wrongful termination lawsuit.

- Analyzed a complex employment agreement between a mining company and its CEO.  Developed a micro-computer model to compute the company's cost under various scenarios of action regarding the CEO.

## CORPORATE RECOVERY EXPERIENCE

- Analyzed the expected rate of return on a portfolio of assets being held to meet future pension plan obligations.  Analyses included determining what investments would be included in a prudent fund manager portfolio and the historical risk premiums on each investment category.

- Performed preference payment, fraudulent conveyance and reclamation claim analyses for a major distributor of over-the-counter and prescription drugs in relation to a large-scale bankruptcy of a discount drugstore chain.

- Reviewed the restructuring plan of a major jewelry retailer in a large-scale bankruptcy.  Analyzed the projected operating expenses for a bank group who was considering debtor-in-possession financing.

- Analyzed a debtor-in-possession's financial projections on an unconsolidated and consolidated basis, performed a preference and fraudulent conveyance analysis, and assisted in the preparation of a Plan of

Reorganization for the Official Unsecured Creditors Committee in relation to a large-scale bankruptcy proceeding of a major bus carrier.

- Prepared a cash flow model, analyzed the viability of projected business plans, reviewed management and accounting controls, and monitored cash transactions and inventory for a major creditor of a manufacturer of cash control devices and electronic monitoring systems.

- Assisted and advised in a creditor foreclosing on the assets of a manufacturer of security products and petroleum equipment.

- Computed and analyzed distributions by creditor class in a large-scale bankruptcy of a financial corporation.

- Performed extensive financial and valuation analysis for a major provider of psychiatric and rehabilitation services and its subsidiaries in a large-scale bankruptcy.

- Developed a cash flow model for a major international commercial real estate management corporation to calculate the value of numerous properties based on projected cash flows.

- Researched industry forecasts and performed extensive financial analyses on several public and private companies to determine the fair market value of a 100 percent ownership interest in a manufacturing company.

## BUSINESS VALUATION EXPERIENCE

- Developed a cash flow model to calculate the value of a home health care corporation and its subsidiaries. The model was used in the negotiation process to sell two of the subsidiaries.

- Analyzed a psychiatric hospital valuation, which included reviewing the company's financial and operational records and researching economic forecasts to determine the appropriateness of the methodology employed.

- Performed extensive financial analysis on several public and private fast food restaurants to determine the fair market value of a 100 percent ownership interest in a privately owned pizza restaurant chain.

- Conducted extensive financial analyses on several public and private steel pipe and tube distributors to determine valuation multiples and capitalization rates.

- Performed financial and valuation analyses on a privately-owned fast food distributing company. Researched industry compensation standards and analyzed the owner's historical compensation.

## TAX EXPERIENCE

- Researched complex business transactions to determine the consequences relating to mergers and acquisitions, spin-offs, forgiveness of debt, etc.

- Researched international tax issues and prepared international tax returns.

- Prepared corporate, consolidated, S-corporation, partnership, and individual tax returns.



EXHIBIT " __D___ "                                                         000347

**TRIAL TESTIMONY EXPERIENCE**

- **ALPS South, LLC v. The Ohio Willow Wood Company** (US District Court for the Middle District of Florida, Tampa Division)(2012)

- **Bert Ogden Harlingen Motors, Inc. v. Chrysler Group LLC** (American Arbitration Association Case No. 70-532-000086-10) (2010)

- **Sexton Chevrolet Cadillac, Inc. v. Chrysler Group LLC** (American Arbitration Association Case No. 30-532-00078-10) (2010)

- **El Dorado Motors, Inc. v. Chrysler Group LLC** (American Arbitration Association Case No. 71-532-000094-10) (2010)

- **U.S. Bank for the Estate of Vearl Sneed, et al. v. Reef Exploration, Inc., et al.** (Probate Court of Dallas County, Texas)(2002)

- **Pioneer Financial Services Inc., et al., v. Omni Loan Co. Ltd.** (US District Court for the Western District of Missouri, Kansas City Division) (2001)

- **The State of Texas v. J. Grady Brown, Jr., et al.** (County Court at Law No. Three of Denton County, Texas)(1997)


**DEPOSITION TESTIMONY**

- **Miller Global Properties, LLC, Miller Global Fund V, LLC, SA Real Estate, LLLP, and SA Resort LLLP v. Marriott International, Inc. and Marriott Hotel Services, Inc.** (In The District Court of Collin County, Texas, 219th Judicial District – Cause No. 219-03327-2009)(2011)

- **Leanne Siri v. The City of Dallas, Dallas City Manager Mary Suhm, Individually; Dallas Assistant City Manager Ryan Evans, Individually, and Dallas Fire-Rescue Chief Eddie Burns, Sr., Individually** (In the United States District Court for the Northern District of Texas, Dallas Division – Civil Action No. 3:10CV0036-M)(2011)

- **Alps South, LLC v. The Ohio Willow Wood Company** (In The United States District Court For the Middle District of Florida, Tampa Division – Civil Action No. 8:08-CIV-1893-T-33MAP)(2011 and 2010)

- **Susan Harrison, et al. v. The Procter & Gamble Company; Taft, Stettinius, & Hollister LLP; and Thomas E. Grossman** (In The United States District Court For the Northern District of Texas, Wichita Falls Division)(2008)

- **BMC Resources, Inc. v. Paymentech, LP** (In the United States District Court for the Northern District of Texas, Dallas Division – Civil Action No. 3:03CV1927)(2005)

- **Siemen Information and Communication Networks, Inc. v. Inter-Commercial Business Systems, Inc.** (In the United States District Court for the Northern District of Texas, Dallas Division- Civil Action No. 3-03CV2171-L)(2005)

EXHIBIT "__D____"

- **Jerry L. Cartwright as A dministrator o f t he E state o f V aleria H. Cartwright an d Je rry L . Cartwright and Vallie J. Cartwright, Individually as survivors, and as next friend of Dana Blunt, minor child of Valeria H. Cartwright, Deceased, Monica Davis, Dewayne Cartwright, and Michael Vaughn and Christie Wilson, Intervenor vs. Premier Parks, Inc. d/b/a Six Flags Over Texas, Inc., vs. Canyon Manufacturing Company** (In the District Court of Tarrant County, Texas, 342ND Judicial District)(2003)

- **Pioneer Financial Services Inc., et al., v. Omni Loan Co. Ltd.** (In the United States District Court for the Western District of Missouri, Kansas City Division)(2001)

- **The State of Texas v. J. Grady Brown, Jr., et al.** (County Court at Law No. Three of Denton County, Texas)(1997)

**Exhibit 2**