**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| SEAN TURNBOW, WILLIAM and MARY RICE, ROBERT YOSKOWITZ, FREDERICK VIEIRA, and ANTHONY TAYLOR, on behalf of themselves and all others similarly situated §§§§§§ | **CIVIL ACTION NO. 3:11-CV-1030-M** |
| *Plaintiffs* §§§§ | (Consolidated with Civil Action Nos 3:11-cv-1093-M, 3:11-cv-1137-M, 3:11-cv-1152-M, 3:11-cv-1225-M, and 3:11-cv-1325-M) |
| v. § | |
| LIFE PARTNERS, INC., LIFE PARTNERS HOLDINGS, INC., BRIAN D. PARDO, and R. SCOTT PEDEN §§§§ | **COMPLAINT – CLASS ACTION** **JURY TRIAL DEMANDED** |
| *Defendants* §§ | |

## INTERVENORS' CLASS ACTION COMPLAINT

TO THE HONORABLE JUDGE BARBARA M. G. LYNN:

COME NOW John Willingham, Marilyn Steuben, Stephen L. Eccles, Daryl Eccles, H. Dwayne Blackwell, Patricia S. Blackwell, Charles J. Contella, Richard Jacobi, Anna Jacobi, Bill Cotten, Nancy Cotten, Jamieson Reader, Misti Reader, Richard Walker, Judy Walker, and Helen Z. McDermott, by and through her attorney in fact Michael McDermott, on behalf of themselves and all others similarly situated, and file this, their Class Action Complaint, and would show the Court as follows:

## NATURE OF ACTION

1.     Defendant Life Partners Inc. ("LPI") is in the life settlement business. LPI claims to act as agent for others wanting to purchase an investment known as "life settlements." LPI refers to itself on its website as the "Architect of Life Settlements."

EXHIBIT "A"

2.       Life settlement transactions involve the sale of an existing life insurance policy to another party. By selling the policy, the policyholder receives an immediate cash payment. The purchaser, on the other hand, takes ownership of the policy and the right to receive the associated death benefits.  Once the policy is purchased, the new owner must pay premiums going forward to keep the policy in force, and receives a cash payment from the death benefits of the policy when the insured dies.  LPI claims that they don't actually buy policies but that they arrange as agent for policies to be sold to their customers.

3.       Participants in a life settlement transaction include: (a) the insured individual or the owner of the policy (the "Seller"), who may also employ a broker to act on his/her behalf; (b) life settlement providers like LPI; (c) life expectancy providers (here, Dr. Donald Cassidy ("Cassidy"), who served as LPI's sole life expectancy provider); (d) investors or buyers of the underlying policy (the "Purchaser"), who may have financial planners (who are LPI "Licensees" acting on their behalf and are paid a commission by LPI); and (e) agents such as LPI who facilitate and manage the many steps in the buy-and-sell transaction as well as the post sale maintenance of the policy, including paying premiums and deciding how much in premiums should be paid.

4.       Purchasers are not informed of the actual amount Defendants pay the Seller, which would be an appropriate estimate of the policy's true value, and they are not informed of any life expectancy that Defendants may use in determining whether to buy the policy from the Seller. Instead, LPI only provides what it calls the "acquisition price," which is not, as the name implies, the price at which LPI acquired the policy. In fact, it is a marked up selling price which LPI—in its sole discretion—sets based upon the inaccurate life expectancy estimates from Cassidy.

5.      According to the results of a *Wall Street Journal* investigation that culminated in a December 21, 2010 article indicting LPI's business practices, LPI "sells a policy for about 2.4 times what the owner is paid," i.e., the "acquisition price" provided to Purchasers is 240% higher than the price at which LPI actually acquired the policy from the Seller.

6.      This is a class action on behalf of all persons in the United States who at any time purchased or otherwise acquired fractional interests in life settlements from or through LPI or LPHI for which Cassidy provided life expectancy assessments (the "Class").   There has been alleged a subclass in this case (the "17200 Subclass") comprising of those members of the Class who are or were residents of California at the time they acquired Defendants' life settlements, This Class Action Complaint by Intervenors seeks to establish an additional subclass (the "Premium Overpayment Subclass"), as more particularly described below, comprising of those members of the Class who at any time purchased or otherwise acquired fractional interests in life settlements from or through LPI or LPHI involving a universal life insurance policy with a level death benefit.

7.      According to its filings made with the Securities and Exchange Commission ("SEC"), LPI plays a critical role in life settlement transactions between Sellers and Purchasers. LPI and life settlement Purchasers first enter into a standard, written, pre-printed, form contract that is entitled "Agency Agreement." Pursuant to the Agency Agreement, LPI agrees to "enter into a relationship of principal and agent" with each Class member. As Class members' agent, LPI agrees to "identify and assist" in the purchase of life insurance policies, and agrees to act at all times in the interest of purchasers and to use its expertise as diligently as possible. LPI's public filings with the Securities and Exchange Commission likewise confirms: "We act as a purchasing agent for life settlement purchasers." *See* 2010 Form 10-K (filed May 12, 2010) at 4.

8.      LPI, in its capacity as an agent, identifies and assists purchasers in identifying supposedly attractively priced life settlements, and LPI and Class members also enter into a standard, written, pre-printed, form contract that is entitled "Policy Funding Agreement."

9.      Defendant Brian D. Pardo ("Pardo"), the founder and Chief Executive Officer of LPI, explained in an October 17, 2008 earnings conference call with analysts:

> BRIAN PARDO: We like to tell our clients to be looking
>
> for a low double-digit return.
>
> ANALYST: Okay. 11, 12%? That kind of return?
>
> BRIAN PARDO: Yes. And I think if they are expecting
>
> that, they will not be disappointed.

10.      Integral to policy pricing to investors are life expectancy assessments. A life expectancy assessment is a prime barometer for (a) the fractional interest investors receive on a policy (*i.e.*, a higher life expectancy would mean a higher fractional ownership) and (b) the acquisition cost for the policy (*i.e.*, a higher life expectancy means a lower acquisition cost). If an insured outlives a life expectancy estimate, death benefits accruing from that policy are delayed. This reduces the return on investment and also requires additional premium payments.

11.      Defendants publicly claim to provide reliable life expectancy assessments. In its May 16, 2008 Form 10-K, LPHI stated: "To foster the integrity of our pricing systems, we use both in-house and outside experts, including medical doctors and published actuarial data."

12.      In December 2010 *The Life Settlements Report* and, subsequently, *The Wall Street Journal*, broke the story that LPI had grossly and systematically underestimated life expectancies in connection with the life settlement transactions for which it served as Class members' agents,

and that LPI has overcharged its customers for years based on those consistently erroneous assessments.

13.      Since approximately late 1999, Defendants utilized the services of Cassidy, an oncologist who lives in Nevada, to prepare life expectancy assessments. Defendants negligently disregarded that the life expectancy assessments they obtain and provide to Class members have been inaccurate—significantly so. Rather than adjusting its practices to account for this fact or using an alternative, reliable source of life expectancy assessments, LPI used the inaccurate assessments prepared by Cassidy. Unlike alternative sources—actuarial firms with extensive training and experience in this area—Cassidy is a full-time practicing physician with no actuarial training or experience. Nonetheless, LPI pays him for this part-time work at a rate that is well-above the market for similar services from experienced actuarial firms, and it has increased his compensation despite the consistently inaccurate life expectancy assessments that he provides. In fact, LPI's pay structure incentivizes Cassidy to be wrong to the detriment of Class members and to the advantage of LPI.

14.      Pardo, who beneficially owns greater than 50% of LPI's publicly-traded stock, is quoted in a December 2010 *Wall Street Journal* article as admitting that LPI's life expectancy assessments "are probably wrong."

15.      Due to the materially improper and inaccurate life expectancy assessments utilized by LPI, LPI overcharged Class members for their life settlement investments and obligated them to additional post-purchase expenses in the form of premium payments

16.      The return that a purchaser receives on a life settlement investment is basically the amount of the death benefit paid out at maturity minus the money paid by the purchaser to acquire and maintain the policy until maturity. When the insured passes away, the purchaser only

receives the set amount of the level death benefit. Thus, the *less* a life settlement investor has to pay to acquire and keep the policy in force, the *greater* the profit the investor will make when the policy matures and the death benefit is paid. Because the payout will not increase, a reasonably prudent investor's goal is to pay as little as possible to keep the policy in force up until the policy matures.  Accordingly, the Class had a clear incentive to "optimize" premium payments down to the minimum necessary to keep the policies in force until maturity.  No reasonably prudent life settlement company would do anything other than "optimize" premiums (i.e., pay the least amount needed) for their customers, as this is the only approach that is in the best interest of the customer.  Any overpayment of premium is kept by the insurer upon the death of the insured.

17.    When a member of the Class purchased an interest in a life settlement, LPI placed a portion of the customer's money into an escrow account for the purpose of paying premiums on the policy. The Purchasers are not able to independently determine the amount necessary to maintain the policy and instead must rely on their agent and attorney in fact, LPI. In each such life settlement transaction, LPI represents an amount as being the amount necessary annually to maintain the policy. Purchasers (including Intervenors and the Class) were dependant on LPI for the accuracy of the amount represented by LPI as necessary to maintain the policy, and dependant on LPI to determine how much and when to pay premiums to keep the policies in force.

18.    On or about January 27, 2011, *The Life Settlement Report*, a source of news and analysis regarding the life settlement market, reported that:

> **[LPI] has been requiring investors to pay level or flat premiums unlike the rest of the market, which optimizes or pays the minimum amount of premiums to keep policies in force**. But now the provider also plans to optimize premiums, according to Tim Harper,

a master licensee for Life Partners with BG&S Management Consultants in Grapevine,

Texas.

(emphasis supplied). In other words, as to life settlement transactions which Intervenors and the

Class had entered into with LPI, it was revealed that LPI made, authorized and/or allowed

excessive and unnecessary payments of the Purchasers' money to the various insurers over and

above the amount required to maintain the polices—*i.e.,* Intevenors and the Class were made to

pay premiums that were not "optimized" to reflect the minimum amount of premiums needed to

keep policies in force.  Although Intervenors and the Class agreed to pay premiums to maintain

the policies, they certainly never agreed to simply give extra money to the insurers that would

provide the purchasers no added benefit whatsoever.

19.    Although it now optimizes premiums for it clients, LPI failed to optimize

premiums on the life settlements at issue herein.  A reasonably prudent life settlement provider

would have optimized the premiums, and, by failing to do so, LPI caused the Class to

significantly overpay the insurance carriers to keep the life settlements in question in force.

20.    This class action seeks to hold Defendants liable for breaches of fiduciary duty,

breach of contract, and violations of California Unfair Competition Law on behalf of thousands

of Class members in connection with more than 6,400 policies.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to the Class Action Fairness

Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because this is a putative class action where a

member of the Class is a citizen of a state different from any Defendant, and the aggregated

amount in controversy exceeds $5,000,000, exclusive of interest and costs.

22.     Venue is proper in this District under the provisions of 28 U.S.C. § 1391 because LPI solicits customers, transacts business, and enters into contracts in this District. Those actions are the subject of this suit.

## PARTIES

### A.      Plaintiffs

23.     SEAN TURNBOW is a citizen of the State of Texas and is a member of the Class. Turnbow purchased fractional interests in life settlements from LPI in 2006. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.

24.     WILLIAM and MARY RICE ("Rices") are citizens of the State of Illinois and are members of the Class. The Rices purchased fractional interests in life settlements from LPI between June and August 2007. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.

25.     ROBERT YOSKOWITZ ("Yoskowitz") is a citizen of the State of California and is a member of the Class and the 17200 Subclass, defined herein below. Yoskowitz purchased fractional interests in life settlements from LPI in 2005. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.

26.     FREDERICK VIEIRA ("Vieira") is a citizen of the State of California and is a member of the Class and the 17200 Subclass, defined herein below. Vieira purchased fractional interests in life settlements from LPI in 2007. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.

Additionally, Vieira held a fractional interest in life settlements from LPI in an Individual Retirement Account ("IRA").

27.     ANTHONY TAYLOR ("Taylor") is a citizen of the State of California and is a member of the Class and the 17200 Subclass. Taylor purchased fractional interests in life settlements from LPI in 2007. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.

**B.     Corporate Defendants**

28.     LIFE PARTNERS, INC. ("LPI") is a Texas corporation and has been engaged in the secondary market for life insurance known generally as "life settlements" since 1997. LPI claims to be the pioneer of this industry. LPI claims it earns fees from providing life settlement agent services to both individual and institutional clients. LPI also acts as a fund advisor to funds purchasing life settlement policies and buys policies for its own investment. In the fiscal years 2010, 2009 and 2008, LPI acquired 974 interests in policies for its own account. LPI is a wholly owned subsidiary of Life Partners Holdings, Inc.

29.     LIFE PARTNERS HOLDINGS, INC. ("LPHI") is a Texas corporation with its principal place of business at 204 Woodhew Drive, Waco, Texas 76712. It is a financial services company and the parent company of LPI.

**C.     Individual Defendants**

30.     BRIAN D. PARDO ("Pardo") has been the CEO of LPI since 1991 and is also the CEO of LPHI. Defendant Pardo, according to LPHI's website, "is one of the pioneers of the life settlement industry having been instrumental in establishing life settlements as a viable financial investment alternative."

31.     R. SCOTT PEDEN ("Peden") serves as General Counsel and Secretary for LPHI and President of LPI. He served as Vice President and General Counsel for LPI since its incorporation in 1991. According to LPHI's website, Defendant Peden "designed the legal structure of the life settlement transaction that is widely used throughout the industry."

**D.      Intervenors**

32.     JOHN WILLINGHAM ("Willingham") is a citizen of the State of Texas and is a member of the Class. Willingham purchased fractional interests in life settlements from LPI in 2006, 2007 and 2008.   Additionally, Willingham held a fractional interest in life settlements from LPI in an Individual Retirement Account ("IRA").   Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

33.     MARILYN STEUBEN ("Steuben") is a citizen of the State of California and is a member of the Class and the 17200 Subclass, defined herein below.   Steuben purchased fractional interests in life settlements from LPI in 2006 and 2007. Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements. Each of them was also a universal life insurance policy with a level death benefit.

34.     STEPHEN L. ECCLES and DARYL ECCLES ("Eccles") are citizens of the State of Texas and is a member of the Class.  Eccles purchased fractional interests in life settlements from LPI in 2008.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

35.     H. DWAYNE BLACKWELL and PATRICIA S. BLACKWELL ("Blackwell") are citizens of the State of Texas and is a member of the Class.  Blackwell purchased fractional

interests in life settlements from LPI in 2007.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements. Each of them was also a universal life insurance policy with a level death benefit.

36.    CHARLES J. CONTELLA ("Contella") is a citizen of the State of Texas and is a member of the Class.  Contella purchased fractional interests in life settlements from LPI in 2007.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

37.    RICHARD JACOBI and ANNA JACOBI ("Jacobi") are citizens of the State of Texas and is a member of the Class.  Jacobi purchased fractional interests in life settlements from LPI in 2008.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

38.    BILL COTTEN and NANCY COTTEN ("Cotten") are citizens of the State of Texas and is a member of the Class.  Cotten purchased fractional interests in life settlements from LPI in 2006.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

39.    JAMIESON READER and MISTI READER ("Reader") are citizens of the State of Pennsylvania and is a member of the Class.  Reader purchased fractional interests in life settlements from LPI in 2008.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

40.     RICHARD WALKER and JUDY WALKER ("Walker") are citizens of the State of Nevada and is a member of the Class.  Walker purchased fractional interests in life settlements from LPI in 2006.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.

41.     HELEN Z. MCDERMOTT, by and through her attorney in fact MICHAEL MCDERMOTT, ("McDermott") is a citizen of the State of South Carolina and is a member of the Class.  McDermott purchased fractional interests in life settlements from LPI in 2008.  Each of them was priced based upon Cassidy's erroneous life expectancy data and LPI failed to optimize premiums on said life settlements.  Each of them was also a universal life insurance policy with a level death benefit.


## FACTUAL ALLEGATIONS

**A.     LPI Used Life Expectancy Assessments By Cassidy To Harm The Class**

42.     As agent for the Class members, LPI obtained life expectancy assessments on each policy that it identified and assisted Class members in purchasing. But rather than obtaining these assessments from an actuarial services firm that specializes in providing life expectancy assessments, since the late 1990s, LPI instead obtained them from Nevada oncologist Cassidy. Cassidy, however, had no actuarial training, no specialized training in preparing life expectancy assessments, no prior experience in providing such services, and no track record of making accurate life expectancy assessments. To the contrary, his record demonstrates that he consistently and significantly misstated life expectancies for LPI for more than a decade.

43.     Cassidy served as LPI's one and only "independent medical doctor" who provided LPI with life expectancies that it, in turn, provided to Purchasers and used to establish the prices it charged them. Cassidy was deposed on November 21, 2008, in connection with a suit by Colorado regulators against LPI for selling unregistered securities. Cassidy testified that *he had no actuarial training*. When questioned about the inaccuracy of his life expectancy calculations, Cassidy noted that on his letters to LPI, there is a disclaimer indicating that no single source should be depended upon in making a life expectancy determination and that the calculations he provides are merely one source.

44.     LPI's annual filings with the Texas Department of Insurance demonstrate the inaccuracy of Cassidy's life expectancy assessments. On policies maturing between 2007 and 2009, for example, Cassidy provided life expectancy assessments averaging fewer than three years—but on average, the assessments were understated by five to six years.

45.     The table below shows Cassidy's approximate performance on the 282 LPI policies that matured during this three-year period:

|  | Number of Policies Maturing | Avg. LE in Years | Avg. Years to Death | Avg. Understatement in Years |
|---|---|---|---|---|
| 2007 | 106 | 2.5 | 8.2 | 5.7 |
| 2008 | 97 | 2.6 | 8.7 | 6.1 |
| 2009 | 79 | 2.9 | 8.2 | 5.3 |
| Total | 282 |  |  |  |

In short, what the table shows is three years worth of maturing policies—282 of them—on which the insureds lived an average of more than eight years, even though Cassidy had assessed life expectancies averaging fewer than three years.

46.     An investigation of Texas insurance records, according to the December 21, 2010, *Wall Street Journal* Article, showed that insureds "often" lived *beyond double or triple the projected life span* that Cassidy determined. Pardo is quoted in the article as admitting that LPI's life expectancy estimates "are probably wrong." In a review of 1,197 LPI policies, the article noted that only 6.8% of insureds passed away at or before LPI's projected life expectancy. Thus, in over 93 of 100 of Defendants' life settlements, the insured lived longer than Cassidy's life expectancy assessment.

47.     Independent analysis of life expectancies also shows how wrong the LPI life expectancy assessments were. A February 17, 2011 *Wall Street Journal* article entitled "Life Partners' Insureds Lived Twice as Long as Expected, Figures Show" reported:

> A [small] sample by The Life Settlement Institute, a trade group representing a handful of providers and one life expectancy provider, found that Life Partners' estimates were 55.8% to 75.7% shorter than estimates by other underwriters in the market. The trade group, which made the comparison on 16 policies, sent its findings to the Securities and Exchange Commission in October 2009, asking that it investigate Life Partners' life expectancies.

48.     The *Wall Street Journal*'s investigative report also compared a small sample (20) of Cassidy's life expectancy assessments to "those of independent firms that specialize in making such estimates." The *WSJ* concluded that "[t]he independent firms' estimates were greater, generally by 50% to 100%" when compared to Cassidy's. To illustrate, the report

provided additional details on one of these policies: In September 2008, for example, LPI sold its clients a $10.8 million policy on the life of a 78-year-old New York man, telling them he had a life expectancy of three to five years. Two independent firms earlier that year separately projected the man had about 11 years to live.

49.     Defendants understood the effect of understating life expectancies. In LPHI's May 15, 2008 Form IO-K it stated: "If we underestimate the average life expectancies and price our transaction too high, our purchasers will not realize the returns they seek, demand may fall, and purchasers may invest their funds elsewhere. In addition, amounts escrowed for premiums may be insufficient to keep the policy in force and it is the responsibility of the purchasers to pay these additional premiums." Further, LPHI stated: "Our purchasers depend on our ability to predict life expectancies and set appropriate price . . . ."

50.     Upon information and belief, Cassidy still has not changed his methodology or accounted in any way for his consistent record of under-stating life expectancies. Cassidy stated at his November 21, 2008, deposition that he did not even know he had been understating life expectancies because he did nothing to check his assessments against actual performance.

51.     LPI used Cassidy exclusively for providing life expectancy assessments to Class members and to determine the price for the life settlement transaction. Even if it had different life expectancy assessments from the insured or the insured's broker or other sources, LPI used only Cassidy's assessments for Class members. And even though Cassidy's life expectancy assessments all state in writing that LPI should not depend solely on him making a life expectancy determination, LPI puts its investors in the position of having to do precisely that. Upon information and belief, LPI had in hand life expectancy assessments from one or more reputable companies that provide such assessments but hid this information from LPI Purchasers

and did not take this information into account in setting the price for the life settlement.  Instead, they relied exclusively on Dr. Cassidy's assessment.

52.      The SEC is currently investigating LPI's practice of establishing and disclosing the life expectancy of insureds of life settlements sold to Class members. On May 9, 2011, LPI received a Wells Notice from the SEC which stated that the SEC staff will recommend that the SEC bring a civil injunctive action against LPI related to accuracy of estimates of life expectancies.

53.      On or about July 29, 2010, the Enforcement Division of the Texas State Securities Board formally commenced an investigation of Defendants LPHI, LPI, Peden and Pardo. The purpose of this investigation is to detect or prevent any violations of The Securities Act. *See* Article 581-1, *et seq*. These suspected violations include but are not limited to the following: Offering for sale and selling investments in life settlement contracts at a time when the investments in life settlement contracts were not registered by qualification, notification or coordination and no permit was granted for their sale in Texas; and Offering for sale and selling investments in life settlement contracts at a time that Respondents were not registered as dealers, agents, investment advisers or investment adviser representatives.

54.      On or about May 29, 2007, Colorado's Securities Commissioner filed an action seeking injunctive and other relief against one or more of Defendants and others based upon the illegal or unlawful sale of securities, wherein or as a result thereof: The Colorado Securities Commissioner alleged from as early as 2004 and continuing through 2007, LPI raised over $11.5 million from more than 110 Colorado investors through the sale of unregistered securities in the form of fractionalized interests in viaticals (a viatical settlement allows a person to invest in another person's life insurance policy) and life settlements; The Colorado court granted partial

summary judgment in favor of the Colorado Securities Commissioner and against LPI finding that LPI sold unregistered securities; and LPI eventually settled the remaining matters in the case.

55.     Since *The Life Settlements Report* and *The Wall Street Journal* broke the story regarding its inaccurate life expectancy assessments, LPI has announced a change in its business model, indicating that "it will begin to pay insurers the least possible amount each year to keep the policies in force, rather than the annual amount recommended by insurers." Per LPI, this alleged new approach—known as "optimizing premiums"—is designed to target annual returns of 7% over seven years in contrast to the 12% plus returns that LPI previously touted.

**B.      LPI Harmed the Class by Overpaying Premiums**

56.     Virtually all of the life settlements at issue herein (for which Cassidy provided life expectancy assessments) involve a type of life insurance known as a "universal life insurance" policy with a level (unchanging) death benefit.  One feature of a universal life insurance policy is that it offers "flexible" premium payments: the premium payer can choose to "optimize" premiums by paying only the current "cost of insurance" (i.e., the minimum necessary to maintain the policy and keep it in force) rather than paying a "level" or "planned" premium.  Optimizing premiums is the industry standard.  If more than the "cost of insurance" is paid as a premium, cash value will build in the policy which is kept by the insurance company upon death of the insured.

57.     LPI controls the amount and timing of the premium payments.  Via standard form agreements, Purchasers appointed LPI to be their agent and attorney in fact to instruct and direct LPI's escrow agent concerning the disbursement of funds placed with LPI, including as to the payment of premiums for maintenance of the policy.  Via a standard form "Policy

Information Statement," LPI represented that its escrow agent would be responsible for holding amounts escrowed for payment of premiums and for paying those premiums from the escrow account "as they come due."  LPI represented that they would only pay premiums to keep the policies in force.

58.     Because it would obviously not be in the best interest of the Purchaser to overpay premiums, LPI should pay only premiums necessary to keep the policy in force. However, LPI overpaid premiums on the life settlements at issue herein by paying "level" premiums.

59.     For LPI, paying level premiums means "[o]btaining an illustration generated by the insurance company for a period of time, which solves for the amount of premiums that would be necessary to carry or maintain the policy for that period of time at a level rate."  The level premium amounts were apparently based on insurance company illustrations showing level premiums to age 100.

60.     A reasonably prudent investor would only want to invest the minimum amount possible to return the highest amount possible.   In a life settlement contract this is accomplished, among other ways, through optimizing premiums. Upon maturity, the life settlement policies involved here will only pay the death benefit and will not pay out any accumulated cash value. If level premiums are paid by life settlement investors for a policy in this situation, large cash values would be "trapped" in that policy and not returned to the life settlement investor at maturity.

61.     To calculate the amount of optimized premiums, there is a widely-used program in the industry called MAPS which reasonably and accurately estimates the cost of insurance so that premiums above the cost of insurance are not paid.  LPI now uses the MAPS program to calculate optimized premiums. From an operational standpoint, Defendants have conceded that

it's just as easy to optimize premiums, as it is to utilize level premiums. In fact, according to Peden, it may take even less time to determine optimized premiums than it would to determine level premiums. Optimized premiums are sufficiently predictable and relatively simple for a life settlement provider to compute.

62.     Using optimized premiums is the reasonably prudent approach to paying premiums on a policy that is the subject of a life settlement contract such as those involved here (which will only pay level death benefits).   As to the Optimized Premium Subclass, a reasonably prudent life settlement provider would use optimized premiums to determine the initial premium reserve, would pay optimized premiums to the insurance carrier, and would optimize premiums to determine amounts needed to meet any premium call in the event the initial reserves become depleted. Intervenors allege that, by failing to do so, LPI failed to act as a reasonably prudent life settlement provider would have acted in such circumstances.

## C.     LPI owed the Purchasers a Fiduciary Duty.

63.     LPI was appointed by the Purchasers for the very purpose of assisting with the subject life settlement investments and that LPI specializes in just such transactions. LPI acted as agent for their Purchasers and owed them a fiduciary duty.   An agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances. Special skills or knowledge possessed by an agent are circumstances to be taken into account in determining whether the agent acted with due care and diligence. If an agent claims to possess special skills or knowledge, the agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents with such skills or knowledge.

64.     As a fiduciary for a Purchaser, LPI was obligated to exercise a high degree of care to conserve the purchaser's money and to pay that money only to those entitled to receive it. LPI was obligated to act with reasonable prudence and good faith, whenever it made any expenditures of the Purchaser's money.

65.     A life settlement purchaser's "interest" and "manifested purpose" is to pay as little as possible for the life settlement in order to maximize the stated return on investment. LPI was employed to act as the agent for the Purchasers and thus owed a duty to be loyal to the principal's interests and to use reasonable care to obtain terms which best satisfy the manifested purposes of the principal—i.e., a duty to use reasonable care to obtain terms, including price, that are most advantageous to the principal. Because the purchasers were seeking economic gain and the very purpose of the agency was to help the client-principal achieve that objective, LPI was obligated to use reasonable efforts to maximize the economic benefit to the client in each transaction.  This includes obtaining the best price for their customers to acquire the life settlement (and using the best information in connection with same) and paying as little in premiums as possible.

66.     LPI breached its duty to be loyal to the purchasers' interests and to use reasonable care to obtain terms which best satisfy the manifested purposes of the agency.

**D.     Plaintiffs' and Intervenors' Life Settlement Investments**

67.     Like the other Class members, Intervenors were provided with a Confidential Case History on the insured under each policy they purchased, which included a Summary of Medical History containing life expectancy estimates, and they purchased fractional interests in life settlements from or through LPI.

68.     Like the other Class members, Intervenors purchased fractional interests in life settlements from or through LPI involving a universal life insurance policy with a level death benefit for which LPI overpaid premiums as a result of paying level premiums rather than only the cost of insurance.

## TOLLING

69.     By a uniform course of conduct common to the entire Premium Overpayment Subclass, Defendants controlled all information and decisions regarding both the life expectancies and the payment of premiums on the life settlements at issue herein. The Class did not know and could not have known that Life Partners was providing false life expectancies. The Premium Overpayment Subclass did not know and could not have known that Life Partners overpaying premiums by failing to optimize premiums until the failure to do so was made public in January of 2011. Accordingly, the discovery rule, fraudulent concealment, and/or equitable estoppel apply here on a class-wide basis to bar Defendants from asserting limitations as a defense.  Further, claims on behalf of all Texas citizens have also been tolled by virtue of a putative class action filed in Texas court on April 8, 2011 (*John Willingham v. Life Partners, Inc.,* Cause No. DC-11-10639, 191st Judicial District, Dallas County, Texas) and claims on behalf of all California citizens have also been tolled by virtue of a putative class action in California court on November 8, 2011 (*Marilyn Steuben v. Life Partners, Inc.,* Case No. BC472953, Superior Court of the State of California in and for the County of Los Angeles).

## CLASS ACTION ALLEGATIONS

70.     Intervenors bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of: (1) a Class, consisting of all those in the United States who at any time purchased or otherwise acquired fractional interests in life settlements from or

through LPI or LPHI for which Cassidy provided life expectancy assessments; (2) a Subclass (the "17200 Subclass") comprising those members of the Class who are or were residents of California at the time they acquired Defendants' life settlements; and (3) a Subclass (the "Premium Overpayment Subclass") comprising of those members of the Class who at any time purchased or otherwise acquired fractional interests in life settlements from or through LPI or LPHI involving a universal life insurance policy with a level death benefit.  Excluded from the Class are Defendants, the officers and directors of LPI and LPHI at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

71.     The Class seeks certification of claims for damages, restitution and fee disgorgement pursuant to the laws governing fiduciary relationships and the various LPI agreements.

72.     Intervenors reserve the right to modify the Class and/or Subclass definitions or add Subclasses and/or a definitive class period following the opportunity to conduct necessary discovery.

73.     The presence of the fiduciary relationship, as well as the omissions by Defendants regarding Cassidy's performance, compensation, incentives, methodology, disclaimers, and lack of training, experience, and expertise, prevented the Class from discovering claims against Defendants and give rise to equitable estoppel or equitable tolling.  Also, Defendants, upon information and belief, withholding life expectancy assessments from reputable companies in the business of providing such assessments likewise gives rise to equitable estoppel or equitable tolling.

74.     The members of the Class are so numerous that joinder is impracticable. As of June 1, 2011, it is estimated that there are approximately 25,000 fractional interests at issue in this dispute. The precise identities, addresses and investment amounts of the Class are unknown to Intervenors, but may and should be known with proper class discovery from LPI, third-parties and their respective records.

75.     Intervenors' claims are typical of the claims of the members of the Class as all members of each class are similarly affected by Defendants' conduct in violation of law that is complained of herein.

76.     Intervenors will fairly and adequately protect the interests of the members of the Class and have retained competent and experienced counsel.

77.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Defendants have engaged in a consistent and uniform practice that has injured all Class Members in the same fashion, i.e., all Class members overpaid for the investments (both in terms of acquiring them and in premium payments), even those few who may eventually profit from them.  Among the questions of law and fact common to the Class are:

    a)  Whether LPI owed and breached fiduciary duties to Class members;

    b)  Whether LPI breached contractual duties and obligations owed to Class members;

    c)  Whether LPHI, Pardo, and Peden aided and abetted LPI's breaches of fiduciary duty and/or violated California Unfair Competition Law regarding the 17200 Subclass;

d)  Whether Class members are entitled to restitution, disgorgement of fees and profits, or other equitable relief to remedy Defendants' misconduct;

e)  Whether Class members are entitled to recover compensatory, exemplary or other damages based upon Defendants' misconduct; and

f)  Whether Class members are entitled to an award of reasonable attorneys' fees, prejudgment interest and costs of suit.

78.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty Against Defendant LPI

79.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

80.     LPI was the agent for each Class member. An agent is a fiduciary with obligations of utmost good faith, particularly when it is receiving compensation in the transaction.

81.     The fiduciary duties that LPI owed the Class include but are not limited to: (1) making the transactions in question fair and equitable to the Class; (2) making reasonable use of the confidence that the Class placed in LPI; (3) acting in the utmost good faith and exercising the most scrupulous honesty toward the Class; (4) placing the interests of the Class before its own; (5) not using the advantage of its position to gain any benefit for itself at the expense of the

Class; (6) not placing itself in any position where its self-interest might conflict with its obligations as a fiduciary; (7) fully and fairly disclosing all important information to the Class concerning the transactions; (8) paying reasonable attention and providing reasonable care to the duties entrusted to it; and (9) acting at all times in the interest of the Class members and using LPI's expertise as diligently as possible.

82.     LPI has breached these obligations in its process of procuring, relying on, utilizing, and presenting the services and life expectancy assessments of Cassidy.

83.     Specifically, LPI breached its fiduciary duties of care and other fiduciary duties by retaining Cassidy to provide life expectancy assessments, by overcompensating him and by incentivizing his poor performance, by failing to monitor his performance or provide or ensure quality control, by creating conflicts of interest and engaging in self-dealing transactions that were unfair to Class members, by failing to pay reasonable attention or provide reasonable care in obtaining and providing life expectancy assessments to the Class, by failing to use its expertise diligently on behalf of the Class members, and by failing to exercise the requisite amount of care that an agent, fiduciary, and expert in life settlements ought to have exercised, among other breaches.

84.     LPI has received fees that it would not have received if it had used proper life expectancy assessments to sell the policies, and it has also benefited from any lapsed contracts that it can resell or keep for its own financial gain.

85.     As to the Premium Overpayment Subclass, LPI breached its fiduciary duties by overpaying premiums to the carriers for the life settlements in question. LPI failed to pay or direct its escrow agent to pay only the cost of insurance necessary to maintain the policies ("optimized" premiums), and LPI instead paid and directed its escrow agent to pay amounts as

premiums that were in excess of the amounts needed to maintain the policies.  LPI breached its duties to be loyal to the principal's interests and to use reasonable care to obtain terms which best satisfy the manifested purposes of the principal and, as a result, caused Intervenors and the Premium Overpayment Subclass to suffer damages (for which claim is hereby brought) in the amount of money paid to insurers beyond the cost necessary to maintain the policies in question and resulted in LPI being unjustly enriched by its breaches of fiduciary duty such that the Subclass is entitled to restitution, disgorgement, and other equitable remedies.

86.     Because of LPI's breaches of fiduciary duty, the Class has been damaged and is entitled to recover all such damages, as well as exemplary damages, attorney's fees, prejudgment interest and costs. Further, LPI has been unjustly enriched by its breaches of fiduciary duty, and the Class is entitled to restitution, disgorgement, and other equitable remedies.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty Against
### Defendants Pardo, Peden, and LPHI

87.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

88.     Defendants Pardo, Peden, and LPHI each knew of the agency and fiduciary relationships between LPI and the members of the Class.

89.     Pardo, Peden, and LPHI also knew that LPI has breached these obligations in its process of procuring, relying on, utilizing, and presenting the services and life expectancy assessments of Cassidy. They knew that LPI retained Cassidy to provide life expectancy assessments, overcompensated him and incentivized his poor performance, failed to monitor his performance or provide or ensure quality control, created conflicts of interest and engaged in self-dealing transactions that were unfair to Class members, failed to pay reasonable attention or

provide reasonable care in obtaining and providing life expectancy assessments to the Class, failed to use its expertise diligently on behalf of the Class members, and failed to exercise the requisite amount of care that an agent, fiduciary, and expert in life settlements ought to have exercised.

90.     Pardo, Peden, and LPHI knowingly participated in and/or encouraged these breaches of fiduciary duty in many ways, including that Pardo retained Cassidy, that Pardo and/or Peden failed to replace him, that Pardo and/or Peden determined Cassidy's compensation, that Pardo and/or Peden participated in the decision not to properly monitor Cassidy's work or provide proper quality control, that Pardo and/or Peden and/or LPHI were involved in and/or had oversight and managerial responsibility for LPI decisions in which LPI had a conflict of interest and was engaging in self-dealing in transactions that were unfair to members of the Class, that Pardo and/or Peden caused LPI to fail to pay reasonable attention or reasonable care in obtaining and providing life expectancy assessments to the Class, that Pardo and/or Peden caused LPI to fail to use its expertise diligently on behalf of the Class members, and that Pardo, Peden, and LPHI orchestrated, defended, and thereby encouraged LPI's failure to exercise the requisite amount of care that an agent, fiduciary, and expert in life settlements ought to have exercised. Additionally, upon information and belief, Pardo and/or Peden and/or LPHI decided or participated in the decision and/or encouraged LPI to withhold from Class members legitimate life expectancy assessments from reputable companies in the business of providing such assessments.

91.     As to Cassidy's compensation specifically, until 2008, Cassidy received $500 for each policy he reviewed if LPI's potential customers ultimately purchased the policy. On policies not purchased, Cassidy's work was not compensated. Because LPI is incentivized to select a

policy for purchase based upon the spread between the purchase price and the price at which it can turn around and sell life settlements to investors, and because the shorter life expectancy assessment, the larger the spread, this arrangement incentivized Cassidy to provide shorter life expectancy assessments so that LPI would be more likely to have Class members purchase an interest in a death benefit and, thus, he would get paid.

92.     Beginning in 2008, in addition to the $500 Cassidy received for each policy that was purchased by LPI customers, Cassidy received an additional $15,000 per month. In other words, despite Cassidy's abysmal performance in 2007, starting in 2008, Defendants Pardo and/or Peden caused LPI to give him a $180,000 raise and continued paying the $500 bonus that incentivized him to provide inaccurately low life expectancy assessments. This compensation significantly exceeds what is typically charged by actuarial services firms who, unlike Cassidy, have considerable training, experience, and actuarial expertise.

93.     Further, because LPHI is publically traded and because the problems associated with Cassidy's life expectancy assessments are material, Defendants Pardo, Peden, and LPHI each had a duty to disclose them. Instead, they failed to disclose that information. By doing so, they not only participated in and encouraged LPI's breaches of fiduciary duty, but also made them possible. Without the participation of these Defendants, LPI could not have profited from its misconduct.

94.     Pardo and/or Peden and/or LPHI also decided on behalf of LPI or encouraged the decision by LPI to pay level premiums and therefore not optimize premiums, which optimization was required to serve the bests interests of the Premium Overpayment Subclass.

95.     Defendants Pardo, Peden, and LPHI are therefore jointly and severally liable with LPI for LPI's breaches of fiduciary duty.

## COUNT III
## Breach of Contract Against Defendant LPI

96.      Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

97.      LPI entered into an "Agency Agreement" with Class members whereby LPI was to use its expertise and diligence to find suitable life settlement contracts in which the Class members were to invest, and LPI would provide the Class members information sufficient to make informed decisions regarding the life settlement contracts. LPI's duties under the Agency Agreement included but were not limited to the following: to be "engaged in the identification, qualification and purchase of discounted life insurance policies (and related death benefits) of senior citizens and terminally ill individuals;" and LPI "shall identify and assist in the purchase for Purchaser [Class members], such life insurance policies and/or related death benefits." The Agency Agreement obligated LPI to act at all times in the interest of the Class members and to use LPI's expertise as diligently as possible on their behalf.

98.      LPI also entered into a "Policy Funding Agreement" with the Class members whereby the Class members were promised an interest in a life settlement contract based upon an insured's particular life expectancy. LPI's duties under the Policy Funding Agreement included but were not limited to the following: "review[ing] applicants for TIPS" [Transferrable Insurance Policies a/k/a life settlement contracts] and "qualify[ing] applicants for TIPS based upon underwriting criteria and other relevant guidelines pursuant to the above-referenced Agency Agreement, and provid[ing] information on such transactions to purchaser." LPI controlled the most critical piece of information provided to Class members in the life settlement transaction: life expectancy determinations.

99.     LPI breached its contractual obligations, including its duty to perform with care, skill, reasonable expedience and faithfulness, all that has been agreed to be done, as well as the confidence and trust that each party will faithfully perform his obligation under the contract, in its process of procuring and utilizing the services and life expectancy assessments of Cassidy. LPI's retention and monitoring of Cassidy and its use of his life expectancy assessments do not meet the contractual standards of skill, care and faithful performance that the investors were contractually entitled to receive.

100.     As to the Premium Overpayment Subclass, LPI breached its contractual obligations, including its duty to perform with care, skill, reasonable expedience and faithfulness, all that has been agreed to be done, as well as the confidence and trust that each party will faithfully perform his obligation under the contract, in its payment of premiums beyond the amount necessary for "maintenance of the policy" and in its failure to only pay those amount necessary to maintain the policy "as they come due."  LPI's overpayment of premiums on the life settlement policies in question does not meet the contractual standards of skill, care and faithful performance that the investors were contractually entitled to receive and resulted in damages to the Premium Overpayment Subclass in the amount of money paid to insurers beyond the cost necessary to maintain the policies in question.

101.     Because of LPI's breaches of contract, the Class has been damaged and is entitled to recover those damages, including attorney's fees, prejudgment interest and costs.

**COUNT IV**
**Violation of California Unfair Competition Law**
**Against Defendants LPI, Pardo, and Peden**
**(Cal. Bus. & Prof. Code § 17200, *et seq*.)**

**ON BEHALF OF THE 17200 SUBCLASS**

102.     Intervenor Steuben, on behalf of the 17200 Subclass, realleges and incorporates by reference the preceding allegations.

103.     Through the use of improper and inaccurate life expectancy assessments, LPI, Pardo, and Peden have (1) directly or indirectly engaged in unlawful and/or unfair business acts and practices toward a person; (2) directly or indirectly obtained property by material misrepresentations and/or omissions; and (3) made, published, and disseminated materially untrue and misleading information.

104.     By overpaying premiums for the life settlements, LPI, Pardo, and Peden have (1) directly or indirectly engaged in unlawful and/or unfair business acts and practices toward a person; (2) directly or indirectly obtained property by material misrepresentations and/or omissions; and (3) made, published, and disseminated materially untrue and misleading information.

105.     Intervenor Steuben is a citizen of the State of California.

106.     LPI, Pardo, and Peden's acts and practices as described herein constitute unlawful and/or unfair business acts and practices. As such, LPI, Pardo, and Peden's conduct violates Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL").

107.     LPI, Pardo, and Peden's conduct as described herein violates not only the unlawful prong of the UCL, but also constitutes a violation of the UCL's "unfair" prong, independent of the other causes of action asserted herein. LPI, Pardo and Peden's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers. Any justification for LPI, Pardo, and Peden's practices is outweighed by the consequences and harm to Steuben and the 17200 Subclass.

108.    Steuben and the 17200 Subclass have suffered injury in fact and have lost money or property as a result of LPI, Pardo and Peden's unlawful and/or unfair business practices.

109.    The above-described unlawful and/or unfair business practices present an ongoing threat of continuing injury to Plaintiffs, the 17200 Subclass, and the general public. Among other things, Steuben, the 17200 Subclass, and the general public continue to be financially disadvantaged by such conduct. Such wrongful conduct is continuing and, unless LPI, Pardo, and Peden are restrained, it will continue to engage in such conduct.

110.    Pursuant to Cal. Bus. & Prof. Code § 17203, Steuben and the 17200 Subclass, on behalf of themselves and the public, seeks an order of this Court enjoining LPI, Pardo, and Peden from continuing their unfair and/or unlawful business acts or practices in the State of California. The public, Steuben, and the 17200 Subclass will be irreparably harmed if such an order is not granted.

111.    Further, Steuben and the 17200 Subclass, on behalf of themselves and the public, seek restitution and disgorgement of profits realized by LPI, Pardo, and Peden as a result of their unfair and/or unlawful business practices.

## PRAYER FOR RELIEF

**WHEREFORE**, Intervenors and each member of the Class pray that the Court:

1.    Certify the proposed Class and Subclasses;

2.    Assess damages against LPI and in favor of Intervenors, Plaintiffs, Class and Subclasses as established by the evidence and as alleged herein;

3.    Grant restitution of all improperly collected charges, fees and interest, and the imposition of an equitable constructive trust over all such amounts for the benefit of Intervenors, Plaintiffs, the Class and the Subclasses;

4.       Award exemplary damages;

5.       Assess prejudgment interest on the damages awarded (except exemplary damages);

6.       Award attorneys' fees, costs of suit and expenses as provided under applicable law; and grant such other and further relief, in law or in equity, as the Intervenors and Class may be entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Intervenors demand a trial by jury on all issues so triable.

Respectfully submitted,

*s/ James Craig Orr, Jr.*
**JAMES CRAIG ORR, JR.**
State Bar No. 15313550
**MICHAEL E. HEYGOOD**
State Bar No. 00784267
**HEYGOOD, ORR & PEARSON**
2331 W. Northwest Hwy., 2nd Floor
Dallas, Texas 75220
(214) 237-9001
(214) 237-9002 (fax)
COUNSEL FOR INTERVENORS

## CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2012, I electronically filed the foregoing document via the CM/ECF electronic filing system and served all counsel of record pursuant to FED. R. CIV. P. 5(b)(2)(E).

*s/ James Craig Orr, Jr.*
James Craig Orr, Jr.