# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

SEAN TURNBOW, WILLIAM *and* MARY RICE,
ROBERT YOSKOWITZ, FREDERICK VIEIRA,
*and* ANTHONY TAYLOR, *on behalf of themselves
and all others similarly situated*,

Plaintiffs,

vs.

LIFE PARTNERS INC., LIFE PARTNERS
HOLDINGS, INC., BRIAN D. PARDO, *and* R.
SCOTT PEDEN,

Defendants.

**CIVIL ACTION NO.: 3:11-CV-1030-M**

**CLASS ACTION**

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' OPINIONS

# **TABLE OF CONTENTS**

I.      INTRODUCTION…………………………………………………………………... 1

II.     ARGUMENT………………………………………………………………….. 2

        A. Legal Standards……………………………………………………………… 2

        B. Background and Summary of Prof. Stallard's Expert Opinions……………3

                i.   *Prof. Stallard is a Preeminent Actuarial Expert*……………………5

                ii.  *Prof. Stallard's Expert Opinions on Class Certification*…………...7

        C. Prof. Stallard's Methodology  Has Been Peer-Reviewed,
           Published, and is Generally Accepted in the Scientific Community………. 8

        D. Defendants' Arguments About the Alleged Lack of "Consensus"
           in the Life Settlement Industry Goes to the Weight of the
           Evidence, Not Admissibility…………………………………………………10

        E. Defendants Have No Evidence To Support the Conclusory
           Assertion that a "Low Number of Deaths" Somehow
           Renders Prof. Stallard's Methodology Unreliable…………………………11

        F.  Stallard's Damages Calculations to Compute Corrected
            Individual LEs Are Reliable With 700+ Insureds………………………… 13

        G. Prof. Stallard's Opinions are the Product of Reliable
           Principles and Methods……………………………………………….... 14

        H. Fuller's Opinions Are Relevant and Reliable……………………………… 16

                i.   *Fuller's Breach of Fiduciary Duty Damages
                     Formula is Relevant and Reliable*………………….………...… 16

                ii.  *Fuller's Breach of Contract Damages Formula is
                     Relevant and Reliable* ...................................................... 19

                iii. *Defendants' Purported Daubert Challenges Only
                     Attack the Weight of Fuller's Damages
                     Formulas, Not Their Admissibility*…………………………………23

III.    CONCLUSION…………………………………………………………………25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398 (5th Cir. 2007) ................................17, 18

*Bigelow v. RKP Radio Pictures*, 327 U.S. 251 (1946) .........................................14

*City of Beaumont v. Excavators & Constructors,* 870 S.W.2d 123 (Tex. App. Ct. 1993) ....14

*Corporate Interiors, Inc. v. Pappas*, 2 Misc. 3d 1009(A),
784 N.Y.S.2d 919 (Sup. Ct. 2004)........................................................................18, 19

*Daubert v. Merrell Down Pharm., Inc.* (*Daubert II*), 43 F.3d 1311 (9th Cir. 1995).............12

*Daubert v. Merrill Dow Pharm., Inc.,* 113 S.Ct. 2786 (1993)................................passim

*ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010)........................18, 19

*General Electric Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.,*
CIV. SA-03-CA-189-RF, 2004 WL 5495590 (W.D. Tex. Oct. 21, 2004)……………2, 23, 24, 25

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054 (8th Cir. 2002)........................................................23

*Hartley*, 310 F.3d at 1061; *Cimmings v. Standard Register Co.*,
265 F.3d 56 (2nd Cir. 2001)................................................................................24

*In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717 (3d Cir. 1994)................................3

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008) ...........................12

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-01819, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) .........................................12

*KIS, S.A. v. Foto Fantasy, Inc.,* 204 F. Supp. 2d 968 (N.D. Tex. 2001)     .........................4

*Lizanetz v. St. Paul Guardian Ins. Co.*, 3-07-CV-0123-BD,
2008 WL 4865581 (N.D. Tex. Nov. 10, 2008)..................................................................3, 16

*Matador Drilling Co. v. Post,* 662 F.2d 1190 (5th Cir. 1981)................................................24

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ................................................11

*Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300 (5th Cir. 1991).....................................24

*Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383 (5th Cir. 2009)..............................2

*Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (5th Cir.2002) ...................................................2

*Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567 (5th Cir. 2001) ...........................................2

*Smith v. Ford Motor Co.*, 215 F.3d 713 (7th Cir. 2000) ......................................................9

*Stevenson Servs., Inc. v. Enserve, Inc.*, 719 S.W.2d 337 (Tex. App. 1986) .........................14

*Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*,
69 Fed. R. Serv. 3d 986 (N.D. Tex. 2007) ............................................................................18

*Tyler v. Union Oil Co. of Cal.*, 304 F.3d 379 (5th Cir. 2002) ................................................23

*U.S. v. Jackson*, 19 F.3d 1003 (5th Cir. 1994) .....................................................................2

*United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County,
Mississippi*, 80 F.3d 1074 (5th Cir. 1996) ............................................................................3

*United States v. Sandoval-Mendoza*, 472 F.3d 645 (9th Cir. 2006) ....................................12

*Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) ...............................................24

*Whitfield v. Tronox Worldwide LLC*, 1:03CV287DD,
2007 WL 2127298 (N.D. Miss. July 23, 2007) ...................................................................16

**Rules**

Fed. R. Evid. 702 .............................................................................................................2, 3, 11

**Other Authorities**

George P. Roach, *A Default Rule of Omnipotence: Implied
Jurisdiction and Exaggerated Remedies in Equity for Federal Agencies*,
12 Fordham J. Corp. & Fin. L. 1, 60-61 (2007).....................................................................18

## I.   INTRODUCTION

There is no basis to exclude Plaintiffs' experts' opinions under *Daubert v. Merrill Dow Pharm., Inc.,* 113 S.Ct. 2786 (1993).  Throughout their motion, Defendants resort to quibbling about the weight of evidence presented by Plaintiffs' actuarial expert, Professor P.J. Eric Stallard ("Professor Stallard"), and by Plaintiffs' damages expert David N. Fuller ("Fuller"), rather than its admissibility for consideration by the trier of fact. None of these attacks constitutes a proper basis for a *Daubert* challenge.

Despite vigorously arguing that Professor Stallard's methodology is unreliable and should be excluded, it is telling that Defendants do not proffer any actuarial expert of their own to seek to rebut the opinions of Professor Stallard, and instead, rely solely on legal arguments. Indeed, Defendants seek to make much of the fact that Professor Stallard acknowledges that if his model for computing corrected LEs analyzed 1,082 insureds, there would be 90% confidence in the result that the margin of error is no more than 5%. But Defendants sidestep the testimony that demonstrates why a smaller sample size is more than adequate here.  Specifically, Professor Stallard testified that an analysis of just 271 life settlements is sufficient to state his conclusions with the same 90% confidence and a margin of error no more than 10%. Because Dr. Cassidy's LEs were off by far more than this margin of error, the sample size distinction will make no material difference in the outcome of Professor Stallard's calculation at trial.  In any event, the argument goes to the weight of the evidence and not its admissibility.

With respect to Plaintiffs' damages expert, Fuller, Defendants' purported *Daubert* challenges only attack the factual bases or underpinnings on which Fuller relied—*i.e.*, the weight of Fuller's opinions—not their admissibility. These attacks simply cannot serve as a basis for exclusion. In fact, Defendants make no effort to challenge the qualifications of Fuller, but instead

only dispute the amount of damages that would be produced by his calculations. It is for the jury to decide "whether it should accept or reject [Fuller's] conclusions after considering all factors that weigh on credibility, including whether the predicate facts on which [he] relied are accurate or complete." *See General Electric Capital Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.,* CIV. SA-03-CA-189-RF, 2004 WL 5495590, at *6 (W.D. Tex. Oct. 21, 2004) (citing *Pipitone v. Biomatrix, Inc*., 288 F.3d 239, 250 (5th Cir.2002)).

Therefore, Defendants' Motion to Exclude Plaintiffs' Experts should be denied in its entirety.

## II.    ARGUMENT

### A.  Legal Standards

The Supreme Court's decision in *Daubert*, 113 S.Ct. 2786, and its progeny, including the revised Fed. R. Evid. 702, assign the trial court a key gatekeeping function for admission of expert testimony. In conjunction with Rule 702, *Daubert*, "imposes a special obligation upon a trial judge to ensure that any and all scientific testimony ... is not only relevant, but reliable." *Rodriguez v. Riddell Sports, Inc*., 242 F.3d 567, 580 (5th Cir.2001) (citation omitted). "Expert testimony is relevant when it relates to any issue in the case." *Paz v. Brush Engineered Materials, Inc*., 555 F.3d 383, 388 (5th Cir. 2009). Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. (citation omitted). Moreover, "[t]he proponent of an expert's testimony need not prove the testimony is factually correct, but rather need only prove by a preponderance of the evidence the testimony is reliable." *Paz*, 555 F.3d at 388. Final determinations regarding the credibility of expert witnesses and the weight to be afforded their opinions, however, remain within the province of the trier of fact. *See, e.g., U.S. v. Jackson*, 19 F.3d 1003, 1007 (5th Cir. 1994).

Indeed, "the rejection of expert testimony is the exception rather than the rule." *See* Fed. R. Evid. 702, Adv. Comm. Notes (2000). *Daubert* did not "work a seachange over federal evidence law, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" *Lizanetz v. St. Paul Guardian Ins. Co.*, 3-07-CV-0123-BD, 2008 WL 4865581, at *1 (N.D. Tex. Nov. 10, 2008) (quoting *United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996); *id.* at 1079 (noting concerns that expert's opinions were speculative and based upon unreliable data, and stating: "The perceived flaws in the testimony of the ... experts are matters properly to be tested in the crucible of adversarial proceedings; they are not the basis for truncating that process.").

Even after *Daubert,* "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Lizanetz*, 2008 WL 4865581, at *1 (quoting *Daubert,* 113 S.Ct. at 2798); *see also In re Paoli Railroad Yard PCB Litigation,* 35 F.3d 717, 744 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

## B.  Background and Summary of Professor Stallard's Expert Opinions

Defendants first seek to exclude Professor Stallard's opinions because his "specific formulas" have not been peer-reviewed or published, but Defendants' reliance on that unremarkable fact just highlights their failure to understand statistics and what is a "specific formula."  It is of course true that the "*specific*" formulas that Professor Stallard utilized in his report have not been previously published because he used different variables, subscripts, and integrals in his "specific" equations to make his approach as easy as possible to explain to the jury.  But mathematicians and statisticians are always free to choose their own variables,

3

subscripts, and integrals to present their formulas in the clearest-possible manner.  That does not change the *mathematical form* of the equations, and *mathematically equivalent* forms of Professor Stallard's specific formulas have been peer-reviewed and published in books and articles for *more than fifty years*.

Defendants also seek to exclude Professor Stallard's testimony on the grounds that it is not reliable because "too many" of the insureds for whom Dr. Cassidy provided woefully short LEs are "still living." Defendants' Motion to Exclude ("Motion") at  8. But Defendants offer no explanation and cite to no evidence why this conclusory assertion makes any sense. Nor could they. The reliability of Professor Stallard's methodology does not require a certain number of deaths to occur, but even if it somehow did, that is an issue for cross-examination at trial and not grounds for exclusion.

Defendants lastly argue that because the size of the pool of insureds for whom Dr. Cassidy provided LEs is 757 and not 1,082, Professor Stallard's methodology is not credible. Motion at 9.  This argument, of course, directly contradicts Defendants' opposition to Plaintiff's motion for class certification, in which Defendants argued that the accuracy of Dr. Cassidy's LEs can and should be done *one at a time*.  Defendants' about-face here fares no better because they wrongly conflate multiple formulas in Professor Stallard's expert report. The academic article that references the 1,082 figure that Defendants so heavily rely upon also states that if the number of insureds is greater than 664, as is the case here, then one can be 99% sure that the maximum departure from the expected number measured is $\pm 10\%$, a variability that will be irrelevant if Dr. Cassidy's systemic bias is as gross as preliminary numbers indicate (if $r < 1$ by more than 10%). At most, Defendants' attacks on the size of the data pool simply go to the weight of the evidence and not admissibility. *See also KIS, S.A. v. Foto Fantasy, Inc.,* 204 F.

Supp. 2d 968, 973 (N.D. Tex. 2001) (Lynn, J.) (denying motion to exclude testimony from expert and stating that "[a]lthough Dr. Howard could have conducted the survey with a larger respondent base, these defects go towards the weight and not the admissibility, of the evidence.")

Professor Stallard has submitted concurrently herewith a detailed declaration responding to each of the purported *Daubert* arguments raised by Defendants, who fail to offer *any contrary expert testimony or opinion*. At their core, Defendants' lawyer-arguments advanced in their brief are just disagreements with Plaintiffs' experts' implementation of their methods—which is no basis for excluding the testimony. Such disputes should be resolved by the jury.

### i. *Professor Stallard is a Preeminent Actuarial Expert*

P.J. Eric Stallard, A.S.A., M.A.A.A., F.C.A., is a Research Professor in the Social Science Research Institute and Associate Director of the Center for Population Health and Aging, in the Duke Population Research Institute, at Duke University. Professor Stallard is a Fellow of the Conference of Consulting Actuaries, Member of the American Academy of Actuaries, and Associate of the Society of Actuaries.[1] He is a Member of the Board of Directors of the Conference of Consulting Actuaries; he is Chairperson of the Academy's Long-Term Care Committee; and he serves on the Academy's Health Practice Council, Social Insurance Committee, and State Long-Term Care Task Force. Previously, he served on the Academy's Board of Directors and on the Society of Actuaries' Long-Term Care Insurance Section Council.

Professor Stallard has served as a Deputy Editor at *Demography* with responsibilities for the demography of aging, actuarial science, and mathematical demography. He also served on the Social Security Advisory Board's 2007 Technical Panel on Assumptions and Methods.

---

[1] All of the qualifications identified here for Professor Stallard are set forth in his Expert Report and the attached Curriculum Vitae, filed June 22, 2012 (Doc. # 87-1 at 38-39 & Ex. 1 at 47-97).

Professor Stallard is currently serving as Principal Investigator on research grants from the Society of Actuaries and the U.S. National Institute on Aging, and on research subcontracts to Duke University from Purdue and Colombia Universities funded by grants from the U.S. National Institute on Aging.  He is also serving as Senior Investigator on two other research grants from the U.S. National Institute on Aging.  Collectively, this research covers the areas of health, disability, long-term care, and mortality.

He has previously served as Principal Investigator on research grants from the Veterans Health Administration, the National Council on the Aging, the National PACE Association, the Bayer Corporation, Wyeth Pharmaceuticals, and General Electric Capital Assurance Co.

Professor Stallard's research expertise includes modeling and forecasting for medical demography and health/long-term case actuarial practice:

- In 2011, he was appointed to the National Academy of Sciences/Institute of Medicine Panel on Measuring Medical Care Risk in Conjunction with the New Supplemental Income Poverty Measure.

- In 2008, he won the Society of Actuaries' Edward A. Lew Award for the Best Paper in Modeling Research for his paper *Estimates of the incidence, prevalence, duration, intensity and cost of chronic disability among the U.S. elderly*.

- In 1999, he won first prize for the best conference paper for his paper *Retirement and health:  Estimates and projections of acute and long-term care needs and expenditures of the U.S. elderly population*, presented at the Society of Actuaries' Retirement Needs Framework Conference.

- He was a 1996 winner of the National Institute on Aging James A. Shannon Director's Award for his research proposal *Forecasting Models for Acute and Long-Term Care*.

Professor Stallard's 1984 book, *Recent Trends in Mortality Analysis*, published by Academic Press with co-author K.G. Manton, provided in-depth and comprehensive models for the analysis of underlying and multiple cause mortality data.  His 2005 book, *Forecasting Product Liability Claims:  Epidemiology and Modeling in the Manville Asbestos Case,* published

with two co-authors covered the full range of epidemiological, demographic, and actuarial issues in asbestos-related disease and mortality.   His seven other books/monographs, 120 scientific articles, and 70 actuarial publications, span a broad range of topics in medical demography and health/long-term care actuarial practice.

### ii.   *Professor Stallard's Expert Opinions on Class Certification*

On June 22, 2012, Professor Stallard submitted his expert report in support of Plaintiffs' motion for class certification. *See* Doc. # 87-1, 0037-0097. The report begins with a common, non-mathematical definition of LE based on a person's age.   The report then explains that the definition can be extended to represent additional information beyond just age and the "key concepts" are that LE is an average value that quantifies average survival time of the relevant set of individuals considered as a group.  *Id.* at 0040-0041.  Professor Stallard opines that given this definition of LE, "a determination could be made using generally accepted statistical methods for survival analysis" which would account for the fact that not all of the insureds will have died when the model is ultimately run at the close of merits discovery.  *Id.* at 0041.  To anyone not schooled in high-level statistics and mathematics, the model may seem complex but boiled down, it requires only three readily ascertainable inputs: (1) the LEs that Dr. Cassidy provided; 2) the mortality tables he used (or an equivalent); and (3) the known survival times of each insured.  *Id.* at 0042.

Professor Stallard then proceeds to define a set of six mathematical terms and describes the statistical test that can be used to establish whether Dr. Cassidy systematically underestimated LEs.  *Id*. at 0042-0045 (equations 1-4).  Professor Stallard's methodology will achieve results at the 1% level of statistical significance.  *Id.* at 8. If the conclusion is reached that Dr. Cassidy did in fact systematically understate his LEs, then another commonly-accepted

formula exists that can be used to correct the individual LEs for each individual insured covered by policies owned by putative Class members. *Id.* at 0045 (equation 5).

Defendants have not offered into evidence an expert of any kind to rebut Professor Stallard's methodology.

### C. Professor Stallard's Methodology Has Been Peer-Reviewed, Published, and is Generally Accepted in the Scientific Community

Defendants claim that Professor Stallard's statistical techniques have not been "peer reviewed, published, nor generally accepted in the scientific community." Motion at 6. This argument is false. Professor Stallard's report states that his "estimation will be done ***using the standard statistical method of maximum likelihood***, with the testing of the hypothesis that $r = 1$ vs. $r < 1$ based on the associated likelihood ratio test." Doc. # 87-1 at 0044 (emphasis added). The statistical method of maximum likelihood has been peer reviewed, published, and has been generally accepted in the scientific community for almost *90 years*. *See* Appx. at 024-027.

The method of maximum likelihood was initially developed by Sir Ronald Aylmer Fisher, the eminent British statistician, and was described in three seminal papers, the first of which was published in 1922.[2] As one scholar has put it: "The making of maximum likelihood was one of the most important developments in 20th century statistics. It was the work of one man but it was no simple process."[3] A list of nearly 400 citations to peer-reviewed articles accepting "maximum likelihood" as a generally accepted statistical method is also readily available.[4]

---

[2] R.A. Fisher (1922), "On the mathematical foundations of theoretical statistics." *Phil. Trans. R. Soc. London. A*, 222: 309–68; R.A. Fisher (1925), "Theory of statistical estimation." *Proc. Camb. Phil. Soc.* 22: 700–25; R.A. Fisher (1934), "Two new properties of mathematical likelihood." Proc. R. Soc. A., 144: 285–307.

[3] J. Aldrich (1997), "R.A. Fisher and the making of maximum likelihood 1912–1922." *Statistical Science* 12(3):162–176,

[4] R.H. Norden (1972), "A Survey of Maximum Likelihood Estimation." International Statistical Review 40(3):329–354. R.H. Norden (1973), "A Survey of Maximum Likelihood Estimation: Part 2." International Statistical Review 40(3):39–58.

Defendants try to make much of the fact that Professor Stallard stated at his deposition that his "specific formulas" had never been written out or used by anyone prior to this lawsuit. Counsel for Defendants is the one who first invoked the phrase "specific formulas" in her question, and it is of course true that Professor Stallard's specific formula which used specific variables, specific integrals, and specific subscripts had not been previously published.  But that fact does not mean that his *methodology* has not been peer-reviewed, published, nor is generally accepted in the scientific community. "If [the expert] was merely applying well-established engineering techniques to the particular materials at issue in this case, then his failure to submit those techniques to peer review establishes nothing about their reliability."  *Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000).

As Professor Stallard explains: "While it is true that Prof. Stallard's expert report dated June 22, 2012 was written specifically for this lawsuit, the statistical theory underlying life table/survival data analysis, in its modern form, as used by Prof. Stallard, has a history that now extends *more than a half century*." Plaintiffs' Appendix ("Appx.") at 027; *see also id.* at 026-028 (comparing the methodology of the five Professor Stallard formulas with published and peer-reviewed mathematically equivalent forms).  Thus, to take a simple example, just because Professor Stallard thought that using the Greek letter "$\alpha_i$" as a variable would be easier for the jury to understand than using a different Greek letter as a variable does nothing to undermine the fact that mathematically equivalent forms of his equations have been peer-reviewed and published for decades. To make this more concrete, the Court should consider, for example, a simple comparison of and to Professor Stallard's first equation which computes $S_i(t)$, defined to mean the mortality survival function at certain times obtained from the mortality table used by Dr. Cassidy in his analysis of the individual insureds. The mathematical equivalent of this

question was peer-reviewed and published in 1960 by the *International Biometric Society*, in an article entitled "A Stochastic Study of the Life Table and Its Applications: I. Probability Distributions of the Biometric Functions", authored by Berkley University Professor Chin Long Chiang. *See* Appx. 069-088. Equation (5) in Professor Chiang's article is mathematically equivalent to Equation (1) in Professor Stallard's report.[5]

Accordingly, while it is true that these two equations are not precisely the same "specific formulas," they are without question mathematically equivalent and thus the methodology that Professor Stallard relies upon has obviously been peer-reviewed and published.

### D. Defendants' Arguments About the Alleged Lack of "Consensus" in the Life Settlement Industry Goes to the Weight of the Evidence, Not Admissibility

Defendants also contend that Professor Stallard's opinions should be disregarded as a matter of law because "the life settlement industry has not yet reached a consensus" on calculating LE estimates, as if corporations like Life Partners get to dictate what is not reliable science. *See* Motion at 7. As Professor Stallard explains, however, there is consensus about this very topic in the scientific field of life table/survival data analysis, which acknowledges the central role of the method of maximum likelihood estimation. *See* Appx. at 028-029.

Even if Defendants' assertion that "key industry participants" cannot reach an agreement on calculating LEs is proven on the merits at trial, that fact just goes to the weight of Professor

---

[5] Mathematical equivalents of Professor Stallard's first equation are also in the first unnumbered equation on p. 229 of S.S. Wang and R.L. Brown (1998), "A frailty model for projection of human mortality." *Journal of Actuarial Practice* 6:221–241. *See also* Equation (8.60) in D. London (1988), *Survival Models and Their Estimation*. ACTEX, Winsted, CT. Mathematical equivalents of Prof. Stallard's second and fifth equations are peer-reviewed and published in N. Keyfitz (1977), "What difference would it make if cancer were eradicated? An examination of the Taeuber paradox." *Demography* 14(4):411–418 (fourth unnumbered equation on p. 413); *see also* equation (15) in J.W. Vaupel (1986), "How changes in age-specific mortality rates affects life expectancy." *Population Studies* 40:147–157. Mathematical equivalents of Professor Stallard's third and fourth equations are peer-reviewed and published in A.S. Littell (1952), "Estimation of The *T*-Year Survival Rate from Follow-Up Studies Over a Limited Period of Time." *Human Biology* 24(2):87–116 (third equation from bottom of p. 92); *see also* equation (2.5) in J.D. Broffitt (1984), "Maximum likelihood alternatives to actuarial estimators of mortality rates." *Transactions of the Society of Actuaries* 36:77–142; equation (6) in J.D. Taulbee (1979), "A general model for the hazard rate with covariates." *Biometrics* 35:439–450; equation (8.67) in D. London (1988), *Survival Models and Their Estimation*. ACTEX, Winsted, CT.

Stallard's opinion, not its admissibility. In *Daubert*, the Supreme Court specifically cautioned against the "wholesale exclusion" of expert testimony, and reiterated that the ultimate assessment of the weight to be accorded to an expert's opinion should be made by the jury at trial after "[the] presentation of contrary evidence, . . . [v]igorous cross-examination, . . . and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. The rejection of expert testimony under Rule 702 is "the exception rather than the rule." Fed. R. Evid. 702, Advisory Committee notes to the 2000 amendments.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to . . . faults in [expert's] use of [particular scientific analysis] as a methodology ... go to the weight, not the admissibility, of his testimony.").

### E.  Defendants Have No Evidence To Support the Conclusory Assertion that a "Low Number of Deaths" Somehow Renders Professor Stallard's Methodology Unreliable

Defendants next argue that Professor Stallard's methodology is unreliable because there have been a "low number of deaths." This conclusory argument has no evidentiary support and it is false.  Appx. at 029-030.  There is not a shred of evidence to support Defendants' argument that a "low number of deaths" destroys Professor Stallard's model because no such evidence exists. The only evidence that Defendants cite to is in footnotes 13 and 15 of their brief. Footnote 13 quotes Professor Stallard making the obvious point at his deposition that if applying his statistical test leads to the conclusion that r=1, then Plaintiffs will have failed to establish that Dr. Cassidy systematically underestimated LEs.  *See* Appx. at 016-018.  That fact says nothing to support the claim that Professor Stallard's methodology is unreliable if there are too few deaths. As Professor Stallard explains:

> Any valid statistical test must be capable of reflecting the true state of reality without any preordained conclusion or biasing factors being built into the test, which is exactly the answer given at the deposition. If Defendants were correct in their position that Dr. Cassidy generated accurate life expectancy estimates, then Prof. Stallard's test would

confirm that.  If not, then the confirmation would not result.  The validity and reliability of the test does not depend on which of these two results is true.

Appx. at 030.

Footnote 15 in Defendants' brief cites to pages 60-61 of Professor Stallard's deposition, in which Professor Stallard states that his methodology specifically accounts for the fact that many of the insureds are still alive.  That too says nothing about any supposed inability to apply his formula if there are too few deaths. Stripped of its rhetoric, Defendants' position is just an attack on the *conclusions* that Professor Stallard might reach *after being presented with all merits discovery*, but it is bedrock law that in assessing the reliability of Professor Stallard's opinions, the Court need not be convinced that Professor Stallard's opinions are correct or even persuasive, only that they are sufficiently reliable to assist the jury. *In re Static Random Access Memory (SRAM) Antitrust Litig*., No. 07-md-01819, 2010 WL 5071694, at *4 (N.D. Cal. Dec. 7, 2010) (citing *In re Scrap Metal Antitrust Litig*., 527 F.3d 517, 529-530, 531 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable [under *Daubert*] is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.")). As the Supreme Court explained in *Daubert*, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached. 509 U.S. at 595; *see also Daubert v. Merrell Down Pharm., Inc.* (*Daubert II*), 43 F.3d 1311, 1318 (9th Cir. 1995) (on remand) ("[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."); *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (holding that expert opinion "is reliable if the knowledge underlying it 'has a reliable basis in the knowledge and experience of [the relevant] discipline'").

**F.  Professor Stallard's Damages Calculations to Compute Corrected Individual LEs Are Reliable With 700+ Insureds**

Defendants continue to attack the weight of Professor Stallard's opinions by arguing that they have cast "serious doubt on his credibility," that his deposition testimony was "evasive" and contained "rambling answers" which were "self-serving." Motion at 9-10.  Defendants' attempt to label Professor Stallard's mathematically precise answers as "rambling" and "self-serving" does not make them so. To support these jury arguments, Defendants point to the fact that Professor Stallard stated under equation (5) of his report that 1,082 insureds is assigned full credibility in generally accepted actuarial practice, but here there were only 757 insureds at issue and thus all of Professor Stallard's equations, including none that even reference the 1,082 figure, should be excluded as unreliable.  This argument is wrong for three reasons.

First, this argument contradicts Defendants' arguments in opposition to Plaintiffs' motion for class certification, in which Defendants' expert took the position that a valid and reliable assessment of LE accuracy can be done on a sample size of 1.  *See* Doc. # 78-7 at 000326 ("The alleged underestimation of life expectancy, if it exists, would be unique to individual policies and would require an individual assessment.").

Second, as Defendants concede in their brief, the number 1,082 is derived from an article by L. H. Longley-Cook entitled "An Introduction to Credibility Theory," which states that an analysis of 1,082 claims for insurance premiums rate-making purposes is highly accurate because there is a 90% chance that the result will be within 5% of the calculation.  *See* Appx. 040-068. If there are more than 700 claims, however, the results are not materially different: there is a 95% chance that the result will be within 7½% of the calculation and a 99% chance that the result will be within 10% of the calculation.  *Id.* at 047. Defendants do not explain, nor could they, why having the 1,082 sample size which generates a *lower probability of being accurate*

(the 90% confidence figure) with a ±5% variability is considered reliable as a matter of law, yet using a sample size of 757 insureds which generates a *higher probability of being accurate* (the 95% or 99% figures) with a slightly bigger variability of ±7½% or 10% is somehow not reliable as a matter of law.  Nor could they. To win compensatory damages in a breach of contract case under Texas law, a plaintiff must prove damages with "reasonable certainty." *City of Beaumont v. Excavators & Constructors,* 870 S.W.2d 123, 139 (Tex. App. Ct. 1993). Damages do not have to be established with precision. *Stewart & Stevenson Servs., Inc. v. Enserve, Inc.,* 719 S.W.2d 337, 346 (Tex. App. 1986). *See also* Appx. at 013-014.

Third, the size of the variability ultimately may not matter at all depending on how poorly Dr. Cassidy underestimated LEs.  Put simply, if Dr. Cassidy's systematic underestimation turns out to be greater than 30%, for example, it will not matter one iota that the variability of the model is ±5%, 7½%, or 10%. *See, e.g.,* Appx. at 016 ("if the set of estimates that Dr. Cassidy provided were 'grossly underestimated' . . . then the distinction between a relative 5 percent or 10 percent variability on a parameter that would in the range of around .5, those distinctions are really of minor consequence . . . ").

 "The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery, for a proven invasion of the plaintiff's rights." *Bigelow v. RKP Radio Pictures*, 327 U.S. 251, 265-66 (1946). Defendants' quibbling over the sample size used in Professor Stallard's fifth equation which only helps compute damages, not liability, at most goes to the weight of the evidence, not its admissibility.

### G. Professor Stallard's Opinions are the Product of Reliable Principles and Methods

Defendants lastly assert a scatter-shot of unsupportable attacks on Professor Stallard, with no supporting evidence. Defendants state that an LE is "indisputably 'accurate'" if an insured dies before the date computed. *See* Motion at 11. This simplistic assertion contradicts actuarial science as well as the commonly-understood definition of an LE and the reasonableness of the associated survival curve. *See* Appx. at 008-010, 011-012. Defendants also make a blanket assertion, with no explanation, that Professor Stallard's opinions ignore the fact that an LE is "unique" and "uncorrelated" to one another. Motion at 12. Professor Stallard's opinions do no such thing, and in fact the equations provided for in his report mathematically account for this very issue. *See* Appx. at 034.

Equally baseless is Defendants' assertion that Professor Stallard's methodology "disregards the medical records containing all of the data available to Dr. Cassidy." Motion at 12. Professor Stallard did no such thing. Appx. at 015 ("My proposed methodology takes full account of the medical history of the insureds in the context that it takes full account of the summarization of that medical history provided by Dr. Cassidy in his life expectancy estimate."). Defendants also wrongly asserted that Professor Stallard's methodology is founded on an "obvious" and "irreconcilable fallacy" that compares "apples to oranges" of different LEs for different insureds provided by Dr. Cassidy. Motion at 12-13. If this argument were so "obvious," Defendants should have been able to cite to some supporting evidence, but they do not and cannot. Professor Stallard's approach to pool all the insureds together for his analysis is the generally accepted approach to analyze survival data in the fields of demography, statistics, and actuarial science. Appx. at 034-036. Professor Stallard co-authored the seminal paper in this field in 1979 in an article published in volume 16 of *Demography,* entitled "The Impact of Heterogeneity in Individual Frailty On the Dynamics of Mortality." No reputable scholar has

ever successfully challenged the theory or uncovered any inconsistency within it, and Defendants' unsupported lawyer-made arguments in their briefs fare no better. *See also* Appx. at 037-038.

### H. Fuller's Opinions Are Relevant and Reliable

As stated previously, Defendants do not call into question the qualifications of Plaintiffs' damages expert, Fuller, but instead only dispute the amount—not the fact—of damages. *See, e.g.*, Motion at 16 ("Fuller's disgorgement formula would over compensate such purchasers…"); Motion at 17 ("[Breach of contract formula] would over compensate every class member).[6] In doing so, Defendants rely on the competing expert report of Bruce Blacker. *See* Defendants' Appendix at 0073-0202. Such an attack, however, merely sets the stage for the classic "battle of experts" and certainly does not render Fuller's formulas unreliable. *See, e.g., Lizanetz*, 2008 WL 4865581, at *1 ("[T]he 'battle of experts' should be resolved by a jury, not by the court. The same is true for expert testimony regarding economic damages.); *Whitfield v. Tronox Worldwide LLC*, 1:03CV287DD, 2007 WL 2127298 (N.D. Miss. July 23, 2007) ("Because the Defendants have retained experts who dispute Dr. Williams' findings, we appear to have a classic 'battle of the experts' where the jury will decide which witness' testimony is more credible.").

#### i.  Fuller's Breach of Fiduciary Duty Damages Formula is Relevant and Reliable

Plaintiffs' primary remedy in this matter is disgorgement of fees and/or profits realized by Defendants as a result of breaches of fiduciary duty and violation of the UCL. Defendants

---

[6] Fuller currently serves as the President of VALUE Incorporated, a financial valuation consulting firm located in Irving, Texas, and holds the Chartered Financial Analyst ("CFA") designation governed by the CFA Institute. *See* Affidavit of David N. Fuller at 0020-0028 [Doc. # 87-1]. He has also earned the Accredited Senior Appraiser ("ASA") designation governed by the American Society of Appraisers. *Id.* Fuller's educational background includes a Masters of Business Administration degree from Southern Methodist University with a concentration in Finance, and a Bachelor of Arts degree from Austin College with a concentration in Economics. *Id.* Additionally, Fuller has been accepted as an expert and offered expert testimony relating to valuation and economic issues in numerous state district courts, federal district courts, the United States Bankruptcy Court, and the United States Tax Court. *Id.*

erroneously claim that Fuller's disgorgement calculation fails to only account for "ill-gotten gains," and thus is "unsupported by the law and [] unhelpful to the court." Motion at 16.

"Disgorgement wrests ill-gotten gains from the hands of a wrongdoer." *Allstate Ins. Co. v. Receivable Fin. Co*., 501 F.3d 398, 413 (5th Cir. 2007). "It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Id*. In order to distinguish between that which has been legally and illegally obtained (*i.e.*, "ill-gotten gains"), Plaintiffs need only show that the "property is causally related to the wrongdoing" at issue. *Id.* Here, Plaintiffs have alleged that due to Defendants' breach of fiduciary duty and violation of the UCL, they should be disgorged of profit and/or fees obtained from facilitating "each individual transaction." *See* Complaint at ¶58. Therefore, there is little doubt that the specific profits and/or fees contemplated by Fuller's formula and sought to be disgorged would be "causally related to the wrongdoing [*i.e.*, the breach of fiduciary duty and violation of the UCL]." *See* Appx. at 093-095 ("They're the direct profits associated with the sales of these interests.").

Next, Defendants claim that Fuller's disgorgement "formula purports to disgorge LPI's entire fee for each transaction, notwithstanding the fact that such fees are not the equivalent of LPI's profits." Motion at 15. Without offering any credible evidence, Defendants also assert that Fuller's disgorgement formula "does not exclude the actual costs incurred by LPI for the operation of its business." *Id*. Defendants allege that because of the foregoing, Fuller's "formula for calculating damages in the form of disgorgement is unreliable, not based on the facts of the case, and not supported by the law." Motion at 16. This argument is just wrong.

Defendants cite to *Allstate* in support of their argument that Fuller's calculation for disgorgement fails to disgorge only "ill-gotten gains." Motion at 16. The Fifth Circuit in *Allstate*, however, was presented with the question as to whether the plaintiffs properly proved <u>at trial</u>

which profits have been legally and illegally obtained. *Allstate*, 501 F.3d at 413. Therefore, *Allstate* lends no support for Defendants' position that at the *Daubert* stage Fuller's formula will be unable to reliably demonstrate the amount of disgorgement damages.

Indeed, "Courts commonly hold that, in a claim for restitution or unjust enrichment, the plaintiff has the duty to establish the defendant's benefit or revenues related to the unjust act and the defendant must at least initially carry the burden of establishing either apportionment, offsetting expenses that should be debited against the revenue credits, or, if applicable, both." George P. Roach, *A Default Rule of Omnipotence: Implied Jurisdiction and Exaggerated Remedies in Equity for Federal Agencies*, 12 Fordham J. Corp. & Fin. L. 1, 60-61 (2007); *cf. ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 878 (Tex. 2010); *Super Future Equities, Inc. v. Wells Fargo Bank Minnesota, N.A.*, 69 Fed. R. Serv. 3d 986, at *17 (N.D. Tex. 2007) (quoting *Corporate Interiors, Inc. v. Pappas*, 2 Misc. 3d 1009(A), 784 N.Y.S.2d 919, at *6 (Sup. Ct. 2004)) ("In the event that plaintiff elects to present evidence of Pappas' gain, and meets its prima facie burden of showing damages, then the burden shifts to Pappas to demonstrate the amount of his direct costs in generating this gross income because he is in exclusive possession of that information. Plaintiff would then have the opportunity to question the reasonableness of any deduction.").

Here, Fuller's proposed disgorgement formula determines the fee retained by LPI net of expenses paid to other parties participating in the facilitation of the transaction. *See* Appx. at 093, 098 ("The fee to LPI as calculated on Schedule A.1 is net of all of the expenses associated with the transaction, including the amounts paid to the seller, the escrowed premiums, the licensee commissions and other fees."). This represents the "direct profits associated with the sales of these interests." *See* Appx. at 095. Accordingly, Fuller's disgorgement calculation will reliably

calculate the amount of disgorgement. If Defendants believe Fuller's calculation of "direct profits" is missing relevant credits or expenses, the burden would fall on them to present some evidence in support, because LPI is in exclusive possession of that information. *Pappas*, 784 N.Y.S.2d 919, at *6; *see also ERI Consulting,* 318 S.W.3d at 878 ("Were this not so, every facially adequate calculation of lost profits would be susceptible to an unsubstantiated challenge that something is missing.").[7] In any event, even if Plaintiffs are required to carry the burden of deducting any additional "actual costs incurred by LPI for the operation of its business," such an analysis can still be made accurately and reliably by simply deducting these purported costs from LPI "direct profits," which could easily be determined through discovery. *See* Appx. at 096-097.

Finally, Defendants' argument that Fuller's disgorgement formula would over compensate "those class members for whom the Dr. Cassidy-issued life expectancies were not underestimated" is a red herring. *See* Motion at 16. Defendants continue to attempt to draw the Court's focus away from the fact that damages are measured at the time of purchase. Each Class member overpaid for his/her interest at the time of purchase due to the systematic underestimation of LEs by Dr. Cassidy. Therefore, the ultimate supposed "accuracy" of a specific LE, which itself is a disputed fact question to be determined on the merits, has no bearing on the inflation already built-into the purchase price paid by Class members. *Id*. Accordingly, there would be no overcompensation as Defendants claim, and certainly not enough to somewhat warrant deeming Fuller's opinions completely unreliable.

### ii. *Fuller's Breach of Contract Damages Formula is Relevant and Reliable*

Defendants erroneously assert that "Fuller's 'breach of contract' damages are also

---

[7] In a half-hearted attempt to demonstrate that Fuller failed to account for LPI's direct costs in generating the direct profits associated with the sales of the interests, Defendants merely point to LPHI's (not LPI's) consolidated statements of income and make the unsubstantiated claim that the costs contained therein should have been excluded from Fuller's calculation. *See* Motion at 16-17. Defendants, however, make no attempt to discern why these costs or even which costs should be excluded from Fuller's damages calculation.

unreliable because he utilizes what amounts to a guaranteed 'rate of return implied by the price the investor paid in light of Dr. Cassidy's life expectancy projection' in calculating his damages figures." Motion at 17. This is a mischaracterization, as Fuller's model utilizes an expected rate of return which was implicitly conveyed to Class members based on the Dr. Cassidy-provided LEs. Therefore, Defendants argument is factually inapposite.

Defendants also contend that "this formula incorrectly, and improperly, assumes that the 'implied rate of return' for the original, Dr. Cassidy-provided life expectancy estimate would likewise apply to a longer, 'correct' (fictitious) life expectancy.'" Motion at 18. As they did in their Sur-reply to Plaintiffs' Motion for Class Certification, Defendants again wrongfully conflate the issue of "actual return" and "expected return." Here, if a Class member acquired a fractional interest in a life settlement policy and that policy was likely to mature in three years, as Dr. Cassidy's LE suggested, then the return the Class member expected would be different, and better, than if maturity was unlikely until five or six years down the road. This difference is precisely what Fuller's damages model measures.[8] Therefore, Fuller's model is based on the Class members' "expected return" when they decided to invest (*i.e.*, the time of purchase), and thus is accurate and reliable.

Next, Defendants argue that Fuller's damages formula is unreliable because it uses a "correct" LE that "would not necessarily correlate with the 'actual' life span of the insured, but such 'correct' (fictitious) life expectancy would be utilized to calculate a purchase price that the class members 'should have' paid, had this 'correct' life expectancy been used." Motion at 19. This argument completely misses the mark, because the "correct" LE does not have to equal the "actual" life span of the insured. Although an investor might have obtained an actual return that

---

[8] *See* Appx. at 104-105 ("[H]olding the rate of return the same, I'm able to calculate the price they would have been willing to pay such that they would have achieved an acceptable rate of return on their investment.").

met or even exceeded expectations, he may nonetheless have damages in that he overpaid at the point of purchase and his return is less than it otherwise would have, indeed, should have been.

Defendants further contend that "Fuller's damages formula overstates damages because it disregards the undisputed fact that LPI included in the acquisition price for all life settlements the total amount of premiums to be escrowed for the duration of the life expectancy estimate." Motion 19-20. Whether Fuller overstates damages or not goes to the weight of the evidence, not admissibility. Regardless, Fuller's formula specifically takes into account that because Dr. Cassidy systematically underestimated LEs, Class members have and will have to pay additional premiums in the future to compensate for the deficient amount of premiums initially escrowed by LPI. *See* Appx. at 101-104. Consequently, Class members would have paid less at the time of purchase if they were basing their purchase on the correct, longer LE. Fuller's formula correctly accounts for this fact. Defendants' assertion that the "revised acquisition price" from Fuller's formula should include additional premiums based on the corrected LE completely disregards the fact that by using Dr. Cassidy's LEs, LPI was able to retain a larger portion of the acquisition price as their fee upfront at the expense of adequately funding escrow accounts for future premium payments.

Moreover, Defendants assert that "Fuller's formula would not calculate damages based upon any breach of contract by LPI (*i.e.*, had LPI promised or guaranteed in the agreements that the purchasers would receive X% rate of return on their purchases), but would, instead, create a fictional transaction in which a guaranteed rate of return is inserted where none was contemplated or agreed to by the parties." Motion at 20. This is sleight of hand by Defendants. Plaintiffs readily admit that LPI did not guarantee any particular rate of return, and Fuller's formula certainly does not contemplate any such guaranteed rate of return. Fuller's formula is

only based on "expected return," which is the amount of return Class members expected to get based on Dr. Cassidy's LEs.[9] Referring to the rate of return associated with Fuller's formula as a guaranteed rate of return is a pure mischaracterization of Fuller's opinions.

Next, Defendants contend that Fuller's formula is unreliable because it "*assumes* that Dr. Cassidy systematically underestimated life expectancies." Motion at 21. This argument directly contradicts the facts. *See* Appx. at 100 ("Q. Okay. But did you not assume in your calculation that Dr. Cassidy systematically underestimated all of the life expectancies for the class? A. … I wouldn't say that I've made an assumption that applies to every policy or every insured because I haven't looked at every policy or insured."). Nevertheless, Fuller is not offering any actuarial opinions related to the accuracy of Dr. Cassidy's LEs. *See* Appx. 099 ("No, I won't be providing an opinion on what the life expectancy of any individual insured would have been, correctly calculated, at the time that the investments were entered into.").[10]

Finally, Defendants put forth an irrelevant argument that Fuller's formula is unreliable because it ignores the fact that Class members take a "'portfolio-based' approach [when investing] which would yield a blended rate of return for the entire amount of funds invested." Motion at 22. Defendants claim that Fuller is thus "disregard[ing] the facts of the case." *Id*. Ironically, it is only Defendants who continue to plainly ignore the facts of this case. Each Class member was harmed at the time of purchase due to the price inflation inherent in each life settlement with systematically underestimated LEs, and therefore, whether Class members took a "portfolio-based" approach simply does not change the fact that all Class members would have still overpaid for each policy in the portfolio. Therefore, Fuller's formula correctly calculates

---

[9] *See* Appx. at 104-106. Class members purchase life settlements based on "expected return." *See also* Appx. at 112 ("The discount rate applied…is the expected return the investor seeks over the specified period of time.").

[10] For the reasons stated previously, because Stallard's formula is fully reliable, any reliance on this formula by Fuller would not render his breach of contract damages formula unreliable.

damages at the life settlement policy level, and then accounts for the fractional interests purchased by each Class member.[11]

### iii.  Defendants' Purported Daubert Challenges Only Attack the Weight of Fuller's Damages Formulas, Not Their Admissibility

Defendants' attacks on both of Fuller's damages formula amount to nothing more than purported *Daubert* challenges that in truth attack only the weight of Fuller's opinions, not their admissibility. *See General Electric,* 2004 WL 5495590, at *5 ("Courts should not [be] lured by arguments disguised as *Daubert* challenges that actually attack the weight of the expert testimony, not its admissibility."). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *See General Electric*, 2004 WL 5495590, at *5 (quoting *Hartley v. Dillard's, Inc*., 310 F.3d 1054, 1061 (8th Cir.2002)); *see also Tyler v. Union Oil Co. of Cal*., 304 F.3d 379, 392–93 (5th Cir. 2002).

With respect to Fuller's breach of fiduciary duty damages formula, Defendants' assertion that Fuller's methodology ignores costs incurred by LPI for its business operations only goes to the weight of Fuller's opinion, not its admissibility. In fact, Defendants do not specifically challenge the methodology employed by Fuller, nor do they contend that the methodology is not applicable to the facts of this case. Instead, Defendants challenge the factual bases or underpinnings of Fuller's damages formula—*i.e.*, they challenge whether Fuller's model fails to account for certain data (expenses). *See* Motion at 16-17 ("But Fuller did not consider this information…"). This argument only goes to the credibility or weight of Fuller's opinion, and not its admissibility. *See General Electric*, 2004 WL 5495590, at *4-5 (citing *Tyler*, 304 F.3d at

---

[11] *See* Appx. at 106 ("My calculations take into account the purchases on an interest-by-interest basis. And to the extent that portfolio rates of return or expectations are reflected in the price that was paid for a group of interests purchased at the same time, different fractions in different policies, then that would carry over and be reflected in the individual interests that are being valued, as well.").

392–93) ("[T]he reliability of data underlying an expert's opinion goes to the weight of this evidence, but should not serve as basis for its exclusion.").

Nevertheless, although Plaintiffs contend that Fuller's proposed methodology for disgorgement is accurate and complete, arguments similar to the one advanced here by Defendants have been rejected by numerous circuit courts, including the Fifth Circuit, as a basis for exclusion of experts under *Daubert. See General Electric*, 2004 WL 5495590, at *5-6 ("[C]ourts have found no basis for exclusion when experts were challenged for failing to take into account certain data."); *see also Moss v. Ole South Real Estate, Inc.,* 933 F.2d 1300, 1307 (5th Cir. 1991); *Matador Drilling Co. v. Post,* 662 F.2d 1190, 1199 (5th Cir. 1981); *Hartley*, 310 F.3d at 1061; *Cimmings v. Standard Register Co*., 265 F.3d 56, 65 (2nd Cir. 2001). Therefore, to the extent that Fuller admitted there might be additional information that he would consider in his disgorgement damages formula, this "admission" would merely open the door for Defendants to examine this factual basis on cross-examination. *See General Electric*, 2004 WL 5495590, at *6 ("Although Dillman's report is clearly and admittedly incomplete, this Court finds insufficient basis to exclude Dillman's testimony under a *Daubert* challenge.").[12] Such an "admission" would not render Fuller's formula "so fundamentally unsupported that it cannot help the fact-finder." *Id*. (citing *Viterbo v. Dow Chemical Co*., 826 F.2d 420, 422 (5th Cir.1987).

Moreover, with respect to Fuller's breach of contract damages formula, Defendants again only challenge the factual bases or underpinnings of Fuller's formula. *See* Motion at 17-22. For example, as discussed above, Defendants claim that Fuller's breach of contract damages formula fails to take into account "the undisputed fact that LPI included in the acquisition price for all life settlements the total amount of premiums to be escrowed for the duration of the life expectancy

---

[12] Fuller only acknowledged that if certain costs "were <u>necessary to the business of facilitating these transactions</u>, that's certainly information I would consider;" however, Defendants have made absolutely no showing that any of these costs were "were necessary to the business of facilitating these transactions." Appx. 096 (emphasis added).

estimate," and thus, damages will be overstated, and that the formula uses a "correct" LE that "would not necessarily correlate with the 'actual' life span of the insured." Motion at 19-20. Even if the Court accepted these arguments as true—which they are not—these attacks are simply not an appropriate basis for excluding Fuller's breach of contract damages formula, as they go to weight and not admissibility. *See General Electric*, 2004 WL 5495590, at \*5-6.

## III.     CONCLUSION

For the reasons set forth herein, Defendants' motion should be denied.


Dated: January 30, 2013

                                            Respectfully submitted,

                                            ___/s/ Kim E. Miller_____
Lewis S. Kahn                               Kim E. Miller
Louisiana Bar No. 23805 (Admitted PHV)      California Bar No. 178370 (Admitted PHV)
Craig J. Geraci, Jr.                        **KAHN SWICK & FOTI, LLC**
Alabama Bar No. 3847-C62G (Admitted PHV)    500 5th Avenue, Suite 1810
**KAHN SWICK & FOTI, LLC**                  New York, NY 10110
206 Covington Street                        Tel: (212) 696-3730
Madisonville, LA 70447                       Fax: (504) 455-1498
Tel: (504) 455-1400                         Email: Kim.Miller@ksfcounsel.com
Fax: (504) 455-1498
Email:

Lewis.Kahn@ksfcounsel.com
Craig.Geraci@ksfcounsel.com

Terrell W. Oxford                           Steven G. Sklaver
Texas State Bar No. 15390500                California Bar No. 237612 (Admitted PHV)
Jonathan Bridges                            Amy T. Brantly
Texas State Bar No. 24028835                California Bar No. 210893 (Admitted PHV)
**SUSMAN GODFREY L.L.P.**                   **SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 5100                 1901 Avenue of the Stars, Suite 950
Dallas, Texas 75202                         Los Angeles, CA 90067-6029
Telephone: 214-754-1900                     Telephone: (310) 789-3100
Facsimile: 214-754-1933                     Facsimile: (310) 789-3150
Email: toxford@susmangodfrey.com            Email: ssklaver@susmangodfrey.com
       jbridges@susmangodfrey.com                  abrantly@susmangodfrey.com

**INTERIM CO-LEAD CLASS COUNSEL**

Bruce K. Packard
State Bar No. 15402300
W. Craig Stokley
State Bar No. 24051392
RINEY PALTER, PLLC
5949 Sherry Lane, Suite 1616
Dallas, Texas 75225-8009
Telephone: 214-461-1200
Facsimile: 214-461-1210
Email: bpackard@rineypalter.com
      cstokley@rineypalter.com

**ADDITIONAL COUNSEL FOR
PLAINTIFFS**

Stuart H. McCluer
Mississippi Bar No. 101366 (Admitted PHV)
MCCULLEY MCCLUER PLLC
1223 Jackson Avenue East, Suite 200
P.O. Box 2294
Oxford, Mississippi 38655
(662) 236-1401
Email: smccluer@mcculleymccluer.com

**COUNSEL FOR PLAINTIFF SEAN
TURNBOW**

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on January 30, 2013, I electronically filed the foregoing document via the CM/ECF electronic filing system and served all counsel of record pursuant to Local Rule 5.1(d) and FED. R. CIV. P. 5(b)(2)(E).

                        /s/ Kim E. Miller
                        Kim E. Miller