**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SEAN TURNBOW, WILLIAM RICE, MARY RICE, ROBERT YOSKOWITZ, FREDERICK VIEIRA, and ANTHONY TAYLOR,<br><br><br>Plaintiffs,<br><br>v.<br><br>LIFE PARTNERS, INC., LIFE PARTNERS HOLDINGS, INC., BRIAN D. PARDO, and R. SCOTT PEDEN,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 3:11-cv-1030-M |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion for Class Certification filed by Plaintiffs Sean Turnbow, William Rice, Mary Rice, Robert Yoskowitz, Frederick Vieira, and Anthony Taylor ("Plaintiffs") [Docket Entry #68].  On February 4, 2013, the Court heard oral argument on this Motion, and then allowed Plaintiffs to supplement their Motion and Defendants to respond. Having carefully considered the briefs, oral arguments, and applicable law, the Court **DENIES** the Motion and declines to certify a class.

### I.     FACTUAL AND PROCEDURAL BACKGROUND

Defendant Life Partners Holdings, Inc. ("LPHI"), through its wholly-owned operating subsidiary, Life Partners, Inc. ("LPI"), does business in the secondary market for life insurance known as life settlement transactions.  *Pls.' Am. Compl.* at ¶¶ 1–2, 23–24.  Such a transaction involves the sale of a previously-issued life insurance policy to a purchaser who takes an

ownership interest in the policy, assumes the obligation to pay premiums, and receives payment of the policy's death benefit when the policy matures; that is, when the insured dies. *Pls.' App.* at Ex. A (LPHI 2010 Form 10-K).

Plaintiffs are investors of life settlement investments made through LPI. LPI's primary function was to act as a facilitator of life settlement investments. The investment process began with LPI and investors entering into a standard "Agency Agreement."[1] *Pls.' Am. Compl.* at ¶¶ 68–69. LPI agreed to act as a purchasing agent to identify, examine, and purchase suitable, attractively-priced life insurance policies on behalf of investors. *Pls.' App.* at Ex. C (Dep. Tr. of Scott Peden) at 39:10–12. In doing so, LPI obtained a life expectancy estimate and a confidential case history of an insured to disclose to investors. *Id.* at 39:21–24. The estimated life expectancy of the insured was a key factor for calculating the expected rate of return on the investment.

After LPI assisted investors in identifying life insurance policies suitable for purchase, LPI and the investor would enter into a second standard contract entitled "Policy Funding Agreement." *Id.* at 40:24–25; 41:1–7. By that agreement, the investor purchased a fractional interest in the death benefits of a specified insurance policy for an acquisition price set by LPI. LPI used the acquisition payment to pay the seller of the policy and fees to third-parties and to escrow expected future premiums on the policy. In the Policy Funding Agreement, LPI did not guarantee a specific return on the investment, nor a specific date of death of the insured. *Defs.' App. in Supp. of Sur-Reply* at Ex. 14 (Sean Turnbow Policy Funding Agreement). The investor signed the Policy Funding Agreement, acknowledging that before signing either he or someone

---

[1] While there are minor variations in the form of the agency agreements used during the proposed class period, LPI always agreed to act as the investors' purchasing agent. *Pls.' App.* at Ex. C (Dep. Tr. of Scott Peden) at 39:10–12.

with his power of attorney had reviewed the confidential case history of the insured.[2]  *Id.*

The life expectancy estimate was the primary factor for determining (a) the size of the fractional interests the investor acquired in a policy (*i.e.*, a longer life expectancy generally meant a greater fractional ownership in the policy) and (b) the acquisition cost for the policy (*i.e.*, a longer life expectancy meant a lower acquisition cost).  *Pls.' App.* at Ex. A (Affidavit of David N. Fuller) at 4; Ex. D (Dep. Tr. of Kurt Carr) at 25:8–13.  Between 1999 and March 2011, LPI engaged a practicing oncologist, Dr. Donald Cassidy ("Dr. Cassidy"), to review and provide life expectancy estimates for life insurance policies considered by LPI for purchase from policy owners.  *Pls.' App.* at Ex. C (Dep. Tr. of Scott Peden) at 31:7–13.  Pursuant to a written employment contract, LPI compensated Dr. Cassidy on a retainer basis—$15,000 per month—and paid him an additional $500.00 for each insurance policy for which LPI facilitated the sale of fractional interests.  *Id* at 126:19–24.  Dr. Cassidy calculated life expectancies for insureds by first determining the average life span of a person like the insured based on a mortality table—which changed over the years—that used the categories of gender, race, and age.  *Defs.' App. in Supp. of Mot. to Exclude* (Decl. of Donald Cassidy) at 49–50.  After determining the life span of a person of the gender, race, and age of the insured, Dr. Cassidy adjusted that life expectancy by accounting for the insured's medical history, such as whether the insured had a smoking history or prior illnesses.  *Id.*

On or about March 2011, after a *Wall Street Journal* article accused LPI of substantially underestimating life expectancies, LPI engaged a new life expectancy provider, 21st Services, LLC, for the purpose of obtaining a second opinion on life expectancy estimates.  During this

---

[2] According to a Complaint filed by the SEC in another action, the confidential case history included the life expectancy estimate provided by Dr. Cassidy.  *Pls.' App. at Exhibit G* (*SEC v. Life Partner Holdngs, Inc., et al.*, No. W-12-CA-0002 (W.D. Tex. Jan. 3, 2012, Complaint).  Neither party here has submitted evidence to support this contention, although logically it is likely so.

time, LPI continued to engage the services of Dr. Cassidy.  *Pls.' App.* at Ex. C (Dep. Tr. of Scott

Peden) at 49:20–25.  After the *Wall Street Journal* article and a piece in *The Life Settlements*

*Report*, various retail customers of LPI, including Plaintiffs, filed this putative class action

lawsuit against Defendants.

 The six named Plaintiffs purchased fractional interests in life insurance policies for which

Dr. Cassidy provided life expectancy estimates.  Plaintiffs assert in their Complaint that LPI

breached its fiduciary duty and its implied contractual duty of care to Plaintiffs by retaining Dr.

Cassidy to provide life expectancy assessments, by overcompensating him and incentivizing his

poor performance, by failing to monitor his performance or provide quality control, by creating

conflicts of interest and engaging in self-dealing transactions that were unfair,[3] by failing to pay

reasonable attention or provide reasonable care in obtaining and providing life expectancy

estimates, by failing to use its expertise diligently, and by otherwise failing to exercise the

requisite care that an agent, fiduciary, or expert in life settlements should have exercised.  In

addition to their claims against LPI for breach of fiduciary duty and breach of contract, Plaintiffs

assert claims against Defendants LPHI, Brian D. Pardo ("Pardo"), and R. Scott Peden ("Peden")

for aiding and abetting breach of fiduciary duty, and against Defendants LPI, Pardo, and Peden

for unfair business practices under California's Unfair Competition Law ("UCL").[4]

 The named Plaintiffs bring this action on behalf of a putative class, composed of "all

persons in the United States who purchased or otherwise acquired fractional interests in life

settlements, from or through LPI or LPHI, for which Dr. Cassidy provided life expectancy

assessments." *Pls.' Mot. for Class Cert.* at 8.  Plaintiffs also move to certify two subclasses: the

---

[3] While Plaintiffs make this general allegation in their Consolidated Class Action Complaint, Plaintiffs' Motion for Class Certification does not focus on this allegation as a basis for their claims.
[4] Since 1991, Defendant Pardo has been the CEO of both LPI and LPHI.  Defendant Peden serves as General Counsel and Secretary of LPHI, and as President of LPI.  *See Defs.' App. in Resp. to Pls.' Mot.* (Aff. of Scott Peden) at 1.

"California Subclass," represented by Plaintiffs Vieira and Yoskowitz, comprising those members of the putative class who are residents of California, suing for violations of the UCL, and a "Seller Subclass," represented by Plaintiff Vieira, comprising those members of the putative class who, after December 21, 2010, sold some or all of the life settlement investments they acquired through LPI.  The proposed class period runs from 2004 to March 2011, when LPI stopped using Dr. Cassidy as its single life expectancy expert.  The putative class is composed of approximately 13,000 investors who purchased fractional interests in approximately 757 life insurance policies.[5]

## II.   STANDARD FOR CLASS CERTIFICATION

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979).  Class certification is only appropriate if the court is satisfied that the party seeking class certification has met its evidentiary burden of demonstrating that (1) all four class action prerequisites of Federal Rule of Civil Procedure 23(a) are met, and (2) that the action is maintainable under one of the three categories set forth in Rule 23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1428 (2013); *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012).

A district court has wide discretion in determining whether or not to certify a class, but it "must *rigorously* analyze Rule 23's prerequisites before certifying a class."  *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012) (internal citation omitted) (emphasis added).   The Supreme Court has recently emphasized that "Rule 23 does not set forth a mere pleading standard" and that a party seeking class certification must affirmatively demonstrate that the case satisfies the particular requirements of Rule 23.  *Wal–Mart Stores, Inc.*

---

[5] Excluded from the putative class are institutional investors, Defendants, officers and directors of LPI and LPHI at all relevant times, members of their immediate families and their legal representatives, heirs, successors, and assigns, and any entity in which Defendants have or had a controlling interest.  *Pls.' Mot for Class Cert.* at 8.

*v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011).   This requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case," *Funeral Consumers Alliance*, 695 F.3d at 345, and "often entail[s] some overlap with the merits of the plaintiff's underlying claim." *Dukes*, 131 S. Ct. at 2551–52.   This is so because a "class determination involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp*, 133 S. Ct. at 1432 (internal quotations omitted).   The Supreme Court has repeatedly emphasized that it "may be necessary for the [trial] court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if after the rigorous analysis, the court confirms the presence of Rule 23's prerequisites.  *Comcast*, 133 S. Ct. at 1432 (internal quotations omitted).

Although the Supreme Court has cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," merits questions may be considered to the extent they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013).   The trial court need not "unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." *Gonzales v. Comcast Corp.*, No. 10–cv–01010–LJO–BAM, 2012 WL 10621, at *9 (E.D. Cal. Jan. 3, 2012) (internal quotation marks and citation omitted), *report and recommendation adopted,* 2012 WL 217708 (E.D. Cal. Jan. 23, 2012). Indeed, "[t]he Court has an independent duty to determine the propriety of the class certification and is not limited to the arguments made by the parties." *Witt v. Chesapeake Exploration, L.L.C.*, 276 F.R.D. 458, 464 (E.D. Tex. 2011) (citing *Daniels v. City of New York,* 198 F.R.D. 409, 413 n.5 (S.D.N.Y. 2001) and *Anderson v. Cornejo*, 199 F.R.D. 228, 238–39 (N.D. Ill. 2000)).   These principles form the backdrop for the Court to decide whether to certify a class

concerning Plaintiffs' life settlement investments.

### III.      RULE 23(a) PREREQUISITES

Rule 23(a) of the Federal Rule of Civil Procedure requires as a prerequisite to certification, that the Court determine the following:

> (1) The class is so numerous that joinder of all members is impracticable;
> (2) There are questions of law or fact common to the class;
> (3) The claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) The representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).

1.  <u>Numerosity</u>

The basic question is practicability of joinder, not the number of interested persons *per se*.  Practicability of joinder depends on the size of the class, ease of identifying its members and determining their addresses, and their geographic dispersion.  *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).  Here, there are approximately 13,000 putative class members, spread across the United States, who purchased fractional interests in 757 life insurance policies.  *Pls.' App.* at Ex. I ("LPHI Form 8-K").  The Court finds that the class is so numerous that joinder of individual investors is impracticable.  Plaintiffs have thus satisfied the numerosity requirement for the Class.[6]

2.  <u>Commonality</u>

To satisfy the commonality requirement of Rule 23(a)(2), there must be at least one question of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2).  "The commonality requirement demands more than the presentation of questions that are common to the class

---

[6] Plaintiffs have not provided evidence of the number of putative class members forming the subclasses.  However, for purposes of this Order, the Court will assume numerosity for the subclasses.

'because any competently crafted class complaint literally raises common questions.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012) (quoting *Dukes*, 131 S. Ct. at 2551). Commonality requires the plaintiff to demonstrate not only that the class members "have all suffered a violation of the same provision of law," but that they "have suffered the same injury" such that "all [of the class members'] claims can productively be litigated at once." *Id.* (internal citation omitted).

The commonality requirement is not met "when the proposed class merely establishes that there is at least one issue whose resolution will affect all or a significant number of the putative class members." *Perry*, 675 F.3d at 840 (internal citation omitted). "Rather, Rule 23(a)(2) requires that all of the class members' claims depend on a common issue of law or fact whose resolution 'will resolve an issue that is central to the validity of each one of the [class member's] claims in one stroke.'" *Id.* (citing *Dukes*, 131 S.Ct. at 2551). "[D]issimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes*, 131 S. Ct. at 2551 (internal citation omitted).

The movant bears the burden of demonstrating that class certification is warranted, *i.e.*, that he can establish a *prima facie* case so that common questions can be considered in the Court's class certification inquiry. *See Avritt v. Reliastar Life Ins. Co.*, No. 07-cv-1817, 2009 WL 455808, at *5 n.5 (D. Minn. Feb. 23, 2009) *aff'd*, 615 F.3d 1023 (8th Cir. 2010) (plaintiffs failed to demonstrate at the class certification stage that their theory would create a *prima facie* case under state law). The Court thus must rigorously assess whether a class-wide proceeding will generate common answers to Plaintiffs' proposed common questions. The mere recitation of questions—even if they are important questions shared by the putative class members—does not satisfy the commonality requirement. *See Perry*, 675 F.3d at 840. Instead, the Court must

analyze whether Plaintiffs' claims depend upon a common contention whose truth or falsity will be established by common proof, and when established, will resolve a central issue in one stroke. *Perry*, 675 F.3d at 843.   The Court cannot merely rely on Plaintiffs' formulation of their case, but must instead, independently assess whether Plaintiffs' case raises common questions that can be answered with common proof.  *Comcast Corp.*, 133 S. Ct. at 1432.

Plaintiffs argue that the following common questions of law and fact are raised in their claims:

> (1) Whether LPI's use of Dr. Cassidy's life expectancy estimates breached LPI's fiduciary and/or contractual duties to the class;
>
> (2) Whether LPI's retention and monitoring of Dr. Cassidy breached LPI's fiduciary and/or contractual duties to the class;
>
> (3) Whether Dr. Cassidy's lack of experience, training, and other credentials and his performance disqualified him to provide life expectancies and whether Defendants knew or should have known that they did not; and
>
> (4) Whether Pardo, Peden, and LPHI (1) knew of the existence of a fiduciary relationship between LPI and the class, (2) knew that LPI had breached such duties through its process of procuring, relying on, utilizing, and presenting the services and life expectancies of Dr. Cassidy, and (3) knowingly participated in and/or encouraged LPI's breaches of its fiduciary duties.

*Pls.' Mot. for Class Certification* at 11.

A.  Proposed Common Question 1:

Plaintiffs contend that a common question is whether or not LPI's use of Dr. Cassidy's estimates constituted a breach of LPI's fiduciary and/or contractual duties to the class.  It is the Court's task to determine whether Plaintiffs can answer this question using common proof, and whether this question is central to the validity of the claims of the putative class members.  *See Dukes*, 131 S. Ct. at 2551.  As evidence that this question can be resolved using common proof,

Plaintiffs offer a statistical method employed by their actuarial expert, P.J. Eric Stallard ("Stallard"). Stallard proposes to pool the survival data of the 757 insureds to determine if there is a statistically significant underestimation in the life expectancies provided by Dr. Cassidy. *Pls.' App. in Sup. of Reply*, Ex. B (Stallard's Report) at 4. What Stallard calls Formula 4 allegedly demonstrates that many insureds will outlive Dr. Cassidy's predictions. The equation in Formula 4 has three inputs: (1) the life expectancy of each insured as calculated by Dr. Cassidy; (2) the predicted life span for that insured obtained only from the mortality tables used by Dr. Cassidy; and (3) the current age of the insured or his date of death. *Pls.' App. in Sup. of Reply*, Ex. B (Stallard's Report) at 4–8. Formula 4 contemplates using these three inputs for the entire pool of insureds in a mathematical equation to determine whether, and to what extent, Dr. Cassidy underestimated life expectancies. In other words, Formula 4 is an equation that purports to determine whether there is a statistically significant deviation between Dr. Cassidy's life expectancy estimates and the actual or expected survival times for the 757 insureds. According to Stallard, the expected variability of these deviations can be quantified to determine whether the actual observed deviation is statistically significant or not. Formula 4 does not account for the specific medical history of each insured. *Id.*

Defendants note that, as of January 10, 2013, 60 of the 757 policies had "matured," and 46 of those 60 insureds died earlier or at the estimated life expectancy provided by Dr. Cassidy. *Defs.' Surreply, Tab B*, (Scott Peden Aff.) at ¶ 5. Of the 697 unmatured life settlement policies, more than 64% of the insureds had not reached Dr. Cassidy's life expectancy estimates as of January 10, 2013. *Id.* Based on Peden's affidavit, nearly 36% (approximately 250) insureds outlived Dr. Cassidy's predicted life expectancies. *Id.* Plaintiffs contend that if Stallard's formula demonstrates that Dr. Cassidy systematically underestimated life expectancies, this is

common evidence that LPI breached its fiduciary and/or contractual duties by using Dr. Cassidy's life expectancies.  The Court disagrees, and finds that Stallard's Formula 4 cannot serve as the foundation for the alleged common question.

First, Stallard focuses on results, not methodology.  At most, Stallard's formula can establish that 264 of 757 of insureds outlived Dr. Cassidy's predictions, and that that number is statistically significant.  However, such results are not probative of the question posed—whether LPI breached its fiduciary and/or contractual duties by using estimates produced by Dr. Cassidy.  Answering this question requires an examination of the reasonableness of Dr. Cassidy's *methods*, not an *ex post facto* analysis of the accuracy of Dr. Cassidy's *results*.  Consider, for example, a hypothetical in which Dr. Cassidy estimated that a policy would mature in five years or less.  If the insured dies in an accident the next day, Dr. Cassidy's estimate would technically be accurate, because the insured died within the estimated time frame.  But this after-the-fact examination reveals little about the reasonableness of the methodology Dr. Cassidy used to calculate the insured's life expectancy.  Whether Dr. Cassidy used an unreasonable method necessitates an analysis of the method, the information available to Dr. Cassidy, and the state of medical care at that time.  Proof only of results does not address these factors.

Nor could an after-the-fact analysis of the insureds' deaths, in the aggregate, establish that LPI was unreasonable in using Dr. Cassidy when and how it did.  Stallard suggests that a bird's eye view of the actual results will reveal significant inaccuracies that will in turn constitute circumstantial evidence of the unreasonableness of Dr. Cassidy's methods.  The Court is highly skeptical that an analysis of results alone could lead a reasonable juror to determine that Dr. Cassidy's methods were flawed.  Moreover, Plaintiffs did not present any expert testimony supporting that conclusion.

Second, Stallard's methodology can provide only the average variations in Dr. Cassidy's conclusions.  Consider, for example, that Stallard's analysis of the estimated life expectancies for all 757 policies demonstrates an *average* statistical variance of two years—that is, that Dr. Cassidy, on average, underestimated life expectancies by two years.  Plaintiffs seek to apply this finding uniformly to all 757 policies to prove liability and corresponding damages. But such a uniform application of Stallard's conclusions inevitably would lead to both over- and under-compensation.  For example, if Dr. Cassidy correctly estimated 707 life expectancies, but greatly miscalculated 50 life expectancies, the average variance could be identical to a scenario in which Dr. Cassidy slightly miscalculated each of the 757 life expectancies.   But application of Stallard's method and Fuller's damages formula would over-compensate investors in 707 policies and under-compensate investors in 50 policies.

Finally, Plaintiffs did not present evidence about when LPI should have known Dr. Cassidy's methodology was flawed, so as to show a time after which it was unreasonable for LPI to use Dr. Cassidy.  Obviously, until a number of Dr. Cassidy's estimates played out, his results could not be used to assess their accuracy.   It follows that application of a results-oriented approach could not make it unreasonable for LPI to use Dr. Cassidy's estimates before that data was available.  This would necessarily split the putative class into at least two parts: those who purchased policies before LPI, based on Dr. Cassidy's results, could have detected a problem with Dr. Cassidy's methodology, and those who purchased thereafter.   Plaintiffs also have not shown that Dr. Cassidy's method was the same throughout the class period.  The Court cannot ascertain whether Dr. Cassidy consistently applied the same methodology.  Despite having had an opportunity to do so, Plaintiffs did not describe any criticism of Dr. Cassidy's methodology.[7]

---

[7] Hearing Tr. at 72:1-2 (Plaintiffs' Counsel: At this stage, class cert stage, we do not have a criticism of Dr. Cassidy's methodology. All that we have is [Stallard's] approach that the Court the court can use … that can make

Recent holdings of the Fifth Circuit on class certification are instructive to the Court's analysis.  In *Benavides*, the plaintiff brought a class action suit against her title insurer, alleging that she and others similarly situated were denied a mandatory discount when they purchased their policies.  *Benavides v. Chicago Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011).  Under Texas law, a mortgage borrower who refinances within seven years of the initial insured loan is entitled to a mandatory discount on a title insurance policy when refinancing.  There is often no definitive way for a title insurer to determine, based on the documents available to it, whether or not a prior loan was covered by title insurance such that a new policy would qualify for the discount.  Title insurance companies thus have developed ad hoc policies for applying the discount when the borrower's file contains indicators of qualifying prior insurance, but some eligible borrowers might not be getting the mandatory discount.  In denying class certification, the district court noted four possible common questions:

(1) Whether the plaintiffs refinanced an existing mortgage within seven years after the recording of the existing mortgage;

(2) Whether the plaintiffs qualified for the mandatory reissue discount in connection with the reissued lender title policy;

(3) The dollar amount of the reissue discount required to be applied to each transaction; and

(4) Whether defendant breached other legal duties to class members by failing to give them the reissue discount.

The district court found, and the Fifth Circuit agreed, that none of the questions advanced by the plaintiff could be definitively answered for all class members using a generalized set of facts and producing one unified conclusion.  Rather, the trial "would require an extensive file-by-file review to sort out the factual details as to each plaintiff."  Consequently, "there [we]re no truly class-wide questions that would benefit from class determination."  *Id.*

that determination.") [Docket Entry #147].

Similarly, in *Ahmad v. Old Republic Nat. Title Ins. Co.*, 690 F.3d 698 (5th Cir. 2012), the Fifth Circuit reversed the district court's decision to certify the class on a similar set of facts, holding that the insureds failed to satisfy the predominance requirement under Rule 23(b)(3) for class certification. While the Fifth Circuit found that plaintiffs failed to meet the predominance requirement, the Fifth Circuit's analysis concerning whether the questions proposed by plaintiffs were common is instructive to the Court's analysis here. In *Ahmad*, the district court found four questions common to the class:

> (1) Whether the plaintiff qualified for the mandatory reissue discount;
>
> (2) What evidence is sufficient to qualify a borrower for the discount;
>
> (3) Whether Defendant or its agents could "earn" or lawfully keep the amount of the discount not given to eligible borrowers; and
>
> (4) Whether Defendant breached other legal duties to class members by failing to give them the discounted reissue premium rates mandated by Texas law and then retaining unearned premiums.

*Ahmad*, 690 F.3d at 703. The Fifth Circuit concluded that questions one and four were not common questions capable of class-wide determination by class-wide proof. As to question two, the court concluded it was not a common question because it did not invite a "yes" or "no" answer, or present a contention whose "truth or falsity" could be established. *Id.* at 704 (quoting *Dukes*, 131 S. Ct. at 2551). The Fifth Circuit noted that even if the trier of fact found that the defendants' proxy indicators constituted evidence from which a reasonable title insurer could conclude that a borrower's original mortgage was insured, the trier of fact would still have to engage in a file-by-file review to determine whether individual plaintiffs had original mortgages covered by title insurance and met the other criteria for the discount. *Id.* As to question three, the Court found this question presupposed that the credit was required to be given, and thus it depended on the resolution of question one and could not be considered a common question. *Id.*

As in *Benavides* and *Ahmad*, a file-by-file review is required here to answer the question posed: was LPI's use of Dr. Cassidy's estimates a breach of its fiduciary and/or contractual duties. Absent a global criticism of Dr. Cassidy's methodology, the fact finder must analyze the particulars of the 757 life expectancies to determine whether his methodology was reasonable, and if not, the earliest point when this information would have reasonably been available to LPI. Because Plaintiffs, who carry the burden to affirmatively prove that the Rule 23 requirements are met, have not proffered a class-wide method to answer question 1, the Court concludes that it cannot be deemed a common question.

B.  Proposed Common Question 2:

Plaintiffs next contend that whether LPI's retention and monitoring of Dr. Cassidy constituted a breach of LPI's fiduciary and/or contractual duties is a common question. Plaintiffs maintain that LPI's failure to conduct any meaningful due diligence on Dr. Cassidy's qualifications to act as an actuary, LPI's use of Dr. Cassidy as a single life expectancy provider, and its failure to independently review Dr. Cassidy's work, amount to breaches of LPI's fiduciary and/or contractual duties.

The Court is skeptical that LPI's failure to monitor Dr. Cassidy's performance, without regard to the reasonableness of Dr. Cassidy's methodology, could amount to a breach of LPI's fiduciary and/or contractual duties. Indeed, it is difficult to contemplate a scenario where Dr. Cassidy's methodology could be found reasonable, yet Defendants could still be liable for retaining and relying on him to provide life expectancies. The Court recognizes that a failure to maintain adequate quality control measures, where, under the circumstances, such are required, can establish a breach of fiduciary duty claim. Here, the issue is whether LPI was under a duty to monitor Dr. Cassidy's work on an on-going basis. Plaintiffs have not adequately alleged the

basis for such a duty.  Plaintiffs have the burden to show they can make out a *prima facie* case, but they have failed to establish a basis for finding a quality control obligation over their expert's predictive work.

Assuming LPI had a quality control obligation, the following issues would be relevant: the nature of LPI's quality control policies and procedures, the manner of monitoring Dr. Cassidy, and LPI's policies and procedures for evaluating Dr. Cassidy's results, and the applicable reasonable standard for such quality control.  The lack of a quality control procedure, if consistently lacking through the class period, could be proven with common evidence and be subject to a common answer.  Question 2 could be a common question but only if Plaintiffs established any basis for finding the duty alleged.

C.  Proposed Common Question 3:

Plaintiffs contend that Dr. Cassidy's lack of experience, training, and other credentials rendered him unqualified to provide life expectancies, and that Defendants knew or should have known this.  The foundation of this question is whether LPI breached fiduciary and/or contractual duties by utilizing the services of a single life expectancy provider with his background, irrespective of whether Dr. Cassidy's methodology was reasonable.  Specifically, Plaintiffs allege that LPI's exclusive use of Dr. Cassidy's life expectancy calculations, when he had no actuarial training or experience and did not have an actuary on his staff, amounts to a breach of duty.

Relevant evidence to answer this question would conceivably consist of a review of Dr. Cassidy's education, and the nature of his oncology practice, and his education, training and experience with actuarial science, or similar work.   Plaintiffs are correct in their assertion that the focus of this question is on Dr. Cassidy's objective qualifications.  However, Dr. Cassidy's

experience must be measured under the circumstances existing at the time of every alleged breach between 2004 and March 2011.  The fact finder would be required to analyze whether Dr. Cassidy's experience and training, at the time he calculated each life expectancy, was inadequate.  This inquiry would not necessarily result in a common answer for the class.  For example, as to investors who purchased policies in 2011, Dr. Cassidy had at least eight years of experience calculating life expectancies.  This would not be the case for those investors purchasing in 2004.  Thus, at a minimum, the putative class would be composed of two groups: those who purchased when Dr. Cassidy had inadequate experience, and those who purchased at a time after Dr. Cassidy gained the necessary experience.  That would not present a common question.

Only the fact of Dr. Cassidy's lack of actuarial training or failure to have an actuary on staff are common questions within the context of question 3. However, an answer to those questions, which are seemingly undisputed, would not resolve a central issue in one stroke.  *See Dukes*, 131 S. Ct. at 2551.  That is because Dr. Cassidy's  training and experience throughout the class period would still need to be considered to determine whether he was unqualified to make life expectancy calculations.  Thus, question 3 cannot be deemed a common question.

D.  Proposed Common Question 4:

Plaintiffs contend that a common question is whether Pardo, Peden, and LPHI (1) knew of a fiduciary relationship between LPI and the class, (2) knew that such had been breached in the use of Dr. Cassidy, and (3) knowingly participated in and/or encouraged LPI's breaches of its fiduciary duties.   Question 4 is a formulation of Plaintiffs' claim of aiding and abetting a breach of fiduciary duties and encompasses alternative theories as to how LPI breached its fiduciary responsibilities.  This question, which requires establishing that LPI breached a fiduciary duty,

suffers from the same infirmities as questions 1–3 and cannot be considered a common question for the reasons explained above.  The additional component of this question—what LPI knew— is capable of being answered using a generalized set of facts and does not require an analysis of each class member's circumstances.  Only those aspects of question 4 could be common questions, but what Pardo, Peden, and LPHI knew could vary at different times and therefore would not resolve a central issue in one stroke.  *See Dukes*, 131 S. Ct. at 2551.

E.   Proposed Questions for the California Subclass:

Plaintiffs also seek to certify a California Subclass for violations of the UCL, California's Unfair Competition Law.  Plaintiffs argue the following questions are common to the California Subclass:

> (1) Whether Defendants' statements regarding LPI's processes for calculating life expectancies were material and misleading and/or constituted breaches of LPI's contractual and/or fiduciary duties to the Subclass, constituting unfair business acts and practices in violation of the UCL;
>
> (2) Whether Defendants negligently disregarded that the life expectancies Dr. Cassidy gave were inaccurate, constituting unfair business acts and practices in violation of the UCL;
>
> (3) Whether Defendants knew of the inaccuracies, but failed to adjust their practices to account for them or to use alternative, reliable means of calculating life expectancies; and
>
> (4) Whether the failure to disclose the incentives under which Dr. Cassidy operated was material and misleading, constituting unfair business acts and practices in violation of the UCL.

*Pls.' Mot.* at 11–12.

The UCL is violated when a defendant's act or practice is unlawful, unfair, fraudulent, or constitutes a false or misleading advertisement.  *Lozano v. AT&T Wireless Servs., Inc*., 504 F.3d 718, 731 (9th Cir. 2007).   A business practice is "unfair" under the UCL when it "offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or

substantially injurious to consumers." *Wilner v. Sunset Life Ins. Co.*, 78 Cal. App. 4th 952 (2000) (internal citation omitted). Thus, a plaintiff bringing suit under the UCL must establish that the practice is unfair (*i.e.*, harm to victim outweighs any benefit) or fraudulent (*i.e.*, is likely to deceive members of the public).[8] *Albillo v. Intermodal Container Serv., Inc.,* 114 Cal. App. 4th 190, 206 (2003).

Relief under § 17200 does not require an individualized showing of reliance. Instead, reliance under the UCL may be presumed for the entire class if a plaintiff can show that *material misrepresentations* were made to class members. *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831 (N.D. Cal. Dec. 21, 2010); *In re Tobacco II Cases,* 466 Cal. 4th 298, 397 (2009). Thus, if the class members' claims arise from the same material representation, a common question may be found without addressing reliance. *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 626 (S.D. Cal. 2007) (citations omitted).

Plaintiffs argue that, in using Dr. Cassidy, Defendants engaged in an unfair business practice and directly or indirectly obtained property by material misrepresentations and/or omissions and for which Plaintiffs seek disgorgement of Defendants' profits. Defendants argue Plaintiffs' UCL questions are not common because materiality, reliance, and damages are not issues subject to common proof. *Pls.' Compl. at* ¶¶ 72–80.

As to Plaintiffs' question 1, which asks whether LPI's statements to investors regarding its process for calculating life expectancies was a material misrepresentation, Plaintiffs proffer no evidence of the specific misrepresentation, the context in which it was made, and whether it was communicated to all putative subclass members in the same manner. *Pls.' Mot.* at 11–12. The Court thus cannot determine whether a common answer could be given. While materiality

---

[8]   In addressing Defendants' Motion to Dismiss, the Court granted Defendants' Motion in part and dismissed Plaintiffs' allegation that Defendants engaged in an unlawful practice under the UCL. *See Memorandum Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss* [Docket Entry #103].

can be an objective issue subject to common proof, Plaintiffs bear the burden to show common misrepresentations and a common basis to find materiality. *See Campion v. Old Republic Home Prot. Co., Inc.*, 272 F.R.D. 517, 537 (S.D. Cal. 2011). They did not. Given the evidence before it, the Court cannot make the determination that common proof can prove LPI made material misrepresentations to California investors. Question 1 cannot be deemed a common question for the California Subclass.

Question 2 asks whether LPI committed an unfair business practice when it negligently disregarded that the life expectancies Dr. Cassidy gave were inaccurate. *Pls.' Mot.* at 11–12. This question is in essence a reformulation of Plaintiffs' proposed question 1 for the Class. As discussed above, Plaintiffs have not proposed a viable common method for determining whether LPI's use of Dr. Cassidy's predictions constitutes an unfair practice or a breach of duty. Absent a common means, individualized inquiries are necessary to prove Dr. Cassidy used an unreasonable method and that LPI knew or should have known that to be so at all times when it used Dr. Cassidy's life expectancies. Thus, question 2 for the California Subclass is not a common question.

In question 3, Plaintiffs contend that whether Defendants knew of the inaccuracies, but failed to adjust their practices to account for them, or to use an alternative, reliable means of calculating life expectancies and that such amounts to an unfair business practice. *Pls.' Mot.* at 11–12. This question suffers from the same infirmities as question 2 for the California Subclass. It presupposes Dr. Cassidy used an unreasonable method and that LPI knew or should have known that at all times when it used Dr. Cassidy's life expectancies. These contentions would have to be proven on a class-wide basis before LPI could be held liable for failing to adjust its practices or failing to use an alternative, reliable means, but it cannot do so. Thus, question 3 for

the California Subclass is not a common question.

Lastly, under question 4, Plaintiffs contend that LPI's failure to disclose to investors how it compensated Dr. Cassidy, and whether this was a material and misleading omission are common questions. Dr. Cassidy's compensation structure and LPI's failure to disclose it to investors is subject to common proof as is whether that nondisclosure was material. The Court concludes, however, that this is not a common issue because it will not resolve a central issue in this case in one stroke. *See Dukes*, 131 S. Ct. at 2551.

F.  Proposed Questions for the Seller Subclass

Plaintiffs have not proffered a set of common questions for the Seller Subclass. The Seller Subclass, as presented by Plaintiff Vieira, comprises those members of the putative class who sold some or all of the life settlement investments they acquired through LPI. The members of the putative Seller Subclass pursue the same theories of liability as does the Class overall and differs only with respect to damages. Thus, the analysis here mirrors that of the Class, and the Court concludes no common questions are presented.

The Court concludes that Plaintiffs have not satisfied the commonality requirement for the Class and the Subclasses. Assuming that there are sufficient common questions, however, the question of whether they predominate over individualized issues remains and will be analyzed *infra* in Section IV.

3.  Typicality

The third requirement of Rule 23(a) is that the plaintiff's claims be typical of the claims of the potential class members. Fed. R. Civ. P . 23(a)(3). Plaintiffs maintain that their claims are typical because proof of Dr. Cassidy's methodology, his qualifications, and LPI's course of conduct would be the same whether this case were an individual action or a class action.

Plaintiffs Vieira and Yoskowitz are the proposed California Subclass representatives. However, Plaintiff Yoskowitz is not typical of the members of the California Subclass because at the time of his purchase, Yoskowitz was not a California resident and thus he does not have standing to assert a claim under the UCL.  Section 17200 of the UCL does not allow claims to be brought by nonresident plaintiffs against nonresident defendants for conduct occurring outside of California.  *See In re Nat'l. Western Life Ins. Deferred Annuities Litigation*, 467 F.Supp. 2d 1071, 1089 (S.D. Cal. 2006) (holding that a Pennsylvania resident could not state claims under § 17200 against a Colorado corporation headquartered in Texas for purchases in Pennsylvania); *In re Mattel, Inc. Toy Lead Paint Prods. Liab. Litig.*, 588 F.Supp. 2d 1111, 1119 (C.D. Cal. 2008) (California "statutory remedies may be invoked by out-of-state parties [only] when they are harmed by wrongful conduct occurring in California.").   Because Yoskowitz was not a California resident when he purchased his life settlement, the alleged conduct did not occur in California, and Defendants are Texas corporations, Yoskowitz cannot assert a claim under the UCL, and thus is not a proper representative of the California Subclass.   In contrast, Vieira is and was a California resident who can prosecute the California claims.

Plaintiff Vieira represents the Seller Subclass.  On January 10, 2011, Vieira sold seven of ten fractional interests in life insurance policies purchased or otherwise acquired from or through LPI or LPHI that utilized life expectancies provided by Dr.  Cassidy.  *Pls.' Mot. for Class Certification* at 13.  Vieira's claims against Defendants appear to be typical of those of other Subclass members.

As to the remaining Plaintiffs, each purchased fractional interests in life settlements for which Dr. Cassidy provided life expectancies through LPI.  While some of the Plaintiffs testified they do not believe oncologists, like Dr. Cassidy, to be *per se* unqualified to provide life

expectancies, this testimony does not render them atypical of the class.  Plaintiffs' allegation is that Dr. Cassidy's qualifications and lack of training or experience in the field of actuarial science rendered him unqualified, not that Dr. Cassidy's status as an oncologist is a *per se* disqualifying factor.  The Court concludes that the factual record shows that, excluding Plaintiff Yoskowitz as a representative of the California Subclass, Plaintiffs' claims are typical of the putative class and subclass members, and that they have thus satisfied the typicality requirement.

      4.  <u>Adequacy of Representation</u>

The fourth requirement of Rule 23(a) is that the representative parties must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Because absent class members will be bound by the judgment in a class action law suit, strict review of the adequacy of representation is required."  *Dodson v. Hillcrest Sec.,* 95 F.3d 52, 1996 WL 459770, at *6 (5th Cir.1996). Adequacy is shown if "(1) the [proposed] representative [has] common interests with the unnamed members of the class; and (2) it . . . appear[s] that the [proposed] representative will vigorously prosecute the interests of the class through qualified counsel." *Dodson*, 1996 WL 459770, at *6 (citing *Gonzales v. Cassidy,* 474 F.2d 67, 72 (5th Cir.1973)).

Plaintiffs maintain that the class representatives of the Class and Subclasses will fairly and adequately protect the interests of the class, and that Plaintiffs' counsel, who have substantial litigation experience, will prosecute the action zealously and competently.  Plaintiffs' counsel have competently and vigorously maintained the suit by undertaking extensive written discovery, taking and defending a number of depositions, engaging in extensive motion practice, and litigating the issues relating to the certification hearing.  The named Plaintiffs possess a sufficient level of knowledge about the litigation, and have taken an active role in the litigation.  No conflict of interest exists between the named Plaintiffs and the absent putative class members.

Except for *Yoskowitz* as a representative of the California Subclass, the Court is satisfied that Plaintiffs have demonstrated that the representative parties would fairly and adequately protect the interests of the Class and Subclasses.

Having found that Plaintiffs have satisfied Rule 23(a), the Court now determines whether the putative class and subclasses satisfies Rule 23(b)(3).

### IV.    RULE 23(B)(3) PREDOMINANCE AND SUPERIORITY REQUIREMENTS

In addition to satisfying the prerequisites of Rule 23(a), a party seeking class certification must also satisfy Rule 23(b).  In this case, Plaintiffs rely on Rule 23(b)(3), which requires that questions of law or fact common to all class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  While the existence of even one common question can satisfy Rule 23(a)(2), the Rule 23(b)(3) predominance inquiry "is more demanding," testing "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ahmad*, 690 F.3d at 703 (citations omitted).  A court must consider how the case will be tried on the merits if the class is certified, "identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class." *Id.*  Rule 23(b)(3)'s predominance requirement cannot be met unless the issues that will predominate are common.  *Id.*

In evaluating the predominance of common questions, the trial court must meaningfully consider how the class's claims will be tried.  *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551 (5th Cir. 2011) ("We hold that the district court abused its discretion by failing to afford its predominance determination the "rigorous analysis" that Rule 23 requires…. The district court did not meaningfully consider how Plaintiffs' claims would be tried….").

This case raises pervasive individual questions pertaining to liability and damages that are so substantial that they make this an inappropriate case for a class action and class treatment an inferior method.

    a.   Individualized Issues in Liability

The foundation of Plaintiffs' case is that the members of the putative class and subclasses overpaid for their respective interests in each life settlement transaction due to Dr. Cassidy's erroneous calculations.  The issue that will ultimately and necessarily predominate is whether or not Dr. Cassidy's methodology was reasonable.  Only individualized inquiries can test the veracity of this central allegation.  During trial, expert witnesses will have to assess the age, sex, race, and medical records of each insured, the mortality tables utilized by Dr. Cassidy, and the state of medical knowledge when Dr. Cassidy prepared each life expectancy.  *See Dukes*, 131 S. Ct. at 2551.  These battles between experts for each of the 757 policies at issue will overwhelm the trial proceedings and result in 757 separate mini-trials.

Having proposed only the hindsight analysis of Stallard, Plaintiffs have not shown how trying all 757 policies in one proceeding is "superior to other available methods for fairly and efficiently adjudicating the controversy."  *Marlo v. UPS, Inc.*, 639 F.3d 942, 947 (9th Cir. 2011) Stallard's formula does not establish that LPI breached its duties in using Dr. Cassidy's predictions *when it did*.  Plaintiffs have to show not only that Dr. Cassidy used an unreasonable method, and that LPI knew or should have known this information when it used Dr. Cassidy's estimates.  Plaintiffs have not produced a common method to do so.  Without a viable common method, it will be necessary for these to be individualized inquires into the life expectancies provided by Dr. Cassidy and whether LPI should have known Dr. Cassidy was using an unreasonable method at each time when he made estimates.

Further, even if Plaintiffs prove their claims with common evidence, Defendants will inevitably examine the circumstances surrounding each putative class member's life settlement investment. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) ("A court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of certification issues."); *In re Wilborn*, 609 F.3d 748, 756 (5th Cir. 2010) (noting that the predominance of affirmative defenses such as waiver or estoppel precluded class certification). Indeed, the Fifth Circuit has noted that an "affirmative defense is not per se irrelevant to the predominance inquiry" because the "'predominance of individual issues necessary to decide an affirmative defense may preclude class certification.'" *Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) (quoting *In re Monumental Life Ins. Co.,* 365 F.3d 408, 420 (5th Cir.2004)). Whether established by Defendants as an affirmative defense or as rebutting an element of Plaintiffs' causes of action, Defendants will seek to disprove liability and damages for each of the 757 policies, by focusing on the reasonableness of Dr. Cassidy's life expectancies and when, if ever, LPI could have known Dr. Cassidy's methodology was flawed.

   b.   <u>Individualized Issues Predominate in Damages</u>

Individualized issues also predominate in Plaintiffs' claims for damages. While damage calculations need not be exact, in the class-certification stage (as at trial), any model supporting a "plaintiff's damages case must be consistent with its liability case." *Comcast Corp.*, 133 S. Ct. at 1433 (internal quotations omitted). And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so. *Dukes*, 131 S. Ct. at 2551–52. Plaintiffs first seek contractual damages for Defendants' breach of the implied duty to perform a contract with care, skill, reasonable expedience, and faithfulness, and then seek disgorgement damages for

breach of fiduciary duties and violations of the UCL.

The Court's first step is to translate the legal theory of the alleged harm into an analysis of the economic impact of the event. *Comcast Corp.*, 133 S.Ct. at 1433 (internal citations omitted). Recently, in *Comcast,* the Supreme Court addressed the burden on plaintiffs at the class certification stage to show that damages are capable of measurement on a class-wide basis. The *Comcast* ruling reiterated a well-established focus of the Rule 23 analysis: The damages must be capable of determination on a class-wide basis and be traceable to a plaintiff's liability case. *Id.* In *Comcast*, the plaintiffs failed to link the asserted damages to the liability case, because the measure of damages flowed from four different antitrust theories, but, only one of them was found viable for trial purposes. In other words, the damage methodology did not clearly measure the damages attributable to plaintiffs' sustainable theory of liability. Thus, it could not be determined that the class-wide determination of damages was caused by plaintiffs' theory of liability.

### i.   Contractual Damages

Plaintiffs' first claim—breach of the implied duty to perform contracts with care, skill, reasonable expedience, and faithfulness—sounds in contract. *See Sipes v. Langford*, 911 S.W.2d 455 (Tex. App. —Texarkana 1995, writ denied) (holding that breach of the duty to perform contract terms with care, skill, and reasonable experience is not actionable in tort). The measure for breach of contract damages is "just compensation for the loss of damage actually sustained." *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 482-83 (5th Cir. 2008) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952)). Plaintiffs claim to be entitled to remuneration for the monetary difference between the amount they paid for their investments and the amount they would have paid had LPI not breached its duties. Plaintiffs maintain that

this is a common inquiry because, for each of Dr. Cassidy's life expectancies, the "same flaw in the same methodology used by the same Dr. Cassidy will have affected the price at the point of purchase." *Pls.' Resp. to Defs.' Sur-Reply* at 4.

Plaintiffs must prove the amount of contractual damages suffered with reasonable certainty. *Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394, 403 (5th Cir. 2008). To show that overpayment damages can be calculated with reasonable certainty using class-wide proof, Plaintiffs offer Stallard, who concludes Formula 4 can be used to create a model for quantifying the amount by which Plaintiffs overpaid for their life settlements, which would then foreclose the need to engage in an individualized analysis. He proposes to apply a single correction as produced by Formula 4 to Dr. Cassidy's life expectancies to calculate the "true" life expectancy for each insured. *Supp. App. to Pls.' Reply*, (Stallard's Declaration) at 1. Under Stallard's model, once the "systematic underestimation" for the entire pool of policies is determined, which is represented by "r" in Stallard's formula, this single "correction" will be applied to all life expectancies to arrive at what Plaintiffs call the "true" life expectancy associated with each insured. Notably, Stallard's formula is a form of averaging, and does not assess the accuracy of life expectancies for specific insureds.

Plaintiffs' damages expert, David N. Fuller ("Fuller"), uses Stallard's results to then calculate the "correct acquisition" price. This formula would first determine the rate of return implied by the price the investor paid, in light of Dr. Cassidy's life expectancy projection and the cash flows associated with the policy interest. It would then use this rate of return, the correct life expectancy for the insured at the time of the transaction, and the adjusted cash flows, taking into account the corrected life expectancy, to determine what the acquisition price should have been. Finally, the formula would compare this price to the actual acquisition price paid in the

transaction, with the difference representing the damages allegedly suffered by the investor. [9]

*Pls.' Supp. App.* at Ex. A ("Aff. of David N. Fuller"); *Pls.' Supp. App.* at 0012-13 ("Fuller

Affidavit").

Even assuming that application of Stallard's formula by Fuller could yield credible

results, Plaintiffs have failed to meet their evidentiary burden.  *See Comcast Corp.*, 133 S. Ct. at

1433. Plaintiffs' proposed damages model does not measure damages resulting from the

particular injury on which Plaintiffs' liability action is premised.  Stallard's "corrected" life

expectancy does not necessarily represent the life expectancy LPI should have used in setting the

acquisition price.  Stallard can at most calculate an "average" statistical deviation.  Stallard's

formula also does not reveal the manner in which Dr. Cassidy's method was allegedly flawed,

much less the causal relationship between Dr. Cassidy's method and the span of the life

expectancies he prepared.   In other words, Stallard's formula cannot calculate what life

expectancy a reasonable life expectancy provider would have calculated for a particular person at

a particular point in time.  This inquiry necessarily involves a file-by-file analysis to determine

what life expectancy should have been calculated by a reasonable provider.   Moreover,

Stallard's method, by relying only on actual results to raise the presumption of wrongdoing,

assumes that LPI should have engaged a provider that used a method that produced accurate

results every time.  LPI's provider did not have to be consistently correct in order for LPI to

avoid breach of its fiduciary and/or contractual duties.

Furthermore, even if Plaintiffs could present a viable common method to calculate a

---

[9] Defendants filed a Motion to Exclude Plaintiffs' Experts, arguing that the experts' methodology does not meet the requirements set forth in *Daubert*.  Defendants argue the methodologies employed by Stallard and Fuller cannot produce reliable conclusions.  Even if the Court accepted the methodologies proposed by Plaintiffs' experts under Federal Rule of Evidence 702, their methods do not resolve the questions for which they have been offered, that is, whether LPI breached its duties by relying on Dr. Cassidy's predictions and if so, the amount of contractual damages.  At this juncture, the Court does not rule on whether their methodologies meet the requirements of the Federal Rules of Evidence.

"corrected" life expectancy, Plaintiffs would still lack a class-wide method to show the effect, if any, of the corrected life expectancy on the purchase price for each policy.  Plaintiffs hope to show that Dr. Cassidy's flawed low life expectancies led to inflated policy prices and that, had Defendants not used such flawed calculations, policy purchase prices would have been lower. Yet policy prices are affected by factors other than estimated life expectancies, including market demand and a buyer's desire and risk tolerance for policies with longer life expectancies.  It is possible that these additional factors would have allowed Defendants to charge the same price for some or all of these policies, notwithstanding a longer life expectancy.  Plaintiffs provide no class-wide formula that could accurately capture the effect of Stallard's conclusions on the prices particular buyers would pay for policies.  Instead, an individualized analysis is again necessary. Plaintiffs will have to present evidence, policy by policy, to prove that a longer life expectancy would have resulted in lower purchase prices.  Defendants will obviously present individualized evidence that the reverse is true.

Plaintiffs' proffered means of proving contractual damages, even if it had been fully developed, does not demonstrate that such damages are capable of measurement on a class-wide basis.  *See Comcast*, 133 S. Ct. at 1433.  While even a wide disparity among class members as to the amount of damages suffered does not necessarily mean that class certification is inappropriate, class treatment is not "suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate."   *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).  The Court is unconvinced that Plaintiffs' proposed damages calculus represents an accurate approximation of any single class member's contractual damages. Numerous factors that affect the amount of damages, if any, to any given class member are not

accounted for in Stallard's formula.  *O'Sullivan*, 319 F.3d at 744 ("Where the plaintiffs' damage claims focus almost entirely on facts and issues specific to individuals rather than the class as a whole, the potential exists that the class action may degenerate in practice into multiple lawsuits separately tried."); *Schafer v. State Farm Fire & Cas. Co.*, No. 06–8262, 2009 WL 2391238, at *4-5 (E.D. La. Aug. 8, 2009) ("the measure of damages require[d] individualized determinations" and the plaintiffs failed to carry their burden [to show] that individual damages could be determined by reference to a mathematical or formulaic calculation); *Burkett v. Bank of Am., N.A.*, No. 1:10-cv-68, 2012 WL 3811741, at *9 (S.D. Miss. Sept. 4, 2012).

Although unpublished, the Fifth Circuit's reasoning *In re Katrina Canal Breaches Litig.*, 401 F. App'x. 884, 886 (5th Cir. 2010) supports the Court's holding.  In *Katrina*, the plaintiff insureds moved to certify a class action against insurers for alleged violations of Louisiana law requiring an offer of settlement of claims within 30 days of the insurer's receipt of notice of loss. There, the district court held, and the Fifth Circuit agreed, that class certification was not appropriate because each plaintiff's claims turned on the reasonableness of the defendants' conduct in deciding whether to make payments to each individual plaintiff.  *See Berthelot v. Boh Bros. Const. Co., L.L.C.*, 431 F.Supp. 2d 639, 646 (E.D. La. 2006).  The Fifth Circuit further stated that "individualized issues will predominate, such as the nature and extent of a class member's damage, whether and how much a class member was paid and for what type of damage, and whether any payment was sufficient and timely." *Id.* at 887.

### ii.  Disgorgement of Fees

In contrast, damages for Plaintiffs' claims for breach of fiduciary duty and violation of the UCL for disgorgement of fees LPI earned can be calculated using common proof.  Plaintiffs offer Fuller's calculations and argue that LPI's profit on each transaction can be readily

determined, using a simple mathematical calculation.

Disgorgement is "an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 413 (5th Cir. 2007) (internal quotations omitted). "Disgorgement wrests ill-gotten gains from the hands of the wrong-doer" and is intended to be "remedial and not punitive." *Id.* In *Allstate*, several insurance companies brought a fraud suit against a group of chiropractic clinics over more than a thousand claim files and sought disgorgement of revenue. *Id.* The jury awarded approximately $3,000,000.00 in damages for fraud. The Fifth Circuit reversed the jury verdict, finding that there was no evidence of how much of the money paid by the insurance companies to the chiropractic clinics was a result of fraudulent billings, rather than billings for reasonable and necessary chiropractic care. Because at least some of the money paid by the insurance companies may have been for legitimate services, disgorgement of all profits received by defendants was not proper. *Id.* at 414.

Plaintiffs carry the burden of differentiating legitimate from ill-legitimate profits and must show that the fees they paid are causally related to the alleged wrong doing. Unlike the situation in *Allstate*—where the plaintiffs sought the portion of fees attributable to rendition of unreasonable or unnecessary care—Plaintiffs here seek the full amount of LPI's gross profits for each transaction, because they assert each transaction was unfair and inequitable. According to Plaintiffs, all of LPI's profits are causally tied to the breach, as the putative class members would not have entered into the transactions had they known about LPI's use of, and inattention to, the work of Dr. Cassidy. LPI's fees earned on each transaction can be calculated, using LPI's internal cost allocation spreadsheets. Unlike the contractual damages, this calculation does not require an analysis of "correct" life expectancies. Under this scenario, the Court agrees that

disgorgement of LPI's profits could be determined using common proof.

The Court declines to redefine the class to include only those class members seeking disgorgement of fees as their sole remedy for breach of fiduciary duty or UCL violation.  If LPI breached its fiduciary duty by misrepresenting the qualifications and credentials of its life settlement provider and can prove that had investors known of Dr. Cassidy's qualifications, or lack thereof, they would have not purchased a life settlement interest from LPI, they may be entitled to disgorgement of all of LPI's fees.  However, that theory is akin to a fraudulent misrepresentation theory, which requires proof of reliance.  *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 283 (Tex. 1994).

Reliance is a barrier to certification, because each of the approximately 13,000 individual investors would have to prove reliance on LPI's alleged misrepresentation or omission.  *Dukes*, 131 S.Ct. at 2552 n. 6.  The case would require approximately 13,000 mini-trials to prove whether class members would have made purchases and for what amount had they received more information about Dr. Cassidy's experience and compensation structure.  For example, among the 60 policies that have matured, some investors received returns "higher than 100%, including as high as 128.24%."  *Defs.' Supp. App.* (Aff. of Scott Peden) at ¶ 7.  This fact illustrates the possibility that some class members would testify they would have still entered into the transaction, despite LPI's alleged misrepresentations or omissions, because the transaction was profitable.  At the least, the jury would evaluate each class member's circumstances individually to evaluate whether a class member relied.  In light of Plaintiffs' need to prove reliance, the Court declines to redefine the class to include only those seeking disgorgement of fees.

## V.    CONCLUSION

The Court concludes, after conducting a rigorous analysis of the requirements of Rule 23, that the developed factual record does not support class certification.    Plaintiffs have failed to demonstrate that the issues pertaining to liability and damages are susceptible to resolution using class-wide proof and thus, the Court concludes that the common questions, to the extent they exist, do not predominate, making a class action an inferior method of adjudicating the case. Accordingly, Plaintiffs' Motion is **DENIED**.    The parties shall confer and submit a joint status report no later than July 30, 2013, informing the Court whether Plaintiffs intend to proceed with their claims individually or to file an interlocutory appeal.

**SO ORDERED.**

Date:  July 9, 2013.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**